UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
                                        )
SONYA ROSS,                             )
                                        )
            *Plaintiff*,                )
                                        )
v.                                      )  Civil Action No. 1:16-cv-00820(TSC)
                                        )
THE ASSOCIATED PRESS,                   )
                                        )
            *Defendant*.                )
_____)

**LOCAL CIVIL RULE 7(H)(1) STATEMENT OF FACTS FOR WHICH THERE IS NO GENUINE DISPUTE**

In accordance with Local Rule 7(h)(1), defendant The Associate Press ("AP"), by an through the undersigned counsel, submits this Statement of Facts for Which There is No Genuine Dispute in support of its Motion for Summary Judgment.[1]

1.  The Associated Press is a member-owned, not-for-profit news gathering cooperative. (Bruce 21).

2.  AP is an equal opportunity employer and, at all relevant times, has maintained an Equal Employment Opportunity policy that prohibited discrimination on the basis of race, gender, age and other protected characteristics, prohibited retaliation for asserting or assisting in the investigation of such claims, and provided a mechanism for employees to raise complaints or otherwise invoke their legal rights. (Cartafalsa Aff. Ex. 6; Ross 131-33).

---

[1] Citations to deposition testimony lists the deponent's last name followed by a transcript page number, i.e. "Ross ___." Relevant pages of the transcripts of Plaintiff Sonya Ross, Jessica Bruce, and Montrese Garner-Sampson are attached to the Affirmation of Joseph B. Cartafalsa as Exhibits 3-6, respectively.

3. Plaintiff, Sonya Ross is African-American, female and, upon information and belief, is in the protected age class. (Complaint.)

4. Ms. Ross is a **current** employee of Associated Press. At all relevant times, Ms. Ross worked, and continues to work, in AP's Washington D.C. Bureau. (Complaint).

5. On or about March 5, 2012, Ms. Ross filed a charge of discrimination with the OFCCP alleging race discrimination, gender discrimination, and retaliation. (Complaint ¶ 21).

6. The OFCCP issued Ms. Ross a Notice of Right to Sue dated February 1, 2016. (Complaint ¶ 27).

7. Ms. Ross commenced this action on May 2, 2016. (Complaint).

8. At all relevant times, Jessica Bruce has served as Senior Vice President, Global Human Resources and Corporate Communications. Ms. Bruce is AP's highest-ranking human resources professional. Ms. Bruce is Caucasian, female and in the age class protected by the Age Discrimination in Employment Act ("ADEA"). (Bruce 19, 44)).

9. At all relevant times, Montrese Garner-Sampson served as a Human Resources Manager for AP, with an office located in Washington D.C. Ms. Garner-Sampson has human resources managerial responsibilities for AP's news operations in Washington D.C. as well as its news operations in the South Region. Like Ms. Ross, Ms. Garner-Sampson is African-American, female and in the age class protected by the ADEA. (Garner-Sampson Aff. ¶ 2).

10. Ms. Ross began working for AP as an intern in or about 1986. Upon conclusion of her internship, AP hired her as a regular full time newsperson. (Ross 38).

11. Since hiring Ms. Ross, AP has promoted her a number of times. (Ross 46-47).

12. In response to Ms. Ross' request, in or about August 2010, AP agreed to create a new position for her, which bears the title of "Race and Ethnicity Editor." (Ross 37-43).

13. For over a year, Ms. Ross and AP negotiated the scope of the job responsibilities, as well as the terms and conditions of employment, including compensation, for the Race and Ethnicity Editor position. (Ross 82-83).

14. AP awarded a wage increase to Ms. Ross when it promoted her from Regional News Editor to Race and Ethnicity Editor. (Ross 174-76).

15. To date, Ms. Ross remains AP's Race and Ethnicity Editor, which is widely recognized as a prominent national news beat. (Ross 83, 177-80)

16. Ms. Ross claims to be knowledgeable about various civil rights laws, including those prohibiting employment discrimination and unlawful harassment. (Ross 29).

17. AP provides information and training about equal employment opportunity rights to all its employees. (Ross 124).

18. Ms. Ross acknowledges that AP has provided her with such information and training during the course of her employment. (Ross 124).

19. AP's executive leadership and management support, and work to develop and maintain, a diverse workforce. In addition to its steadfast commitment to equal employment opportunity, AP is committed to diversity in its workforce to ensure that its news report reflects all viewpoints and remains fair and unbiased. (Ross 147-48; 151).

