IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF C OLUMBIA

| | | |
|---|---|---|
| SONYA ROSS | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | Civil Action No. |
| | : | |
| THE ASSOCIATED PRESS, | : | |
| | : | |
| Defendant. | : | |

**PLAINTIFF'S RESPONSES TO DEFENDANT'S STATEMENT OF UNDISPUTED FACTS AND PLAINTIFF'S FURTHER STATEMENT OF MATERIAL FACTS**

Pursuant to Local Rule 7(h), Sonya Ross hereby submits the following statement of material facts as to which there is a genuine dispute.

1.     The Associated Press is a member-owned, not-for-profit news gathering cooperative. (Bruce 21).

**Response:**

Ms. Ross admits this statement.

2.     AP is an equal opportunity employer and, at all relevant times, has maintained an Equal Employment Opportunity policy that prohibited discrimination on the basis of race, gender, age and other protected characteristics, prohibited retaliation for asserting or assisting in the investigation of such claims, and provided a mechanism for employees to raise complaints or otherwise invoke their legal rights. (Cartafalsa Aff. Ex. 6; Ross 131-33).

**Response:**

Ms. Ross admits this statement to the extent that it has maintained a so-called Equal

Employment Opportunity policy. Ms. Ross disputes that AP is "an equal opportunity employer."

Leading Edge Report, incorporated herein as Exhibit "D"; Robert Naylor Affidavit, incorporated

herein as Exhibit "X."

3.     Plaintiff, Sonya Ross is African-American, female and, upon information and belief, is in the protected age class. (Complaint.)

**Response:**

Ms. Ross admits this statement.

4.     Ms. Ross is a current employee of Associated Press. At all relevant times, Ms. Ross worked, and continues to work, in AP's Washington D.C. Bureau. (Complaint).

**Response:**

Ms. Ross admits this statement.

5.     On or about March 5, 2012, Ms. Ross filed a charge of discrimination with the OFCCP alleging race discrimination, gender discrimination, and retaliation. (Complaint 21).

**Response:**

Ms. Ross admits this statement.

6.     The OFCCP issued Ms. Ross a Notice of Right to Sue dated February 1, 2016. (Complaint ¶ 27).

**Response:**

Ms. Ross admits this statement.

7.     Ms. Ross commenced this action on May 2, 2016. (Complaint).

**Response:**

Ms. Ross admits this statement.

8.     At all relevant times, Jessica Bruce has served as Senior Vice President, Global Human Resources and Corporate Communications. Ms. Bruce is AP's highest-ranking human resources professional. Ms. Bruce is Caucasian, female and in the age class protected by the Age Discrimination in Employment Act ("ADEA"). (Bruce 19, 44)).

**Response:**

Ms. Ross admits this statement.

9.     At all relevant times, Montrese Garner-Sampson served as a Human Resources Manager for AP, with an office located in Washington D.C. Ms. Garner-Sampson has human resources managerial responsibilities for AP's news operations in Washington D.C. as well as its news operations in the South Region. Like Ms. Ross, Ms. Garner-Sampson is African-American, female and in the age class protected by the ADEA. (Garner-Sampson Aff. ¶ 2).

**Response:**

Ms. Ross admits this statement.

10.     Ms. Ross began working for AP as an intern in or about 1986. Upon conclusion of her internship, AP hired her as a regular full time newsperson. (Ross 38).

**Response:**

Ms. Ross admits this statement to the extent that Ms. Ross was hired as an intern as a result of a consent decree into which AP entered to ameliorate systemic discrimination against African Americans and women. Sonya Ross Deposition, incorporated herein as Exhibit "A" at 36-37.

11.     Since hiring Ms. Ross, AP has promoted her a number of times. (Ross 46-47).

**Response:**

Ms. Ross *denies* this statement to the extent Defendant's record citations do not support its claim. Ms. Ross admits that she was promoted to the positions of Urban Affairs Reporter, White House Reporter, World Services Editor and regional Washington Bureau news editor. Ms. Ross has been denied promotions to Chief White House Correspondent, Assistant Washington Bureau Chief (twice), Washington Bureau Chief and Director of Content Development and Alliances. Since this litigation, Ms. Ross has been denied promotions to Deputy Managing Editor for U.S. News; Director of Partnerships; and News Editor National Beats. Ex. A at 94-95.

12.     In response to Ms. Ross' request, in or about August 2010, AP agreed to create a new position for her, which bears the title of "Race and Ethnicity Editor." (Ross 37-43).

**Response:**

Ms. Ross admits the facts contained in paragraph 12 of the Defendant's Statement of Material Facts to the extent that although Defendant's record citations do not support this claim, AP did create the position of Race & Ethnicity upon her request after Ms. Ross's repeated

attempts for promotion to senior management positions in AP were unsuccessful. Ex. A 81, 83-84, 177.

13.    For over a year, Ms. Ross and AP negotiated the scope of the job responsibilities, as well as the terms and conditions of employment, including compensation, for the Race and Ethnicity Editor position. (Ross 82-83).

**Response:**

Ms. Ross admits the facts contained in paragraph 13 of the Defendant's Statement of Material Facts. AP, however, diminished the scope of the job responsibilities, including compensation initially contemplated during those negotiations and ultimately gave Sarah Nordgren, a white female, some of the responsibilities proposed by Ms. Ross when they promoted Nordgren to director of content development and alliances. Ex. A 81.

14.    AP awarded a wage increase to Ms. Ross when it promoted her from Regional News Editor to Race and Ethnicity Editor. (Ross 174-76).

**Response:**

Ms. Ross admits the facts contained in paragraph 14 of the Defendant's Statement of Material Facts, to the extent AP initially refused to offer a pay increase for this carved out role until Ms. Ross demanded a pay increase. Ultimately, Ms. Ross was led to believe she would receive a 2% wage increase, the same amount offered for the standard annual merit increase. Moreover, AP did not actually pay Ms. Ross the increase until three years later when she discovered, during a personal review of her pay statements, that her base salary had not changed. Ms. Ross immediately raised the issue with her manager Sally Buzbee, who asked whether she had proof of the raise "in writing." Ms. Ross also raised the issue with Jessica Bruce, and with the OFCCP investigator on her case. Ms. Ross received the 2 percent increase and a retroactive payment in December 2013. Ms. Ross has not received a raise in the five years since that retroactive payment was made. Ex. A at 176.

15.     To date, Ms. Ross remains AP's Race and Ethnicity Editor, which is widely recognized as a prominent national news beat. (Ross 83, 177-80).

**Response:**

Ms. Ross *denies* the facts contained in paragraph 15 of the Defendant's Statement of Material Facts to the extent that Defendant's record citations do not support its instant claims. Nevertheless, Ms. Ross agrees that AP's Race & Ethnicity news beat was one of the first of its kind and provided a model for other media organizations. Because of AP's lack of investment and marginalization of Ms. Ross on the beat, however, other media organizations have eclipsed AP in the prominence of its race and ethnicity coverage and her placement in the position did not assist in raising her stature within AP. Ex. A at 230-231.

16.     Ms. Ross claims to be knowledgeable about various civil rights laws, including those prohibiting employment discrimination and unlawful harassment. (Ross 29).

**Response:**

Ms. Ross admits this statement.

17.     AP provides information and training about equal employment opportunity rights to all its employees. (Ross 124).

**Response:**

Ms. Ross admits this statement.

18.     Ms. Ross acknowledges that AP has provided her with such information and training during the course of her employment. (Ross 124).

**Response:**

Ms. Ross admits this statement.

19.     AP's executive leadership and management support, and work to develop and maintain, a diverse workforce. In addition to its steadfast commitment to equal employment opportunity, AP is committed to diversity in its workforce to ensure that its news report reflects all viewpoints and remains fair and unbiased. (Ross 147-48; 151).

**Response**:

Ms. Ross *denies* the facts contained in paragraph 19 of the Defendant's Statement of Material Facts to the extent that Defendant's record citations do not support this claim and mischaracterizes Ms. Ross's deposition testimony. Ms. Ross testified that AP has repeatedly failed to develop and maintain an *African-American* workforce in management positions in favor of increased diversity efforts among *white women* and a report commissioned by AP found that not only was it NOT a diversity leader, but that it failed to ensure its hiring and retention practices were devoid of systemic bias. Ex. A at 49-50, 145-151; Ex. D; Ex. F; Ex. G; Ex. U; Ex. V; Ex. X.

