

Transcript of **Jessica Bruce**

Friday, March 2, 2018

*Sonya Ross v. The Associated Press*

Alderson Court Reporting
1-800-FOR-DEPO (367-9976)
Info@AldersonReporting.com
www.AldersonReporting.com

Alderson Reference Number: 76680

```
 1    IN THE UNITED STATES DISTRICT COURT

 2    DISTRICT OF COLUMBIA
      ------------------------------------X
 3    SONYA ROSS,

 4              Plaintiff,

 5          -against-

 6          Civil Action No. 16-820-TSC

 7    THE ASSOCIATED PRESS,

 8              Defendant.
      ------------------------------------X
 9
                1745 Broadway
10              New York, New York 10019

11              March 3, 2018
                ^ TIME
12

13          EXAMINATION BEFORE TRIAL of

14    JESSICA BRUCE, a representative of

15    Defendant herein, taken by the

16    Plaintiff, pursuant to Article 31 of the

17    Civil Practice Law & Rules of Testimony,

18    and Notice, held at the above-mentioned

19    time and place, before GAREN FERSTANDIG,

20    a Notary Public of the State of New

21    York.

22

23

24

25
```

Page 2

1  A P P E A R A N C E S
2
3  Lisa Alexis Jones, PLLC
4      Attorney for Plaintiff
       One Rockefeller Plaza, Tenth Floor
5      New York, NY 10020
   BY: LISA ALEXIS JONES, Esq.
6
7
8  OGLETREE DEAKINS
       Attorneys for Defendant
9      1745 Broadway, 22nd Floor
       New York, NY 10019
10 BY: JOSEPH B. CARTAFALSA, Esq.
11 ALSO PRESENT: SOYA ROSS - via
12 teleconference
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 4

1  I N D E X   O F   W I T N E S S E S
2  EXAMINATION BY          PAGE
3  MS. JONES              6
4
5  I N D E X   O F   E X H I B I T S
6  NO.              PAGE
7  1:               9
8  2:               36
9  3:               66
10 4:               73
11 5:               91
12 6:               92
13 7:               92
14 8:               100
15
16
17
18
19
20
21
22
23
24
25

Page 3

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 5

1      STIPULATIONS
2      IT IS HEREBY STIPULATED AND AGREED,
3  by and among counsel for the respective
4  parties hereto, that the filing, sealing
5  and certification of the within
6  deposition shall be and the same are
7  hereby waived;
8      IT IS FURTHER STIPULATED AND AGREED
9  that all objections, except as to form
10 of the question, shall be reserved to
11 the time of the trial;
12     IT IS FURTHER STIPULATED AND AGREED
13 that the within deposition may be signed
14 before any Notary Public with the same
15 force and effect as if signed and sworn
16 to before the Court.
17      *    *    *
18
19
20
21
22
23
24
25

Page 6

1 J E S S I C A   B R U C E, after having
2 first been duly sworn by a Notary Public
3 of the State of New York, was examined
4 and testified as follows:
5 EXAMINATION
6 BY MS. JONES:
7    Q.    State your name for the
8 record, please.
9    A.    Jessica Bruce.
10    Q.    State your address for the
11 record, please.
12    A.    200 Liberty Street, New
13 York, New York 10281.
14    Q.    Good morning.
15    A.    Good morning.
16       MS. JONES:  For the record,
17 the Plaintiff, Ms. Ross, is on the
18 line.  Mr. Catafalsa, I don't know
19 if you want to discuss some of the
20 usual rules for the New York
21 depositions.
22       MR. CARTAFALSA:  Sure.  Ms.
23 Ross, we ask if you're on the line
24 we have a court reporter here, so
25 we ask that you don't record this

Page 7

1 deposition or the call, please.
2 Also, there should be no one else
3 in the room present while you're
4 there.  If it's on speaker or
5 others can overhear, we wouldn't
6 want any of that if that's okay
7 with you?  Can you hear?
8       MS. JONES:  She has muted the
9 line.
10       MS. ROSS:  Yes, that's fine.
11       MS. JONES:  For the record, I
12 have advised her of those
13 admonishments as well.
14       MR. CARTAFALSA:  We'll go
15 over the rules of confidentiality
16 and the like.  If there's any
17 testimony or documents involving
18 employees other than Ms. Ross, we
19 are going to ask that they be kept
20 confidential if there's a motion in
21 this case or this deposition and
22 used only for the purposes of the
23 lawsuit.
24       MS. JONES:  Absolutely, no
25 objection to that.

Page 8

1    Q.    Once again, Ms. Bruce, good
2 morning.  My name is -- I think you
3 know is Lisa Alexis Jones, I
4 represent Ms. Ross in a pending
5 matter against the Associated Press
6 and we are here today to take your
7 deposition.
8       A couple of just general
9 guidelines that Mr. Catafalsa has
10 probably gone over with you, but I
11 would like to reiterate them on the
12 record.  And the first one is it's
13 important for you to answer questions
14 if there's a yes or no to the
15 question to say yes or no as opposed
16 to uh uh or uh huh or nodding or
17 shaking your head.  It's going to be
18 important for you to allow me to
19 finishing asking my question before
20 you answer the question.  I will
21 endeavor to allow you to finish
22 answering the question before I start
23 asking you another one.  I would like
24 to go about an hour and a half
25 between breaks, I don't anticipate

Page 9

1 being here hours and hours, but
2 generally speaking, if you need a
3 break, just feel free to tell us.
4 The only admonishment is if there's a
5 question pending, I'm going to
6 require that you answer the question
7 before we take the break, unless
8 there's some issue regarding
9 privilege that you might need to
10 speak with counsel about.
11    A.    I understand.
12    Q.    Remember to keep your voice
13 up.  We are not necessarily in a
14 rush, so keep it conversational so
15 that the court reporter will be able
16 to get a nice clean record.
17       (Whereupon, Plaintiff's
18 Exhibit One was marked for the
19 purpose of identification.)
20    Q.    Ms. Bruce, if you want to
21 look at that copy, then Mr. Catafalsa
22 will have his copy.
23       Ms. Bruce, have you seen
24 this document before?  The
25    A.    I don't believe so.  The

Page 10

1   front page, the notice of deposition.
2       Q.    Have you been advised that
3   -- or have you been advised that
4   whether or not you have been
5   designated as a corporate
6   representative?
7       A.    Yes, I have.
8       Q.    And you understand that
9   you're here today not just in your
10  personal capacity as a H.R. employee,
11  but on behalf of the corporation as
12  well?
13      A.    Yes, I have.
14      Q.    Do you see on page three of
15  Exhibit One there are a series of
16  topics for deposition one through
17  seven?  Are you familiar with these
18  topics?
19      A.    Familiar with the topics, I
20  guess.  Can you explain -- rephrase
21  that a little bit for me.
22      Q.    Have you seen these -- the
23  topics for deposition noted in
24  Exhibit A?
25      A.    Yes.

Page 11

1       Q.    Are you prepared today to
2   answer questions on any or all of
3   those topics?
4       A.    I should be, yes.
5       Q.    Are there any topics that
6   you are not prepared to answer?
7       A.    Item number six, "identify
8   the name, position, age and gender
9   and race of every individual laid off
10  by the Associated Press."  I don't
11  think I could do that by rogue
12  memory.
13      MS. JONES:  Mr. Catafalsa,
14  unless you have an objection, I
15  tend not to separate out questions
16  that are 30(b)(6) questions versus
17  personal knowledge questions
18  particularly for this particular
19  witness where a lot of this might
20  be in her personal knowledge as
21  well.
22      MR. CARTAFALSA:  That's fine
23  with me, that makes sense.  I note
24  that some of these and for example,
25  with the persons who were laid off

Page 12

1   in that time period.  We had
2   produced documents showing -- and I
3   think the document request people
4   were terminated and left the
5   employment in that time period, but
6   those were produced.
7       MS. JONES:  Yes, they were
8   and I think they were produced in
9   response to interrogatory 15 or
10  document production number 15.
11      MR. CARTAFALSA:  Sounds
12  right, yes, just to make it easier.
13      MS. JONES:  And I'm prepared
14  to do that.
15      Q.    Ms. Bruce other than
16  speaking to counsel and/or reviewing
17  documents directed by counsel for you
18  to review, what, if anything, did you
19  do to prepare for your deposition
20  today?
21      A.    I met with Joe who walked me
22  through what a deposition might be
23  like and prepared for the deposition
24  and that's it.
25      Q.    Have you ever had your

Page 13

1   deposition taken?
2       A.    I have.
3       Q.    And have you had your
4   deposition taken as an employee or
5   representative of the Associated
6   Press?
7       A.    Yes.
8       Q.    About how many times?
9       A.    Twice.
10      Q.    Can you tell me generally
11  the context of each of those prior
12  depositions?
13      A.    One was in the Shepard
14  Fairey case, which was a case where
15  the Associated Press I believe was
16  actually suing someone for misuse of
17  our contact and my role there was to
18  testify or to be deposed on the facts
19  around the employment of one of the
20  creators of the contact.  The other
21  was in a case for a woman named
22  Christine Tash who was I believe
23  alleging discrimination based on
24  disability.  So I was in as a
25  corporate witness.

Page 14

1    Q.    And do you recall how long
2  ago Ms. Tash's case was pending
3  and/or when you took your deposition?
4    A.    I don't specifically recall.
5    Q.    About when?
6    A.    I'm trying to remember.
7  Maybe 2012, '13.
8    Q.    Can you tell me, Ms. Bruce,
9  generally your educational
10  background?  You have graduated from
11  college I take it?
12    A.    Yes, graduated from college.
13    Q.    Where did you graduate from?
14    A.    From Wheaton College in
15  Massachusetts in 1987 and for other
16  formal education went to the Harvard
17  Business School for something called
18  the advanced management program in
19  2012 I believe -- 2010, maybe
20  somewhere in there.
21    Q.    I think it's on your
22  Linkedin page?
23    A.    Yes.
24    Q.    What degree did you receive
25  or what was your major from Wheaton?

Page 15

1    A.    Art history.
2    Q.    When did you first start
3  working for the AP?
4    A.    In 1997.
5    Q.    And what was the position or
6  job that you had right before you
7  first started working for the
8  Associated Press?
9    A.    I was working for News
10  Corporation and a division they had
11  called the News America Publishing
12  Group.  I was the director of
13  employee benefits.
14    Q.    And you said that was News
15  Corp?
16    A.    Yes, News Corporation.
17    Q.    Is that the same corporation
18  that owns Fox News and those
19  affiliates?
20    A.    They have a publishing
21  division and they have a media
22  division.  It was the publishing
23  division.
24    Q.    And how long were you there?
25    A.    Approximately two years.

Page 16

1    Q.    How was it that you started
2  working for the Associated Press?
3    A.    I was recruited out of my
4  position.  The headhunter called,
5  said would I be interested in a new
6  job, I said yes.
7    Q.    What was the position that
8  you were recruited into?
9    A.    Director of employee
10  benefits for the Associated Press.
11        MS. JONES:  Ms. Ross?
12        MS. ROSS:  Yes, I'm here.
13  Sorry, my phone died and I had to
14  change phones.
15    Q.    How long were you in that
16  position as director of employee
17  benefits?
18    A.    I was '97 to probably 1999.
19  I can't remember exactly.
20    Q.    Where did you go after that?
21    A.    My job changed to also
22  encompass employee relations -- this
23  is for the Associated Press, yes.
24  Encompassed employee relations after
25  someone else in the department left.