20. Ms. Ross acknowledges that AP has taken various steps to hire, promote, retain and advance the professional development of African-Americans and women throughout the company. (Ross 47-48, 147-48).

21. AP has various government contracts. As such, its Washington news operation has participated in a number of Office of Federal Contract Compliance Programs ("OFCCP") investigations and audits. (Bruce 79-81; Garner-Sampson 55-60).

22.     As part of its investigative process, the OFCCP has requested to interview various employees; AP has cooperated fully and consistently with all such requests. (Bruce 79-81; Garner-Sampson 55-60).

23.     In or about October 2011, Diane Parker, Director of Staffing and Diversity, advised Ms. Ross that, as part of an audit of AP's compliance obligations, the OFCCP would be on-site at AP's Washington offices on or about November 15, 2011. (Ross 123-24).

24.     Shortly after Ms. Parker spoke to her, Ms. Ross contacted the OFCCP and spoke with Willis Lucas, the investigator conducting the audit. Mr. Lucas indicated to Ms. Ross that he would contact her. (Ross 124, 130).

25.     Ms. Ross testified that she understood this to mean that Mr. Lucas would contact her when he was on-site at AP's Washington offices. (Ross 130).

26.     Ms. Ross did **not** tell anyone at AP that she contacted the OFCCP. (Ross 205).

27.     As the human resources manager for that business location, Ms. Garner-Sampson was responsible for assisting Mr. Lucas in his preparation for the November 15 on-site audit. (Garner-Sampson 54, 56-62).

28.     Ms. Garner-Sampson compiled appropriate information and reports for the audit, and communicated with Mr. Lucas regarding any employees whom he desired to interview, in order to ensure their availability and relief from work assignments during the day of his on-site visit. (Garner-Sampson 52-68; Garner-Sampson Aff ¶ 5, Ex. 1).

29.     On the day of his visit, Mr. Lucas informed Ms. Garner-Sampson of the particular employee whom he wished to interview, and Ms. Garner-Sampson would locate the employee and escort/direct him/her to the conference room where Mr. Lucas would conduct his interview. (Garner-Sampson 61-62).

30. After conducting several interviews of employees on his pre-determined list, Mr. Lucas informed Ms. Garner-Sampson that he wished to speak with another employee, whose name was not on that list. (Garner-Sampson 62). Specifically, Mr. Lucas explained to Ms. Garner-Sampson that Ms. Ross had previously contacted him and expressed a desire to speak with him. (Garner-Sampson 62-68; Garner-Sampson ¶ 6, Ex. 2).

31. Mr. Lucas requested Ms. Garner-Sampson's assistance so that he could speak with Ms. Ross, who was not previously designated for interview that day. *Id.*

32. In compliance with his request, Ms. Garner-Sampson located Ms. Ross and informed her that Mr. Lucas of the OFCCP was on site, and that he would like to meet with her. (Ross 197-99; Garner-Sampson 62-64; Garner-Sampson ¶ 6, Ex. 2).

33. Ms. Ross responded defensively, and used such words or manner that it suggested to Ms. Garner-Sampson that Ms. Ross did not know Mr. Lucas or anything about an OFCCP audit. (Ross 197-99, 211; Garner-Sampson 62-64; Garner-Sampson ¶ 6, Ex. 2). In response, Ms. Garner-Sampson simply reiterated what Mr. Lucas had stated to her—that Mr. Lucas was the OFCCP investigator whom Ms. Ross had contacted, and that Mr. Lucas wished to follow-up with her. ((Ross 197-99; Garner-Sampson 62-64; Garner-Sampson ¶ 6, Ex. 2).

34. Ms. Ross replied that she would meet with Mr. Lucas. (Garner-Sampson Aff. ¶ 6, Ex. 2).

35. Ms. Garner-Sampson informed Ms. Ross of the conference room location. *Id.*

36. Ms. Garner-Sampson walked to the conference room, and informed Mr. Lucas of her exchange with Ms. Ross. (Ross 197-198).

37. Ms. Ross testified that when she arrived at the conference room, Mr. Lucas stated that he was expecting her. (Ross 208).

5

38. Ms. Ross testified that she did **not** ask what Mr. Lucas had said to Ms. Garner-Sampson, but did inform him of her earlier exchange with Ms. Garner-Sampson. (Ross 208).