20.    Ms. Ross acknowledges that AP has taken various steps to hire, promote, retain and advance the professional development of African-Americans and women throughout the company. (Ross 47-48, 147-48).

**Response**:

Ms. Ross *denies* the facts contained in paragraph 20 of the Defendant's Statement of Material Facts to the extent that Defendant's record citations do not support this claim and mischaracterizes Ms. Ross's deposition testimony. Ms. Ross testified that AP has repeatedly failed to develop and maintain an *African-American* workforce in management positions in favor of increased diversity efforts among *white women* and a report commissioned by AP found that not only was it NOT a diversity leader, but that it failed to ensure its hiring and retention practices were devoid of systemic bias. Ex. A at 49-50, 145-151; Ex. D; Ex. F; Ex. G; Ex. U; Ex. V; Ex. X.

21.    AP has various government contracts. As such, its Washington news operation has participated in a number of Office of Federal Contract Compliance Programs ("OFCCP") investigations and audits. (Bruce 79 -81; Garner-Sampson 55-60).

**Response:**

Ms. Ross admits the facts contained in paragraph 21 of the Defendant's Statement of Material Facts.

22.     As part of its investigative process, the OFCCP has requested to interview various employees; AP has cooperated fully and consistently with all such requests. (Bruce 79 -81; Garner-Sampson 55-60).

**Response:**

Ms. Ross admits the facts contained in paragraph 22 of the Defendant's Statement of

Material Facts to the extent that it accurately reflects OFCCP's investigative process. Ms. Ross

denies that AP "fully and consistently" cooperates with OFCCP. On at least one occasion during

an on-site investigation into Ms. Ross's claims, OFCCP requested AP make an employee, Lisa

Matthews, available for an interview. AP told the investigator that Matthews was not "present"

to be interviewed. Matthews, however, was working at her desk in the newsroom on the day of

the interview request and even observed the OFCCP delegation being escorted through the

newsroom. Affidavit of Lisa Matthews, incorporated herein as Exhibit "Z."

23.     In or about October 2011, Diane Parker, Director of Staffing and Diversity, advised Ms. Ross that, as part of an audit of AP's compliance obligations, the OFCCP would be on-site at AP's Washington offices on or about November 15, 2011. (Ross 123-24).

**Response:**

Ms. Ross admits the facts contained in paragraph 23 of the Defendant's Statement of

Material Facts.

24.     Shortly after Ms. Parker spoke to her, Ms. Ross contacted the OFCCP and spoke with Willis Lucas, the investigator conducting the audit. Mr. Lucas indicated to Ms. Ross that he would contact her. (Ross 124, 130).

**Response:**

Ms. Ross admits the facts contained in paragraph 24 of the Defendant's Statement of

Material Facts that she called OFCCP and eventually spoke with Mr. Lucas. Ms. Ross *denies* and

Defendant's record citation does not support the claim that Mr. Lucas said he would contact Ms. Ross. Rather, Ms. Ross testified that she expected to hear from someone at OFCCP whether they would call or reach out to her while they were on-site for the audit of AP's EEO compliance. Ex. A at 124-130.

25.    Ms. Ross testified that she understood this to mean that Mr. Lucas would contact her when he was on-site at AP's Washington offices. (Ross 130).

**Response**:

Ms. Ross *denies* the facts contained in paragraph 25 of the Defendant's Statement of Material Facts and the record citation provided by Defendant does not support this claim. Ex. A at 129-130.

26.    Ms. Ross did not tell anyone at AP that she contacted the OFCCP. (Ross 205).

**Response:**

Ms. Ross admits the facts contained in paragraph 26 of the Defendant's Statement of Material Facts.

27.    As the human resources manager for that business location, Ms. Garner-Sampson was responsible for assisting Mr. Lucas in his preparation for the November 15 on-site audit. (Garner-Sampson 54, 56-62).

**Response:**

Ms. Ross admits the facts contained in paragraph 27 of the Defendant's Statement of Material Facts.

28.    Ms. Garner-Sampson compiled appropriate information and reports for the audit, and communicated with Mr. Lucas regarding any employees whom he desired to interview, in order to ensure their availability and relief from work assignments during the day of his on-site visit. (Garner-Sampson 52-68; Garner-Sampson Aff ¶ 5, Ex. 1).

**Response:**

Ms. Ross *denies* the facts contained in paragraph 28 of the Defendant's Statement of

Material Facts to the extent that AP has falsely represented to OFCCP of an employee's unavailability for an interview on at least one occasion. Ex. Z.

29.     On the day of his visit, Mr. Lucas informed Ms. Garner-Sampson of the particular employee whom he wished to interview, and Ms. Garner-Sampson would locate the employee and escort/direct him/her to the conference room where Mr. Lucas would conduct his interview. (Garner-Sampson 61-62).

**Response:**

Ms. Ross *denies* the facts contained in paragraph 29 of the Defendant's Statement of Material Facts to the extent that AP has falsely represented to OFCCP of an employee's unavailability for an interview on at least one occasion. Ex. Z.

30.     After conducting several interviews of employees on his pre-determined list, Mr. Lucas informed Ms. Garner-Sampson that he wished to speak with another employee, whose name was not on that list. (Garner-Sampson 62). Specifically, Mr. Lucas explained to Ms. Garner-Sampson that Ms. Ross had previously contacted him and expressed a desire to speak with him. (Garner-Sampson 62-68; Garner-Sampson ¶ 6, Ex. 2).

**Response:**

Ms. Ross admits the facts contained in paragraph 30 of the Defendant's Statement of Material Facts.

31.     Mr. Lucas requested Ms. Garner-Sampson's assistance so that he could speak with Ms. Ross, who was not previously designated for interview that day. *Id.*

**Response:**

Ms. Ross admits the facts contained in paragraph 31 of the Defendant's Statement of Material Facts.

32.     In compliance with his request, Ms. Garner-Sampson located Ms. Ross and informed her that Mr. Lucas of the OFCCP was on site, and that he would like to meet with her. (Ross 197-99; Garner-Sampson 62-64; Garner-Sampson ¶ 6, Ex. 2).

**Response:**

Ms. Ross admits the facts contained in paragraph 32 of the Defendant's Statement of

Material Facts, to the extent that Ms. Garner-Sampson approached Ms. Ross while she was talking with another employee. Ms. Ross *denies* that Ms. Garner-Sampson innocuously told her that Mr. Lucas "would like to meet with her." Rather, Ms. Garner-Sampson interrupted Ms. Ross's conversation with the other employee, Wendy Benjaminson, stating, "You reached out to Willie Lucas"? in an accusatory, menacing and intimidating tone. Ex. A at 196-197, 209-210. Ms. Ross replied "Excuse me?" without confirming nor denying Ms. Garner-Sampson's question about her protected activity in part because of the presence of the other employee. After asking that question, Garner-Sampson informed Ms. Ross that Mr. Lucas was on site and wanted to speak with her. Ex. A at 197-198. Ms. Garner-Sampson then repeated her question about whether Ms. Ross reached out to Willie Lucas. Ms. Ross believed that Ms. Garner-Sampson was waiting and expecting her to confirm that she had spoken to an OFCCP official in advance of the onsite audit. Ross 199. Ms. Garner-Sampson again told Ms. Ross that Mr. Lucas wanted to interview her "upstairs." Ex. A at 198-199.

33.     Ms. Ross responded defensively, and used such words or manner that it suggested to Ms. Garner-Sampson that Ms. Ross did not know Mr. Lucas or anything about an OFCCP audit. (Ross 197-99, 211; Garner-Sampson 62-64; Garner-Sampson ¶ 6, Ex. 2). In response, Ms. Garner-Sampson simply reiterated what Mr. Lucas had stated to her—that Mr. Lucas was the OFCCP investigator whom Ms. Ross had contacted, and that Mr. Lucas wished to follow-up with her. ((Ross 197-99; Garner-Sampson 62-64; Garner-Sampson ¶ 6, Ex. 2).