Page 17

1    Q.    And do you recall who that
2  person?
3    A.    Clotilde Dillon.
4    Q.    Clotilde?
5    A.    C-L-O-T-I-D-E D-I-L-L-O-N.
6    Q.    Did you consider that to be
7  a promotion?
8    A.    It was an addition of
9  responsibilities.  I don't know if I
10  went into the system as it would show
11  a promotion per se.
12    Q.    What would be the difference
13  for the record between you doing
14  employee benefits versus employee
15  relations?  What additional duties
16  did you receive?
17    A.    In addition to the benefits
18  piece, I started working on employee
19  relations usually encompasses some
20  labor relations, performance
21  management, helping managers guide
22  employees through performance issues.
23  Again, labor relations which was
24  participating in labor negotiations.
25  Not running them, but handling

Page 18

1  grievance procedures and grievances
2  from the union for domestic -- it was
3  just for domestic AP employees.
4      Q.    And so you received those
5  additional duties in about 1999?
6      A.    That seems right.
7      Q.    To what extent has your role
8  changed from being the director of
9  employee benefits/employee relations?
10     A.    How much detail would you
11 like?
12     Q.    Well, why don't we start
13 with the titles.  Has your title
14 changed since then?
15     A.    Yes.
16     Q.    What was the next title
17 change that you had?
18     A.    After that I became I
19 believe the deputy director of human
20 resources.
21     Q.    About when was that?
22     A.    Probably a year and a half
23 later, so around 2000.  And then
24 around 2003 I became the director of
25 human resources.  In 2004 I became

Page 19

1  the vice president and while I was
2  still the director of human resources
3  my reporting lines changed to report
4  directly to the CEO and then in 2012
5  I also became responsible for global
6  security.  And actually before that
7  around 2010 or 2011 for a brief
8  period of time I was responsible for
9  mobile startup unit called
10 I-Circular.  We sold that in 2012,
11 then I picked up global security in
12 2012, but the title is still vice
13 president human resources and
14 beginning of 2016 -- wait.
15     Q.    Take your time.
16     A.    2016 or 2017.  I should
17 know, but I can't recall, it's been a
18 whirlwind.  I also became in charge
19 of corporate communications as well
20 as human resources and global
21 security.
22     Q.    And is that your current
23 title and duties?
24     A.    That is my currently title
25 and duties.

Page 20

1      Q.    I know sometimes with my
2  speech patterns it might be finished,
3  but just wait a beat before we move
4  on.
5      A.    Thank you.
6      Q.    Do you recall who hired you?
7      A.    James Donna.
8      Q.    What was his title at the
9  time?
10     A.    Vice president for human
11 resources and secretary to the board
12 of directors.
13     Q.    Was he your supervisor when
14 you first came on board?
15     A.    Yes.
16     Q.    Who was your supervisor by
17 the time you got to be the deputy
18 director of H.R?
19     A.    That was also Jim Donna.
20     Q.    When you became the director
21 of H.R., I believe you testified that
22 you began reporting to the CEO; is
23 that right?
24     A.    I had started working for
25 Jim Donna and then when a became a

Page 21

1  vice president I began reporting
2  directly to the CEO.
3      Q.    And when you first became
4  vice president of human resources,
5  who was the CEO?
6      A.    Tom Curley.
7      Q.    Did there come a time that
8  you no longer reported to Mr. Curley?
9      A.    Yes.
10     Q.    When was that and who did
11 you report to?
12     A.    That was in 2012 when Tom
13 Curley retired and the AP hired Gary
14 Pruitt as the CEO.
15     Q.    Is that one T or two T's?
16     A.    Two.
17     Q.    Does Mr. Pruitt remain the
18 CEO of the AP?
19     A.    Yes.
20     Q.    What is the Associated Press
21 for the record?
22     A.    The Associated Press is a
23 not for profit cooperative that
24 delivers news primarily and other
25 products to American newspapers, to

Page 22

1  all American media sources and many
2  international news entities.  We also
3  have commercial businesses, we have
4  commercial photo sales that extend
5  beyond news.  We have an assignments
6  business so other people can use AP
7  photographers and equipment to cover
8  their own stories internationally and
9  domestically.
10     Q.    And where is it's principal
11  place of business, the Associated
12  Press?
13     A.    We have a headquarters
14  location in New York.  We operate out
15  of more than 130 different locations.
16     Q.    Are those locations,
17  separate locations designated any
18  particular name or all of those
19  bureaus in other words?
20     A.    We often call them bureaus,
21  yes.
22     Q.    And there is a -- is there a
23  New York bureau or a Mid Atlantic
24  bureau?
25     A.    Yes.

Page 23

1     Q.    And is that based in New
2  York or is that based in D.C. or
3  someplace else?
4     A.    There's a New York bureau
5  and there's a Mid Atlantic bureau.
6     Q.    And is there a Washington
7  bureau that's separate from the Mid
8  Atlantic bureau?
9     A.    Yes.
10     Q.    Where is the Mid Atlantic
11  bureau based out of?
12     A.    Today, Washington.  I think
13  for a while it was out of Virginia.
14  I can't recall.
15     Q.    Now, the Associated Press is
16  run by a board of directors, correct?
17     A.    Yes.
18     Q.    And the CEO reports to the
19  board; is that correct?
20     A.    Yes.
21     Q.    And is there a position
22  called the executive director or
23  something along those lines?
24     A.    Not that I'm aware of.
25     Q.    Beneath the CEO there is a

Page 24

1  position denoted as executive editor?
2     A.    Yes.
3     Q.    And what does the executive
4  editor do?
5     A.    The executive editor runs
6  really the AP news division.
7     Q.    What does the CEO do?
8     A.    The CEO runs the company as
9  a whole.
10     Q.    And does the executive
11  editor report to the CEO?
12     A.    Yes.
13     Q.    Is there a position called
14  the managing editor?
15     A.    Yes.
16     Q.    And is that something
17  separate from the executive editor?
18     A.    Actually, I would like to
19  correct it.  I don't believe we have
20  a managing editor position today.
21  There has been generally -- over time
22  there have been managing editors.
23     Q.    And when the AP had a
24  managing editor, what function would
25  that individual do?

Page 25

1     A.    That person reported to the
2  executive editor and Tom ran the
3  day's news stories.
4     Q.    And does the Associated
5  Press have a position denoted as
6  bureau chief?
7     A.    Yes.
8     Q.    And what does that position
9  entail?
10     A.    In the U.S. or overseas?
11     Q.    Let's keep it in the U.S.
12  for now.
13     A.    Those bureau chief positions
14  with a few exceptions are primarily
15  sales jobs now.
16     Q.    Sales jobs?
17     A.    Yes.
18     Q.    And you said currently they
19  are essentially sales jobs?
20     A.    Yes.
21     Q.    And around 2012 or so, what
22  was the nature of the position?
23     A.    In 2012 I believe they were
24  also largely sales jobs with a few
25  exceptions.

Page 26

1    Q.    And when you say "sales,"
2  what do you mean by that?
3    A.    They were responsible for
4  revenue development with local media
5  companies.
6    Q.    And who would the bureau
7  chiefs report to?
8    A.    The bureau chiefs report to
9  the -- today they report to the head
10  of local sales.  They reported to
11  people in the revenue division in the
12  revenue department.
13    Q.    The Associated Press has
14  employees, reporters who report the
15  news every day, correct?
16    A.    Yes.
17    Q.    And the reporters, who do
18  they report to in terms of their
19  supervision?
20    A.    Usually they report to a
21  news editor or some other type of
22  editorial leadership position like a
23  beats editor.
24    Q.    And the news editor, who
25  does the news editor or the beats

Page 27

1  editor report to?
2    A.    It depends on which bureau
3  and which location.
4    Q.    Let's take the Washington
5  bureau.
6    A.    The Washington bureau is one
7  of those where there's an exception
8  where the bureau chief in Washington
9  is actually a news job.
10    Q.    Does the Washington bureau
11  chief also have sales?
12    A.    Very limited.
13    Q.    So in Washington, who would
14  be the salesperson?
15    A.    In Washington there is
16  usually someone else who is
17  dedicated.  They may be a Mid
18  Atlantic bureau chief which would be
19  different than the Washington bureau
20  chief, even if they are in the same
21  location, but the Washington bureau
22  chief is really a very news heavy
23  job.  And in Washington the news
24  editors in Washington would report
25  specifically to the Washington bureau

Page 28

1  chief in Washington, whereas in
2  another bureau the news editors might
3  report to a regional editor instead
4  of the local bureau chief.
5    Q.    And in Washington was there
6  a position denoted as assistant
7  bureau chief?
8    A.    There has been, yes.
9    Q.    Is there currently an
10  assistant bureau chief in Washington?
11    A.    I don't recall.
12    Q.    What would the duties of the
13  assistant bureau chief be?
14    A.    They would range, but would
15  include budgets and budgeting.  They
16  might also include some news coverage
17  and administration.
18    Q.    Of the employees at the
19  Associated Press, which general
20  positions are non-exempt versus
21  exempt employees?  That is which
22  employees are subjected to a
23  collective bargaining agreement and
24  which are not?
25    MR. CARTAFALSA:  Sort of a

Page 29

1  compound question.  I will object,
2  but you can answer.
3    A.    The collective bargaining
4  agreement applies just to editorial
5  staff and to staff that are directly
6  related to producing news for the
7  wire.  So we have non-exempt staff
8  working outside of news and that are
9  also not in the union.  And on the
10  editorial side, on the news side, all
11  of the -- generally, the writers,
12  reporters, photographers, editorial
13  assistants, office assistants, most
14  editorial jobs that are
15  non-managerial jobs are covered by
16  the collective bargaining and
17  therefore eligible for overtime.
18    Q.    By the way, if you don't
19  understand a question, feel free to
20  have me rephrase it or we can have
21  the court reporter read it back.
22    A.    Thank you.
23    MR. CARTAFALSA:  Just to be
24  clear, one of the rules and we are
25  acting under the D.C. rules, but

Page 30

1    we'll go here today.  I'm not going
2    to be waiving objections, I don't
3    want to interrupt things except to
4    form, otherwise all those
5    objections will be reserved for a
6    later day.
7        MS. JONES:  Absolutely.
8        Q.    Ms. Bruce are you familiar
9    with a strategic plan report prepared
10   by an organization called leading
11   edge associates?
12       A.    Yes.
13       Q.    Did the Associated Press
14   commission Leading Edge to prepare
15   that report?
16       A.    Yes.
17       Q.    And why if you recall?
18       A.    It was a long time ago, so I
19   may not remember specifically, but at
20   the time it was an effort to be
21   responsive to concerns expressed by
22   some of the news management team and
23   staff about the diversity of AP's
24   news room and in an effort to try to
25   look for outside expertise to help

Page 31

1    news figure out how to effectively
2    increase the diversity of the news
3    room.
4        Q.    And do you recall reading
5    the report that was generated by
6    Leading Edge?
7        A.    Yes, I have not read it
8    recently, but I recall reading the
9    report.
10       Q.    Sitting here today, do you
11   recall the essence of the findings
12   made by Leading Edge?
13       A.    I remember meeting with
14   Larry Olmsted who is Leading Edge's
15   consultant.  In reviewing them, I'm
16   not sure I recall the specifics of
17   their final recommendation.  I
18   haven't read the report recently.
19       Q.    Do you recall what, if
20   anything, the AP did as a result of
21   receiving this report?
22       A.    The news division created a
23   position dedicated to trying to or
24   assigned someone the responsibility
25   of trying to improve the diversity of

Page 32

1    the news room.  I don't remember much
2    more than that.
3        MS. JONES:  Could you reread
4    that answer?
5        (Whereupon, the requested
6    portion of the transcript was read
7    back.)
8        Q.    Do you recall what the title
9    of the position was?
10       A.    No.
11       Q.    Do you recall who, if
12   anyone, was selected to be in the
13   position?
14       A.    I recall the recommendation
15   from Larry was that we open the
16   position, but he thought from his
17   interviews and conversations that he
18   thought Sarah Nordgren would be good
19   candidate for that position.
20       Q.    For the record, who is Sarah
21   Nordgren?
22       A.    Sarah Nordgren was a manager
23   in the news division who at the time
24   I think was running state news, but I
25   don't recall specifically.