39. Ms. Ross acknowledged that she did **not** "hold back" when speaking with Mr. Lucas and provided him with a "full report of the instances of discrimination" that she allegedly experienced. (Complaint ¶ 20, Ross 208).

40. Ms. Garner-Sampson's conversation with Ms. Ross did **not** diminish Ms. Ross' ability to complain to the OFCCP and/or to participate in its audit or investigation. *Id*.

41. Ms. Ross agrees that **no** AP employee or supervisor ever made derogatory comments, remarks or slurs based on her race, gender, or age. (Ross 241).

42. Ms. Ross filed her OFCCP charge on March 5, 2012. (Complaint ¶ 26).

43. In her deposition testimony, Ms. Ross stated that AP's "institutional" discrimination was not directed to any specific person and was without the formation of a specific intent to discriminate. (Ross 44, 142, 147 and 169)

44. Ms. Ross alleges that AP's assignment of a co-editor to her news beat and revision of her managerial reporting line purportedly "diluted" her managerial authority. (Complaint ¶ 24).

45. Ms. Ross concedes that her editorial peers perceived the alteration of Ms. Ross' managerial reporting line to be a promotion. (Complaint ¶ 24).

46. Ms. Ross contends that these actions were not a promotion because she did not receive a simultaneous pay raise when she began reporting to a higher ranking editor. *Id*.

47. AP never assigned another "co-editor" to the Race and Ethnicity beat. At all relevant times, Ms. Ross has been, and remains, the sole Race and Ethnicity Editor. (Ross 226; Garner-Sampson Aff. ¶ 4 ; Ross 226).

48. Instead, AP assigned Pauline Arrillaga, a National Enterprise Editor based in Phoenix with experience in covering race and related news issues for AP's Southwest news region, to "assist" Ms. Ross. In short, Ms. Arrillaga was never named a "co-editor" for the beat. Moreover, AP assigned Ms. Arrillaga to "assist" Ms. Ross rather than to diminish or dilute her authority. *Id.*

49. Prior to 2015, Ms. Ross had requested that the AP expand the Race and Ethnicity team. (Ross 225-26).

50. Through 2015 and 2016, Ms. Ross reported to Sally Buzbee, AP's then-Washington D.C. Bureau Chief. Ms. Ross' reporting to Ms. Buzbee did not change when the Race and Ethnicity team was expanded. (Garner-Sampson Aff. ¶ 4).

51. Ms. Ross does **not** offer any statistical evidence of the effects of any alleged discriminatory practice. (Ross 148).

52. Paragraph 20 of Ms. Ross' Complaint makes the following allegations: "On the short walk from the newsroom to the room where the interviews were being held, [Ms.] Garner Sampson (sic) made **comments** about Ms. Ross that made it abundantly clear to Ms. Ross that if she did not keep quiet about the discrimination she had experienced, there would be consequences." (Complaint ¶ 20, emphasis added).

53. Ms. Ross testified that while walking to the conference room to meet with the OFCCP investigator, Ms. Garner-Sampson only spoke about insignificant things -- "just small talk, the weather." (Ross 199-200).

54. Ms. Ross testified that it was the "tone," rather than the substance of the words used by Ms. Garner-Thompson about the OFCCP interview, which troubled Ms. Ross. (Ross 199-200).

55. In her OFCCP charge, Ms. Ross alleges that Ms. Garner-Sampson "attempted to menace me by telling me she knows that I had communicated with OFCCP officer Willie Lucas." (OFCCP Charge).

56. Ms. Garner-Sampson spoke with Ms. Ross about the interview with the OFCCP investigator only because he **asked** her to do so. (Garner-Sampson Ex. 2)

57. At her deposition, Ms. Ross conceded that, when Ms. Garner-Sampson mentioned Mr. Lucas, she had the following reaction: "I might have given her a raised eyebrow look like; what?" (Ross 211). Ms. Ross further testified that she said "excuse me?" at that time. (Ross 197).

58. Shortly after the incident with Ms. Garner-Sampson, Ms. Ross complained to Ms. Bruce. Ms. Bruce is AP's highest ranking human resources professional; she assured Ms. Ross that she would not be retaliated against. She further informed Ms. Ross that she was free to complain about discrimination. (Ross 212-13).