**Response:**

Ms. Ross *denies* the facts contained in paragraph 33 of the Defendant's Statement of Material Facts to the extent that Ms. Ross never said, suggested or indicated to Ms. Garner-Sampson whether she knew who Willie Lucas was. Ex. A at 197. Rather, Ms. Ross was "incredulous" and nonplussed that Ms. Garner-Sampson would repeatedly query her about whether she had lodged a complaint to OFCCP in an intimidating tone and in front of her professional colleague. Ex. A at 197-199.

34.     Ms. Ross replied that she would meet with Mr. Lucas. (Garner-Sampson Aff. ¶ 6, Ex. 2).

**Response:**

Ms. Ross *denies* the facts contained in paragraph 34 of the Defendant's Statement of Material Facts to the extent that Ms. Ross did not entertain Ms. Garner-Sampson's effort at small talk en route to the interview and merely accompanied her to the conference room where the interviews were being conducted. Ex. A at 197-199.

35.     Ms. Garner-Sampson informed Ms. Ross of the conference room location. *Id.*

**Response:**

Ms. Ross *denies* the facts contained in paragraph 35 of the Defendant's Statement of Material Facts to the extent that Ms. Garner-Sampson told Ms. Ross that Mr. Lucas was "upstairs." Ex. A at 199.

36.     Ms. Garner-Sampson walked to the conference room, and informed Mr. Lucas of her exchange with Ms. Ross. (Ross 197-198).

**Response:**

Ms. Ross *denies* the facts contained in paragraph 36 of the Defendant's Statement of Material Facts to the extent that Ms. Ross and Garner-Sampson walked together to the conference room and Ms. Garner-Sampson opened the door, informed Mr. Lucas that Ms. Ross was there, and left. Ms. Ross did not hear any other exchange between Mr. Lucas and Ms. Garner-Sampson when they arrived at the conference room. Ex. A at 200.

37.     Ms. Ross testified that when she arrived at the conference room, Mr. Lucas stated that he was expecting her. (Ross 208).

**Response:**

Ms. Ross admits the facts contained in paragraph 37 of the Defendant's Statement of Material Facts.

38.     Ms. Ross testified that she did not ask what Mr. Lucas had said to Ms. Garner-Sampson, but did inform him of her earlier exchange with Ms. Garner-Sampson. (Ross 208).

**Response:**

Ms. Ross admits that she informed Mr. Lucas of Garner-Sampson's statement to her.

39.     Ms. Ross acknowledged that she did not "hold back" when speaking with Mr. Lucas and provided him with a "full report of the instances of discrimination" that she allegedly experienced. (Complaint ¶ 20, Ross 208).

**Response:**

Ms. Ross admits the facts contained in paragraph 39 of the Defendant's Statement of

Material Facts.

40.     Ms. Garner-Sampson's conversation with Ms. Ross did not diminish Ms. Ross' ability to complain to the OFCCP and/or to participate in its audit or investigation. *Id.*

**Response:**

Ms. Ross admits the facts contained in paragraph 40 of the Defendant's Statement of

Material Facts. Ms. Ross *denies* that since her complaint to OFCCP, she has nonetheless been the

subject of materially adverse consequences as a result of her complaints and the filing of this

civil action. Since November 2011, Ms. Ross's superiors have treated her largely as a pariah. She

was excluded from making significant contributions to the AP's political coverage in 2012 and

2016, despite her extensive experience covering state and national politics as a reporter, and

directing regional political coverage as an editor. To this day, Ms. Ross works in a climate of

corporate indifference and disrespect. AP news managers regularly go around her to others in

planning coverage in her area of responsibility. Top AP news executives routinely do not

respond to emails from her. Her requests for raises also have been ignored. Her requests for

resources for her reporters are often left to languish and the assault on her professional credibility

is constant. Ms. Ross was unfairly singled out and chastised for alleged performance failures

around coverage of the 2017 Charlottesville racial violence and the 50th anniversary of Martin Luther King Jr.'s assassination, despite clear, abundant evidence that she did her job well. Enduring years of protracted mistreatment by AP has been highly stressful for Ms. Ross, and has taken a toll on her physical health. In April 2018, three days after being told by AP that she needs to "improve" her performance, Ms. Ross was rushed to the hospital for emergency gall bladder surgery, and afterward was advised by her doctor to reduce her stress levels. No AP executives visited during her monthlong recuperation at home. One day after being accused of blowing deadlines on the MLK coverage, Ms. Ross was notified by the Society of Professional Journalists that she had been selected for induction into the DC Pro Chapter's Hall of Fame. No AP executives attended the ceremony. The sentiment Ms. Ross shared with OFCCP at the time she filed her complaint -- "I go to work every day feeling as if there is a target on my back" -- remains very true for her.  Affidavit of Sonya Ross, incorporated herein as Exhibit "V" at ¶¶7, 9.

41.    Ms. Ross agrees that no AP employee or supervisor ever made derogatory comments, remarks or slurs based on her race, gender, or age. (Ross 241).

**Response:**

Ms. Ross *denies* the facts contained in paragraph 41 of the Defendant's Statement of Material Facts, to the extent that Ron Fournier had a history of being mean and verbally abusive to her dating back to their time as colleagues on the White House beat in the early 2000s -- treatment about which AP was well aware because Ross complained about it and documented it. AP also knew that he subjected women to verbal abuse more than men. Evidence of his abusive behavior toward black women is well-documented. Ex. Bat 39-40, 46-49; Ex C at 227, 40-31, 49-50.

42.    Ms. Ross filed her OFCCP charge on March 5, 2012. (Complaint ¶ 26).

**Response:**

Ms. Ross admits the facts contained in paragraph 42 of the Defendant's Statement of Material Facts.

43.     In her deposition testimony, Ms. Ross stated that AP's "institutional" discrimination was not directed to any specific person and was without the formation of a specific intent to discriminate. (Ross 44, 142, 147 and 169)

**Response:**

Ms. Ross *denies* the facts contained in paragraph 43 of the Defendant's Statement of Material Facts. Ms. Ross testified that she was treated abusively by Ron Fournier, that Montrese Garner-Sampson subjected her to threats of retaliation and intimidation to discourage her from engaging in the protected activity of speaking up about this mistreatment and other discriminatory behavior by AP, that specific individuals assisted in the systemic issues relating to the lack of diversity in the newsroom, including Fournier, Nordgren, Oreskes, Carroll, Buzbee, former CEO Tom Curley and Jessica Bruce. Ex. A at 197-200.

44.     Ms. Ross alleges that AP's assignment of a co-editor to her news beat and revision of her managerial reporting line purportedly "diluted" her managerial authority. (Complaint ¶ 24).

**Response:**

Ms. Ross admits the facts contained in paragraph 44 of the Defendant's Statement of Material Facts.

45.     Ms. Ross concedes that her editorial peers perceived the alteration of Ms. Ross' managerial reporting line to be a promotion. (Complaint ¶ 24).

**Response:**

Ms. Ross *denies* the facts contained in paragraph 45 of the Defendant's Statement of Material Facts. The perception of the Race & Ethnicity Editor position as a promotion was promulgated by Ms. Ross's superiors. Ex. V at ¶10.

46.     Ms. Ross contends that these actions were not a promotion because she did not receive a simultaneous pay raise when she began reporting to a higher ranking editor. *Id.*

**Response:**

Ms. Ross *denies* the facts contained in paragraph 46 of the Defendant's Statement of Material Facts. When then-acting Bureau Chief Steve Komarow was preparing the public announcement of the Race & Ethnicity Editor position, Ms. Ross told him that she considered the job a lateral move due to the lack of a significant increase in pay, no upward repositioning of her line of report, no budget or editorial authority and no direct reports. Ex. V at ¶11.

47.     AP never assigned another "co-editor" to the Race and Ethnicity beat. At all relevant times, Ms. Ross has been, and remains, the sole Race and Ethnicity Editor. (Ross 226; Garner-Sampson Aff. ¶ 4 ; Ross 226).

**Response:**

Ms. Ross *denies* the facts contained in paragraph 47 of the Defendant's Statement of Material Facts. AP determined Ms. Ross needed to "share" with another person the work she was already performing alone in accordance with her job description. Ms. Ross believed that AP was positioning this co-editor as an avenue to go around her. Ms. Ross admits that she is the only person with the title "Race & Ethnicity Editor." Id. at ¶12.