Page 33

1        Q.    How did Mr. Olmsted know
2    that -- how was he familiar with Ms.
3    Nordgren?
4        A.    As I recall as part of his
5    process, he interviewed a lot of the
6    news management team and she would
7    have been part of that news
8    management team.
9        Q.    Did he express to you or
10   articulate the basis for which he
11   thought Ms. Nordgren would be a good
12   fit for that position?
13       A.    During her -- as I recall
14   during her tenure in charge of state
15   news, which is the domestic news
16   bureaus in our different state
17   reports, she actually increased the
18   diversity of our staff specifically
19   in a way that people before her had
20   not.
21       Q.    And in requesting or
22   retaining Leading Edge to perform
23   this investigation and prepare this
24   report, what was the -- do you recall
25   essentially what the nature of the

Page 34

1    complaints about diversity were being
2    made that led to retaining Leading
3    Edge?
4        A.    I had a lot of conversations
5    with different people about diversity
6    at the AP over time.  I'm not sure I
7    can remember specifically which of
8    those conversations led to the hiring
9    of Leading Edge.
10       Q.    Do you recall generally
11   whether the complaints or issues
12   being raised were about the lack of
13   women in the news division or the
14   lack of minorities including African
15   Americans in the news division or
16   some combination of both of those?
17       A.    As I recall it was more
18   specifically targeted at people of
19   color in the news room and AP's lack
20   of diversity in that arena.  AP had
21   more women in leadership positions
22   relatively speaking and fewer people
23   of color in news leadership positions
24   than in news jobs.
25       Q.    So as a result of Mr.

Page 35

1    Olmsted's recommendation, do you
2    recall whether Ms. Nordgren was given
3    that position or at least those
4    duties?
5        A.    Yes, I believe she was given
6    those duties.
7        Q.    Were there any conversations
8    about potentially giving those duties
9    or hiring a person of color to
10   perform those duties?
11       A.    Yes, I don't recall the
12   specifics, but I think there were a
13   lot of discussions about who would be
14   best in that job and other people
15   were interested in the job and who
16   news thought would deliver the
17   results most effectively.
18       Q.    Did AP announce publicly an
19   opening for this particular position?
20       A.    I don't recall.
21       Q.    Did the Associated Press
22   conduct any interviews other than
23   potentially with Ms. Nordgren?
24       A.    I don't recall, I would
25   imagine so.

Page 36

1        Q.    Sitting here today, do you
2    recall when the report was generated?
3        A.    No, sorry, I don't.
4            (Whereupon, Plaintiff's
5        Exhibit Two was marked for the
6        purpose of identification.)
7        Q.    Court reporter's handed you
8    Exhibit Two, Ms. Bruce.
9        A.    Thank you.
10       Q.    Does that refresh your
11   memory?
12       A.    Yes.
13       Q.    As to about when the report
14   was generated and the report was
15   generated about August of 2007?
16       A.    2007, yes.
17       Q.    Ms. Bruce, I'm not going to
18   ask you anymore questions about that.
19           As a result of the report in
20   the either the hiring or putting on
21   Ms. Nordgren's plate a task to
22   increase the diversity of the news
23   room, were there any -- let me ask it
24   this way.  Was Ms. Nordgren given any
25   metrics to which the Associated Press

Page 37

1    wanted her to meet?
2        A.    I don't know if Kathleen
3    Carroll gave her specific metrics to
4    meet.  She had metrics at her
5    disposal, but I don't know that there
6    was a you must hire X by X.
7        Q.    Was there any between 2007
8    and let's say 2010, do you recall
9    whether there was an increase in the
10   hiring or retention of African
11   American employees in the news
12   division?
13       A.    I don't recall specifically.
14       Q.    Do you know who Ron Fournier
15   is?
16       A.    Yes.
17       Q.    Who is Ron Fournier?  Is
18   that how you pronounce it?
19       A.    Fournier, I think so.  Ron
20   was the bureau chief in Washington at
21   one point and a white house reporter
22   before that.
23       Q.    Do you recall when he was
24   hired to be the Washington bureau
25   chief?

Page 38

1    A.    I don't know the date.
2    Q.    But do you recall the
3   process in which he was hired into
4   that position?
5    A.    Yes.
6    Q.    And Mr. Fournier had been
7   the white house correspondent and
8   then had left the Associated Press at
9   some point and then returned as the
10  bureau chief?
11   A.    I don't recall, but he had
12  been the White House correspondent
13  and he was the bureau chief and I
14  don't recall him leaving, but it
15  certainly is possible.
16   Q.    Were you involved in the
17  hiring process for him to be employed
18  in the position of the bureau chief?
19   A.    No.
20   Q.    And who would have been the
21  selecting official the hiring?
22   A.    For the Washington bureau
23  chief?
24   Q.    Yes.
25   A.    The managing editor and the

Page 39

1   executive editor would have been the
2   hiring managers.
3    Q.    Before Mr. Fournier was
4   hired as the Washington bureau chief,
5   had there been any complaints about
6   his temperament by any of his
7   subordinates or co-workers?
8    A.    Yes.
9    Q.    What kind of complaints were
10  expressed?
11   A.    I won't get the specific
12  wording, but Ron was a challenging
13  individual who was abrupt and curt
14  and did not have a good interpersonal
15  demeanor.
16   Q.    By the time -- withdrawn.
17       Had you received any or
18  heard any complaints about Ms. Sonya
19  Ross in particular about his
20  demeanor?
21       MR. CARTAFALSA:  This is
22  before he was bureau chief?
23       MS. JONES:  Before he was
24  bureau chief.
25   A.    I believe so.  I don't

Page 40

1   remember whether I heard directly
2   from Sonya or whether I heard from
3   somebody else, but I seemed to recall
4   there being issues when he was either
5   chief White House correspondent or
6   somewhere in there, but I just
7   remember I think that may have been
8   my first introduction to Ron's
9   challenges.
10   Q.    Did there come a time that
11  you became aware or the AP became
12  aware of some issues involving Mr.
13  Fournier and his relationship to the
14  Bush administration?
15   A.    I had heard employees talk
16  about rumors that he was right
17  leaning, but I didn't receive formal
18  complaints.  There were no formal
19  conversations or anything, it was
20  just chatter.
21   Q.    Are you aware of reports of
22  Mr. Fournier actually communicating
23  with members of the Bush White House
24  on a particular issue -- withdrawn.
25       Let me come back to that, I

Page 41

1   want to get it precisely right.
2    A.    Sure.
3    Q.    Do you recall whether or not
4   Mr. Fournier competed for the
5   position of bureau chief at
6   Washington?
7    A.    I don't recall.
8    Q.    Do you recall that after --
9   at some point after Mr. Fournier was
10  hired as the Washington bureau chief
11  that the assistant bureau chief for
12  Washington position became open and
13  was put out for competition?
14   A.    Yes.
15   Q.    Do you recall -- sitting
16  here today, do you recall who was the
17  assistant bureau chief before?
18   A.    I don't.
19   Q.    Did you have any role in
20  filling that assistant bureau chief
21  position?
22   A.    Not that I recall.
23   Q.    Sitting here today, do you
24  recall who was hired for that
25  position?

Page 42

1    A.    No.
2    Q.    Go back just for a second in
3  terms of the H.R. division.  What is
4  it's formal name?
5    A.    Human resources.
6    Q.    And the head of human
7  resources would be the vice president
8  of human resources?
9    A.    Usually, yes.
10    Q.    And who would be under the
11  vice president?
12    A.    Today or?
13    Q.    Well, around 2010-2012
14  period?
15    A.    At that time I believe I had
16  a global director of employee
17  relations, a director of employee
18  benefits, a director of H.R.I.S.
19  which is human resources information
20  systems, director of international
21  H.R., director of staffing and
22  diversity director of benefits -- did
23  I say that already?
24    Q.    Yes.
25    A.    That's probably it.  I might

Page 43

1  have missed one or two, but that's
2  probably it.
3    Q.    And do you know who Montrese
4  Garner-Sampson is?
5    A.    Sampson, Garner-Sampson.
6    Q.    And who is Ms.
7  Garner-Sampson?
8    A.    She's the local human
9  resources manager for the Washington
10  D.C. bureau in that general area.
11    Q.    In around 2010 to 2012, who
12  would have been the director of
13  staffing and diversity?
14    A.    Dianne Parker.
15    Q.    Did Ms. Nordgren ever have
16  that position?
17    A.    No.
18    Q.    In implementing the Leading
19  Edge recommendations, was there any
20  thought about having the director of
21  staffing and diversity handle those
22  duties specifically as opposed to
23  adding another layer of management to
24  do that?
25    A.    Yes, that was given

Page 44

1  consideration.
2    Q.    Why wasn't it done,
3  implemented in that way?
4    A.    The leaders on the news side
5  felt that it would be taken more
6  seriously if it was run out of news
7  and not seen as a directive pushed
8  onto the news division by outsiders,
9  by another division.
10    Q.    Sitting here today, do you
11  recall what Ms. Parker's race was?
12    A.    She's African American.
13    Q.    Do you know what Ms.
14  Nordgren might consider her race to
15  be?
16    A.    White, Caucasian.
17    Q.    And Ms. Garner-Sampson, do
18  you know what she may consider her
19  race to be?
20    A.    African American.
21    Q.    By the way, what do you
22  consider your race to be?
23    A.    I'm Caucasian.
24    Q.    To the extent that there are
25  different races of humans other than

Page 45

1  the human race?
2    A.    Yes.
3    Q.    And Ms. Garner-Sampson, who
4  would she have reported to?
5    A.    She would have reported to
6  the director of H.R. for news and
7  depending on the year that would have
8  been either Cathy Raines or Jean
9  Maye.
10    Q.    And is that R-A-I-N-E-S?
11    A.    Correct and Cathy with a C.
12    Q.    And Gean, G-E-A-N?
13    A.    J-E-A-N and M-A-Y-E.
14    Q.    Does Ms. Garner-Sampson
15  still work for the Associated Press?
16    A.    Yes, she does.
17    Q.    What is her current
18  position?
19    A.    She's a manager in human
20  resources.  She covers the Washington
21  bureau, but also many of the bureaus
22  on the eastern side of the AP.
23    Q.    And today, who does she
24  report to?
25    A.    She reports to Jean Maye.