59. Ms. Ross testified: "[Ms. Bruce's] response was that I was perfectly entitled to speak to whomever I wanted, about whatever I wanted, whenever I wanted. And she also said that we could discuss it further if I wanted that." Ms. Ross in fact spoke with Ms. Bruce and was "comfortable" with the response. (Ross 213).

60. Ms. Ross knew that Ms. Garner-Sampson did not in any way control or influence Ms. Ross' job status, compensation or other terms and conditions of employment. (Ross 206-07).

61. Ms. Ross "nevertheless, provided the investigator with a full report" after the purported threats. (Complaint ¶ 20). Consistent with her Complaint, Ms. Ross expressly testified that she "didn't hold back" when speaking to the Investigator. (Ross 208).

62. Ms. Garner-Sampson's alleged comment simply did not stop Ms. Ross from fully complaining to the OFCCP. (Complaint ¶ 20; Ross 208).

8

63. Ms. Ross further conded that she knew that other employees had been interviewed by the OFCCP, but she does not know whether any felt threatened by Ms. Garner-Sampson. (Ross 206).

64. Ms. Ross complained to AP about the lack of resources well **prior** to her filing with the OFCCP in March 2012. (Complaint at ¶ 19).

65. Ms. Ross was not sent to the 2008 conventions. (Ross 108-109).

66. AP asked Ms. Ross to be available during the 2012 conventions to do her job and be available, including editing short notebook stories, as needed. (Ross 108).

67. AP also advised Ms. Ross of the need to be prepared to focus on any race-related news developing from the conventions. (Ross 107-09).

68. Ms. Ross asked to be excused from her AP duties during the 2012 convention to work as an analyst for the Black Entertainment Television Network. (Ross 107).

69. AP did not permit her absence because AP's coverage of the conventions require "all hands on deck" if the unexpected occurs or the expected requires additional resources. (Ross 108-109).

70. Ms. Ross' 2013 bonus amount was greater than her 2012 bonus amount, and was consistent with the bonuses that AP provided to national beat editors who had not filed complaints. (Garner-Sampson ¶ 3).

71. Ms. Ross testified that since 2012 AP has made a number of changes to its news report (including layoffs) for fiscal reasons, and acknowledged AP's financial concerns. (Ross 109).

72. Ms. Ross concedes the review was not issued for discriminatory reasons. (Ross 96).

73. At her deposition, Ms. Ross contended that her 2012 performance review was retaliatory because it stated that she did not perform to expectations, but she was unclear about her expectations. (Ross 100). A copy of the 2013 performance review is attached to the Cartafalsa Aff as Exhibit 9.

74. Ms. Ross also contends her 2013 performance review was retaliatory because she previously "received a 360 review form Sally [Buzbee] and some other AP colleagues that was more exemplary than the performance review." (Ross 97).

75. Five of the six substantive questions in the 360 review ask for feedback on the employees **"skills"** and the last inquiry is as follows: "Please share some thoughts on what this person could do to become a more successful **manager and leader** in your organization." (Copies of the 360 reviews produced by Plaintiff are attached to the Cartafalsa Aff. as Ex. 10).

76. The 360 review completed by Ms. Buzbee for Ms. Ross reflects some of the same deficiencies raised in the performance review. Cartafalsa Aff. Exs. 9 and 10.

As a first example, Ms. Buzbee's 360 review provides as follows:

> *Sonya has sometimes struggled with the loose matrix structure of her job. It's not a unique structure within AP - it's fairly common at this point in time and reflects ongoing changes within AP. Sonya has made some strides at learning to influence people who don't report directly to her - to get the type of coverage that we want. But that remains critical to success in the job. Effective collaboration even when that's hard and not smooth is key.*

Ms. Ross' performance review contains similar comments and provides as follows:

> *The structure that Sonya works in - where she has a limited number (in this case, one) direct report but us tasked with guiding the beat (race and ethnicity coverage) work of reporters who do not report to her, is a relatively common structure within AP. Many other managers have similar structures heading beat teams. It requires strong outreach to other managers and editors, to encourage them to promote race and ethnicity coverage, and Sonya must forge those strong editor to editor relationships. She has had success doing this with audio and video managers, but struggled with some other managers. In particular, she frequently argued with other editors on the Trayvon Martin story, insisting they must structure stories the*

10

> *way she wanted. As a longtime manager, we expect Sonya to work collaboratively and productively with a wide range of other editors. She was given that verbal and written feedback at the time. Strong and collaborative relationships with her fellow managers in other locations is critical to making the job productive.*