48.     Instead, AP assigned Pauline Arrillaga, a National Enterprise Editor based in Phoenix with experience in covering race and related news issues for AP's Southwest news region, to "assist" Ms. Ross. In short, Ms. Arrillaga was never named a "co-editor" for the beat. Moreover, AP assigned Ms. Arrillaga to "assist" Ms. Ross rather than to diminish or dilute her authority. *Id.*

**Response:**

Ms. Ross *denies* the facts contained in paragraph 48 of the Defendant's Statement of Material Facts. AP attached enterprise editor Pauline Arrillaga to jointly handle the Race & Ethnicity portfolio with Ms. Ross in 2016, and Ms. Arrillaga operated in the belief that she had as much responsibility as Ms. Ross had for directing this coverage. Id. at ¶13.

49.    Prior to 2015, Ms. Ross had requested that the AP expand the Race and Ethnicity team. (Ross 225-26).

**Response:**

Ms. Ross admits the facts contained in paragraph 49 of the Defendant's Statement of Material Facts. Ms. Ross had been asking AP for direct reports, as well as editorial and budget authority, since the inception of the Race & Ethnicity coverage in 2010. She was granted one direct report, Suzanne Gamboa, in 2011 at Gamboa's request. The AP moved to create the Race & Ethnicity team in March 2016, roughly a month after OFCCP released its reasonable cause retaliation finding in Ms. Ross' complaint.  Ms. Ross was unaware of the decision to create the reporting team for her area of responsibility until she was brought into the planning process already started by Nordgren, Arrillaga and Pane. Id. at ¶14.

50.    Through 2015 and 2016, Ms. Ross reported to Sally Buzbee, AP's then-Washington D.C. Bureau Chief. Ms. Ross' reporting to Ms. Buzbee did not change when the Race and Ethnicity team was expanded. (Garner-Sampson Aff. ¶ 4).

**Response:**

Ms. Ross admits the facts contained in paragraph 50 of the Defendant's Statement of Material Facts.

51.    Ms. Ross does not offer any statistical evidence of the effects of any alleged discriminatory practice. (Ross 148).

**Response:**

Ms. Ross *denies* the facts contained in paragraph 51 of the Defendant's Statement of Material Facts. Since Ms. Ross was promoted into news management in 2002, AP has not hired another African-American news editor in the Washington bureau despite multiple opportunities to do so. The black colleagues who preceded her in Washington management were systematically purged from the company, as was a colleague of mixed race who came after her.

Furthermore, Ms. Ross steered multiple African-American candidates to AP for various management vacancies in Washington and none were hired. The majority of news editing positions that Ms. Ross has seen come open for new hire over the course of her long tenure in Washington bureau management went to white candidates, and the majority of recent hires in these and other roles in the Washington bureau have been white women. The only African-American reporters hired in the Washington bureau between 2013 and this month were interns selected by Ms. Ross On any given day in the area where Ms. Ross works -- the Washington bureau's print journalism operation -- Ms. Ross is the lone black manager and there are only two African American reporters -- one assigned to the White House team, and one who reports to Ms. Ross. Id. at ¶16.

52.     Paragraph 20 of Ms. Ross' Complaint makes the following allegations: "On the short walk from the newsroom to the room where the interviews were being held, [Ms.] Garner Sampson (sic) made comments about Ms. Ross that made it abundantly clear to Ms. Ross that if she did not keep quiet about the discrimination she had experienced, there would be consequences." (Complaint ¶ 20, emphasis added).

**Response:**

Ms. Ross admits the facts contained in paragraph 52 of the Defendant's Statement of Material Facts.

53.     Ms. Ross testified that while walking to the conference room to meet with the OFCCP investigator, Ms. Garner-Sampson only spoke about insignificant things -- "just small talk, the weather." (Ross 199-200).

**Response:**

Ms. Ross admits the facts contained in paragraph 53 of the Defendant's Statement of Material Facts.

54.     Ms. Ross testified that it was the "tone," rather than the substance of the words used by Ms. Garner-Thompson about the OFCCP interview, which troubled Ms. Ross. (Ross 199-200).

**Response:**

Ms. Ross *denies* the facts contained in paragraph 54 of the Defendant's Statement of Material Facts. In addition to her tone, Garner-Sampson's repeated interrogation of whether Ms. Ross had affirmatively called OFCCP was *per se* unlawful and intimidating, irrelevant to the task she was assigned and inappropriate in front of professional colleagues. Ex. A at 197-200.

55.    In her OFCCP charge, Ms. Ross alleges that Ms. Garner-Sampson "attempted to menace me by telling me she knows that I had communicated with OFCCP officer Willie Lucas." (OFCCP Charge).

**Response:**

Ms. Ross admits the facts contained in paragraph 55 of the Defendant's Statement of Material Facts.

56.    Ms. Garner-Sampson spoke with Ms. Ross about the interview with the OFCCP investigator only because he asked her to do so. (Garner-Sampson Ex. 2)

**Response:**

Ms. Ross *denies* the facts contained in paragraph 56 of the Defendant's Statement of Material Facts to the extent Mr. Lucas asked Ms. Garner-Sampson to get Ms. Ross, not interrogate her. Id.

57.    At her deposition, Ms. Ross conceded that, when Ms. Garner-Sampson mentioned Mr. Lucas, she had the following reaction: "I might have given her a raised eyebrow look like; what?" (Ross 211). Ms. Ross further testified that she said "excuse me?" at that time. (Ross 197).

**Response:**

Ms. Ross admits the facts contained in paragraph 57 of the Defendant's Statement of Material Facts as Ms. Ross was not obligated to, was uncomfortable with and did not want to answer Garner-Sampson's interrogation. Id.

58.    Shortly after the incident with Ms. Garner-Sampson, Ms. Ross complained to Ms. Bruce. Ms. Bruce is AP's highest ranking human resources professional; she assured Ms. Ross

that she would not be retaliated against. She further informed Ms. Ross that she was free to complain about discrimination. (Ross 212-13).

**Response:**

Ms. Ross admits the facts contained in paragraph 58 of the Defendant's Statement of Material Facts to the extent that that it accurately characterizes Ms. Bruce's response.

59.     Ms. Ross testified: "[Ms. Bruce's] response was that I was perfectly entitled to speak to whomever I wanted, about whatever I wanted, whenever I wanted. And she also said that we could discuss it further if I wanted that." Ms. Ross in fact spoke with Ms. Bruce and was "comfortable" with the response. (Ross 213).

**Response:**

Ms. Ross admits the facts contained in paragraph 59 of the Defendant's Statement of Material Facts to the extent that that it accurately characterizes Ms. Bruce's response.

60.     Ms. Ross knew that Ms. Garner-Sampson did not in any way control or influence Ms. Ross' job status, compensation or other terms and conditions of employment. (Ross 206-07).

**Response:**

Ms. Ross admits the facts contained in paragraph 60 of the Defendant's Statement of Material Facts to the extent that Garner-Sampson herself had no power to affect the terms of her employment. Ms. Ross denies Defendant's contention to the extent Garner-Sampson greatly and consistently influenced how Ms. Ross's managers treated her by providing her managers, including Sally Buzbee, with extensive advice and counseling relating to Ms. Ross's performance evaluations and counseling. Email Streams, incorporated herein as Exhibits "L," "P," and "W."

61.     Ms. Ross "nevertheless, provided the investigator with a full report" after the purported threats. (Complaint ¶ 20). Consistent with her Complaint, Ms. Ross expressly testified that she "didn't hold back" when speaking to the Investigator. (Ross 208).

**Response:**

Ms. Ross admits the facts contained in paragraph 61 of the Defendant's Statement of

Material Facts.

62.     Ms. Garner-Sampson's alleged comment simply did not stop Ms. Ross from fully complaining to the OFCCP. (Complaint ¶ 20; Ross 208).

**Response:**

Ms. Ross admits the facts contained in paragraph 62 of the Defendant's Statement of Material Facts.

63.     Ms. Ross further conded (sic) that she knew that other employees had been interviewed by the OFCCP, but she does not know whether any felt threatened by Ms. Garner-Sampson. (Ross 206).