Page 46

1    Q.   Sitting here today, do you
2  recall -- going back to Mr. Fournier
3  -- do you recall in addition to the
4  complaints about his temperament, any
5  complaints about violations of Title
6  Seven or any other violations of
7  civil rights laws of the United
8  States?
9    A.   I remember having
10  conversations with Ms. Ross about
11  some of her concerns about Mr.
12  Fournier and kind of those arenas.  I
13  don't think we talked about Title
14  Seven, but we talked about
15  perceptions that he was singling her
16  out potentially because of her race
17  or gender or both.
18    Q.   And do you recall --
19  withdrawn.
20        Was she still working --
21  withdrawn.
22        Not as a result of the
23  complaints, but Ms. Ross was making
24  these complaints because Mr. Fournier
25  was her direct supervisor?

Page 47

1    A.   I believe so, yes.
2    Q.   And do you recall sitting
3  here today what her position was?
4    A.   No, I don't.  She was an
5  editor in Washington.
6    Q.   What, if anything, did you
7  advise Ms. Ross to do as a result of
8  her complaints?
9    A.   I don't recall specifically.
10    Q.   What, if anything, did you
11  do as a result of her complaints?
12    A.   I'm certain that I probably
13  had a conversation with Kathleen
14  Carroll who is the executive editor
15  and depending on whether it was Jean
16  Maye or Cathy Raines would have had a
17  conversation with the news director
18  for H.R. and probably had a
19  conversation with Montrese.  We would
20  have talked about it as an H.R. team.
21    Q.   You used the word "probably"
22  a couple of times.  Do you have a
23  specific recollection of having these
24  conversations or is your testimony
25  that would have been your routine to

Page 48

1  have those conversations?
2    A.   That would have been my
3  routine and I recall having a number
4  of conversations about Ron.  I can't
5  tell you exactly when they happened
6  in relation to my conversations with
7  Sonya.
8    Q.   Other than Ms. Ross, did you
9  receive complaints about Ron relating
10  to either harassment or
11  discrimination by others other than
12  Ms. Ross?
13    A.   I hate getting hung up on
14  technicalities.  Did I receive them?
15  No.  Was I aware of them?  Yes.  Was
16  that the question?
17    Q.   Yes.
18    A.   I had heard other people
19  complain about Ron and I had heard
20  Montrese Garner-Sampson complain
21  herself about Ron.
22    Q.   What did Ms. Garner-Sampson
23  say about Ron Fournier?
24    A.   They got into an argument
25  one day.  I don't remember the topic

Page 49

1  and I don't remember the outcome, but
2  it was a very heated argument and
3  she's very unhappy about it.
4    Q.   And was Mr. Fournier the
5  bureau chief at that time?
6    A.   I believe he was, yes, I'm
7  almost certain.
8    Q.   Other than Montrese and Ms.
9  Ross, do you recall anybody else
10  specifically making a complaint or
11  were you aware of anyone making a
12  complaint?
13    A.   What kind of complaint
14  specifically?
15    Q.   Well, harassment,
16  discrimination.  Anything out of
17  beyond, well, he's just an asshole.
18    A.   That actually helps.  There
19  were a lot of conversations that I
20  had with people about Ron being a
21  jerk, there really were.  Kathleen
22  Carroll expressed concern that he
23  seemed to feel more free being a jerk
24  with women than with men.
25    Q.   Did there come a time that

Page 50

1  Mr. Fournier left the Associated
2  Press?
3      A.    Yes.
4      Q.    Do you recall when that was?
5      A.    No, I don't.
6      Q.    Do you recall why he left?
7      A.    He left for what he
8  considered a promotional opportunity
9  outside of the AP.
10     Q.    Given Ms. Carroll's opinion
11 or take on or perception of how he
12 treated women versus how he treated
13 men, do you recall any type of
14 intervention or plan of action to
15 remediate that issue?
16     A.    Yes.
17     Q.    And what happened?
18     A.    I probably don't have all
19 the details, but I know that Kathleen
20 herself had numerous conversations
21 and counseling sessions with Ron
22 about his behavior and the
23 perceptions of his mistreatment and I
24 believe she assigned Mike Oreskes who
25 was the managing editor to work

Page 51

1  closely with Ron to fix that.
2      Q.    And before he left, was
3  there a perception that he had fixed
4  it or it had gotten better?
5      A.    I can't speak for everyone's
6  perception. Can you be more
7  specific?
8      Q.    As a result of this
9  intervention, were the complaints
10 less forthcoming or about the same?
11     A.    I don't know. I wasn't
12 happy with his performance.
13     Q.    Were there any discussions
14 about that you know of about
15 terminating his employment or
16 demoting him?
17     A.    I had a specific
18 conversation with Ron before he left
19 that he would have no further career
20 progression minimally if he didn't
21 fix his problems.
22     Q.    What was his reaction?
23     A.    He quit. He didn't quit
24 that day, he quit the next day.
25 Clearly he had that job lined up. He

Page 52

1  didn't say I had a terrible
2  conversation with Jessica, I better
3  go get a job.
4      Q.    How did it come about that
5  you had the conversation with him?
6  Sitting here today, do you recall?
7      A.    I don't recall. I was in
8  Washington and I don't know that I
9  went there specifically to have that
10 conversation. I think I just met
11 with him when I was there.
12     Q.    At the time that Mr. Oreskes
13 was tasked with getting Mr. Fournier
14 back on track, do you recall what his
15 position was?
16     A.    What Oreskes's position was?
17     Q.    Yes.
18     A.    Managing editor. I believe
19 it may have been senior managing
20 editor, that was the functional role.
21     Q.    In the last you few months,
22 news reports have been generated
23 about some serious issues regarding
24 Mr. Oreskes's treatment of women
25 while he was at National Public

Page 53

1  Radio. You know those reports?
2      A.    Yes.
3      Q.    Were you aware of any
4  complaints while he was at the
5  Associated Press by women or African
6  Americans about his treatment of
7  them?
8      A.    Yes.
9      Q.    Let's start with his
10 treatment of women. What kinds of
11 complaints were you made aware of?
12     A.    We had one complaint that
13 came through to human resources of
14 it's unwanted e-mail communication.
15 He had started an e-mail
16 communication with someone under the
17 guise -- I say guise, maybe it was
18 honest, I don't know, of chatting and
19 mentoring and he brought that
20 conversation from the AP e-mail
21 system into his personal e-mail and
22 then it started getting overly
23 familiar. Not sexually charged, not
24 racy, but just overly familiar. It
25 made her uncomfortable, she went to a

Page 54

1    -- she was not in news, she was
2    outside of news.  She went to a news
3    manager and said this makes me
4    uncomfortable, the news manager said
5    it should and you should talk to H.R.
6    She came and she talked to H.R., we
7    reviewed the e-mail exchanges, agreed
8    that it was not appropriate, had a
9    conversation with Mike at that time
10   and said you may not do this and that
11   was the last complaint that I'm aware
12   of that we had at that time.
13       Q.    Was that the first and last
14   or just the last?
15       A.    Can you restate the
16   question?
17       Q.    Well, you said that that's
18   the last complaint that you had.
19   Were there more complaints other than
20   this?
21       A.    Not while he was employed
22   with the AP.
23       Q.    At the time Mr. Oreskes was
24   tasked with reining Mr. Fournier in,
25   do you know whether or not H.R. was

Page 55

1    aware of that complaint from that
2    individual?
3        A.    I don't remember the
4    proximity of the two events, I don't
5    recall.  Michelle Ehrlich is the name
6    of the person that had the
7    conversation with Mike about his
8    behavior.  I'm trying to piece
9    together the timeline of when
10   Michelle was here versus Ron.
11       Q.    By the way, what position
12   was Michelle Ehrlich in?
13       A.    She was the director of
14   global director of labor and employee
15   relations and Jean Maye and/or Cathy
16   Raines would have reported to her.
17       Q.    And Ms. Ehrlich reported to
18   you?
19       A.    Yes, we no longer have that
20   position anymore, the global.
21       Q.    Since Mr. Oreskes has left
22   the AP, has H.R. or the Associated
23   Press been made aware of other
24   instances of inappropriate conduct
25   towards women or with women by Mr.

Page 56

1    Oreskes while he was employed by AP?
2        A.    We have received one
3    additional complaint.  Similar what I
4    would call pestering behavior.
5        Q.    How about any complaints
6    from African Americans about Mr.
7    Oreskes?
8        A.    Nothing that came to my
9    attention.
10           MS. JONES:  Why don't we take
11   a five-minute break.
12           (Whereupon, a recess was
13   taken.)
14           MS. JONES:  Mr. Court
15   reporter, could you reread the last
16   question that I asked?
17           (Whereupon, the requested
18   portion of the transcript was read
19   back.)
20       Q.    Go back a couple of steps
21   and ask some more questions about Mr.
22   Fournier.  When he -- after you had
23   that conversation where you told him
24   that he would have no further upward
25   mobility at the AP and then the next

Page 57

1    day he effectively quit, were there
2    any efforts to retain him as a bureau
3    chief after he expressed?
4        A.    Not to my knowledge.
5        Q.    Relief?
6        A.    Yes.
7        Q.    Why?
8        A.    From a human resources
9    perspective, Ron was a problematic
10   leader who created regular problems
11   for us, for human resources.  As a
12   manager, he was very difficult.
13       Q.    To the extent that human
14   resources and Ms. Carroll in
15   particular knew about these issues
16   before he was hired as the bureau
17   chief for Washington, were these
18   issues raised while he was -- at
19   least to some degree while he was the
20   White House correspondent?
21       A.    Yes.
22       Q.    Are you aware of an incident
23   that eventually came to light in
24   which Mr. Fournier was accused of
25   sending Karl Rove an e-mail relating

Page 58

1  to an investigation surrounding Pat
2  Tillman's death?
3      A.    I remember there being a
4  issue with an e-mail that he sent to
5  Karl Rove.  I didn't remember the
6  specifics.
7      Q.    Were you made aware of it --
8  I will ask you and then AP overall --
9  were you made aware of it while Mr.
10  Fournier was still employed by the
11  Associated Press?
12      A.    I don't recall.  I think so,
13  but I don't recall.  I think yes, but
14  I don't remember the exact timing.
15      Q.    You know who Sonya Ross is?
16      A.    Yes.
17      Q.    And do you recall when you
18  first met her?
19      A.    I don't recall when I first
20  met her, no, I don't.
21      Q.    Did you have an awareness of
22  how she came to work for the
23  Associated Press?
24      A.    Sonya had some fans and I
25  heard Diane Parker who worked for me

Page 59

1  is one of Sonya's fans I will call
2  it.  So I heard about Sonya there and
3  I had heard about her favorably from
4  John Wollman who was the long time
5  ago bureau chief as someone he
6  thought very highly of.
7      Q.    But did you know how she
8  came to start working for the
9  Associated Press?
10      A.    I think Diane told me she
11  was an intern at one point.
12      Q.    Did you know or do you know
13  that at some point in I guess the 60s
14  or 1970s that the Associated Press
15  was under some kind of consent decree
16  to open it's doors to more diversity?
17      A.    Yes.
18      Q.    And did you know that Ms.
19  Ross had come in as an intern under
20  that consent decree?
21      A.    Yes.
22      Q.    As a result of the events on
23  September 11th of 2001, Ms. Ross was
24  at the right place at the right time;
25  fair to say?