As a second example, Ms. Buzbee's 360 review provides as follows:

> *Sonya is an important mentor to many reporters across the country. In recent months, she has worked with the reporter who reports directly to her in the Washington bureau, and with a handful of reporters in other bureaus, to guide and bring to completion substantial enterprise stories. Sonya has striven in recent months to communicate more effectively with colleagues both inside and outside the WDC bureau. She has worked recently to try to find ways to move toward a useful and productive relationship with a reporter key to her area of coverage, who reports to another editor in another city. She can be an effective and useful help to colleagues and peer editors across the country, helping them to be aware of and pay attention to, the need for race and ethnicity stories. She has sometimes struggled to do this in the loose matrix.*

Ms. Ross' performance review similarly contains similar comments and provides as follows:

> *Sonya has struggled to produce a steady and valuable set of race and ethnicity stories - especially enterprise stories - over the last year. This has improved somewhat in recent months, and this is encouraging. In particular, in recent months, Sonya has worked with the reporter who reports directly to her and a handful of reporters in other bureaus (through their editors) to guide and bring to completion enterprise stories on topics such as Hispanics meeting with 3FK, gun violence among minorities, stories looking at Hindus in Congress and a tip passed on about Civil War era promises made to black southern residents- These stories have been along the lines of what is desired, and are encouraging. Sonya has struggled with the structure of her Job in this period, finding it hard to be productive at times. In recent months, she has made progress toward doing productive work within that structure, for example, by finding ways to work with reporters in other bureaus, with the agreement of their news editors. That is encouraging. Sonya should continue her outreach to reporters and editors, increasing her network within the company so as to best forge productive coverage of race and ethnicity issues.*

77. The 2012 performance review is consistent with many of her prior reviews issued by different managers throughout prior years of her career. (See, Cartafalsa Aff. Ex. 11).

78. In the twelve specific categories in the 2013 performance review, AP rated Ms. Ross as "meets expectations" in six (6) categories; as "met some but not all expectations" in five (5) categories; and "above expectations" in one (1) category. The 2013 performance review also acknowledges positive aspects of Ms. Ross' performance, including an "encouraging" recent "improvement" and "progress." Cartafalsa Ex. 9.

79. Ms. Ross was not solely responsible for editing every AP article on race and ethnicity. (Ross 42).

80. Ms. Ross did not notice, and did not notify the AP that she had not been given her 2010 raise until 2012. At such time AP quickly remedied the oversight. (Ross 175).

81. Other beat editor's, like Ms. Ross, could reach out across the AP for assistance from reporters or others. Ms. Buzbee's comments in the above-referenced performance review is instructive: "The structure that Sonya works in where she has a limited number (in this case, one) direct report but is tasked with guiding the beat (race and ethnicity coverage) work of reporters who do not report to her, is a relatively common structure within AP." Cartafalsa Aff. Ex. 9

                                            Respectfully submitted,

                                            OGLETREE, DEAKINS, NASH,
                                              SMOAK & STEWART, P.C.

By:   s/ Joseph B. Cartafalsa
       Joseph B. Cartafalsa
       1745 Broadway, 22nd Floor
       New York, New York 10019
       Telephone: 212.492.2500
       Facsimile: 212.492.2501
       *joseph.cartafalsa@ogletree.com*

       *Counsel for Defendant*
       *The Associated Press*

Dated: May 29, 2018

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____
                                                  )
SONYA ROSS,                                       )
                                                  )
        *Plaintiff,*                        )
v.                                                ) Civil Action No. 1:16-cv-00820(TSC)
                                                  )
THE ASSOCIATED PRESS,                             )
                                                  )
        *Defendant.*                        )
_____)

## **CERTIFICATE OF SERVICE**

I hereby certify that on 29th day of May, 2018, a copy of the foregoing, Defendant's Statement of Facts for Which There is No Genuine Dispute, was filed via the Court's ECF system and served on all counsel of record.

        Respectfully submitted,

        OGLETREE, DEAKINS, NASH,
          SMOAK & STEWART, P.C.

By:   s/ Joseph B. Cartafalsa
      Joseph B. Cartafalsa
      1745 Broadway, 22nd Floor
      New York, New York 10019
      Telephone: 212.492.2500
      Facsimile: 212.492.2501
      *joseph.cartafalsa@ogletree.com*

      *Counsel for Defendant*
      *The Associated Press*