**Response:**

Ms. Ross *denies* the facts contained in paragraph 63 of the Defendant's Statement of Material Facts to the extent that, during the 2013 onsite visit by OFCCP investigators handling Ms. Ross' complaint, office assistant Earl Hinton, an African-American male, expressed a desire to speak with OFCCP. Ms. Garner-Sampson made comments to him that he deemed threatening and told him his cooperation might "backfire" on him. Email from Earl Hinton, incorporated herein as Exhibit "M."

64.     Ms. Ross complained to AP about the lack of resources well prior to her filing with the OFCCP in March 2012. (Complaint at ¶ 19).

**Response:**

Ms. Ross admits the facts contained in paragraph 64 of the Defendant's Statement of Material Facts.

65.     Ms. Ross was not sent to the 2008 conventions. (Ross 108-109).

**Response:**

Ms. Ross admits the facts contained in paragraph 65 of the Defendant's Statement of Material Facts.

66.     AP asked Ms. Ross to be available during the 2012 conventions to do her job and be available, including editing short notebook stories, as needed. (Ross 108).

**Response:**

Ms. Ross admits the facts contained in paragraph 66 of the Defendant's Statement of Material Facts to the extent that that was the justification proffered by AP at the time. Ms. Ross disputes that was the real reason since neither before nor after her request to provide commentary to BET during the convention she was assigned no duties related to the political conventions. Ex. A at 108-109.

67.     AP also advised Ms. Ross of the need to be prepared to focus on any race-related news developing from the conventions. (Ross 107-09).

**Response:**

Ms. Ross admits the facts contained in paragraph 67 of the Defendant's Statement of Material Facts to the extent that that was the justification proffered by AP at the time.

68.     Ms. Ross asked to be excused from her AP duties during the 2012 convention to work as an analyst for the Black Entertainment Television Network. (Ross 107).

**Response:**

Ms. Ross admits the facts contained in paragraph 68 of the Defendant's Statement of Material Facts.

69.     AP did not permit her absence because AP's coverage of the conventions require "all hands on deck" if the unexpected occurs or the expected requires additional resources. (Ross 108-109).

**Response:**

Ms. Ross admits the facts contained in paragraph 69 of the Defendant's Statement of Material Facts to the extent that that was the justification proffered by AP at the time. Ms. Ross disputes that was the real reason since neither before or after her request to provide commentary

to BET during the convention she was assigned no duties related to the political conventions. Ex. A at 108-109.

70.     Ms. Ross' 2013 bonus amount was greater than her 2012 bonus amount, and was consistent with the bonuses that AP provided to national beat editors who had not filed complaints. (Garner-Sampson ¶ 3).

**Response:**

Ms. Ross *denies* the facts contained in paragraph 70 of the Defendant's Statement of Material Facts.

71.     Ms. Ross testified that since 2012 AP has made a number of changes to its news report (including layoffs) for fiscal reasons, and acknowledged AP's financial concerns. (Ross 109).

**Response:**

Ms. Ross admits the facts contained in paragraph 71 of the Defendant's Statement of Material Facts. Ms. Ross denies that all layoffs in the news division were the result of financial concerns. Ex. X at __.

72.     Ms. Ross concedes the review was not issued for discriminatory reasons. (Ross 96).

**Response:**

Ms. Ross *denies* the facts contained in paragraph 72 of the Defendant's Statement of Material Facts. Defendant's record citation is actually the opposite of its representations and Ms. Ross testified that she felt her performance review was discriminatory and retaliatory. Ex. A at 96.

73.     At her deposition, Ms. Ross contended that her 2012 performance review was retaliatory because it stated that she did not perform to expectations, but she was unclear about her expectations. (Ross 100). A copy of the 2013 performance review is attached to the Cartafalsa Aff as Exhibit 9.

**Response:**

Ms. Ross admits the facts contained in paragraph 73 of the Defendant's Statement of Material Facts.

74.     Ms. Ross also contends her 2013 performance review was retaliatory because she previously "received a 360 review form Sally [Buzbee] and some other AP colleagues that was more exemplary than the performance review." (Ross 97).

**Response:**

Ms. Ross admits the facts contained in paragraph 74 of the Defendant's Statement of Material Facts.

75.     Five of the six substantive questions in the 360 review ask for feedback on the employees "skills" and the last inquiry is as follows: "Please share some thoughts on what this person could do to become a more successful manager and leader in your organization." (Copies of the 360 reviews produced by Plaintiff are attached to the Cartafalsa Aff. as Ex. 10).

**Response:**

Ms. Ross admits the facts contained in paragraph 75 of the Defendant's Statement of Material Facts.

76.     The 360 review completed by Ms. Buzbee for Ms. Ross reflects some of the same deficiencies raised in the performance review. Cartafalsa Aff. Exs. 9 and 10.

As a first example, Ms. Buzbee's 360 review provides as follows:

*Sonya has sometimes struggled with the loose matrix structure of her job. It's not a unique structure within AP - it's fairly common at this point in time and reflects ongoing changes within AP. Sonya has made some strides at learning to influence people who don't report directly to her - to get the type of coverage that we want. But that remains critical to success in the job. Effective collaboration even when that's hard and not smooth is key.*

Ms. Ross' performance review contains similar comments and provides as follows:

*The structure that Sonya works in - where she has a limited number (in this case, one) direct report but us tasked with guiding the beat (race and ethnicity coverage) work of reporters who do not report to her, is a relatively common structure within AP. Many other managers have similar structures heading beat teams. It requires strong outreach to other managers and editors, to encourage them to promote race and ethnicity coverage, and Sonya must forge those strong editor to editor relationships. She has had success doing this with audio and video managers, but struggled with some other managers. In particular, she frequently argued with other editors on the Trayvon Martin story, insisting they must structure stories the way she*

*wanted. As a longtime manager, we expect Sonya to work collaboratively and productively with a wide range of other editors. She was given that verbal and written feedback at the time. Strong and collaborative relationships with her fellow managers in other locations is critical to making the job productive.*

As a second example, Ms. Buzbee's 360 review provides as follows:

*Sonya is an important mentor to many reporters across the country. In recent months, she has worked with the reporter who reports directly to her in the Washington bureau, and with a handful of reporters in other bureaus, to guide and bring to completion substantial enterprise stories. Sonya has striven in recent months to communicate more effectively with colleagues both inside and outside the WDC bureau. She has worked recently to try to find ways to move toward a useful and productive relationship with a reporter key to her area of coverage, who reports to another editor in another city. She can be an effective and useful help to colleagues and peer editors across the country, helping them to be aware of and pay attention to, the need for race and ethnicity stories. She has sometimes struggled to do this in the loose matrix.*

Ms. Ross' performance review similarly contains similar comments and provides as follows:

*Sonya has struggled to produce a steady and valuable set of race and ethnicity stories - especially enterprise stories - over the last year. This has improved somewhat in recent months, and this is encouraging. In particular, in recent months, Sonya has worked with the reporter who reports directly to her and a handful of reporters in other bureaus (through their editors) to guide and bring to completion enterprise stories on topics such as Hispanics meeting with 3FK, gun violence among minorities, stories looking at Hindus in Congress and a tip passed on about Civil War era promises made to black southern residents- These stories have been along the lines of what is desired, and are encouraging. Sonya has struggled with the structure of her Job in this period, finding it hard to be productive at times. In recent months, she has made progress toward doing productive work within that structure, for example, by finding ways to work with reporters in other bureaus, with the agreement of their news editors. That is encouraging. Sonya should continue her outreach to reporters and editors, increasing her network within the company so as to best forge productive coverage of race and ethnicity issues.*

**Response:**

Ms. Ross admits the facts contained in paragraph 76 of the Defendant's Statement of

Material Facts to the extent it accurately states the text of Buzbee's comments.

77.     The 2012 performance review is consistent with many of her prior reviews issued by different managers throughout prior years of her career. (See, Cartafalsa Aff. Ex. 11).