Page 60

1      A.    Yes.
2      Q.    Meaning she was on the
3  flight with the then President of the
4  United States as he was going and
5  flying around in secure locations?
6      A.    I had heard that, yes.
7      Q.    Do you know whether Ms. Ross
8  applied for the Washington bureau
9  chief position?
10      A.    I don't know whether she
11  did.
12      Q.    Do you know whether she
13  applied for the assistant bureau
14  chief position?
15      A.    I don't recall.
16      Q.    And when she was being
17  supervised by Mr. Fournier, what was
18  her job title?
19      A.    I don't know that I recall.
20  I believe she was -- at one point she
21  was chief White House correspondent.
22  Again, I don't know the timing of
23  that, but I think that may have been
24  her role initially when Ron was
25  there.

Page 61

1      Q.    Did there come a time when
2  she expressed some dissatisfaction
3  about her professional progression at
4  the Associated Press?
5          MR. CARTAFALSA:  Answer
6  verbally.
7          MS. JONES:  I think she's
8  still thinking.
9      A.    When she expressed her -- to
10  me or to just in general to?
11      Q.    Let's take you first.
12      A.    At some point we had a
13  conversation about it, yes.
14      Q.    And sitting here today, do
15  you recall what her issues were or
16  her complaints were?
17      A.    Not specifically.  As I
18  recall, she was looking for
19  advancement opportunities, perfectly
20  appropriate and reasonable and trying
21  to talk about how to get her some of
22  those.
23      Q.    Is it fair to say that by
24  this point the AP was attempting to
25  address some of the concerns that

Page 62

1  were raised by employees and then
2  discussed in the Leading Edge report
3  in terms of increasing diversity and
4  retaining African American employees?
5      A.    I don't recall the timing,
6  but it's likely.
7      Q.    Do you recall a point where
8  Ms. Ross presented the AP with an
9  idea of carving out a particular role
10 for her regarding reporting on
11 ethnicity issues?
12     A.    Yes.
13     Q.    To what extent were you
14 involved in those conversations?
15     A.    Sonya talked to me about
16 that directly at one point, maybe
17 more than one point.  I can't recall,
18 but I think it was more of a
19 counseling conversation question and
20 then it may have been can we move
21 this along question, check-ins
22 periodically to try and get the
23 process moving through I believe it
24 was Mike Oreskes at that time.
25     Q.    And did either you or AP

Page 63

1  generally think it was a good idea,
2  was it a not so good idea?  What was
3  the AP's position?
4      A.    It was probably a difference
5  between AP's position and my
6  position, but me personally, yes, I
7  thought it was a very good idea.  I
8  think the AP thought it was a good
9  idea.  I think it was well received
10 as a concept.  The timing seems
11 right, perhaps even late, so yes.
12     Q.    Had President Obama been
13 elected at this point?
14     A.    Probably even if he hadn't
15 been our conversations about race and
16 ethnicity at the AP predated Obama's
17 election.
18     Q.    Did you and/or the AP
19 believe that Ms. Ross was a good fit
20 for the position or were you thinking
21 about her ideas and potentially
22 competing out to a wider group to
23 fill that position?
24     A.    Personally I thought Sonya
25 was probably well suited for the

Page 64

1  role.  It's difficult for human
2  resources to put roles in place
3  without posting them.  We have job
4  posting requirements.  We need to
5  make sure people have an opportunity
6  to apply for various advancement
7  opportunities or lateral moves, but I
8  think Sonya would have been suited
9  for that role, sure.
10     Q.    Do you know who Robert
11 Naylor is?
12     A.    Yes.
13     Q.    Who is Mr. Naylor?
14     A.    Robert used to be an
15 employee of the Associated Press in a
16 number of different roles.
17     Q.    Do you recall around 2010
18 Mr. Naylor wrote then CEO Tom Curley
19 a letter outlining some issues that
20 were being raised by some of the
21 African American employees?
22     A.    Yes.
23     Q.    And when did you first hear
24 about this Robert Naylor letter if
25 you recall?

Page 65

1      A.    I don't recall.  I don't
2  recall whether I was copied on it or
3  whether Tom Curley sent it to me.
4      Q.    What, if anything, do you
5  recall happening after Mr. Naylor's
6  letter was sent and circulated?
7      A.    I seem to recall Tom saying
8  look into this and I believe I
9  responded to Robert kind of formally.
10     Q.    Did you send something in
11 writing to him?
12     A.    I think it was an e-mail.
13     Q.    When you sent the e-mail,
14 had there been any kind of
15 investigation done or -- withdrawn.
16          What was the nature of the
17 e-mail that you sent Mr. Naylor?
18     A.    As I recall, he made a
19 number of points to Mr. Curley and I
20 tried to address those piece by piece
21 kind of, each one of those.
22     Q.    Prior to addressing Mr.
23 Naylor's letter piece by piece, had
24 you had any -- was any kind of
25 investigation done on the part of

Page 66

1  H.R. to kind of suss out some of
2  those issues?
3     A.   Yes.
4     Q.   And were you in charge of
5  that investigation or who was in
6  charge of that investigation?
7     A.   I don't recall at the time,
8  but our normal practice would be to
9  go and look into each one of the
10  issues that were raised, whether it's
11  Robert's and H.R. would be the one to
12  do that.  That would have been
13  Michelle Ehrlich or Cathy Raines or
14  Jean Maye or Diane Parker if it was
15  related to her kind of department of
16  staffing and diversity.
17     Q.   In performing that
18  investigation, were any interviews of
19  some of the African American
20  employees conducted?
21     A.   I don't recall.
22     (Whereupon, Plaintiff's
23  Exhibit Three was marked for the
24  purpose of identification.)
25     Q.   Ms. Bruce, the court

Page 67

1  reporter has handed you Exhibit
2  Three.  Let me know when you have had
3  an opportunity to review.
4     A.   Sure.
5     Q.   My question is have you seen
6  this particular document before?
7     A.   I'm familiar with much of
8  the content, but I don't know if I
9  have seen this particular document
10  before.
11     Q.   There's some handwriting at
12  the top of it.  Do you know whose
13  handwriting that is?
14     A.   I don't.
15     Q.   Were you involved in any
16  meetings that Ms. Raines might have
17  had with Mr. Naylor about his letter?
18     A.   I wasn't in any of the
19  meetings with Cathy and Robert.
20     Q.   It appears to me that this
21  is Mr. Naylor's original letter that
22  has redlined comments interspersed
23  within the body of the letter.  Is
24  that kind of your take on?
25     A.   That's what it appears to

Page 68

1  look like to me as well.
2     Q.   Do you know who made these
3  comments?
4     A.   No.
5     Q.   Was Mr. Naylor ever
6  considered for the position that Ms.
7  Nordgren took in relation to the
8  diversity issues recommended by
9  Leading Edge?
10     A.   I believe so, yes.
11     Q.   Do you know who made the
12  decision to place Ms. Nordgren in
13  that position?
14     A.   I don't recall specifically,
15  but it would have been a news
16  executive.
17     Q.   A news executive like Ms.
18  Carroll?
19     A.   Yes.
20     Q.   And just for the record
21  because I'm not sure that the record
22  is clear, do you recall whether there
23  were interviews conducted for that
24  position?
25     A.   I don't recall if there

Page 69

1  were.  I would imagine that there
2  would have been.  It would have been
3  regular process I believe.
4     Q.   Sitting here today, do you
5  recall what Mr. Naylor's position was
6  at around the time that you were
7  implementing the Leading Edge
8  recommendations?
9     A.   I don't recall the title
10  specifically.  He was working in news
11  for Kathleen Carroll I believe as the
12  executive editor focused on I believe
13  career development in news.
14     Q.   Do you recall his title
15  being the director of career
16  development?
17     A.   That sounds right.
18     Q.   What would the director of
19  career development do?
20     A.   Robert wrote his own job
21  description as I recall, but I don't
22  recall the specifics.  I believe he
23  was in charge of editorial training
24  for news and I believe he was just
25  trying to find career paths and

Page 70

1  advancement opportunities for people
2  within news.
3     Q.    Sitting here today, do you
4  recall what you expressed to Mr.
5  Naylor in your e-mail to him about
6  his letter?
7     A.    I don't recall the details.
8  I believe I disagreed with him or
9  stated on the record for the AP that
10  we did not agree with some of his
11  points.
12     Q.    Did the AP agree with some
13  of them?
14     A.    I don't recall.
15     Q.    Other than this
16  investigation or other than the
17  investigation that you testified that
18  Ms. Maye and Ms. Raines might have
19  been involved in and obviously the
20  conversations that Ms. Raines had
21  with Mr. Naylor, what, if anything,
22  did the AP do with Mr. Naylor's
23  complaints?
24     A.    I'm not sure I understand
25  the question.

Page 71

1     Q.    Was there any task force
2  formed or any effort to make any
3  recommendations to possibly remediate
4  some of the issues that he raised?
5     A.    There was no task force
6  formed.  Certainly it let us know, I
7  can't speak for every manager, but he
8  let me at human resources know and
9  Tom Curley know and Kathleen Carroll
10  know that there was still concerns
11  not just by Robert.  Well, he wrote
12  the note.  He made it clear he was
13  not speaking for himself about the
14  perception of mobility for African
15  Americans most specifically, but a
16  diverse work force in general in
17  news.  So I think minimally it made
18  sure it stayed on everyone's A list
19  so to speak.
20     Q.    Was Ms. Nordgren brought
21  into this conversation if you recall?
22     A.    I don't recall.  I don't
23  recall if she was still on that role
24  at that time or not.
25     Q.    There came a time that she

Page 72

1  moved out of that role?
2     A.    Yes.
3     Q.    Was someone else placed in
4  that role or the role just kind of?
5     A.    I don't recall.
6     Q.    Is there someone at AP
7  performing those duties other than
8  maybe the staffing and diversity
9  director?
10     A.    For advancement for news?
11     Q.    For diversity and retention
12  in the news division?
13     A.    No.
14     Q.    Do you recall while Ms. Ross
15  was developing the race and ethnicity
16  role and having discussions with AP
17  about what that would look like and
18  generally and specifically that her
19  then current position was announced
20  and recruited for while she was still
21  in the position?
22     A.    I remember I think Sonya
23  reaching out and saying what the heck
24  about something around those lines.
25  I don't remember all the specific