**Response:**

Ms. Ross *denies* the facts contained in paragraph 77 of the Defendant's Statement of

Material Facts. As an initial matter, Defendant does not articulate how the FY 2005 performance

review is consistent with Ms. Ross's 2012 review. Moreover, in her FY 2005 review, Ms. Ross

did not receive a "Below Expectations" rating on *any* performance category, received

"Outstanding" ratings in two categories and "Above Expectations" in five categories. Ex. 11. In

her 2012 performance review, Ms. Ross did not earn a single "Outstanding" rating, awarded only

one "Above Expectations" rating, and was subjected to six below expectations ratings. ECF 22-2

at 149-165.

78.     In the twelve specific categories in the 2013 performance review, AP rated Ms.
Ross as "meets expectations" in six (6) categories; as "met some but not all expectations" in five
(5) categories; and "above expectations" in one (1) category. The 2013 performance review also
acknowledges positive aspects of Ms. Ross' performance, including an "encouraging" recent
"improvement" and "progress." Cartafalsa Ex. 9.

**Response:**

Ms. Ross admits the facts contained in paragraph 78 of the Defendant's Statement of

Material Facts to the extent Ms. Ross again received no "Outstanding" ratings for 2012. Id.

79.     Ms. Ross was not solely responsible for editing every AP article on race and
ethnicity. (Ross 42).

**Response:**

Ms. Ross admits the facts contained in paragraph 79 of the Defendant's Statement of

Material Facts.

80.     Ms. Ross did not notice, and did not notify the AP that she had not been given her
2010 raise until 2012. At such time AP quickly remedied the oversight. (Ross 175).

**Response:**

Ms. Ross admits the facts contained in paragraph 80 of the Defendant's Statement of

Material Facts to the extent she discovered she was not actually receiving her purported raise.

Ms. Ross denies the averment to the extent AP first objected and required her to establish that the

raise had been approved "in writing." Ex. A at 166-167; 174-176.

81.    Other beat editor's, like Ms. Ross, could reach out across the AP for assistance from reporters or others. Ms. Buzbee's comments in the above-referenced performance review is instructive: "The structure that Sonya works in where she has a limited number (in this case, one) direct report but is tasked with guiding the beat (race and ethnicity coverage) work of reporters who do not report to her, is a relatively common structure within AP." Cartafalsa Aff. Ex. 9

**Response:**

Ms. Ross *denies* the facts contained in paragraph 81 of the Defendant's Statement of Material Facts to the extent, like other African-American employees, she experienced resistance from her peers to relating to the use of their reporters for race and ethnicity coverage and Ms. Ross complained bitterly about it to Ms. Buzbee. Ex A at 86-88, 99-103, 214, 216.

## COUNTER-STATEMENT OF MATERIAL FACTS IN DISPUTE

1.    In about 1983, the Associated Press created a hiring program pursuant to a federal Consent Decree designed to ameliorate systemic discrimination in the hiring and retention of African-American and women employees. Complt ¶ 6.

2.    Since that time, AP has made strides in the hiring and retention of white woman employees.

3.    The hiring and retention of African-American employees at AP has lagged, if not regressed. By 2018, there are only two African-American reporters in Washington. Ex. A at 60.

4.    The 1983 Consent Decree led to the hiring of Sonya Ross as an Atlanta-based intern in 1986. Ex. A at 37-38. Soon after, Ms. Ross was hired as a full-time reporter. Id.

5.    In 1992, Ms. Ross was transferred to the Washington Bureau and assigned to the Civil Rights/Urban Affairs beat. Ex. A at 38.

6.    In 1995, Ms. Ross was assigned to cover the White House. Ex. A at 42.

7.    In 1999, Ms. Ross was the first African-American woman elected to the board of the White House Correspondence Association. Ex. A at 43.

8.      Among Ms. Ross's colleagues on the White House team was Ron Fournier, a white male. Ex. A at 159-160

9.      Initially, Ms. Ross and Fournier were contemporaries and colleagues on the White House beat. Id.

10.     By 2001, Fournier had been elevated to lead White House correspondent. Ms. Ross had been prevented from an opportunity to compete for it because of the lack of posting for the position. Id.

11.     Fournier promptly created a hostile climate for Ms. Ross, and during his tenure as White House Correspondent and throughout his career at AP developed a richly-deserved reputation relating to his general temperament, as well as his particular interaction with African-American women. Ex. C at 26-27.

12.     Ms. Ross recalled Fournier's particular abuse of her. Ex. A at 105-118.

13.     Another instance of Fournier's abuse of his black female colleagues was his treatment of Montrese Garner-Sampson. Ex C at 30-31, 49-50.

14.     Ms. Garner-Sampson recalled soon after his arrival at AP, Fournier and reporting to her that he had thought she was "a real bitch." Id.

15.     Jessica Bruce acknowledged that Fournier did not like Garner-Sampson "at all." Ex. B at 88.

16.     Later, when Fournier was the Washington Bureau Chief and not in Garner-Sampson's supervisory chain, approached Garner-Sampson's office, raised his voice and demanded that she do something that she disagreed with. Ex. C at 29-33, 37-39, 50-51.

17.     Fournier berated Garner-Sampson and proceeded to "remind me who he was. . . [and] that I worked for him." When Fournier refused Garner-Sampson's demand that he leave her office, she told him she would have him "escorted" out if he continued to refuse. Ex. B at 43,

48-49; Ex. C at 29-33, 37-39, 50-51.

18.     During the Presidential administration of George W. Bush, Fournier exposed his political bias by communicating with then-presidential assistant Karl Rove on how to handle the media regarding topics potentially adverse to the administration.

19.     In September 2001, Fournier abruptly changed a travel rotation so that Ms. Ross would be required to travel with President Bush to Florida for what was considered a "crappy" assignment to Florida instead a highly regarded trip to the United Nations.

20.     As a result, Ms. Ross was with President Bush as the attacks on September 11, 2001, unfolded and was one of only five journalists that traveled with the president on Air Force One as he was being evacuated to safety under procedures established during the Cold War. This was the first ever activation of the so-called "nuclear bunker pool." Complaint, paragraph 10.

21.     Ms. Ross was told by colleagues that Fournier was deeply resentful of her for having this distinction. Ex. A at 246-247.

22.     After that professional success, Fournier undercut Ms. Ross in many ways. Ms. Ross complained to their editor, and Fournier was sent to "sensitivity training."

23.      In 2002, Ms. Ross sought refuge from Fournier's supervision, eventually seeking and receiving a promotion in June 2002 from then-Washington bureau chief Sandy Johnson, a white woman, to supervisor of AP's World Services desk in Washington. Ex. A at 82-83.

24.     In 2004, Ms. Ross was promoted by Sandy Johnson to the position of regional news editor, supervising a team of 13 Washington-based reporters. Ex. A at 82-83.

25.     In an effort to respond to concerns about the diversity of AP's news room, or lack thereof, surrounding African-American journalists, in 2007 AP commissioned an investigation and strategic plan report. Ex. C at 30, 34-36; Leading Edge Report, incorporated herein as Exhibit "D."

26.     The report submitted in August 2007 found that AP was underperforming in underperforming in recruitment and diversity efforts in part because hiring managers failed to maintain their own networks of internal and external candidates or personal relationships with diverse candidates. Ex. D at Bates 612-613.

27.     The report found that the hiring process did not systemically minimize bias and that minority employees not used in the screening or assessment candidates. Ex. D at Bates 619.

28.     The hiring of diverse candidates not seen as fundamental to success at AP by its managers. Ex. D at Bates 618.

29.     AP was not a diversity leader. Ex. D at Bates 619

30.     The report concluded that while AP had improved gender diversity in senior positions, it had regressed in the numbers of African-Americans and other people of color, with all key decision and policy makers being white. Ex. D at Bates 618.

31.     Accordingly, the report writers recommended that AP create a diversity "czar" with a "highly skilled," "credible," and "respected high-ranking AP manager" placed into the position. 6 Ex. D at Bates 614, 621.

32.     Finally, the report admonished AP to act "aggressively" to get minorities into key management and bureau chief rolls. Id.

33.     Although the report specifically addressed AP's efforts in recruiting and retaining "people of color," as opposed to white women in leadership positions, in the news room, Sarah Nordgren, a white woman, was name-selected for the position. Ex. B at 31-35.

34.     Nordgren had been a manager running state news at the time, and had no experience in staffing and diversity. Ex. B at 32-33, 42-43.