Page 73

1  details.  I remember looking into it
2  at the time and I believe I remember
3  coming back and saying it's not what
4  it looks like, but I don't recall
5  much more than that.
6        (Whereupon, Plaintiff's
7     Exhibit Four was marked for the
8     purpose of identification.)
9     Q.    Ms. Bruce, the court
10  reporter has handed you Exhibit Four.
11  Have you seen this document?
12     A.    No, I don't believe I have.
13     Q.    Would you happen to know
14  whose handwriting this is?
15     A.    I don't recognize it.
16     Q.    Thank you, that's all I have
17  for it.
18        Go back to your testimony
19  with regard to this issue about Ms.
20  Ross's position being competed out
21  while she was in at least from her
22  perspective and is it your
23  recollection that I know you told her
24  it doesn't look like it, it's not
25  what it looks like.  Do you have a

Page 74

1   present recollection of what it did
2   look like?
3       A.    It was a long time ago and
4   so not really as I recall -- I mean
5   hard for me to remember.
6       Q.    Let me ask you this, unless
7   you're finished.
8       A.    Go ahead.
9       Q.    Do you recall who eventually
10  became the news editor or was placed
11  in Ms. Ross's position after she
12  became the Race and Ethnicity
13  director?
14      A.    No, I don't recall.
15      Q.    Do you recall an issue that
16  Ms. Ross raised about a job posting
17  for a director of content development
18  alliance being substantially similar
19  to the Race and Ethnicity job that
20  she was developing?
21      A.    I have some recollection
22  about that, yes.
23      Q.    What do you recall about
24  that?
25      A.    I think it was a job outside

Page 75

1   of news on the revenue side.  I think
2   I think it was reporting to Sue
3   Cross, who I don't remember her title
4   at the time, but it was on the
5   revenue side and I remember looking
6   into it.  I don't remember the exact
7   resolution.
8       Q.    I think one of -- my
9   understanding that one of Ms. Ross's
10  issues was that from her perspective
11  in developing this Race and Ethnicity
12  position that a component of it was a
13  commercial side of selling certain
14  content related to the work product
15  that would be generated; do you
16  recall that?
17      A.    As soon as you said it I
18  thought it, I remember that, but I
19  didn't.  I didn't a moment ago.
20  Sonya had a well developed proposal,
21  it wasn't a narrow role.
22      Q.    So the director of content
23  development and alliances, was this a
24  new position?
25      A.    I believe it was, yes.

Page 76

1       Q.    Do you recall how it came to
2   be that this particular position was
3   developed?
4       A.    No, I don't.  It was again,
5   as I recall, it was in Sue Cross'
6   revenue team somewhere, but I don't
7   recall where or when they decided
8   they needed it or why.
9       Q.    Do you recall who eventually
10  got the position?
11      A.    I think Sarah Nordgren did.
12      Q.    Do you know whether or not
13  she still had the diversity issues on
14  her plate when she became the
15  director of content and development?
16      A.    No, she did not.  None of
17  the responsibilities from the news
18  side transferred with her onto the
19  business side.  So Sonya Ross would
20  have been going from a news division
21  job into a business division job and
22  at that time they wanted a bright
23  line separating business and news.
24      Q.    Had Ms. Nordgren ever been
25  on the business side from your

Page 77

1   memory?
2       A.    I don't recall, I don't
3   think so.  From my memory, no, I
4   don't think so.
5       Q.    Who was the hiring official
6   for that position?
7       A.    I don't remember.  Again, it
8   was in Sue Cross' division, but
9   whether it was reporting directly to
10  Sue or reporting to somebody else in
11  that group, it may have been one of
12  Sue's direct reports.
13      Q.    Who is Sally Buzbee?
14      A.    Sally Buzbee is currently
15  the executive editor of the
16  Associated Press.
17      Q.    Do you recall about when Ms.
18  Buzbee became executive editor?
19      A.    About a year ago, year and a
20  quarter ago.
21      Q.    And before then, what was
22  her position; do you recall?
23      A.    She was the Washington
24  bureau chief.
25      Q.    And do you know who Steve

Page 78

1    Camaro is?
2        A.    I believe so.  He used to
3    work for the AP in Washington.  Maybe
4    he was the A.C.O.B., assistant chief
5    of bureau.
6        Q.    And what, if anything, do
7    you recall -- let me ask it this way.
8    Were you involved in any discussions
9    surrounding the terms and conditions
10   of Ms. Ross's going into this Race
11   and Ethnicity position?
12       A.    I don't recall getting into
13   that level of detail conversation.
14   Again, my recollection is my
15   involvement was more trying to speed
16   the process along.
17       Q.    Do you recall whether that
18   position, a position of Race and
19   Ethnicity editor was posted and
20   competed for or was Ms. Ross hired
21   into the position?
22       A.    I don't recall.
23       Q.    What, Ms. Bruce, is the
24   Office of Federal Contract
25   Compliance?

Page 79

1        A.    The O.F.C.C.P?
2        Q.    Yes.
3        A.    The governing arms.  Our
4    government that makes sure we do what
5    we are supposed to do and pays
6    attention to what we are supposed to
7    pay attention.  Post-hire, follow
8    rules of reporting to E.E.O. Title
9    Seven.  They are a compliance arm.
10   I'm not being very eloquent here.
11       Q.    Why is the AP, the
12   Associated Press under the purview of
13   the Department of Labor and the
14   O.F.C.C.P?
15       A.    We are a government
16   contractor.  I'm not sure, they would
17   probably consider us a contractor.
18   They are a significant customer of
19   the Associated Press.
20       Q.    From the time that you first
21   started working for AP to November of
22   2011, do you recall the AP being
23   audited by the Office of Federal
24   Contract Compliance?
25       A.    Yes.

Page 80

1        Q.    I believe you started
2    working for the AP in 1997?
3        A.    Yes.
4        Q.    So from 2011, how many times
5    was the AP audited?
6            MR. CARTAFALSA:  You said
7    2001 or 2011?
8            MS. JONES:  2011.
9        A.    I don't recall.  More than
10   once probably, but I don't recall.
11   There's a difference between a big
12   audit and a small.  Sometimes they
13   just want us to provide some
14   information, we provide information
15   and that's the end of it.  So the
16   audit can expend we are in contact
17   with them on occasion.
18       Q.    Are these audits from your
19   knowledge triggered by any particular
20   complaints or are they random or
21   sometimes a combination.
22       A.    Both can be the answer.  I
23   believe usually they are random and
24   somewhat regular.
25       Q.    When you say "regular,"

Page 81

1    meaning what?
2        A.    I mean probably once a year
3    we have a request for some sort of
4    audit either in some state or some
5    bureau location.  We have a lot of
6    them, so that's what I mean by
7    "regular," as not infrequent.
8        Q.    And in October or November
9    of 2011, the AP was advised that
10   there was going to be an audit --
11       A.    Yes.
12       Q.    -- by the Office of Federal
13   Contract Compliance.
14           Do you know whether that
15   particular audit was the result of
16   any particular complaints made to the
17   Department of Labor or was it just a
18   random annual audit?
19       A.    I believe that one was in
20   response to specific complaints.
21       Q.    And do you know what
22   complaints it was in response to?
23       A.    I don't recall specifically.
24       Q.    Do you know to what extent
25   the Robert Naylor issues were a part

Page 82

1 of what triggered this particular
2 audit?
3     A.    I don't know.  My
4 understanding was that it was
5 specific to complaints in Washington.
6     Q.    And generally how does --
7 what is the process O.F.C.C.P?
8     A.    O.F.C.C.P.
9     Q.    O.F.C.C.P. contacts the AP,
10 says we are coming, you all work out
11 a day, correct?
12     A.    Yes.
13     Q.    And what does O.F.C.C.P. do
14 when they arrive?
15     A.    The point person for all of
16 our dealings with the O.F.C.C.P. is
17 Diane Parker, the director for
18 staffing and diversity who works in
19 H.R. for me.  So whether they want
20 paper, whether want they come in and
21 meet with her, whether they want to
22 meet with other employees, we
23 schedule it and have them come in and
24 tell everybody to be open and honest
25 and it's not a -- we treat it like

Page 83

1 regular business, come on in.  Try
2 and be as prepared as we can, try and
3 have whatever they asked for ready
4 and not make them stand and wait.
5     Q.    Sitting here today, do you
6 recall who the investigator was for
7 this particular audit in 2011?
8     A.    I don't remember his name
9 offhand.  I have heard it a bunch, I
10 just can't remember.
11     Q.    If I told you Willie Lucas?
12     A.    Willie Lucas, it just came
13 to me.
14     Q.    Did Mr. Lucas give AP a list
15 of specific individuals, employees
16 that they wanted to speak to?
17     A.    I believe so, yes.
18     Q.    Was Ms. Ross one of those
19 individuals?
20     A.    I don't think so, I don't
21 recall.  Again, this would have been
22 reported to me after the fact and I
23 was not involved in the scheduling or
24 the setting up of the meeting.
25     Q.    And who would have been

Page 84

1 involved in that?
2     A.    Montrese Garner-Sampson and
3 Diane Parker.
4     Q.    Do you know who Earl Hinton
5 is?
6     A.    An employee of the AP in
7 Washington I think.
8     Q.    Do you recall whether he was
9 on the list by Mr. Lucas to be
10 interviewed?
11     A.    I believe so.
12     Q.    And did you have an
13 awareness of why Mr. Lucas was asking
14 for these particular people?
15     A.    I don't recall.  The
16 assumption is that they had a
17 complaint or an issue.
18     Q.    And so it's fair to say that
19 Mr. Lucas comes in.  Before he comes
20 in, does the Associated Press provide
21 him with any kind of documents that
22 he might have asked for?
23     A.    If they asked for documents
24 in advance and we can provide them,
25 we always do.

Page 85

1     Q.    So the AP sets him up in a
2 conference room?
3     A.    Yes.
4     Q.    And either Ms. Parker or Ms.
5 Garner-Sampson or is it
6 Sampson-Garner?
7     A.    Garner-Sampson.
8     Q.    Will eventually fetch the
9 witnesses as per scheduled?
10     A.    Whenever he says go get this
11 for us, please, we try and go get
12 that for them.
13     Q.    Does a Associated Press
14 employee other than the employee that
15 Mr. Lucas is interviewing sit in on
16 any of those interviews?
17     A.    Not to my knowledge.
18     Q.    Do you know whether he
19 records the interviews?
20     A.    I don't know.
21     Q.    Have you ever been
22 interviewed in the context of one of
23 these audits?
24     A.    No, I have not.
25     (Whereupon, a discussion was

Page 86

1    held off the record.)
2        Q.    When did you first hear that
3    Ms. Ross was expressed concern about
4    some comments that Ms. Garner-Sampson
5    made to her while she was being
6    brought into the interview room?
7        A.    I believe Sonya reached out
8    to me herself, but I probably heard
9    about it from Diane before that.
10       Q.    And had Ms. Ross complained
11   to Ms. Parker?
12       A.    I don't know.
13       Q.    Did you know about this
14   issue before -- withdrawn.
15           Eventually Ms. Ross filed a
16   complaint with the O.F.C.C.P?
17       A.    Yes.
18       Q.    Did you know about this
19   issue before Ms. Ross actually filed
20   and AP received the actual physical
21   complaint?
22       A.    I don't know all of those
23   dates to answer the question.  As I
24   recall, Sonya and I spoke or had an
25   e-mail exchange pretty soon after it

Page 87

1    happened.
2        Q.    And Earl Hinton expressed a
3    similar concern, didn't he?
4        A.    Maybe, I don't recall.
5        Q.    You don't recall any e-mail
6    exchanges between you and Mr. Hinton
7    about some discomfort that he had
8    about comments that Ms.
9    Garner-Sampson made to him?
10       A.    I don't recall, I don't
11   know.
12       Q.    Other than Ms. Ross, have
13   you heard or are you aware of any
14   complaints from any other AP employee
15   about comments made by Ms.
16   Garner-Sampson in relation to the
17   employees' cooperation with either of
18   the O.F.C.C.P. or the E.E.O.C. or any
19   kind of investigative body?
20       A.    No.
21       Q.    Are you aware of any
22   complaints of retaliation other than
23   Ms. Ross, from Ms. Ross about Ms.
24   Garner-Sampson?
25       A.    No.