35.     Indeed, at the time, AP had a director of staffing and diversity, Dianne Parker, a black woman, who was not tasked in any manner to lead the effort. Ex. B at 43-44.

36.     AP also had an African-American employee, Robert Naylor, in the position of Director of Career Development who was specifically tasked with developing advancement opportunities for AP staff. Ex. B at 68; Letter from Robert Naylor, incorporated herein as Exhibit "F"; Affidavit of Robert Naylor, incorporated herein as Exhibit "X" at paragraphs 6-8.

37.     Naylor was not interviewed for the position Nordgren was placed in. Id. at paragraphs 15-16.

38.      At around the same time of the Leading Edge report, Bruce began to hear complaints from Ms. Ross about her career advancement. Ex. B at 61-62.

39.     For her part, Ms. Ross was aggressive in recommending qualified African-American candidates for employment with AP after the reports release. Emails from Sonya Ross, incorporated herein as Exhibit "E."

40.     Not one of Ms. Ross's recommendations were hired, and Ms. Ross expressed the same concerns that were discovered in the Leading Edge investigation of a culture of systemic "confirmation bias" exhibited by Nordgren and other hiring managers. Id.

41.     In 2008, Sandy Johnson was replaced as Washington Bureau Chief by Ron Fournier who had left AP and was returning from a short and unsuccessful stint at an internet startup and despite his well-earned history of intemperate behavior and political bias that made him particularly unsuited for this management role. Ex. A at 230-231.

42.     Ms. Ross did not apply for that position since she assumed she would get it. Ex. A at 161-162.

43.     Ms. Ross believed she was more qualified because of her management experience, even temperament and lack of political bias. Ex. A at 162-163, 230-231; Ex. B at 39, 40-41, 48.

44.     By that promotion, Fournier served as Ms. Ross's immediate supervisor, and he

began to single Ms. Ross out for unwarranted criticism and harsh verbal abuse, pulled her from the team of editors being sent to the Democratic National Convention during the year Barack Obama, the first African-American major-party candidate for president was nominated, and yelled at in front of her subordinate. Ex. A at 105-112.

45.     Indeed, Fournier was a well-known "jerk," and Kathleen Carroll, AP's CEO, expressed concern that "he seemed to feel more free being a jerk with women than with men." Ex. B at 49.

46.     Ms. Ross again complained about Fournier's treatment to Human Resources that Fournier was singling her out because of her race and gender, and an internal investigation was launched into Fournier's conduct. Ex. B at 39-40, 46-48.

47.     Fournier was counseled by Mike Oreskes, the then Managing Editor of AP. Ex. B at 49. Oreskes, however, was himself the subject of at least one complaint of unwanted sexual advances toward a female employee while at AP. Ex. B at 53-54.[1]

48.     Later that year in 2008, the position of Assistant Bureau Chief became open, and Ms. Ross applied. Ex. A at 137-140.

49.     When Ms. Ross reached out to Fournier, who was the interviewing official, when he had planned to interview her, Fournier later summoned her to his office without notice for a 15 minute "interview" and asked her questions relevant to an operations position to which she had not applied. Id.

50.     A white woman from outside of AP was hired. Ex. A at 84.

---

[1] After his employment separation, AP received at least one other complaint from a female employee about unwanted sexual advances by Michael Oreskes. Ex. B at 53-54. Oreskes's professional career ended in disgrace after numerous serious and credible allegations of sexual harassment surfaced while he was later employed at National Public Radio. Ex. B at 52-53; Article, incorporated herein as Exhibit "T."

51.     Ms. Ross was substantially more qualified for the position than the selectee because she had wire service, print publication and enterprise rewriting experience while the selectee's experience was limited to broadcast news. Ex. A at 84-85.

52.     By 2009, it had been five years since Ms. Ross had received a promotion, including promotions to more mainstream senior management positions, such as the assistant bureau chief position that she applied for in 2008, and felt her career languishing. Ex. A at 81-84, 90-91, 106.

53.     Accordingly, Ms. Ross presented a proposal for a new work role to Oreskes and suggested AP create an editing role focused on generating special coverage of racial and ethnic-oriented news – coverage that would increase in demand because the country was undergoing a major demographic shift – that AP could then sell as an independent news product.  Ex. B at 62.

54.     Oreskes agreed to create the role of Race & Ethnicity Editor for Ms. Ross and had Ms. Ross write a job description. Ex. A at 82-83.

55.     The job description was then handed to Fournier and Nordgren, who removed the significant management duties (such as oversee reporters and generate custom content) and watered the position down to essentially a writer's job. Id.

56.     Indeed, as rewritten, the newly created job would have amounted to a demotion as it diminished her editorial duties, and Ms. Ross rejected their rewrite. Ex. A at 82-83; Ex. V at paragraph 10.

57.     In early 2010, Robert Naylor warned then-CEO Tom Curley that black employees at AP were experiencing significant problems with discrimination and the hiring, retention and upward mobility of African-American employees. Ex. B at 64-65, 101-102; Ex. C at 42-44; Ex. F.

58.     That report identified Ms. Ross and two other African-American employees,

Delores Barclay and Andrew Frasier as examples of these ongoing issues and their matters were added to the investigation. Ex. B at 101-102; Ex. F.

59.     Naylor also complained that his role in career advancement had been hamstrung and expressed concern that he had not been interviewed for the diversity position given to Nordgren. Id.

60.     During this period, Mr. Naylor was also recommending experienced and qualified African-American journalists for open AP positions. Ex. X at paragraph 8.

61.     Not one of his recommended candidates were hired. Id. at paragraphs 8-9.

62.     AP's investigation into Naylor's letter acknowledged the "obvious." Ex. F.

63.     In the three two years since the Leading Edge report and the promotion of Nordgren as diversity czar, AP had not resolved its problems with recruiting and retaining African-American journalists. Ex. B at 37.

64.     Naylor felt targeted as a result of his complaint to Curley. Ex. A at 76-77, 133-134; Emails by Robert Naylor to Jessica Bruce, incorporated herein as Exhibit "G"; Ex. X at paragraphs 21, 24, 25.

65.     When Nordgren left the position in about 2010, it was never refilled. Ex. B at 72.

66.     Meanwhile, Ms. Ross's negotiations for the Race & Ethnicity job stagnated. At one point during the negotiations, the job Ms. Ross held at the time, regional news editor, was posted while she still occupied it. Ex. A at 89-90; Ex. B at 72-74.

67.     In March 2010, Ms. Ross gave the latest revisions of the Race & Ethnicity job she envisioned to Nordgren and Fournier. Three weeks later, a job posting surfaced for a director of content development and alliances that was substantially similar to the job description drafted by Ms. Ross. Ex. B at 74; Job Posting, incorporated herein as Exhibit "H."

68.     Ms. Ross applied for the position and was interviewed. Nordgren was ultimately

hired for the job. Ex. A at 92-94; Ex. B at 76-77.

69.     By June 2010, the misconduct issues surrounding Fournier became untenable and Jessica Bruce informed him that if he did not fix his issues, he could not expect any further professional advancement at AP. Ex. B at 51.

70.     The next day Fournier quit and was replaced by Sally Buzbee, a white woman, as the Washington Bureau Chief. Ex. B at 51-52.

71.     In August 2010, AP announced Ms. Ross's "promotion" to as Race & Ethnicity Editor.

72.     Although Ms. Ross had created the position, AP nonetheless posted it and required her to compete for it. Ex. A at 91.

73.     Ms. Ross believed the posting was meant to pressure her into taking the Race & Ethnicity position, "as is." Ex. A at 167-168.

74.     AP gave her no direct reporters, no budget authority for assigning stories, no substantive resources to do the job, and, initially, no increase in pay. Ex. A at 166-167, 190-196.

75.     According to her written job description, the position required Ms. Ross to herself "periodically" write news stories. Position Description, incorporated herein as Exhibit "Y."

76.     When Ms. Ross protested that this was a lateral move and pushed for a pay increase, AP promised her a two percent increase. A white woman, replaced Ms. Ross as regional news editor after Ross took over the Race & Ethnicity job. Ex. A at 89-90.

77.     In 2011, the position of Assistant Washington Bureau Chief became open. The position was not posted and Ms. Ross did not get an opportunity to apply for it. Ex. A at 90, 92.