Page 88

1        Q.    Are you aware of any
2    complaints of discrimination by Ms.
3    Garner-Sampson on or on the part of
4    Ms. Garner-Sampson?
5        A.    No, Ron Fournier didn't like
6    her at all, but I didn't think that
7    was -- I don't think he ever brought
8    up discrimination as one of the
9    issues.
10           (Whereupon, a discussion was
11       held off the record.)
12       Q.    During the course of the
13   audit by O.F.C.C.P. in November of
14   2011, that was the first -- you
15   personally were made aware that Ms.
16   Ross had actually contacted the
17   O.F.C.C.P.; is that fair to say?
18       A.    Yes, I think so.
19       Q.    Were you surprised?
20       A.    No, I wasn't surprised, no.
21       Q.    And were you then surprised
22   when you actually get a physical
23   complaint, a written complaint by Ms.
24   Ross to the O.F.C.C.P?
25       A.    Yes, but people -- we try to

Page 89

1    make sure people know they can talk
2    to whomever they want to whenever
3    they want to talk to people.  And I
4    think people do and it doesn't always
5    result in a formal complaint coming
6    from work.  So, surprised, but not
7    shocked.
8        Q.    So is it your testimony that
9    you had a conversation with Ms. Ross
10   about her interaction with Ms.
11   Garner-Sampson?
12       A.    At some point, yes.
13       Q.    And what was your opinion
14   about the complaint that she lodged?
15       A.    As I understood it, Sonya
16   felt that Montrese had been overly
17   forward in her announcement of Willie
18   Lucas there to see Sonya and what I
19   wanted to make sure Sonya understood
20   is that she can talk to anybody she
21   wants to.  But if Montrese gave her
22   that impression, I wanted to make
23   sure she understood that the
24   Associated Press has no problem with
25   her talking to Willie Lucas or the

Page 90

1 O.F.C.C.P. Everyone has the right to
2 protect themselves in their own
3 interest.
4    Q.   Did you have a conversation
5 with Ms. Garner-Sampson about Ms.
6 Ross's perceptions of her
7 interaction?
8    A.   I talked to Ms.
9 Garner-Sampson's boss, so Montrese.
10    Q.   And who was that?
11    A.   Jean Maye maybe at the time
12 or perhaps it was Michelle Ehrlich
13 and Montrese either worked for Jean
14 who worked for Michelle who worked
15 for me or Jean who worked for Cathy
16 who worked for me.  And just kind of
17 expressed some concerns, whether it
18 happened, whether it didn't, whether
19 it was inadvertent, whether it was
20 intentional, we just can't have
21 people feeling like we have an issue
22 with that.
23    Q.   Did you give Ms.
24 Garner-Sampson's then supervisor any
25 type of direction to either counsel

Page 91

1 her or have a conversation with her?
2    A.   Just to make sure that that
3 doesn't happen again.
4    Q.   Is it your understanding
5 that the supervisor did speak with
6 Ms. Garner-Sampson?
7    A.   Yes.
8    Q.   And sitting here today, you
9 don't know whether you had a similar
10 conversation relating to any
11 complaints that Earl Hinton may have
12 made?
13    A.   I don't recall any.
14        (Whereupon, Plaintiff's
15    Exhibit Five was marked for the
16    purpose of identification.)
17    Q.   Ms. Bruce, the court
18 reporter has handed you Exhibit Five.
19    A.   Yes.
20    Q.   Do you recognize this
21 document?
22    A.   No.
23    Q.   The handwriting at the
24 bottom of it, do you recognize that
25 handwriting?

Page 92

1    A.   I do not.
2    Q.   That's it.
3        (Whereupon, Plaintiff's
4    Exhibit Six was marked for the
5    purpose of identification.)
6    Q.   The court reporter has
7 handed you, Ms. Bruce, Exhibit Six.
8 Do you recognize this document?
9    A.   No, I don't.
10    Q.   There's some handwriting at
11 the top right corner.  Do you
12 recognize that handwriting?
13    A.   No, I do not.
14    Q.   Thank you, that's all.
15        (Whereupon, Plaintiff's
16    Exhibit Seven was marked for the
17    purpose of identification.)
18    Q.   Court reporter has handed
19 you Exhibit Seven, Ms. Bruce.
20    A.   Yes.
21    Q.   Do you recognize this
22 document?
23    A.   No.
24    Q.   Do you recognize the
25 handwriting in it?

Page 93

1    A.   It might be Michelle
2 Ehrlich's.
3    Q.   In this particular document
4 there is a reference to a Lisa Payne?
5    A.   Yes.
6    Q.   Do you see that?
7    A.   Yes.
8    Q.   Do you know who Lisa Payne
9 is?
10    A.   Lisa Payne is an employee of
11 the Associated Press.
12    Q.   What is her position if you
13 know?
14    A.   Right now she is a reporter
15 working with a focus on gun violence
16 I believe.
17    Q.   Was she at any point a
18 direct reportive of Ms. Ross's if you
19 recall?
20    A.   I don't recall.  A direct
21 reportive of Sonya's?
22    Q.   Yes.
23    A.   I don't recall specifically,
24 but she might have been.
25    Q.   Did you ever sit in any

Page 94

1    meetings with Ms. Ross and Sally
2    Buzbee?
3        A.    I don't think so.
4        Q.    Did you ever have any
5    meetings with Ms. Buzbee about Ms.
6    Ross and either her general
7    complaints or her O.F.C.C.P.
8    complaint?
9        A.    I don't recall having any
10   meeting with Sally designated to
11   discuss that, no.
12       Q.    Do you recall in probably
13   the first quarter of 2012 some issues
14   being raised about Ms. Ross's
15   Facebook page and some comments that
16   may have been made on her page?
17       A.    No, I don't recollect that
18   at all.
19           (Whereupon, a recess was
20   taken.)
21       Q.    Good afternoon, Ms. Bruce.
22       A.    Good afternoon.
23       Q.    Let's kind of go to present
24   day and work back a little bit.
25   Within the entirety of the Associated

Page 95

1    Press, are there any -- today, are
2    there any bureau chiefs?
3        A.    Yes.
4        Q.    African American bureau
5    chiefs?
6        A.    Oh, African American.  I
7    don't believe so, no.
8        Q.    Any assistant bureau chiefs?
9        A.    Our assistant bureau chiefs
10   might be limited to Washington now,
11   but the answer is on there.  Sorry,
12   yes, there are a few assistant bureau
13   chiefs.  No, there are no African
14   American bureau chiefs.
15       Q.    In Washington, in the
16   Washington bureau, were there any
17   editors, African American editors
18   that is?
19       A.    Yes.
20       Q.    And who are those?
21       A.    Sonya Ross is one of them
22   and I don't know the other editors in
23   Washington.
24       Q.    How about New York?  Do you
25   know whether there are any African

Page 96

1    American editors?
2        A.    Yes, I believe there are.
3    I'm not sure I can name all of the
4    employees Amanda Barrett runs our
5    nerve center which is a top editorial
6    position.  Nekesa Moody is our
7    entertainment editor and Amanda
8    Barrett is African American and those
9    are the two that come to mind right
10   now.
11       Q.    In about 2012, do you recall
12   other than Ms. Ross who was an editor
13   in the Washington bureau?
14       A.    I'm not particularly
15   familiar with all the editors in the
16   Washington bureau or not to that
17   level of detail.
18       Q.    Do you know whether the
19   Associated Press has ever had an
20   African American bureau chief?
21       A.    Yes.
22       Q.    And how many do you recall
23   sitting here today?
24       A.    Two.
25       Q.    Do you recall who those

Page 97

1    were?
2        A.    The two that I recall, there
3    may have been more, but the two that
4    I recall are Robert Naylor and Denise
5    Cabrera.
6        Q.    And is Mr. Naylor still
7    employed?
8        A.    No, not by the AP.
9        Q.    Do you recall what his last
10   position was?
11       A.    I believe his last position
12   was the director of career
13   advancement for news.
14       Q.    And how about Ms. Cabrera,
15   is she still employed with AP?
16       A.    She's not.
17       Q.    Do you recall about when she
18   left?
19       A.    I don't.  She left as part
20   of a reduction of force.  I can't
21   remember the exact date.
22       Q.    Do you recall what her last
23   position was?
24       A.    I believe she was bureau
25   chief for Baltimore.

Page 98

1    Q.    Sitting here today, do you
2  recall the circumstances of Mr.
3  Naylor's being transitioned out of
4  the role of bureau chief?
5    A.    Hold on, I need to think.
6  He was bureau chief in Mississippi,
7  he was then bureau chief in Albany
8  and I believe he asked to be
9  transferred out of Albany into a
10 different role or to be made aware
11 there are opportunities for him
12 outside of being bureau chief in
13 Albany and I believe the first spot
14 that he got was called something like
15 director of news strategy, but I may
16 have that wrong.
17   Q.    Do you recall about when Mr.
18 Curley decided to retire in leaving
19 the AP?
20   A.    I believe he left in July of
21 2012.
22   Q.    But he had announced before
23 he actually left; is that fair to
24 say?
25   A.    Yes.

Page 99

1    Q.    But before he left there was
2  a reduction in force; do you recall
3  that in 2012?
4    A.    Yes, we have had a few over
5  the last five or six years, but I do
6  recall there was one before he left,
7  yes.
8    Q.    And why was there this
9  reduction in force in early 2012
10 right before Mr. Curley left?
11   A.    The circumstances for that
12 reduction in force I don't believe
13 were any different for they had been
14 for others.  Significantly declining
15 revenues and a need to significantly
16 reduce operating expenses.
17   Q.    Were you part of or involved
18 in decisions surrounding who would be
19 part of that reduction of force?
20   A.    Yes.
21   Q.    And who was the ultimate
22 decision maker in terms of exactly
23 who would be part of the reduction of
24 force?
25   A.    The head of the division.