78.     In January 2011, Wendy Benjaminson, the white woman who had just taken over Ms. Ross's regional news editor position six months' prior, was hired for the position. Id.

79.     Ms. Ross was substantially more qualified for the Assistant Bureau Chief position

since she had had more than six years of experience as a regional news editor in the Washington bureau compared to Ms. Benjaminson's six-month stint. Id.

80.    In the fall of 2011, Ms. Ross learned that AP would undergo an onsite audit from the Labor Department's Office of Federal Contract Compliance. Ms. Ross sought to inform the investigators of the treatment she had been experiencing and those previously documented by Robert Naylor. Ms. Ross managed to get a name for the investigator, Willie Lucas, and called him. Ex. A at 123-129, 195-200.

81.    According to Bruce, the 2011 audit was prompted in response to specific complaints of discrimination against African-American employees in the Washington Bureau. Ex. B at 101-102.

82.    On November 15, 2011, the day of the onsite audit, Mr. Lucas requested an interview with Ms. Ross. Ex. A at 205.

83.    AP Washington Bureau human resources manager, Montrese Garner Sampson, came to the newsroom to get Ms. Ross for the interview. Ex. A at 197-200.

84.    She spoke to Ms. Ross in a manner that conveyed that if Ms. Ross did not keep quiet about the discrimination she had experienced, there would be consequences. Id.

85.    Ms. Ross, nevertheless, provided the investigator with a full report of the instance of discrimination and abuse, as well as the HR manager's attempt to menace her into silence. Id.

86.    Based on her report, Mr. Lucas suggested Ms. Ross file a complaint. Ex. A at 203.

87.    Garner-Sampson was eventually counseled for her interaction with Ms. Ross. Ex. B at 90-91; Ex. C at 73, 83-84, 89.

88.    In January 2012, three senior black news managers were laid off on the same day, including the director of career development Robert Naylor, Delores Barclay and Frazier, three individuals who were specifically named, along with Sonya Ross, in Mr. Naylor's original

internal complaint.[2] Ex. A at 72-73; Ex. X at paragraph 25; Press Release by NABJ, incorporated herein as Exhibit "I."

89.     At least two of those positions were immediately reposted and filled replaced by white females. Ex. A at 73-74, 214-216; Ex. X at ___.

90.     Following her cooperation with OFCCP, AP began to "document" and counsel Ms. Ross for the first time for a variety of purported infractions, including with regarding to a posting on her personal Facebook page and supposed "performance" issues related to the amount and frequency of her won "writing." Email Streams, incorporated herein as Exhibit "L."

91.     Ms. Ross protested that her position description only referred to "periodic" writing and that she had never been provided any guidance that she should write more until early 2012. Ex. A at 86-88,99-103.

92.     On March 5, 2012, Ms. Ross filed a complaint of discrimination based on race and gender and unlawful retaliation with the OFFCP. Complaint, incorporated herein as Exhibit "J."

93     Following her complaint with OFCCP, AP continued to marginalize and subject her to disparate treatment. Ex. A 214-216.

94.     On or about April 26, 2012 Jessica Bruce received a notice from OFCCP of Ms. Ross's filing. Email, dated April 26, 2012, incorporated herein as Exhibit "K."

95.     Thereafter, Ms. Ross was denied any meaningful editing role in the 2012 political conventions. Ex. A at 107-109.

---

[2] In discovery, AP submitted a spreadsheet ostensibly to establish other laid off employees in January 2012. At her deposition, Ms. Bruce testified that the spreadsheet was a list of all AP employees who left in 2012, including those who voluntarily left and she could not identify who from the spreadsheet was actually "laid off" as opposed to separate under other circumstances. Ex. B at 100, 105-106.

96.     Prior to 2013, the last performance review Ms. Ross received was in 2006. Email Stream, incorporated herein as Exhibit "W."

97.     On March 14, 2013, OFCCP contacted AP's counsel and advised him that it would be conducting an "on-site" investigation into Ms. Ross's complaint. Email dated March 14, 2013, incorporated herein as Exhibit "Q."

98.     On or about March 19, 2013, Buzbee and Garner-Sampson began discussing the contents of what would be Ms. Ross's first performance evaluation in over six years. Ex. W.

99.     Garner-Sampson's goal was to present the performance evaluation it to Ms. Ross before the OFCCP on site Meeting. Ex. W at 1.

100.    On March 22, 2013, Buzbee presented what would be Ms. Ross's first negative performance appraisal. Ex. A at 86; Ex. W; ECF 22-2 at 162.

101.    Ms. Ross had never received a poor performance review prior to her complaint to OFFCP. Ex. A at 95-96, 99-100.

102.    On April 5, 2013, OFCCP confirmed that it would be conducting interviews relating to Ms. Ross's complaint between May 7, 2013 and May 10, 2013, and provided a list of witnesses to be interviewed, as well as documents to be produced. Letter, dated April 5, 2013, incorporated herein as Exhibit "S."

103.    Another African-American employee, Earl Hinton, was not already on witness list, but on May 8, 2013, OFCCP requested to speak with him. Ex. B at 84, 109-110; Email from Earl Hinton, incorporated herein as Exhibit "M."

104.    According to Hinton, Ms. Garner-Sampson told him, "Make sure you're not confused [about speaking with OFCCP] because you don't [want] for this to backfire." Ex. C at 60, 74-83; Ex. M.

105.    Mr. Hinton felt that his job would be in jeopardy if he talked to OFCCP. *Id.*

106.    In February 2016, OFCCP concluded its investigation in Ms. Ross's complaint and issued a reasonable cause finding that AP had allowed and tolerated a climate of hostility toward African-American employees generally and that Garner-Sampson had threatened retaliation against Ms. Ross and Earl Hinton for their protected activity. Letter to Tom Curley and Conciliation Agreement, incorporated herein as Exhibit "N."

107.    That same year, the News Media Guild, a domestic news union organization, prepared a study and issued findings regarding the lack of African-Americans in upper management at AP. Ex. B at 111-112; News Guild Findings, incorporated herein as Exhibit "O."

107.    Ms. Ross filed her civil action on May 2, 2016.

108.    Since then, Ms. Ross has been denied promotional opportunities.  The next year, Ms. Ross applied for three jobs at AP: Deputy Managing Editor for U.S. News; Director of Partnerships; and News Editor National Beats. Ms. Ross's application was unsuccessful in each vacancy announcement and all three openings went to white woman. Ex. A at 94-95.

109.    At the time of the filing of her complaint, Ms. Ross was the only African-American news editor in the Washington Bureau *and* the lowest paid news editor. Ex. A at 163; Ex. B at 95-96.

110.    By 2018, AP had just one African-American Bureau Chief and no African-American Assistant Bureau Chiefs. Ex. B at 96-97.

111.    In its 170-year history, The AP has never had an African-American Bureau Chief in Washington or an African-American female lead White House Correspondent. In its domestic U.S. operation, The AP currently has only one African-American Bureau Chief, Kia Breaux, and only four previously: Denise Cabrera, Larry Campbell, Jerry Gray and Robert Naylor. Ex. A at 24; Ex. B at 96-97.

112.    Both Cabrera and Naylor were eventually terminated as a result of a Reduction-in-Force. Ex. B at 96-97.

Respectfully submitted,

CKR LAW, LLP

By:      */s/ Lisa Alexis Jones*
          Lisa Alexis Jones, Esq.
1330 Avenue of the Americas
14th Floor
New York, N.Y.  10019
(212) 259-7300
(212) 259-8200 (Fax)
ljones@ckrlaw.com

Cynthia Goode Works, Esq.
9701 Apollo Drive, Suite 301
Largo, Maryland  20774
(301) 474-5562

*Counsel for Plaintiff*

Dated: August 29, 2018

## CERTIFICATE OF SERVICE

I hereby certify that on the 29th day of August 2018, a true and correct copy of Plaintiff's Statement of Material Facts in Dispute was sent via ECF to:

Joseph B. Cartafalsa, Esq.
Ogletree, Deakins, Nash, Smoak & Stewart, P.C.
599 Lexington Avenue, 17th Floor
New York, NY 10022

/s/ Lisa Alexis Jones
Lisa Alexis Jones, Esq.