Page 100

1  So if it's for news it would be the
2  executive editor, if it's for
3  technology it would be the chief
4  information officer.  That kind of
5  thing.
6    Q.    And so in 2012, who was head
7  of the news division?
8    A.    Kathleen Carroll.
9    Q.    And Mr. Naylor's position as
10 director of career development, would
11 that have come under the news
12 division?
13   A.    Yes.
14       (Whereupon, Plaintiff's
15    Exhibit Eight was marked for the
16    purpose of identification.)
17   Q.    The court reporter has
18 handed you Exhibit Eight.  Do you
19 recognize this document, Ms. Bruce?
20   A.    Yes, I do.
21   Q.    Did you assist in the
22 preparation of it?
23   A.    Yes, it was in preparation
24 for today's deposition.
25   Q.    Did you assist in the

Page 101

1  preparation of the actual document?
2    A.    No, I did not.
3    Q.    What is this document, what
4  is your understanding?
5    A.    My understanding is that
6  this is a list of everyone who left
7  the company during a set period of
8  time in 2012.
9    Q.    And sitting here today, do
10 you recall what period of time this
11 references in 2012?  Is it the
12 entirety of 2012 or in particular the
13 reduction in force that took place in
14 the first quarter of 2012?
15   A.    My understanding is it's the
16 first quarter of 2012.
17   Q.    Do you know who prepared
18 this document?
19   A.    Not offhand.
20   Q.    We know in about March of
21 2010 Mr. Naylor had raised questions
22 in his letter to Tom Curley about the
23 recruitment and retention and
24 treatment of African American
25 employees.  By November of 2011 there

Page 102

1   were an audit that raised questions
2   about the recruitment and retention
3   of African American employees.
4       A.   Yes.
5       Q.   And that audit wasn't
6   necessarily a part of a routine audit
7   as much as in reaction to some
8   complaints that the Department of
9   Labor had received from the
10  Associated Press; is that fair to
11  say?
12      A.   I think so, yes.
13      Q.   We know that in Mr. Naylor's
14  letter he raised questions regarding
15  the treatment of not just African
16  Americans in general, but specific
17  individuals?
18      A.   Yes.
19      Q.   And that included Ms.
20  Barclay, Dolores Barclay?
21      A.   Yes.
22      Q.   Do you recall that it also
23  included Andrew Frasier?
24      A.   Yes.
25      Q.   And it included Ms. Ross?

Page 103

1       A.   Yes.
2       Q.   Had -- other than the letter
3   to Mr. Curley, had Mr. Naylor filed a
4   complaint with the Equal Employment
5   Opportunity Commission or the Office
6   of Federal Contract Compliance?
7       A.   Not that I'm aware of.
8       Q.   Had he ever filed a lawsuit?
9       A.   Not to my knowledge.
10      Q.   Had Ms. Barclay ever filed a
11  complaint other than what was in the
12  letter to Mr. Curley filed a
13  complaint with the E.E.O.C. or the
14  Office of Federal Contract
15  Compliance?
16      A.   Not that I'm aware of.
17      Q.   How about Mr. Frasier?  Had
18  he filed a complaint with the
19  E.E.O.C. or the Office of Federal
20  Contract Compliance?
21      A.   Not that I'm aware of.
22      Q.   Do you recall the date that
23  the first quarter 2012 layoffs were
24  announced to the laid off employees?
25      A.   No, I don't.

Page 104

1       Q.   Do you recall whether you
2   had received or AP had received Ms.
3   Ross's complaint with the Office of
4   Federal Contract Compliance at the
5   time that it was announced that these
6   layoffs would occur?
7       A.   I don't remember.
8       Q.   In this particular layoff, a
9   reduction in force, do you recall
10  whether or to the extent that whole
11  bureaus or offices were actually shut
12  down as a result of the riff?
13      A.   I don't recall shutting down
14  a bureau as part of this riff, but
15  there were consolidations that
16  happened.  So I don't know that there
17  was a closure.  There was a lot of
18  moving parts.
19      Q.   I noticed in this exhibit,
20  Exhibit Eight, that a number of --
21  we'll start with Arizona.  A number
22  of positions were reduced in the
23  State of Arizona.  Does that refresh
24  your memory as to whether there was
25  some consolidation in Arizona in

Page 105

1   particular?
2       A.   No.
3       Q.   Ms. Barclay was the arts and
4   entertainment editor as it's
5   enumerated in this exhibit; do you
6   see that?
7       A.   Yes.
8       Q.   Reviewing this document,
9   were any other New York based editors
10  riffed as a result?
11      A.   Hold on I would have to
12  review the document.
13      Q.   Take your time.
14      A.   There was at least one
15  person on this list that departed
16  during that period of time, but was
17  not part of the reduction in force.
18      Q.   And who might that be?
19      A.   Alicia Quarlesa.  She left
20  during that period of time.  So it's
21  accurate she left during that period
22  of time, but she was not part of the
23  reduction in force.
24      Q.   Do you recall the
25  circumstances of her leaving?

Page 106

1    A.    She as I recall wanted a job
2  with more on-air opportunity.  She
3  was an entertainment editor, she was
4  the global entertainment editor and
5  she left for what she saw as an
6  opportunity for more TV time I
7  believe.  So Elizabeth Tollan is also
8  listed as an editor in New York.
9    Q.    Let me ask you a couple of
10 questions and then we'll kind of
11 revisit this particular issue.
12 Sitting here today, do you know
13 whether this is a complete list of a
14 -- complete and accurate list of who
15 and who was not riffed during this
16 particular employment action?
17    A.    This seems to be a list of
18 everyone who left the AP during that
19 period of time, but given Alicia is
20 on this report, it's not an accurate
21 list of people who were riffed or
22 laid off.  So it's one of those it
23 may include everybody, but it may
24 include other people as well.
25    Q.    Do you have any actual

Page 107

1  knowledge as to whether Ms. Tollen
2  was actually riffed as opposed to
3  whether she just left around this
4  time period?
5    A.    I don't recall.
6    Q.    But we do know that Ms.
7  Barclay was a subject of the
8  reduction of force?
9    A.    Yes.
10   Q.    Do you know who Stephanie
11 Stout on is?
12   A.    I believe she was an
13 employee of the Associated Press.
14   Q.    Do you know about when she
15 left?
16   A.    I don't.
17   Q.    Do you recall what her
18 position was before she left?
19   A.    I don't.
20   Q.    Do you recall the
21 circumstances of her leaving?
22   A.    I don't.
23   Q.    Do you recall whether after
24 Ms. Barclay was riffed that the
25 position of arts and entertainment

Page 108

1  editor based out of New York was --
2  that position was posted and the
3  vacancy filled?
4    A.    I don't know.  There is
5  still an arts and entertainment
6  department.  I don't know that they
7  have the same number of editors that
8  they had before, so I don't know.
9    Q.    Do you recall whether there
10 remained some arts and entertainment
11 -- let me ask it this way.
12        How many arts and
13 entertainment editors are based out
14 of New York?
15   A.    I don't know.  Most of them
16 are in New York, there are some in
17 London and there may be one or two
18 outside of New York.
19   Q.    Los Angeles maybe?
20   A.    Yes, I just don't know how
21 many.
22   Q.    More than five?
23   A.    I don't know, probably.
24   Q.    Ms. Bruce, for the record,
25 who is Wendy Benjamin?

Page 109

1    A.    I know a Wendy Benjaminson.
2    Q.    Wendy Benjaminson, I'm
3  sorry.
4    A.    She was an employee of the
5  Associated Press.
6    Q.    Do you recall when she left
7  about?
8    A.    Within the last year.
9    Q.    Do you recall what her last
10 position was?
11   A.    She was I believe running a
12 beats team of some sort out of
13 Washington.
14   Q.    Ask you a couple of
15 questions surrounding Earl Hinton,
16 Ms. Bruce.
17   A.    Okay.
18   Q.    Do you know whether in the
19 2011 audit by O.F.C.C.P. was Mr.
20 Hinton amongst one of the individuals
21 that Mr. Lucas specifically asked
22 for?
23   A.    I don't remember seeing the
24 list that Mr. Lucas asked for.  What
25 I know is from what I heard from

---

Page 110

1  Montrese or Diane I believe he was.
2      Q.    Do you recall whether Mr.
3  Hinton was specifically asked for in
4  the second -- withdrawn.
5          Was there an audit by
6  O.F.C.C.P. of AP in 2013; do you
7  recall that?
8      A.    I don't recall the date.
9      Q.    But do you recall there
10 being an audit in 2013?
11     A.    I don't recall.  There was
12 an audit by the O.F.C.C.P., I don't
13 recall the date.
14     Q.    And you don't recall the
15 year?
16     A.    That's what I'm saying, yes.
17     Q.    And was that audit -- let me
18 ask it this way.  Since that 2011
19 audit, how many times has the AP been
20 audited by O.F.C.C.P. since then
21 until today?
22     A.    I'm not sure.  I don't think
23 we have had an audit that was the
24 same scope as the one in 2011.  Since
25 then we may have had some requests

---

Page 111

1  come to Diane Parker for information
2  and that's about all I know.
3      Q.    Ms. Bruce, are you familiar
4  with an organization called the News
5  Media Guild?
6      A.    Yes.
7      Q.    What is that?
8      A.    That is the union that
9  covers our domestic news staff.
10     Q.    And would that include
11 editors?
12     A.    Yes.
13     Q.    Are you familiar with a
14 study that the guild issued in about
15 2016 regarding the relative numbers
16 of African Americans in the upper
17 echelon of management at the
18 Associated Press?
19     A.    Not specifically, but it
20 rings a bell, but I can't recall the
21 details.
22     Q.    Do you recall any
23 conversations internally about --
24 withdrawn.
25          Did AP actually get a copy

---

Page 112

1  of the study or just was aware of it
2  because of news reports surrounding
3  it?
4      A.    I don't remember whether
5  they gave me a copy of the study or
6  not.  Probably.
7      Q.    When you say "they?"
8      A.    The News Media Guild.
9      Q.    And were there any internal
10 conversations about -- we have been
11 -- since Leading Edge report that
12 there did not seem to be any great
13 movement or improvement on some of
14 these issues from 2007 until 2016 or
15 did you not agree with the report?
16     A.    I don't remember having
17 meetings to discuss the report and I
18 don't recall too much of the report
19 and I don't remember why the report
20 was written or made, I don't recall.
21     Q.    You don't recall what
22 prompted the News Guild to
23 investigate and write a report on the
24 hiring practices and retention by the
25 Associated Press in particular?

---

Page 113

1      A.    I don't recall if we were in
2  negotiations with the guild at that
3  time and why perhaps that may have
4  been part of that.  That's what comes
5  to mind.
6          (Whereupon, a discussion was
7      held off the record.)
8      Q.    Ms. Bruce, thank you for
9  coming, I don't have anything
10 further.
11         MR. CARTAFALSA:  Nothing
12 further.
13         (Time noted:  2:25 P.M.)
14
15
16
17
18
19
20
21
22
23
24
25

Page 114

```
1        C E R T I F I C A T E
2   STATE OF NEW YORK  )
3   COUNTY OF NEW YORK
4
5        I, GAREN FERSTANDIG, a Notary
6   Public within and for the State of New
7   York, do hereby certify:
8        THAT JESSICA BRUCE, the witness
9   whose deposition is hereinbefore set
10  forth, was duly sworn by me and that
11  such deposition is a true record of the
12  testimony given by such witness.
13       I further certify that I am not
14  related to any of the parties to this
15  action by blood or marriage; and that I
16  am in no way interested in the outcome
17  of this matter.
18       IN WITNESS WHEREOF, I have
19  hereunto set my hand this 2nd of March
20  2018.
21
22
23          GAREN FERSTANDIG
24
25
```