

Transcript of **Montrese Garner-Sampson**

Monday, March 5, 2018

*Sonya Ross v. The Associated Press*

Alderson Court Reporting
1-800-FOR-DEPO (367-9976)
Info@AldersonReporting.com
www.AldersonReporting.com

Alderson Reference Number: 76815

```
 1              IN THE UNITED STATES DISTRICT COURT

 2                FOR THE DISTRICT OF COLUMBIA

 3    --------------------------------:
      SONYA ROSS,                     :
 4                                    :
                   Plaintiff,         :
 5         vs.                        :  Civil Action No.:
                                      :  16-820-TSC
 6    THE ASSOCIATED PRESS,           :
                                      :
 7                   Defendant.       :
      --------------------------------:

 8
                                     Washington, DC
 9
                              Monday, March 5, 2018
10
      Deposition of:
11

12              MONTESE GARNER-SAMPSON,

13    called for oral examination by counsel for

14    the Plaintiff, pursuant to notice, held at the

15    Law Offices of Ogletree, Deakins, Nash, Smoak &

16    Stewart, P.C., 1909 K Street, N.W., Suite 1000,

17    5th Floor, Washington, D.C. 20006 before Lohna Burns,

18    a Notary Public in and for the District of Columbia,

19    beginning at 10:29 a. m., when were present on behalf of the

20    respective parties:

21

22
```

Page 2

1    A P P E A R A N C E S
2  On behalf of Plaintiff:
3        LISA ALEXIS JONES, ESQUIRE
4        Lisa Alexis Jones, PLLC
5        One Rockefeller Plaza
6        10th Floor
7        New York, New York  10020
8        (646) 756-2967
9        Email:  ljones@lisaajones.com
10  -and-
11        CYNTHIA GOODE WORKS, ESQUIRE
12        Law Offices of Cynthia Goode Works, LLC
13        9701 Apollo Drive
14        Suite 301
15        Largo, Maryland  20774
16        (301) 474-5562
17        e.cynthia@goodeworkslaw.com
18
19
20
21
22

Page 3

1  APPEARANCES (continued)
2
3        On behalf of Defendant:
4        JOSEPH B. CARTAFALSA, ESQUIRE
5        Ogletree, Deakins, Nash, Smoak
6         & Stewart, P.C.
7        1745 Broadway
8        22nd Floor
9        New York, New York 10019
10       (212) 492-2500
11       Email:  joseph.cartafalsa@ogletree.com
12
13  Also Present:
14  Sonya Ross
15
16
17              * * * * *
18
19
20
21
22

Page 4

1          C O N T E N T S
2  EXAMINATION BY:                    PAGE
3    Counsel for Plaintiff            6
4
5          INDEX TO EXHIBITS
6  EXHIBIT NO.        DESCRIPTION        PAGE
7  Exhibit 1      Email from Mr. Hinton      80
8              to Hintonearl@gmail.com
9              12/18/2017
10             Re: FW: Concern
11             (2 pages)
12  Exhibit 2      Email from Ms. Garner-Sampson  84
13             to Ms. Bruce and Ms. Maye
14             2/10/2016
15             Re:  FW: Ross OFCCP Complaint
16             (AP000663 - 664)
17  Exhibit 3      Email from Ms. Garner-Sampson  96
18             to Ms. Ehrlich
19             4/27/2012
20             RE:  FW: Race/Ethnicity
21             Coverage - CONFIDENTIAL
22             (AP000843 - 853)

Page 5

1  EXHIBITS (continued)              PAGE
2  Exhibit 4      Email from Ms. Garner-Sampson  108
3              to Aracelia Mercado
4              11/7/2013
5              Re:  Sonya Ross
6              (AP0003)
7  Exhibit 5      Handwritten Notes          110
8              (AP 644 - 649)
9  Exhibit 6      Email from Ms. Buzbee       110
10             to Ms. Garner-Sampson
11             3/9/2012
12             (AP000859 - 899)
13  Exhibit 7      Complaint Executive Order    113
14             11226
15             (AP 000588 - 589)
16  Exhibit 8      Handwritten notes         114
17             (1 page)
18
19  **(Exhibits attached to transcript)
20
21
22

Page 6

1          P R O C E E D I N G S

2    WHEREUPON,

3          MONTRESE GARNER-SAMPSON,

4    called as a witness, and having been first duly

5    sworn, was examined and testified as follows:

6          EXAMINATION BY COUNSEL FOR PLAINTIFF:

7    BY MS. JONES:

8    Q.   Good morning.

9    A.   Good morning.

10   Q.   My name is Lisa Jones.  And I represent

11   Sonya Ross in the matter against the Associated

12   Press.  And we are here to take your deposition.

13   A.   Yes, ma'am.

14   Q.   Can you, for the record, state your name

15   for the record, spelling your last name.

16   A.   Yes.  Montrese Garner-Sampson, G-A-R-N-E-R

17   S-A-M-P-S-O-N.

18   Q.   And Ms. Garner-Sampson, sometimes I mix up

19   your last name.  Sometimes I call you

20   Ms. Samson-Garner and so --

21   A.   It's okay.

22   Q.   Ms. Garner-Sampson, have you ever had your

Page 7

1    deposition taken?

2    A.   Many years ago, yes.

3    Q.   And was that in association with your --

4    with your work with the Associated Press?

5    A.   I've had it done for that and also for

6    personal reasons, for an auto accident.

7    Q.   So the deposition relating to the

8    Associated Press, do you recall the nature of that

9    case?

10   A.   I don't.

11   Q.   Well, I am going to kind of give some

12   guidelines.  I think Mr. Cartafalsa has probably

13   given you some of them.

14   A.   Yes, ma'am.

15   Q.   The first is it's important for you to

16   allow me to finish asking my question before you

17   answer.  And I will endeavor to allow you to finish

18   your answer before I ask another one so that we can

19   have a nice clean record and there's no cross talk.

20        It's important if there's an answer to a

21   question that is a yes or no answer, it's important

22   for you to say yes or no as opposed to uh-uh or

Page 8

1    huh-uh or nodding or shaking your head.  Okay?

2    A.   Yes, ma'am.

3    Q.   If you don't understand a question that I

4    ask, feel free to ask me to either rephrase it, or

5    we can have the court reporter read it back, okay?

6    A.   Okay.

7    Q.   I usually go about an hour and a half

8    before I take a break.  But if you need to take a

9    break before then, feel free to say I need a break.

10   The only admonishment if there's a question pending

11   is I am going to require that you answer the

12   question before we take the break unless there's

13   some issue that -- some legal issue you need to

14   speak to Mr. Cartafalsa about.

15        MS. JONES:  I think I don't say your name

16   right.

17        MR. CARTAFALSA:  Cartafalsa.

18   BY MS. JONES:

19   Q.   Ms. Garner-Sampson, other than speaking to

20   Mr. Cartafalsa in preparation for the deposition

21   today, what, if anything, did you do?

22   A.   Not much at all.  I think I kind of just

Page 9

1    played it back in my head trying to rement what

2    happened in 2011/2012-ish.

3    Q.   Okay.  Other than any documents that Mr.

4    Cartafalsa might have directed you to review, did

5    you review any documents?

6    A.   No.

7    Q.   Can you describe for me generally your

8    education history.  Did you attend college?

9    A.   Yes, I did.

10   Q.   Where did you attend?

11   A.   I have an undergraduate degree from

12   Virginia Commonwealth University down in Richmond,

13   Virginia, and I have a Master's Degree from Johns

14   Hopkins in Baltimore, Maryland.

15   Q.   When did you graduate from college?

16   A.   I graduated from VCU in 1993, and from

17   Johns Hopkins in 1999.

18   Q.   What was your Master's in?

19   A.   Applied Behavioral Science.

20   Q.   And currently who do you work for?

21   A.   The Associated Press.

22   Q.   And how long have you been working for the

Page 10

1  Associated Press?
2      A.   July of 2005, I believe?
3      Q.   And what do you recall was your -- where
4  you worked right before you started working for the
5  Associated Press?
6      A.   Anderson Automotive Group.
7      Q.   And where is that located?
8      A.   Baltimore, Maryland.
9      Q.   How long had you worked for Anderson
10  Automotive Group?
11      A.   Seven or eight a years, I believe.
12      Q.   For the record, Ms. Garner-Sampson, when
13  were you born -- what year were you born?
14      A.   1971.
15      Q.   How did it come that you started working
16  for the Associated Press?
17      A.   I was contacted by a head hunter with an
18  opportunity that they thought I might have been
19  suitable for, and it was with the Associated Press.
20      Q.   What were you doing for Anderson?
21      A.   I was their human resources director.
22      Q.   Do you recall who you interviewed with at

Page 11

1  Associated Press?
2      A.   Jessica Bruce, Jill Bowmen, Brad Kalbfeld,
3  Jim Williams and Sandy Johnson.  And there may have
4  been one other person in New York, I just don't
5  recall who that was.  They might have been on the
6  benefits side.
7      Q.   And were these interviews separate or was
8  it a group interview?
9      A.   I'm sorry.
10      Q.   Go ahead.
11      A.   I remember Carol Joe Yen in New York.
12  J-O-E Y-E-N.
13      Q.   Okay.  And was it a group interview or was
14  it separate, each of these individuals?
15      A.   Jessica and Jill I believe were together.
16  Carol, I believe was separate.  Brad Kalbfeld and
17  Jim Williams were together, and Sandy Johnson was
18  separate.
19      Q.   At the time, what position did Sandy
20  Johnson hold?
21      A.   She was the bureau chief of the Washington
22  D.C. office.

Page 12

1      Q.   Do you recall who gave you the offer of
2  employment?
3      A.   It was either Jill Bowmen or Jessica
4  Bruce, I don't recall which one, but one of the two
5  because it came from New York.
6      Q.   What was Jill's position at the time?
7      A.   She might have been an HR director, I
8  don't recall for sure.
9      Q.   And do you recall what Ms. Bruce's
10  position was at the time that you were hired?
11      A.   At that point she might have been a VP
12  already.
13      Q.   And what location were you to work when
14  you started at the Associated Press?
15      A.   I was going to be based in Washington,
16  D.C.  At that time we had two offices in D.C.  And
17  so I was to work between the two offices.
18      Q.   And why were there two offices in D.C.?
19      A.   There was broadcast -- there was a
20  broadcast operation, and there was the text
21  operation.  So that's why there were the two
22  offices.

Page 13

1      Q.   Okay.  And did you have a regular location
2  between the two of them?
3      A.   I was primarily based at the broadcast.
4      Q.   And what was that by the way?
5      A.   1825 K Street was the broadcast office.
6      Q.   And you said the text office, was that...
7      A.   T-E-X-T.
8      Q.   Where was that located at the time?
9      A.   I believe the office location was 1921 K,
10  also on K Street.
11      Q.   And between these two offices, they were
12  known as the Washington Bureau of the Associated
13  Press; is that correct?
14      A.   No, ma'am.  The broadcast office was
15  considered and called BNC, the Broadcast News
16  Center.
17      Q.   BNC?
18      A.   B, N as in Nancy, C.
19      Q.   Okay.
20      A.   And the other side was the Washington
21  Bureau, the other office.
22      Q.   And you performed HR functions for both

Page 14

1  BNC and the Washington Bureau?
2      A.  Yes.
3      Q.  When you arrived in 2005, who was your
4  supervisor?
5      A.  Jill Bowmen.
6      Q.  And was she the highest ranking HR person
7  in the Washington area?
8      A.  That would have been me.  Jill Bowmen was
9  based in New York.
10     Q.  So you were the highest ranking HR
11  employee in the Washington area when you first
12  started?
13     A.  Domestically, yes.
14     Q.  And do you recall what your title was?
15     A.  Off the top my head I don't know what it
16  was exactly.
17     Q.  Has your title changed since you first
18  started working for the Associated Press?
19     A.  Yes.
20     Q.  Do you recall who Jill reported?
21     A.  Who Jill reported to?
22     Q.  Yes.

Page 15

1      A.  I believe it was Jessica Bruce.
2      Q.  And how long did your title remain -- let
3  me ask it this way:  It what point did your title
4  change from your original title?
5      A.  I don't remember the date, but it would
6  have been around the time the AP changed its
7  organizational structure and went to a regional
8  format.  And so regional was inserted into the
9  title.
10     Q.  And you don't know about when that was?
11     A.  I don't recall.
12     Q.  What has been the full complement of your
13  title, regional human resource...
14     A.  Manager.
15     Q.  Manager.  Okay.
16         And has your title changed since then?
17     A.  No.
18     Q.  So currently your title is regional human
19  resource manager for Washington?
20     A.  No, ma'am.  My area of responsibility
21  expands beyond Washington.  So when I was hired, it
22  was Washington, D.C., and all things broadcast

Page 16

1  related domestically.  That expanded across the
2  country.
3         When regional happened, I absorbed, in
4  addition to everything broadcast, Washington, D.C.,
5  I also have everything that is what is considered
6  the south region.
7      Q.  Okay.  Got it.
8         Is it fair to say that at least from the
9  perspective of the text portion of AP, that it's
10  broken up in regions across the country?
11     A.  Outside of Washington, D.C. and New York,
12  yes.
13     Q.  So what are those regions off the top of
14  your head --
15     A.  The south region.
16     Q.  Let me finish the question.
17     A.  I thought you said if you recall.  So I
18  thought you were finished.  I'm sorry.  Go right
19  ahead.
20     Q.  No. You go.
21     A.  South Region, East, West and Central.
22     Q.  And is New York in the east region or just

Page 17

1  a separate region altogether?
2      A.  It is headquarters and it -- it's kind of
3  its own separate entity.
4      Q.  And other than the expansiveness of the
5  geographic duties, from the time you first started
6  working at the Associated Press until now, have your
7  duties substantially changed since then?
8      A.  So in addition to the additional
9  geographic and resource management, I also now have
10  the facility slash administration operation in
11  Washington, D.C.
12     Q.  What does that entail?
13     A.  It's the receptionist, it's the office
14  assistant, and it's handling facility-related items
15  for the Washington office because we are now one
16  office versus two.
17     Q.  So when you say the receptionist, you
18  supervise those individuals, is that what your
19  testimony is?
20     A.  They have a dotted line to me, yes.
21     Q.  Who do they have a solid line to?
22     A.  It depends.  I guess from an org chart, it

Page 18

1 would be Warren Rickert.
2  Q. Who is he?
3  A. He is the ENPS business manager.
4  Q. What does ENPS stand for?
5  A. Electronic News Production System. It is
6 a product of the AP.
7  Q. So other than that, describe for me what
8 your duties are as regional HR manager.
9  A. I am involved in hiring; terminations;
10 policy; policy management; making sure that policies
11 to the best of our ability are consistent and adhere
12 to employee relations; labor relations; performance
13 management; and then the facilities piece.
14  Q. Does the Associated Press have any hiring
15 protocols, that is, our position descriptions
16 standardized and there's a protocol for what kinds
17 of positions are competed out for versus, you know,
18 maybe a name selected from an internal candidate,
19 are there any policies along those lines?
20  A. We post jobs as part of our obligation
21 under the collective bargaining agreement. Jobs are
22 posted internally for two weeks. Sometimes we post

Page 19

1 jobs externally as well when we want to expand our
2 candidate pool. In a perfect world we would be
3 posting all jobs.
4  Q. Is it not a perfect world?
5  A. It is not a perfect world.
6  Q. So as a result of it not being a perfect
7 world, what has happened?
8  A. What sometimes happens is a person is in a
9 position that kind of morphs into another or an
10 expanded position that was not posted.
11  Q. You mentioned the collective bargaining
12 agreement. What union are you referring to?
13  A. News Media Guild.
14  Q. Under what circumstances would an external
15 posting happen?
16  A. Depends on the job and what the hiring
17 manager would like to do. It also depends on what
18 approvals we get from news leadership as to whether
19 a job will be an internal or internal and external
20 posting.
21  Q. In terms of the mechanics of postings,
22 either internal or external, is that something that

Page 20

1 happens through your office?
2  A. It should happen through HR, yes.
3  Q. It does not happen that way sometimes; is
4 that your testimony?
5  A. It should happen through HR. Sometimes
6 there are managers that kind of, as part of their
7 meeting people, they are recruiting people, they are
8 telling them about jobs that they believe we have,
9 so sometimes they are doing the recruiting and
10 unofficial, "We are going to be posting a job."
11  Q. I see. What is your role in terms of
12 terminations?
13  A. I would be working with the managers to
14 talk through the reason for them wanting to
15 terminate someone. I would be talking through what
16 steps they have gone through in order to give the
17 person feedback and get to a point where termination
18 is necessary.
19     If we are doing a reduction in force or a
20 layoff, I would be managing and coordinating that
21 process.
22  Q. Is a manager empowered to fire or

Page 21

1 terminate an individual without going through HR?
2  A. Not to my knowledge, no. That has never
3 been my experience since I've been with the AP.
4  Q. Okay. And to what extent are you
5 involved -- withdrawn.
6     Does AP have a policy in terms of
7 performance evaluations?
8  A. Yes. There is -- for the union staff or the
9 guild staff, the collective bargaining agreement
10 says we do a three-month, five-month, eight-month
11 performance appraisal, and thereafter annually.
12     On the administrative side, so meaning the
13 non union staff, we should be doing them annually.
14  Q. And to what extent are you involved in a
15 manager's written performance evaluation of one of
16 their direct reports? Do they have to go through
17 you for review of any sort before it's submitted to
18 the employee?
19  A. It depends. If it is an appraisal where
20 there are performance-related issues or one where
21 they believe the staffer is outstanding, then I like
22 to look at them in advance before the appraisal is

Page 22

1  given.
2      If it is a staffer who is performing
3  satisfactorily and meeting our expectations, they
4  certainly can go ahead and give those appraisals.
5      Q.   So if they are on the low end and then if
6  they are on the high end or the highest end, you
7  want to kind of just take a look at it and assess
8  it --
9      A.   Yes, ma'am.
10     Q.   -- is that fair to say?
11     A.   Yes, ma'am.
12     Q.   And is an individual manager empowered to
13  give a direct report a performance warning or
14  counseling without involving HR?
15     A.   They should not do that on a normal course
16  of business, no.
17     Q.   So they always have to call you up and say
18  Look, I'm thinking -- this has happened, what do you
19  think?
20     A.   They should be contacting some member of
21  HR, one of the generalists or their regional HR
22  partners to have those discussions, yes.

Page 23

1      Q.   Speaking of which, other than the facility
2  people who have a dotted line to you, do you have
3  direct reports?
4      A.   Not any longer.
5      Q.   About 2011/2012, did you have direct
6  reports?
7      A.   I did.
8      Q.   How many people did you have, about?
9      A.   Approximately three or four.  I don't
10  recall when -- we have changed the structure of the
11  receptionist and the office assistant several times
12  so it depends.  I don't recall the exact number that
13  year.  And then I had an HR person.
14     Q.   An HR person?
15     A.   Uh-huh.
16     Q.   What do you mean by that?
17     A.   I had a person in HR who worked with me.
18  I've had several.  At one point there were two.  And
19  as people have left, we have not back filled
20  positions so ...
21     Q.   So why hasn't AP back filled those
22  positions?

Page 24

1      A.   The AP has gone through a process where
2  all vacancies are evaluated and leadership makes a
3  determination as to whether we fill a job or not.
4  So there are many positions across the company where
5  just because someone left we have either not back
6  filled or we have back filled and moved that
7  resource or head to some other area.
8      Q.   Is that the reason why you no longer have
9  any direct reports?
10     A.   Yes.
11     Q.   Ms. Garner-Sampson, it will take me a
12  little bit, do you know who Mr. Fournier is?
13     A.   I do.
14     Q.   Who is Mr. Fournier?
15     A.   He's a former AP employee.
16     Q.   When he was -- do you recall what his last
17  position was at the Associated Press?
18     A.   Would have -- to my recollection it would
19  have been Bureau Chief for the Washington, D.C.
20  Bureau.
21     Q.   And do you know who Sonya Ross is?
22     A.   Yes.

Page 25

1      Q.   Who is Sonya Ross?
2      A.   Sonya Ross is an editor in the D.C.
3  office, news editor.
4      Q.   Do you recall whether Ms. Ross ever worked
5  with Ron Fournier?
6      A.   I do believe in one of the structures, she
7  did report into the bureau chief, to Ron, yes.
8      Q.   Let me ask you this:  In terms of -- I
9  assume the Associated Press has EEO policies?
10     A.   Yes.
11     Q.   Can you describe for me what, if any,
12  complaints or policies or practices the AP has
13  relative to discrimination issues or even workplace
14  issues?
15     A.   I'm sorry.  Is your question what process
16  someone would go through if they wanted to file a
17  complaint?
18     Q.   Yes.
19     A.   Okay.  They have a few avenues.  We try to
20  maintain an open door policy so they could start
21  with any member of management that they would like,
22  their manager, a level up, Jessica Bruce is

Page 26

1  available.
2      If for some reason they didn't want to
3  report to their direct HR person they could go to
4  any other generalist in the department.
5      We have an integrity hot line which people
6  can use to file complaints as well.  And that would
7  be all of the avenues off the top of my head.
8      Q.  Okay.  Have you ever personally received
9  any complaints regarding Ron Fournier and his
10  treatment of his subordinates or colleagues?
11     A.  I did not have any formal complaints that
12  I recall.  There were people who would speak about
13  Ron Fournier and the manner which he did or did not
14  do something in his approach, but I don't recall
15  anyone off the top of my head filing a formal
16  complaint about Ron.
17     Q.  How would you distinguish between a formal
18  complaint or informal complaint?  Is a formal
19  complaint something that has been put in writing?
20     Why are you using that term of art in
21  particular?
22     A.  Because sometimes people will simply vent

Page 27

1  about an interaction that they had, something that
2  he said or something that he wrote.  So that's more
3  of a venting.  That's not a complaint.
4      Q.  And what would a complaint be from your
5  vantage point?
6      A.  Someone would say to me, "I want to file a
7  complaint.  I want to make sure that you're aware of
8  what transpired and I would like to have something
9  done about that," usually.
10     Q.  So from your perspective, at least from
11  your personal knowledge, nobody came to you to file
12  a formal complaint against Mr. Fournier?
13     A.  Not that I recall, no.
14     Q.  Had you heard venting about Mr. Fournier?
15     A.  Yes.
16     Q.  What kind of comments or information would
17  be conveyed to you about Mr. Fournier?
18     A.  He was harsh.  He was crude in his word
19  choice.  He would -- people would complain that he
20  would raise his voice at them or sometimes he may
21  point his finger at people.  There might have been
22  one person vent about his cursing.

Page 28

1      That would be all I can remember at this
2  time.
3      Q.  Do you recall when Mr. Fournier became the
4  Washington Bureau Chief?
5      A.  I recall it happening.  I don't remember
6  the time frame.
7      Q.  Were you involved in that hiring process?
8      A.  Probably.  Probably.
9      Q.  Do you recall what his position was before
10  he became Washington Bureau Chief?
11     A.  He may have been a journalist, meaning a
12  news person.  I don't recall specifically without
13  having a file.
14     Q.  Do you recall him being, at least at one
15  point, in the Bush Administration, the White House
16  correspondent?
17     A.  Yes, was a journalist, yes.
18     Q.  But he was also the White House
19  correspondent as opposed to just a miscellaneous
20  journalist, right?
21     A.  I wouldn't say miscellaneous journalist.
22  Our new people indeed are journalists so I wouldn't

Page 29

1  say miscellaneous.
2      Q.  I don't want to denigrate and I didn't
3  mean to denigrate other journalists, but a White
4  House correspondent for the Associated Press has a
5  fairly well-known position, fair to say?
6      A.  Sure.  Yes.
7      Q.  Do you know whether you had heard about
8  these comments about Mr. Fournier's temperament
9  before he became the Washington Bureau Chief?
10     A.  Not that I recall, no.
11     Q.  Do you recall an incident that has been
12  reported in the press in which Mr. Fournier was
13  discovered to have sent Karl Rove an email that
14  raised questions about Mr. Fournier's objectivity?
15     A.  Off the top of my head, no.
16     Q.  You have never heard about that incident?
17     A.  Can't say I recall the incident, no.
18     Q.  You have had some issues -- you had some
19  issues with Mr. Fournier yourself, correct?
20     A.  Yes.
21     Q.  Is it true that you got into an argument
22  with him?

Page 30

1    A.  I don't know I would characterize it as an
2  argument.  I had interactions with him that I found
3  problematic.  And he said what he needed to say.  I
4  said what I needed to say.  And that was the end of
5  it.
6       It was not necessarily a back and forth,
7  so I wouldn't characterize it as an argument.
8    Q.  So why was it problematic?  Can you tell
9  me what the issue was.
10    A.  There were -- off the top my head I can
11  think of two:  One was when I first me him.  And his
12  first words to me -- excuse my language -- we were
13  on a train coming back from New York.  I was with my
14  then direct report.  And I had never met him.
15       And my direct report introduced me to him.
16  And he said to me -- again, excuse me language --
17  "You know, I thought you were a real bitch." And he
18  said, "I now realize you are not."
19       And I remember looking at him confused and
20  I said, "I'm sorry, first of all, I don't know why
21  you would think that's appropriate to say; but,
22  then, I don't understand why you would even think

Page 31

1  that since we've never met."
2       And then he went on to elaborate why.
3       And at that point, I had no further
4  discussion with him at that interaction.
5    Q.  What did he say?
6    A.  He said because when I would come to the
7  bureau, the text side of the operation, I didn't
8  speak to anyone.  And he said, "But I realize why
9  that was," he said, "because Sandy wouldn't allow
10  you to talk to anyone without her approval."
11       He said but he didn't realize that until
12  after some conversation with other people.  Okay.
13       And then the --
14    Q.  Was that true?
15    A.  That was, indeed, accurate, yes.
16    Q.  And Sandy Johnson was what, now?
17    A.  Sandy was the bureau chief.
18    Q.  I'm sorry.  I interrupted you.  You were
19  going to elaborate.
20    A.  Then my next interaction with that I
21  found problematic, at this point he was the bureau
22  chief.  And I was in my office.

Page 32

1       And he came upstairs -- I don't remember
2  what the subject matter was -- but he came upstairs
3  and he was demanding that I do something that I
4  disagreed with.
5       And I explained to him I would not do that
6  and why.
7       And he proceeded to remind me who he was.
8  That I worked for him.  And that I would do it.
9       I said I would not.  He raised his voice.
10  And I asked him to leave my office.  And he said he
11  did not have to leave my office.
12       And I said to him, "You most certainly
13  will leave my office or I will have you escorted
14  from my office."
15       And he turned and he walked away.
16       Sometime after, that I don't remember the
17  same day or next day, he apologized for that.
18       And I explained to him that I was not sure
19  what he was used to, but that I wouldn't tolerate
20  that type of interaction from anyone that I worked
21  with.  I didn't come there, and I don't disrespect
22  people, and I wasn't going to tolerate such from

Page 33

1  him.
2       And from that point on, we didn't seem to
3  have those type of interactions.
4    Q.  Indeed, you didn't work for him?
5    A.  I did not work for him.
6    Q.  You reported to somebody altogether
7  different, right?
8    A.  Yes.
9    Q.  Were there incidents of him -- let me ask
10  it this way:  Do you recall in terms of folks coming
11  to you and venting or hearing stuff about Ron
12  Fournier, would you hear these things from people
13  who were his subordinates or people who were his
14  peers or people who were superior in terms of the
15  hierarchy?
16    A.  They were not people to my recollection
17  who reported to him.  Most of the time they
18  were people outside of the news operation that I
19  interacted with.
20    Q.  Did you ever hear Ms. Ross venting about
21  how he was treating her?
22    A.  No, not that I recall.

**Page 34**

1    Q.  In terms of people -- folks venting, did
2   you have any discussions with Ms. Bruce or anybody
3   else about, Well, you know, we've been hearing
4   these -- about these issues with Mr. Fournier.  I,
5   myself, have experienced some issues, that there
6   maybe needs to be some type intervention or
7   counseling?
8    A.  I spoke with, by that time, Jill Bowmen.
9    Q.  When you say, by that time...
10   A.  By the time I had such a conversation or
11  similar conversation to what you are describing.
12  Jill Bowmen was gone so my conversation I believe
13  would have been with Michelle Ehrlich.  And I don't
14  recall if I had a direct conversation with Jessica
15  or not, but I did have conversation with Michelle
16  Ehrlich.
17   Q.  Who is Michelle Ehrlich?
18   A.  So Michelle Ehrlich was a director in HR.
19  She was -- if I -- loosely describing it as
20  Jessica's second -- her right hand.
21   Q.  Do you recall whether -- I believe your
22  testimony is you don't recall Ms. Ross ever

**Page 35**

1   complaining to you about Ron?
2    A.  I don't recall her complaining to me
3   directly about Ron.
4    Q.  How about indirectly?
5    A.  I don't -- I don't recall that.
6    Q.  Do you recall any of her direct reports
7   complaining about Ron; one of her reporters?
8    A.  It's been so long ago I don't recall.
9    Q.  As result of the conversations that you
10  had with either Michelle or Jessica about Ron, was
11  there any determination that some type counseling or
12  intervention needed to happen?
13   A.  Those conversations would have been had in
14  New York between Michelle and or Michelle and
15  Jessica.  If they chose to do something like that,
16  that would have been a decision that they made and
17  something they would have coordinated.
18   Q.  Is it your testimony that they would not
19  have either brought you into the loop or advised you
20  what the action might be?
21   A.  I don't recall that they did that, no.
22   Q.  Do you know who Devlin Barnett is?

**Page 36**

1    A.  The name is familiar.  Former staffer.
2    Q.  Would that refresh your memory as to
3   whether either Mr. Barrett or another reporter who
4   was a direct report of Ms. Ross complained to you
5   about Ron?
6    A.  I don't recall.
7    Q.  Is it your testimony, Ms. Ross -- not Ms.
8   Ross -- Ms. Garner-Sampson, that if someone comes to
9   you and vents and says, I've been treated -- I've
10  been mistreated by my supervisor but doesn't use the
11  word, I want to file a complaint, that that, in and
12  of itself, is not a complaint for purposes of some
13  responsibility or action that HR might be required
14  to take under either Title VII of the Civil Rights
15  Act?
16      MR. CARTAFALSA:  Object to form.
17      THE WITNESS:  If someone says to me that
18  they feel as though they have been mistreated, that
19  is different than someone venting to me.
20      If someone says they feel as though they
21  have been mistreated, then I am going to go through
22  having a conversation about why they feel that way.

**Page 37**

1   I would more than likely be having a conversation
2   with that manager or whomever they are speaking
3   about, manager, colleague, whoever they feel is
4   mistreating them.
5       So that is different than someone venting.
6    Q.  Well, if someone comes to you and doesn't
7   use the word, I've been mistreated but comes to you
8   and says, "Ron Fournier yelled at me," and there are
9   some circumstances that raises some issues that
10  makes it clear that whatever conduct happened was
11  inappropriate, is it your testimony that unless they
12  say the golden words mistreatment or complaint, that
13  HR doesn't have an obligation to follow up on that
14  venting?
15   A.  No.  It requires some further conversation
16  and some additional information seeking on my part.
17  But that does not necessarily rise to the level of a
18  complaint.
19   Q.  Did you feel that Ron mistreated you?
20   A.  I feel as though Ron's behavior towards me
21  at times was inappropriate and unprofessional, yes.
22   Q.  In addition to having conversations that

Page 38

1  you testified that you had with Ron, did you relay
2  those concerns to either Michelle or Jessica or
3  Lynn?
4      A.  Or who?
5      Q.  Or Lynn.  Or Jill.  Jill.  I'm sorry.
6      A.  Jill -- Jill, I do not believe was there
7  at the time which is why I had the conversations
8  with Michelle.  And, yes, I made it clear to
9  Michelle that I did not appreciate how Ron had
10  spoken to me.
11          And I made it clear that it needed to be
12  addressed; and that I did not believe I should be
13  subject to that.
14          So, yes, I had those conversations
15  directly with Michelle Ehrlich.
16      Q.  As the Washington Bureau Chief, who was
17  Mr. Fournier's supervisor?
18      A.  Kathleen Carroll.  I believe he rolled
19  directly to Kathleen Carroll.
20      Q.  For the record, what was Kathleen
21  Carroll's title?
22      A.  I don't recall her exact title.  It might

Page 39

1  have been managing editor with a VP attached.  I
2  don't remember her exact title.
3      Q.  And generally speaking, over the managing
4  educators and -- the managing editor and the
5  executive editor is a CEO --
6      A.  Yes.
7      Q.  -- is that correct?
8          As a result of your complaint to Michelle,
9  do you know whether any counseling or performance
10  warning occurred with reference to Ron's treatment
11  of you?
12      A.  I do not know.
13      Q.  I know you testified, Ms. Garner-Sampson,
14  you hadn't or don't remember this incident in which
15  Mr. Fournier was caught having sent Karl Rove an
16  email that kind of raised questions about his
17  objectivity.  Do you recall, though, issues being
18  raised about -- generally about Mr. Fournier's
19  objectivity?
20      A.  Off the top of my head I don't recall.
21      Q.  Okay.  Do you know who Mike Oreskes is?
22      A.  Former AP manager, leader, executive.

Page 40

1      Q.  Do you recall at one point he was the
2  managing editor at AP?
3      A.  He was an executive leader at AP.
4      Q.  But you don't recall exactly what his
5  title?
6      A.  Don't recall his title.
7      Q.  Okay.  Sitting here today, do you recall
8  any complaints that either you received personally
9  or AP received generally about Mr. Oreskes?
10      A.  About Mr. Oreskes?
11      Q.  Oreskes.
12      A.  Those complaints would have been handled
13  by New York directly so I would not have had a
14  reason to be actively involved if it did not involve
15  something within my scope.
16      Q.  Because he was based in New York?
17      A.  He was based in New York, yes.
18      Q.  Do you recall a period in which Mr.
19  Oreskes -- withdrawn.
20          Do you recall a period in which Ms. Ross
21  was attempting to expand or recast her role from
22  editor to what would end up being called Race and

Page 41

1  Ethnicity Editor; do you recall that period?
2      A.  I have some knowledge of it, yes.
3      Q.  What do you recall of it?
4      A.  That was something that was done in
5  coordination with, I believe, Ron, perhaps Michael
6  Oreskes.  I can't recall remember if Sarah Norton
7  was involved or not and then someone from HR.  It
8  would have been someone from New York more than
9  likely.
10      Q.  So to what extent would you have been
11  involved in someone within the Washington Bureau
12  recasting their job description?
13      A.  For most people in D.C., I would have been
14  actively involved in it.  For Sonya I was not.
15      Q.  Why not?
16      A.  Based on my recollection, Sonya's
17  interactions traditionally with HR were done with
18  our New York office.  Sometimes Jessica directly.
19  Maybe Jean Maye once she arrived.  That was just how
20  the process went.
21      Q.  Do you recall whether that position was --
22  whether a vacancy announcement was issued and that

Page 42

1  position was competed for?
2      A.  Since I wasn't -- since I don't recall
3  being actively involved in it, I don't know.
4      Q.  Do you know who Robert Naylor is?
5      A.  Former AP staffer.
6      Q.  Did you know him personally?
7      A.  I had interaction with him on occasion.
8      Q.  Do you recall sitting here today what his
9  title was before he left?
10     A.  I do.  I believe it may have had something
11  to do with training, but I don't recall for sure.
12     Q.  Do you recall where he was based out of?
13     A.  New York.
14     Q.  If I told you that Mr. Naylor's job title
15  was director of career development, would that ring
16  a bell?
17     A.  It possibly could have been.
18     Q.  But sitting here today, do you have a
19  present recollection that it was?
20     A.  I do not.
21     Q.  Are you familiar with a written complaint
22  that Mr. Naylor lodged in about 2010 about the

Page 43

1  hiring and retention practices of the Associated
2  Press?
3      A.  I'm aware that he lodged a complaint.  I
4  don't recall the specifics of it but I'm aware that
5  he raised an issue.
6      Q.  You how did you become aware of it?
7      A.  I believe it was probably part of a call
8  where the generalists were together and we kind of
9  give a quick readout of things that we are working
10  on, and I believe it probably came up on such a
11  call.
12     Q.  And were you involved in any investigation
13  of Mr. Naylor's complaint?
14     A.  Not that I recall.  I believe it was
15  handled by New York.
16     Q.  Did you ever see a copy of his complaint?
17     A.  I don't recall.
18     Q.  Other than this conversation where it
19  might have been brought up, did HR or management
20  ever have any discussions about what the AP might do
21  about the issues that Mr. Naylor raised?
22     A.  I would guess that they had those

Page 44

1  conversations, yes.
2      Q.  Do you recall whether there were those
3  conversations?
4      A.  I don't know.
5      Q.  The Associated Press has had some issues
6  with hiring and retention of African-American
7  employees in its history; hasn't it?
8      A.  I believe so, yes.
9      Q.  At some point, either in the 70's or 80's,
10  it was under a consent decree relating to its
11  retention and hiring practices as it related to
12  African-American employees, correct?
13     A.  At some point in time, yes.  At some point
14  in time I believe there was some consent decree.  I
15  don't know that it specifically related to
16  African-Americans; but, yes, there was some consent
17  decree years ago, yes.
18     Q.  And this has, in addition to Mr. Naylor's
19  complaint, has been an ongoing issue at the
20  Associated Press; fair to say?
21     A.  What has been an ongoing issue?
22     Q.  The retention and hiring of

Page 45

1  African-American employees in the news division.
2      A.  I don't know that I would say that's fair
3  to say.
4      Q.  Are you familiar with a report that or a
5  study that the AP commissioned known as the Leading
6  Edge Report?
7      A.  I'm not.
8          MS. JONES:  Let's take a five minute
9  break.
10         (Recess)
11  BY MS. JONES:
12     Q.  Ms. Garner-Sampson, are you familiar with
13  any report commissioned by the Associated Press in
14  kind of the mid to late 2000s about its retention in
15  hiring of African-American employees?
16     A.  No.
17     Q.  Does the Associated Press perform any
18  specific recruiting of African-American employees?
19     A.  Your question is do we specifically engage
20  in activities around recruiting African-Americans?
21     Q.  Yes.
22     A.  To my knowledge, not specifically

Page 46

1    African-Americans. I think we make an effort to
2    recruit from a diverse pool of people across the
3    board, but I don't know that we engage in any
4    specific activity for African-Americans.
5        Q.   The Associated Press doesn't go to
6    historically black colleges to recruit on campus?
7        A.   We go to many colleges, some are
8    historically black and some are not. So we go to
9    many colleges. We attend journalism association
10   conventions. So we do an outreach of many things to
11   get a diverse pool of people.
12       Q.   Are you familiar with a study by The News
13   Guild about the paucity of African-Americans in the
14   news division as recently as 2016 or 2017?
15       A.   Done by the News Media Guild?
16       Q.   Yes.
17       A.   No. No. Not to my knowledge, I don't
18   recall it.
19       Q.   It's true that there is a paucity of
20   African-Americans in the news division at the
21   Associated Press, correct?
22       A.   Can you rephrase that?

Page 47

1        Q.   Relative to the general population, the
2    general population of African-Americans in the
3    United States, there is an under-representation of
4    African-American employees in the news division
5    relative to the general population of
6    African-Americans in the United States, correct?
7        A.   I'm not going to say it's correct or not
8    correct. I will say that we would like to increase
9    our numbers across the board as relates to diverse
10   candidates. I would just not say African-Americans,
11   so I would not say that's true.
12       Q.   You would not say -- well, your testimony
13   is that there is equal or near equal representation
14   of African-Americans in the news division at the
15   Associated Press relative to the general population
16   of African-Americans in the United States?
17       A.   No, I did not say that.
18       Q.   Because that's true, there is an
19   under-representation of African-Americans in the
20   news division, correct?
21       A.   I did not say that.
22       Q.   I'm sorry?

Page 48

1        A.   I did not say that.
2        Q.   My question is: That it's true, yes, that
3    there is an under-representation of
4    African-Americans in the news division?
5        A.   I would say it is true that we would like
6    to increase our numbers of diverse staff across the
7    board.
8        Q.   My question to you is: It is true there
9    is an under-representation of African-Americans in
10   the news division at the Associated Press, yes or
11   no?
12       MR. CARTAFALSA: Object. Asked and
13   answered, but you can answer.
14       THE WITNESS: I'm not going to say that
15   that is a true statement. I've given you my take on
16   it. I'm not going to say that is a totally true
17   statement.
18   BY MS. JONES:
19       Q.   Well, the numbers speak for themselves,
20   correct?
21       A.   Okay.
22       Q.   Have you ever applied for a promotion from

Page 49

1    your current position?
2        A.   Within the Associated Press?
3        Q.   Yes.
4        A.   No, there have not been any other jobs I
5    was interested in at the Associated Press.
6        Q.   So you never submitted an application for
7    promotion at the Associated Press?
8        A.   No.
9        Q.   Have you expressed interest in a promotion
10   at the Associated Press?
11       A.   No.
12       Q.   When Ron Fournier called you a bitch, you
13   would agree that was a violation of Title VII?
14       MR. CARTAFALSA: Objection.
15       You can answer.
16       THE WITNESS: He did not call me a bitch.
17   He said he thought that I was a bitch. Excuse my
18   language. I definitely believed it was certainly
19   inappropriate and unprofessional.
20   BY MS. JONES:
21       Q.   And he wouldn't have called a male a
22   bitch; would he have?

Page 50

1    A.   I don't began to know what Ron would or
2  would not do.
3    Q.   Do you know whether he expressed that
4  sentiment to other people, that he thought you were
5  a bitch?
6    A.   I don't know whether he did or didn't.
7  Beyond the person that was sitting with us, I don't
8  know if he did or did not.
9    Q.   Is it your testimony that other than
10  Michelle Ehrlich, you were complaining to Michelle
11  Ehrlich, that you didn't put this incident in
12  writing?
13    A.   I don't recall if I put it in writing to
14  Michelle.  I know we talked about it.  There may
15  have been an email, I want to talk about X.  I don't
16  recall whether I put anything else in writing.
17    Q.   Did he ever point his finger at you?
18    A.   He might have.  I don't know.  Ron was
19  extremely animated so he might have.
20    Q.   He raised his voice at you, didn't he?
21    A.   Definitely.
22    Q.   You all had a shouting match, didn't you?

Page 51

1    A.   I haven't engaged in a shouting match with
2  anyone.  Were we having a conversation that was
3  heated?  Yes.
4    Q.   So if various witnesses have described the
5  interaction between you and Ron as having been a
6  shouting match, that would be inaccurate; is that
7  your testimony?
8    A.   I do not recall having a shouting match
9  with anyone.
10    Q.   Including Ron Fournier?
11    A.   Including Ron Fournier.  I don't recall
12  having a shouting match.
13    Q.   Ms. Garner-Sampson, do you know who Jean
14  Maye is?
15    A.   Yes.
16    Q.   Who was Ms. Maye?
17    A.   She is the HR director for the news side
18  of the operation.  She's also my direct manager.
19    Q.   We were talking a little bit before the
20  break about Robert Naylor's complaint.  And I
21  believe you testified that you were made aware of it
22  during the course of some general comments or

Page 52

1  conversation in an HR meeting or conference call; do
2  you recall that?
3    A.   I think that's how I became aware of it,
4  yes.
5    Q.   Other than that, what do you know about
6  Mr. Naylor's complaint?
7    A.   I don't know much about his complaint at
8  all because it wasn't handled by me.  It would have
9  been handled through New York.
10    Q.   What do you know about it?
11    A.   I know he filed a complaint.  Again, I
12  don't know the specifics of the complaint -- I don't
13  recall the specifics.  Don't recall if I ever knew
14  the specifics of the complaint.
15    Q.   Do you recall who investigated the
16  complaint?
17    A.   I would -- I don't know.  It would
18  probably have been Michelle Ehrlich or Jessica or
19  Jean if she was here.  I don't remember when Jean
20  came into the organization, but it would have been
21  handled by someone in New York.
22    Q.   Were you made aware of what, if any,

Page 53

1  findings resulted from the complaint?
2    A.   No.  And I will adjust one thing to your
3  prior question:  I had another manager between --
4  after Jill Bowmen, Cathy Raines was also one of my
5  managers.  So she, too, may have been involved.  I
6  just don't remember the timing of when he filed a
7  complaint and who was in New York at the time.
8    Q.   By the way, what would you -- what would
9  Ms. Maye consider her race to be, if you know?
10    A.   I would think she would say she's
11  African-American.
12    Q.   How about Ms. Raines?
13    A.   She is white. Cathy with a C.
14    Q.   Jean may have come to AP after you
15  arrived; is that right?
16    A.   Yes.
17    Q.   And did she replace someone?
18    A.   Not really.  When Michelle Ehrlich left we
19  didn't have a replacement for a period of time, I
20  don't remember how long.  Jean came in sometime
21  thereafter, but she did not assume the same role
22  that Michelle had.

Page 54

1    Q.   And so was there a vacancy -- withdrawn.

2         Did Ms. Maye -- was Ms. Maye hired based

3    on some type of vacancy announcement or posting?

4    A.   I believe there was a posting, yes.

5    Q.   And you didn't apply for that job?

6    A.   No, I did not apply for that job.  I had

7    no interest in moving to New York.

8    Q.   We talked a little bit about

9    reduction-in-force actions.  To what extent would

10   you play a role in that?

11   A.   Depends on where it is.

12   Q.   And what do you mean by that?

13   A.   Depends on the geographic location.  So if

14   it's something that falls within my scope, then I

15   would play a role in coordinating, gathering

16   information, coordinating it, things like that,

17   depending on where again the reduction in force was

18   to happen.

19   Q.   If it's not in your jurisdictional -- in

20   your region, would you play any role in it?

21   A.   It depends if a colleague needed

22   assistance or support in some way, they may reach

Page 55

1    out to any of us and ask for assistance.

2    Q.   Do you know who Tom Curly is?

3    A.   Former staff.

4    Q.   A former staff?

5    A.   Yes, he was a CEO; He was a former

6    employee of the Associated Press.

7    Q.   You call a CEO a staffer?

8    A.   A staffer is an employee, yes.

9    Q.   He is the former chief executive officer

10   of the Associated Press.

11   A.   He's a former employee, yes.

12   Q.   He's the former chief executive officer,

13   yes?

14   A.   Yes.

15   Q.   In 2011, about November -- withdrawn.

16        What is the Office of Federal Contract

17   Compliance?

18   A.   The OFCCP is a governmental agency that,

19   in part, looks at the work and compliance of federal

20   contracts.

21   Q.   Compliance with what?

22   A.   EEO and Title VII.

Page 56

1    Q.   And the Associated Press is subject to

2    OFCCP's jurisdiction because it has federal

3    contracts, yes?

4    A.   Yes.

5    Q.   And as a result of having federal

6    contracts, the Associated Press has to maintain

7    records as to its hiring of African-American

8    employees in particular, yes?

9    A.   It maintains records on its hiring

10   practices, yes.

11   Q.   Every once in a while, the Associated

12   Press is audited by OFCCP?

13   A.   Yes.

14   Q.   From the time that you arrived in 2005 to

15   2018, about how many times has OFCPP audited the

16   Associated Press?

17   A.   I don't know how many times in totality

18   because they may audit various offices.

19   Q.   How about the Washington Bureau?

20   A.   Three or four maybe.  I don't know for

21   sure.

22   Q.   And describe generally the process in

Page 57

1    terms of OFCCP initial outreach, that they are going

2    to do an audit, and then what happens after that?

3    A.   It depends on where the notice comes.

4    Sometimes they come to D.C. directly, and they --

5    usually it's addressed to someone who no longer

6    works for us, a former employee or staffer based on

7    whatever their records have.

8         Sometimes it will come to Jessica Bruce or

9    Tom Curly.  Sometimes it will come to me.  So it

10   just depends who they are addressing it to.

11        If it comes to me, I send a note to New

12   York to several people saying FYI I have received

13   the following and depending on what it is they are

14   asking for.  Usually it is the gathering of

15   information, and then we submit it to them.

16        If it comes to New York, traditionally

17   someone from New York will reach out and say,

18   "Montrese, OFCCP is going to do an audit, we need to

19   gather the following."

20        And then we'll determine who is going to

21   do what in terms of responding.

22   Q.   And what, from your understanding, prompts

Page 58

1  OFCCP to an audit?

2     A.  I don't know.

3     Q.  Are audits sometimes done randomly; do you

4  know?

5     A.  I believe sometimes they are.

6     Q.  Are audits sometimes as a result of some

7  complaints that have been made specifically?

8     A.  I gather that's probably yes.

9     Q.  And what kinds of documents generally

10  would the AP be compiling to send to OFCCP after

11  it's gotten information that an audit is coming?

12     A.  It depends on what they are asking for.

13  Sometimes it will be information around policies.

14  Sometimes it will be information about who has been

15  hired between X period or X period.

16        So it depends on what it is they are

17  asking for specifically.

18     Q.  And does OFCCP sometimes ask to speak to

19  specific people during the course of their audit?

20     A.  They have done that, yes.

21     Q.  Are there other people that the Associated

22  Press will itself designate to actually speak to

Page 59

1  OFCCP?

2     A.  I don't recall that we have ever

3  recommended or offered up people for them to talk

4  to, no.  We usually respond to what they are asking

5  for.

6     Q.  In about November of 2011 you recall that

7  OFCCP conducted an audit in the Washington Bureau?

8     A.  I believe it was around that time, yes.

9     Q.  Do you know who Willie Lucas is?

10     A.  Yes.

11     Q.  Who is Willie Lucas?

12     A.  He was the representative from the OFCCP

13  who was going to be coming to the Washington, D.C.

14  office to conduct the audit or participate in the

15  audit.

16     Q.  What role do you recall you having with

17  regard to this particular audit from about

18  November 2011?

19     A.  I think I was probably involved in

20  gathering materials, meaning documents they may have

21  asked for; I would have coordinated the setting up

22  of the space they were going to use; I more than

Page 60

1  likely did some outreach to staff if they identified

2  staff who they wanted to meet with; and I probably

3  reached out to the managers and advised them that we

4  are going to be having an audit and saying to them,

5  "I may have to ask to take some of your people off

6  of the floor to participate in that audit."

7     Q.  Is it fair to say that Mr. Lucas had given

8  you a list of employees that he wanted to speak to

9  in advance?

10     A.  I do believe he did, yes.

11     Q.  And Ms. Ross wasn't on that list --

12     A.  Not that I recall.

13     Q.  -- was she?

14        Do you know who Earl Hinton is?

15     A.  Yes.

16     Q.  And who is Mr. Hinton?

17     A.  Earl Hinton is an office assistant in

18  the -- I think his title might be head office

19  assistant in the D.C. office.

20     Q.  Is he still an employee --

21     A.  Yes.

22     Q.  -- at Associated Press?

Page 61

1        And was Mr. Hinton on that original list

2  given to Associated Press by Willie Lucas in advance

3  of the audit?

4     A.  I don't recall who was specifically on the

5  list from 2011.

6     Q.  But you recall Ms. Ross was not on the

7  list?

8     A.  She was not on the list.

9     Q.  There came a point during the course of --

10  let me ask it this way:  Generally speaking, what is

11  your -- what was your interaction with Mr. Lucas in

12  terms of coordinating witnesses for him to speak to?

13     A.  So I would -- if it were people that were

14  on the list already, I had -- if memory serves, I

15  had pre-arranged the time, so a schedule to try to

16  keep it orderly and structured for him to meet with

17  people.

18        He may have also then subsequently said,

19  Oh, after talking to X person, I would now like to

20  speak to this person.

21        And so I would coordinate finding out if

22  the person was there in the office and if they were

Page 62

1  available to speak with Mr. Lucas.

2      Q.   Other than Ms. Ross, was there any other

3  individuals or employees that Mr. Lucas wanted to

4  speak to that were not on his original list?

5      A.   I don't recall.

6      Q.   You recall, though, that Mr. Lucas

7  indicated to you that he wanted to speak to Ms.

8  Ross --

9      A.   Yes.

10     Q.   -- correct?

11         What did he say to you?

12     A.   I don't remember his specific wording from

13  2011; but, it was something to the effect that Ms.

14  Ross had reached out to him and since he was in the

15  office, if she was available, he'd like to say hello

16  to her or speak with her.

17     Q.   Were you surprised?

18     A.   No.

19     Q.   Were you surprised that Ms. Ross had --

20  that Mr. Lucas had indicated that Ms. Ross had

21  actually reached out to him separate?

22     A.   I was surprised that he said that, yes.

Page 63

1      Q.   So you were surprised?

2      A.   That he said that, yes.

3      Q.   Why are you distinguishing between that he

4  said that as opposed to -- withdrawn.

5         So did you -- what happened after he said

6  that to you?

7      A.   I said that I would see if she was in the

8  office; and, if so, I would let her know that he was

9  there.

10         We were on separate floors, meaning the

11  news operation where Ms. Ross would be and Mr. Lucas

12  where we were doing the meetings.

13         So I believe I said, "Okay, I'll see if

14  she's in."

15         I probably almost immediately went

16  downstairs to the news room floor.  I believe she

17  was in the news room talking to someone, but I don't

18  recall who.

19         I think I waited a few minutes or a few

20  seconds before saying, "Sonya, can I see you for a

21  second?"

22         And I advised her that Mr. Lucas was in

Page 64

1  the office and had asked see her.

2      Q.   Anything else that you recall from your

3  interaction with her?

4      A.   Oh, I think she either said verbally or --

5  kind of motioned that she didn't know a Mr. Lucas.

6         So I then elaborated that he was from the

7  OFCCP, and he had said that she reached out to him

8  and while he was in the office he'd like to talk

9  with her.

10         I more than likely would have then said,

11  He's in X room and I'll let him know that you will

12  come upstairs.

13         And then I more than likely turned and

14  went back upstairs to advise him she was indeed in

15  and would be coming upstairs.

16     Q.   And what did he say?

17     A.   I don't know.  I gather he acknowledged

18  what I said.  I don't know if he said anything else.

19  I don't recall he said anything else.

20     Q.   And did Ms. Ross come up upstairs and

21  speak with Mr. Lucas?

22     A.   Yes, I believe she did.

Page 65

1      Q.   How do you know that?

2      A.   I believe I was a few steps ahead of her,

3  but I do believe she was behind me and came

4  upstairs.

5      Q.   Did she come into the room before you left

6  the room?

7      A.   I don't recall.

8      Q.   Where were you while she was in the

9  room -- withdrawn.

10         Were you in the room while she was

11  speaking to Mr. Lucas?

12     A.   I was not in the room when he spoke to any

13  of our staffers that I recall, no.

14     Q.   Specifically, were you in the room when he

15  spoke to Ms. Ross?

16     A.   I do not recall being present when he

17  spoke to Ms. Ross.

18     Q.   By your testimony that you don't recall,

19  is there a possibility that you were in the room

20  when he spoke to Ms. Ross?

21     A.   I would doubt it.

22     Q.   Have you ever been in the room when an

Page 66

1  investigator from OFCCP has interviewed an employee?

2      A.  No, not to my recollection.

3      Q.  And where did you go, did you go back to

4  your office after you escorted Ms. Ross into the

5  interview room?

6      A.  I didn't escort Ms. Ross into the

7  interview room, and I don't recall where I went

8  thereafter.  I don't recall what was going on at

9  that time so I don't know where I would have went.

10  It is possible I went back to my office, yes.

11     Q.  What was the practice that after Mr. Lucas

12  finished with a witness, would he call you and

13  say -- or email you and say, Okay, I'm finished with

14  this person, can you get me the next person, or I

15  can see you?

16     A.  I think he probably would have -- again, I

17  don't recall the specifics -- the mechanics of how

18  we did it.  But he would have alerted that he was

19  ready.

20         If there was someone else on the schedule

21  they may have just come up themselves if they were

22  going to meet with him.  Or he may have called me to

Page 67

1  say I need a break or can you get X person because

2  he may have gotten information from that person that

3  he wanted to confirm or talk to someone else about.

4         So I don't remember the specifics.

5      Q.  But generally he would give you a call and

6  say, I'm finished and I need to speak --

7      A.  It was either that, or I think it might

8  have been a call.  I don't remember there being

9  email communication so I think it probably would

10  have been a call.

11         I don't recall if there was someone else

12  with him when he came who may have also come and

13  said, Hey, we are done with X, could you now get --

14  I don't recall.  I'm sorry.

15     Q.  Do you recall -- what, if anything, do you

16  recall about Mr. Lucas or some other person from

17  OFCCP indicating to you that his interview with

18  Ms. Ross was complete?

19     A.  I don't recall there being an interview,

20  and he certainly didn't use the word interview as it

21  related to Ms. Ross.  He said he wanted to talk to

22  her while he was in the office.  He'd like to see

Page 68

1  her while he was in the office.  He did not use the

2  word interview as he had done with other people.

3      Q.  Well, why are you making that distinction?

4      A.  Because he didn't -- the other people he

5  seemed more formal.  He used the word interview.

6  I've asked you to set up a meeting with X person.

7         It was not that way with Ms. Ross.  He was

8  more casual.  It was, "I'm in the office.  She

9  reached out to me.  If she's available I would like

10  to see her."

11     Q.  But you don't know whether he interviewed

12  her?  To the extent that we can parse an interview

13  versus having a discussion, you don't know what

14  happened in that room; do you?

15     A.  I have no idea what happened in that room.

16     Q.  When did you learn that Ms. Ross had

17  complained about your interaction with her prior to

18  the meeting with Mr. Lucas?

19     A.  I'm sorry.  Would you say that again?

20     Q.  When did you learn that Ms. Ross either

21  complained or had an issue with how you interacted

22  with her immediately prior to going up to Mr. Lucas'

Page 69

1  conference room?

2      A.  I don't believe it was the same day, so I

3  think it would have been a day or two thereafter.

4         I don't believe it was the same day.  I

5  don't believe it was the same day.

6      Q.  How did you learn?

7      A.  I don't know if it was -- I don't remember

8  what manager from New York mentioned it to me.  I

9  don't remember who it was.

10         I think I also said to Mr. Lucas when I

11  went up to say she was coming, I think I said, "She

12  seemed surprised that I had told her -- that you

13  asked to see her."

14         So I don't remember if it was Michelle or

15  Jessica, but one of them reached out to me to find

16  out what interaction I had had with Ms. Ross.

17     Q.  Why did you think it was important to tell

18  Mr. Lucas that Ms. Ross was surprised?

19     A.  Mr. Lucas seemed -- again, he was very

20  casual in his approach, but he seemed like she would

21  know who he was.  And so I was simply saying she

22  seemed surprised.

Page 70

1    Q.   And what did he say, if anything?

2    A.   I think it was something like, "Well

3 that's -- she reached out to me," I think is really

4 all he said.

5         And said, "Well, she reached out to me,"

6 and he kind of left it at that.  And I didn't ask or

7 probe and I went on my way.

8    Q.   Did whoever spoke to you about or relay to

9 you about Ms. Ross's feelings about the interaction

10 that you'd had with her, do you know where those

11 managers got that information, whether Ms. Ross went

12 to them specifically or whether they heard something

13 from Mr. Lucas?

14   A.   It was my understanding that she reached

15 out to them specifically or directly.

16   Q.   And you are basing that understanding

17 because they told you that?

18   A.   Yes.

19   Q.   And did they have some type of complaint

20 that had been lodged in writing or that Ms. Ross had

21 just called them up and relayed this issue to them?

22   A.   I don't recall that they specified or

Page 71

1 clarified how they got -- how they interacted with

2 her.  I don't recall.

3    Q.   And so Michelle and Jessica are in New

4 York, right?

5    A.   Yes.

6    Q.   And you are in D.C.?

7    A.   Yes.

8    Q.   And so what, do they call you or send you

9 an email about it initially?

10   A.   I don't recall.

11   Q.   And what did they say to you?

12   A.   I believe they asked kind of what my

13 interaction with Sonya and Mr. Lucas had been.

14        I described it.  Then I believe they said

15 something to the effect about, "Well, she raised a

16 concern or she had a concern about how you

17 interacted with her."

18   Q.   And were they more specific than, "Well,

19 she raised a concern?"  Were they more specific

20 about what the concern was?

21   A.   I don't -- I don't recall what

22 specifically they said, whether it was around tone

Page 72

1 or -- I don't recall.  I'm sorry.

2    Q.   You don't recall what the specific

3 allegation was that was relayed to you during that

4 specific period?

5    A.   Correct.

6    Q.   You since have learned or had learned

7 specifically what Ms. Ross was complaining about,

8 correct?

9    A.   Yes.

10   Q.   And what is your understanding of the

11 nature of her complaint?  What was the issue that

12 she has said caused her concern based on that

13 interaction?

14   A.   I believe it was that I -- I think the

15 word may have been menaced or attempted to

16 intimidate her.

17   Q.   After either Michelle or Jessica raised

18 this issue with you, what happened?  Was there any

19 type of investigation of the incident?

20   A.   I don't know exactly what Michelle and

21 Jessica did on their end.  I am going to gather that

22 they did some sort of checking out of what had

Page 73

1 transpired.  I don't know for certain what they did.

2    Q.   So other than -- I take it that you denied

3 that you had menaced or threatened Ms. Ross to -- to

4 Michelle and Jessica, correct?

5    A.   I stated that I did not believe that I

6 engaged in any behavior that was menacing or

7 intimidating, so, yes, I disagreed with that

8 characterization.

9    Q.   You were counseled, though, about this

10 issue, weren't you?

11   A.   Michelle and/or Jessica said that, you

12 know, I should be cognizant of, I think maybe word

13 choice.  If you want to call that counseling, I

14 guess you could call it counseling.

15   Q.   Were you upset that -- that you -- it was

16 deemed that you needed counseling on this issue?

17   A.   No, I'm not upset when someone takes an

18 opportunity to share something with me that they

19 believe I could do differently.

20   Q.   Has anybody lodged -- other than

21 Ms. Ross -- lodged a complaint against you from your

22 knowledge relating to either discrimination or

Page 74

1  retaliation?

2      A.  No.

3      Q.  Never?

4      A.  That they have lodged a complaint?  No.

5      Q.  Earl Hinton lodged a complaint, didn't he?

6      A.  I don't know that he lodged a complaint.

7  I believe he raised what he said was a concern.  I

8  don't know that he raised a complaint.  I don't

9  know.

10      Q.  Has anybody raised a concern about your

11  conduct rising to the level of some type of

12  discrimination or retaliation?

13      A.  Not to my knowledge.

14      Q.  Well, Mr. Hinton has, right?

15      A.  I don't believe that he raised a complaint

16  about retaliation or discrimination.

17          (Off-the-record discussion)

18  BY MS. JONES:

19      Q.  You recall, Ms. Garner-Sampson, Mr. Hinton

20  raising some issues surrounding an interaction with

21  you during the course of an audit for OFCCP; don't

22  you?

Page 75

1      A.  I don't remember when -- the timing of it,

2  but he did raise an issue or concern.

3      Q.  And how were you made aware that Mr.

4  Hinton had raised this concern?

5      A.  Again, I think it would have been Jessica

6  or Michelle because he -- he raised it with

7  New York.

8      Q.  And what do you recall them telling you

9  about this complaint?

10      A.  I think it had to do with him feeling

11  stressed out about my -- or my -- I don't know if it

12  was my interaction or just my comment with him about

13  him meeting with the OFCCP and what his -- I think

14  what he believed what his right was or not as

15  related to that.  I don't remember the specifics.

16      Q.  Did you ever see the email, the actual

17  email, that Mr. Hinton sent to Ms. Bruce or Ms.

18  Ehrlich about his complaint?

19      A.  I might have sometime ago, yes.

20      Q.  And he, in that email, expressed that he

21  felt threatened by something that you said.

22      A.  Again, I don't recall the specifics of

Page 76

1  what he said, whether it was threatened or stressed.

2  I don't remember the specifics.

3      Q.  And did Ms. Bruce or Ms. Ehrlich again

4  counsel you on your interactions with the employees

5  as they were being interviewed or interacting with

6  OFCCP?

7      A.  No.  They reached out and asked for my --

8  my side of what transpired with him.  There was no

9  counseling that I recall.

10      Q.  You would agree that at least twice in

11  your career, two people have complained about your

12  interaction with them relating to their cooperation

13  with the Office of Federal Contract Compliance,

14  correct?

15          MR. CARTAFALSA:  Object.

16          You can answer.

17          THE WITNESS:  No, I would not agree with

18  how you phrased that.

19  BY MS. JONES:

20      Q.  And why wouldn't you agree?  What's wrong

21  with that phrasing?

22      A.  Well, I don't believe that they agreed --

Page 77

1  or complained about their involvement with the

2  OFCCP.  I disagree with that.

3      Q.  They complained about your interaction

4  with them in relation to their cooperation with

5  OFCCP, yes?

6      A.  I don't believe that Ms. Ross complained

7  about cooperation.

8      Q.  What was your understanding of what she

9  was complaining about?

10      A.  It was that she believed I menaced

11  because -- or menaced or intimidated as it related

12  to her reaching out to them, not cooperation because

13  of anything that they came there to do.

14      Q.  Okay.  Well, you would agree, then, that

15  at least two employees have complained about your

16  interaction with them in relation to either

17  cooperation or lodging a complaint with the Office

18  of Federal Contract Compliance, yes?

19      A.  No, because I don't believe that

20  Mr. Hinton raised a complaint with the OFCCP.  And

21  to my knowledge, at that time, Ms. Ross hadn't

22  raised a complaint with the OFCCP.  So, again, no, I

Page 78

1 don't agree with that statement.

2    Q.   Well, you just testified, Ms.

3 Garner-Sampson, that your understanding was that Ms.

4 Ross had felt threatened or menaced in relation to

5 her reaching out to OFCCP, yes?

6    A.   No, I did not say threatened.  I said

7 menaced or intimidated.  So I didn't say threatened.

8    Q.   Okay.  Menaced or intimidated in relation

9 to her reaching out to OFCCP?

10    A.   Yes, that is how she felt.

11    Q.   And in relation to Mr. Hinton, Mr. Hinton,

12 the interaction arose from the fact that Mr. Hinton

13 had an appointment to be interviewed by Mr. Lucas or

14 by someone at OFCCP during the course of an audit?

15    A.    I don't recall if he had an appointment

16 or not.  I don't remember how he became involved in

17 the OFCCP visit.

18    Q.   But at some point, he was going to go

19 speak to Mister -- to whoever was doing the audit,

20 right?

21    A.   He was trying to make a decision whether

22 he was or not.  I don't know whether he was going to

Page 79

1 or not.

2    Q.   And as a result of his interaction with

3 you, he decided not to cooperate with OFCCP, right?

4    A.   I don't know why he made the decision he

5 made to or not to because I don't remember if he did

6 or did not.

7    Q.   I'm sorry.  You don't remember whether he

8 went ahead with the interview or not?

9    A.   I don't recall if he went ahead with the

10 interview or not, from 2011 roughly.

11    Q.   Do you recall that Mr. Hinton complained

12 that -- withdrawn.

13       Do you recall that there was an audit by

14 OFCCP in 2013 of the Associated Press?

15    A.   I don't recall the dates of the audits

16 that have transpired, but there might have been.

17    Q.   Do you recall Mr. Hinton ever being

18 actually on the list issued by OFCCP to be

19 interviewed?

20    A.   I don't recall if he was on a list or not

21 on a list.

22    Q.   Now, Mr. Lucas --

Page 80

1       MS. JONES:  I'm sorry, can we go off the

2 record one more time.

3       (Off-the-record discussion)

4       (Sampson Deposition Exhibit 1

5        marked for identification)

6 BY MS. JONES

7    Q.   Ms. Garner-Sampson, the court reporter has

8 handed you Exhibit No. 1.

9    A.   Okay.

10    Q.   I want to direct your attention

11 specifically to Page 2 --

12    A.   Uh-huh.

13    Q.   -- and the email that Mr. Hinton has

14 written to Jessica Bruce on May 9, 2013.  If you

15 want to take a moment to just read that email.

16       (Pause)

17    A.   Okay.

18    Q.   Have you seen this email before?

19    A.   I don't recall.  It's from 2013, so I

20 don't recall if I've seen it or not.

21    Q.   Does this refresh your memory as to the

22 particular audit that Mr. Hinton was raising

Page 81

1 questions about?

2    A.   No.

3    Q.   Sitting here today, what, if anything, do

4 you remember about the interaction between you and

5 Mr. Hinton?

6    A.   I can't say that I remember anything

7 specific about the interaction.  I would have had

8 conversation with him, similar as I did to other

9 people, that X agency was in the office; they have

10 either asked to meet with them, you know,

11 proactively in advance of them coming on-site, or

12 once they were on-site, they have asked to meet with

13 them.

14       If a staffer asked, What's this about, I

15 would have shared what it was about.  I would have

16 made sure that they knew that they had the right to

17 either participate and speak with the agency or not

18 do it.

19    Q.   Here Mr. Hinton has claimed that he didn't

20 ask you what it was about, but you asked him what it

21 was about; do you see that?

22    A.   Yes, I do.  He says that.

Page 82

1  Q.  Do you disagree with that?

2  A.  I disagree with that.

3  Q.  Sitting here today, based on what do you

4  disagree?

5  A.  I do not and would not have asked a

6  staffer, he or anyone else, what they were going to

7  be talking about with the OFCCP any other agency

8  about.

9  Q.  But you agree that you don't have --

10 according to you, you don't have a recollection of

11 your conversation one way or the other, do you?

12 A.  I do not have a recollection of my

13 specific conversation with him.  I am going by what

14 my normal process would have been.

15 Q.  Later on, Mr. Hinton alleges that you said

16 to him, Make sure you're not confused because you

17 don't -- I guess there should be a "want" in

18 there -- don't want this to backfire.

19    Do you see that?

20 A.  Uh-huh.  Yes.

21 Q.  Again, you don't have a present memory of

22 that conversation one way or the other, do you?

Page 83

1  A.  I don't recall that specific conversation,

2  but that would have been outside of my normal

3  practice.  I would not have said that to him or any

4  other person who was participating.

5  Q.  But you don't have a present memory

6  whether you said that or not?

7  A.  I do not have a present memory of that

8  specific conversation.

9  Q.  And it's your testimony that you were

10 never counseled or otherwise reprimanded based on

11 Mr. Hinton's complaints about this interaction in

12 2013; is that right?

13 A.  I do not recall being reprimanded for any

14 interaction with Mr. Hinton, no.

15 Q.  Do you recall being reprimanded at all

16 during your career at the Associated Press?

17 A.  Not that I recall, no.

18 Q.  Well, it would be something that you would

19 recall, wouldn't it?

20 A.  I hope I would, yes.

21 Q.  Other than the counseling that you

22 received relating to your interaction with Ms. Ross,

Page 84

1  have you ever been the subject of any kind of

2  counseling?

3  A.  No.

4  Q.  Only as it related to Sonya Ross; is that

5  right?

6  A.  Yes, there was conversation as it related

7  to Ms. Ross.

8  Q.  Do you recall that Ms. Ross did actually

9  file a complaint with the Office of Federal Contract

10 Compliance?

11 A.  I don't recall.

12 Q.  You don't recall that she actually filed a

13 written complaint?

14 A.  I don't recall that she formally filed

15 one, and I don't recall reading it if she did.

16    (Sampson Deposition Exhibit 2

17    marked for identification)

18 BY MS. JONES

19 Q.  Ms. Garner-Sampson, the court reporter has

20 handed you Exhibit 2.

21 A.  Yes.

22 Q.  Let me know when you have had a chance to

Page 85

1  review that.

2       (Pause)

3    MR. CARTAFALSA:  Take your time --

4    THE WITNESS:  I'm sorry?

5    MR. CARTAFALSA:  I'm just saying --

6    MS. JONES:  Yes, take your time.

7    (Off-the-record discussion)

8  BY MS. JONES

9  Q.  Do you recognize this document?

10 A.  I do, yes.

11 Q.  And what is it, Ms. Garner-Sampson?

12 A.  It is an email looking like from February

13 10 of 2016 from me to Jessica and Jean regarding

14 OFCCP complaints.

15 Q.  This is regarding Ms. Ross' complaint to

16 OFCCP?

17 A.  Yes.

18 Q.  And does this refresh your memory as to

19 whether you've seen -- withdrawn.

20    Does this refresh your memory as to

21 whether Ms. Ross filed a complaint with OFCCP --

22 A.  Yes.

Page 86

1    Q.   And you've got to let me finish.

2         Does it refresh your memory as to whether

3    you reviewed Ms. Ross' OFCCP complaint?

4    A.   Yes.

5    Q.   And you now know that -- you know that

6    Ms. Ross filed a written OFCCP complaint?

7    A.   Yes.

8    Q.   And you did review that OFCCP complaint,

9    yes?

10   A.   Yes.

11   Q.   And there's an indication in the middle of

12   the page that she, meaning Ms. Ross, filed her

13   complaint in March of 2012.  Do you see that?

14   Under -- it says "Promotion" --

15   A.   Under "Promotion," yes.

16   Q.   And does that refresh your memory as to

17   about when Ms. Ross filed her complaint with OFCCP?

18   A.   If I go by this, yes.

19   Q.   If Ms. Ross had had any performance issues

20   raised by any of her supervisors, that's something

21   you would have been involved in; isn't that fair to

22   say?

Page 87

1    A.   No, it's not accurate.

2    Q.   It is accurate, though, to say that you

3    were involved sometimes in discussing performance

4    issues surrounding Ms. Ross, yes?

5    A.   Yes.

6    Q.   Sitting here today, do you recall any

7    counseling that Ms. Ross was subjected to between --

8    let's take it from 2008 until 2012.

9    A.   I can't say.  That was so long ago.

10   Q.   Do you recall from 2008 to 2012 any

11   performance issues being raised or any issues being

12   raised about Ms. Ross's performance?

13   A.   I don't -- I don't recall from that time

14   period.

15   Q.   After Ms. Ross lodged her complaint about

16   her interaction with you, outside of relating to

17   Willie Lucas, do you recall any performance issues

18   or other issues being raised about Ms. Ross'

19   performance or any other workplace issues?

20   A.   I -- I think there may have been issues or

21   concerns raised around the volume of writing that

22   she was doing, so the amount of writing she was

Page 88

1    contributing to the news report.

2         Beyond that, I can't say that I recall

3    much of anything.

4    Q.   And do you recall --

5    A.   And I don't remember the timing of that.

6    Sorry.

7    Q.   And do you recall when Ms. Ross became the

8    race and ethnicity editor?

9    A.   I don't recall the exact date, no, I do

10   not.

11   Q.   You recall about the year?

12   A.   I don't.  I believe Ron Fournier was still

13   the COB, chief of bureau, but I don't remember the

14   date or exact time, no.

15   Q.   By 2012, though, who was -- do you recall

16   who the Washington Bureau Chief was?

17   A.   No, I don't remember the timing of the

18   comings and goings of the bureau chiefs in the

19   interim.

20        (Off-the-record discussion)

21        (Recess)

22   BY MS. JONES:

Page 89

1    Q.   Good afternoon.

2    A.   Hi.

3    Q.   Ms. Garner-Sampson, I am going to go back

4    a couple steps.

5         In addition we were talking about the

6    interaction between you and Ms. Ross surrounding the

7    Willie Lucas OFCCP audit, and you testified that

8    either Michelle or Jessica engaged in some kind of

9    counseling related to that interaction; right?

10   A.   I said that we had a conversation about

11   the interaction.

12   Q.   It's true you were directed to go to

13   retraining; isn't that right?

14   A.   That is not correct.

15   Q.   You graduated from Johns Hopkins in 1999.

16   Were you -- you were getting your master's -- were

17   you also employed as well when you were in your

18   master's program?

19   A.   Yes.

20   Q.   Where were you working?

21   A.   I don't recall whether it was Integrated

22   Health Services or Goldwell Cosmetics or the

Page 90

1  dealership, I don't recall.

2      Q.  And actually what was your major at VCU?

3      A.  HR and Industrial Relations.  Human

4  Resources and Industrial Relations.

5      Q.  What was your first HR job as a

6  professional?

7      A.  As a professional, it would have been

8  probably University of Maryland Dental School.

9      Q.  And do you recall when that was?

10     A.  I graduated in '93.  Maybe somewhere

11  between '94, maybe, '95.  I don't...

12     Q.  Let me jump to '99.  Do you recall -- I

13  believe you don't recall precisely where you were

14  working while you were in the master's program.  Do

15  you recall what your first full-time job was after

16  whatever job you were in during your master's

17  program that you had?

18     A.  It was probably still at the same company

19  that I started my master's program with.

20     Q.  That you don't recall?

21     A.  It might have been the dealership.  I

22  don't recall when I started there.

Page 91

1      Q.  What dealership was this?

2      A.  Anderson Automotive.

3      Q.  So that's a dealership, a car dealership?

4      A.  Yes.

5      Q.  How many employees did Anderson Automotive

6  have?

7      A.  By the time -- when I got there, maybe

8  just over 100.

9      Q.  So the job that you had before Anderson

10  Automotive was the job that you had during your

11  master's program?

12     A.  Probably.  Without looking at my resume,

13  probably.  I don't remember the '90s all that well;

14  but, somewhere in there, yes.

15     Q.  So do you think you had a job between the

16  time that you -- the job that you had while you were

17  in the master's program at Anderson Automotive?

18     A.  I don't recall.

19     Q.  Have you ever been fired from a job?

20     A.  No.

21     Q.  We talked a little bit,

22  Ms. Garner-Sampson, about Tom Curly.

Page 92

1      A.  Yes.

2      Q.  And do you recall a time when, right

3  before he, Mr. Curly, left the Associated Press,

4  that the company engaged in a reduction-in-force

5  action?

6      A.  We've done a few reduction in forces, so I

7  remember some of them, yes.

8      Q.  Do you recall -- sitting here today, would

9  you know who Robert Naylor was?  If he walked in the

10  door, you'd say that's Robert Naylor?

11     A.  Probably.  I think so, yes.

12     Q.  You have an awareness that he left as a

13  result of the reduction in force -- the results of a

14  reduction in force?

15     A.  I don't know why he left because I wasn't

16  involved in that.  So I don't recall why he left.

17     Q.  You weren't involved in what?

18     A.  Any reduction in force that related to

19  Robert.

20     Q.  How about a reduction in force related to

21  Delores Barkley?  Do you know --

22     A.  No, they are not part of --

Page 93

1      Q.  Answer the question.

2      A.  No, she was not part of my client group,

3  just like Robert was not.

4      Q.  How about Andrew Frazier?

5      A.  No, ma'am.

6      Q.  Who is Andrew Frazier?

7      A.  I don't know him.  I'm assuming he's a

8  former AP staffer.

9      Q.  You testified earlier that sometimes even

10  though there may be a reduction in force in other

11  regions that you often help some of your colleagues

12  with those -- with some of those issues.

13     A.  If they request assistance.

14     Q.  Is it your testimony that nobody requested

15  any assistance from you with regard to a reduction

16  in force in January 2012 that involved Mr. Naylor,

17  Mr. Fraizer and Ms. Barkley?

18     A.  I don't.

19         MR. CARTAFALSA:  Object to form.

20         You can answer.

21         THE WITNESS:  I do not recall being

22  involved with the three of -- any of those three,

Page 94

1  no, ma'am.
2  BY MS. JONES:
3      Q.  Were any individuals from the Washington
4  Bureau laid off as result of this particular
5  employment action, reduction-in-force action?
6      A.  I don't recall the dates that we did RIFs
7  that included people from Washington, D.C.  I don't
8  recall if it was at that time of those three or at
9  some other time, but we have done them.
10     Q.  Do you know who Stephanie Stoughton is?
11     A.  I do know Stephanie Stoughton.
12     Q.  Who is she?
13     A.  She's a former AP staffer who worked in a
14  few different offices, but left the AP from the D.C.
15  office.
16     Q.  Do you recall the circumstances of her
17  separation?
18     A.  We were doing a reorganization that
19  resulted in a reduction in force and she was one of
20  the people who left as a result of that reduction in
21  force.
22     Q.  And sitting here today, do you recall who

Page 95

1  else left as a result of the reduction in force?
2      A.  Left D.C. or left --
3      Q.  Left D.C.
4      A.  No, I don't remember all the people who
5  were included in that.
6      Q.  Do you recall about how many people were
7  included?
8      A.  No.
9      Q.  Was it more than ten?
10     A.  Out of D.C.?
11     Q.  Yes.
12     A.  I don't think so.  I don't recall.
13     Q.  More than five?
14     A.  Again, without having a record to look at,
15  I don't recall how many people were part of a RIF in
16  2012.
17     Q.  I believe we touched briefly, or we were
18  starting to touch on some performance issues that
19  were being -- some issues being raised about
20  Ms. Ross' performance.  And do you recall issues
21  being raised about the amount of writing Ms. Ross
22  was or was not doing as the race and ethnicity

Page 96

1  editor?
2      A.  Yes.
3      Q.  What do you recall about that?
4      A.  Again, without specifies, I believe it
5  related to leadership wanting her to do more writing
6  than she was doing to contribute to the news report.
7      Q.  And do you recall about when those issues
8  were being raised?
9      A.  No.
10         (Sampson Deposition Exhibit 3
11          marked for identification)
12  BY MS. JONES
13     Q.  I'm going to direct your attention
14  specifically, Ms. Garner-Sampson, to Bates No. 845,
15  which is Page 2.  And I just -- for purposes of just
16  the exhibit, I kept the Bates stamp in order
17  although the page before it is blank.
18     A.  Okay.
19         MR. CARTAFALSA:  We produced those that
20  way.  I guess they were sent to us by the client
21  with blank pages so we produced ...
22

Page 97

1  BY MS. JONES:
2      Q.  Directing your attention to an email from
3  you to Sally Buzbee from March 12, 2012.  Take your
4  time and read it.
5      A.  Some of the text is a bit light, so bear
6  with me, please.
7      Q.  Okay.
8      A.  Okay.  I've reviewed the page that you
9  referenced.
10     Q.  Couple questions before I ask you about
11  the substance of the email.  I'm going to refer you
12  to your signature block, Montrese Garner-Sampson,
13  PHR.
14         For the record, what does PHR stand for?
15     A.  Professional human resources.
16     Q.  And are you required to get some type of
17  certification in order to hold yourself out as a
18  PHR?
19     A.  AP does not require such.  So I have that
20  certification.  I have an additional HR
21  certification, but AP does not require such.  I did
22  it because I wanted to have that certification and

Page 98

1   continue my learning in the field.

2       Q.   When did you receive that certification?

3       A.   PHR might have been '99, maybe.

4       Q.   While you were doing your masters, you

5   think?

6       A.   Somewhere in there or not long after, I

7   believe.

8       Q.   Any other certifications?

9       A.   SHRM-CP certification.  It's another HR

10  certification.

11      Q.   When do you believe you received that

12  certification?

13      A.   This is '18.  Approximately 2015 or '16.

14      Q.   Okay.  When a complaint from either OFCCP

15  or EEOC comes into the Associated Press, how are

16  those documents processed?  Does it go directly

17  to -- or does it go directly to Jessica Bruce, or

18  are you required to send it to Jessica Bruce?

19  What's the process?

20      A.   It depends on -- as I mentioned earlier

21  today, it depends on where it comes.  If it comes

22  into New York, then -- depends on who it's addressed

Page 99

1   to.  Sometimes they were addressed to Tom Curly,

2   sometimes to Jessica.  So it depends on the agency

3   sending it and who they have on record.

4       If it comes into D.C., it again depends on

5   whether it's addressed to someone no longer with us.

6   So oftentimes they would come in addressed to Jim

7   Williams, who hasn't been with the company in years.

8       Q.   Who's Jim Williams?

9       A.   He was the former VP of Broadcast.

10      Q.   Go ahead.

11      A.   So sometimes they'll come to his

12  attention.  Sometimes they'll come to my attention.

13      If they come to my attention, I date

14  stamp, and then I send a quick note up to New York,

15  usually to whoever my manager is, and Jessica

16  saying, FYI, I just received the following.

17      I may also include Diane Parker.

18      Q.   Okay.  And do you know whether that

19  essentially is the same process if something goes to

20  New York to Jessica, specifically it is Bates

21  stamped?

22      A.   I don't know.

Page 100

1       Q.   Date stamped?

2       A.   Yeah, I'm not sure.

3       Q.   Now, this is an email from you to Sally

4   discussing your thoughts about Ms. Ross generally

5   and her job description and the issues surrounding

6   her writing in particular.

7       Do you see that?  Is that fair to say?

8       A.   About her -- them wanting her to write

9   more, yes.

10      Q.   So why did they ask you to weigh in on

11  this?

12      A.   Why did Sally ask me?  I don't know.

13  Sally and I talk frequently about people.  Sally

14  must have been the COB at that time, I gather,

15  because she's asking the question.

16      And probably just asking as she does about

17  performance things often.

18      Q.   So this wasn't unusual?

19      A.   For her to ask about -- for Sally?  No.

20      Q.   Do you recall whether this was the first

21  time that Sally asked you about Ms. Ross'

22  performance in particular?

Page 101

1       A.   I don't know if it was the first time or

2   not.  I think the only -- yeah, I don't remember if

3   this was the first time or not.

4       Q.   If there were other times, fair to say

5   that there would be some type of documentation

6   surrounding your communications with Sally --

7       A.   No.

8       Q.   -- or others?

9       A.   No, it could have been that the

10  conversations were done face to face.  So there were

11  some managers that I meet with weekly, and we have a

12  conversation where we're catching up on here's

13  what's happening or here's what's coming down the

14  pike.

15      So it's an exchange of information.  So

16  sometimes it might be done in writing, or it could

17  be a conversation we were having during our meeting.

18      Q.   Are notes taken during any particular

19  meeting with your managers?

20      A.   It depends.

21      Q.   Do you recall whether before November of

22  2011 that an issue was ever raised by Sally or

Page 102

1  anybody else about Ms. Ross' performance generally
2  and her writing in particular?
3      A.  I vaguely recall that all of the COBs and
4  even the interim COB wanted to see Sonya -- Ms. Ross
5  write more.  They all seemed to agree that she was a
6  good writer and they wanted to see her write more.
7      Q.  And when you say all of the COBs, who are
8  you referring to specifically, Ms. Garner-Sampson?
9      A.  Sally Buzbee; B-U-Z-B-E-E; Ron Fournier;
10  Steve Komoraw was an interim, K-O-M-O-R-A-W I think
11  is how he spelled it off the top of my head,
12  sorry -- wanted to see her write more.
13      Q.  Anybody else?
14      A.  Those are the only COBs that I can think
15  of.
16      Q.  And Ron was, Mr. Fournier, is it your
17  recollection that Ms. Ross had transitioned into the
18  race and ethnicity position when Mr. Fournier was
19  still there?
20      A.  I believe the discussion started when he
21  was there.  I don't recall the exact timing, if it
22  happened before he left or not.  But to my

Page 103

1  knowledge, I thought the conversation started while
2  he was there as the COB.
3      Q.  Were any of these concerns placed or put
4  in writing?
5      A.  I don't remember from back then.  I don't
6  know.  They may have been in a -- a -- a performance
7  appraisal.  I don't know if there were any other
8  conversations or written documents around them.
9  There may have been an exchange like you see here
10  with Sally or I, but ...
11      Q.  Were you ever involved in helping to draft
12  a performance evaluation for Ms. Ross?
13      A.  I wasn't involved in -- I don't ever
14  recall being involved in drafting a performance
15  appraisal.  I wouldn't do that for Ms. Ross or any
16  other person.
17      As I mentioned earlier, the managers write
18  the performance appraisals, not HR.
19      Q.  I understand that, Ms. Garner-Sampson.  My
20  question is, were you ever -- I'll put this way:
21  Were you ever involved in the preparation of a
22  performance evaluation for Ms. Ross?

Page 104

1      A.  I don't recall being involved in the
2  preparation of it, no.
3      Q.  You didn't review a draft of a performance
4  evaluation before it was released to Ms. Ross?
5      A.  I don't recall.  I don't remember from
6  back then.
7      Q.  Could that have happened?
8      A.  It's possible.
9      Q.  Okay.  But generally what is your role
10  with regard to performance evaluations?
11      A.  So as I mentioned earlier, what I do is
12  the managers -- AP has a common review date.  And
13  traditionally I will send out a note to managers
14  saying, FYI, appraisals are going to be due on X
15  date.  It's time -- let me clarify.
16      As I mentioned earlier, we have the
17  collective bargaining agreement that specifies when
18  appraisals are due for the union staff.
19      Traditionally, the managers will get an
20  email that says, Manager X, please be advised that
21  Joe Blow's appraisal is due on or before X date.
22      For the administrative staff, which

Page 105

1  Ms. Ross is a part of, I would traditionally send
2  notes to all the managers saying, FYI, the common
3  review date is X.  You should start working on your
4  appraisals.  And managers start working on their
5  appraisals, putting them together.
6      If there is one that has concerns,
7  performance concerns, I ask to see them and review
8  them.  If there's one where, again, they are going
9  to rate someone outstanding, so the two ends of the
10  spectrum, I try to look at those as well.
11      Q.  So it's your testimony that, as a matter
12  of course, you don't provide any insight or opinion
13  about a particular employee's performance in
14  preparation for a performance evaluation?
15      A.  I would not normally have the benefit of
16  knowing about their performance.  If there's an
17  employee who is performing well, the manager would
18  not necessarily be having a conversation with me
19  about that; so, therefore, I would not have to be
20  involved in the preparation of an appraisal.  That's
21  what the managers are charged with doing.
22      Q.  What if, purportedly, the employee is not

Page 106

1  having -- withdrawn.
2       What if an employee is having issues, at
3  least according to Associated Press and her
4  managers, with her performance?
5     A.  So if a manager believes that there's a
6  performance issue, then we would be having a
7  conversation.  I want to know what are the issues.
8  I want to hear what it is we want to talk about in
9  the appraisal.  I want to help them evaluate how to
10 communicate that information in a fair and
11 constructive manner.
12    Q.  So if Ms. Ross received a substandard
13 performance evaluation, it's fair to say that you
14 would have been involved in discussions surrounding
15 that performance evaluation?
16    A.  It's not fair to say that because, again,
17 sometimes the managers will have conversation with
18 Jessica or Jean, so they could be having
19 conversations with several of us.  Or they may have
20 a conversation directly with Jessica or Jean.  It
21 depends on who the manager is.
22    Q.  Well, the manager was Sally Buzbee.

Page 107

1     A.  Uh-huh.
2     Q.  In March of 2012, she's asking you for
3  your input into Ms. Ross' performance.
4     A.  No, she's not asking for my input.  What
5  she was asking about was, Here are the things that I
6  want to be sure to talk about, how best to talk
7  about them.
8     Q.  When would Ms. Ross' performance
9  evaluation for 2012 have been prepared and released?
10    A.  I don't know.  The common review date is
11 June 1.  So depending on where the managers are in
12 their process, some are proactive and early and hit
13 that June 1 mark.  Some are slow and delayed and
14 don't hit that mark, so I can't tell you for certain
15 when it would have been prepared and delivered.
16    Q.  So according to you, Ms. Buzbee is asking
17 you for advice on how to articulate what she
18 perceived to be performance issues; is that what
19 your testimony is?
20    A.  She's asking about how to complete the
21 appraisal and document the things that she wants to
22 go over with a staffer, yes.

Page 108

1       Are you still on Exhibit 3?
2     Q.  Maybe.  Maybe not.  Keep it there.
3       (Sampson Deposition Exhibit 4
4       marked for identification)
5  BY MS. JONES
6     Q.  Ms. Garner-Sampson, the court reporter has
7  handed you Exhibit 4.
8       Let me know when you finish reviewing.
9     A.  Okay.
10    Q.  Do you recognize this email?
11    A.  Now that I've reviewed it, yes.
12    Q.  And who is Aracelia Mercado?
13    A.  Aracelia Mercado, yes.
14    Q.  Who is she?
15    A.  She is a staffer based in New York.  She
16 works with HRIS.  And she is the one who is in
17 charge of -- one of the things she does is maintain
18 the personnel files.
19    Q.  And what are you asking from Aracelia?
20    A.  I say, Hi, Aracelia -- this is dated
21 Thursday, November 7, 2013 -- Hi, Aracelia, can you
22 check Sonya Ross' file and send me anything you find

Page 109

1  as soon as possible regarding her change in position
2  from news editor to news editor urban affairs on
3  2/1/11 and then to race and ethnicity editor on
4  3/7/11.  Thanks much.
5     Q.  Does this refresh your memory as to about
6  when Ms. Ross became the race and ethnicity editor?
7     A.  According to this, it was sometime in
8  March of 2011, it looks like.
9     Q.  In November of 2013, why are you asking
10 Ms. Mercado for this information?
11    A.  I have no idea in 2018 why I asked her
12 about this in 2013.  It doesn't seem to have any
13 other page to it to it to allow for context so I don't
14 know why I asked.
15    Q.  Would it be your practice to get a
16 personnel file?
17    A.  Yes, I do often ask for personnel files if
18 I'm looking for something, researching something, if
19 somebody raises an issue and I need to confirm
20 something.
21       MS. JONES:  Off the record.
22       (Off the record)

Page 110

1          (Recess)

2       (Sampson Deposition Exhibit 5

3          marked for identification)

4   BY MS. JONES:

5       Q.   Ms. Garner-Sampson, the court reporter has

6   handed you Exhibit 5.

7       A.   Yes, ma'am.

8       Q.   Do you recognize this document?

9       A.   No.

10      Q.   Do you recognize that writing that's

11  contained in this document?

12      A.   No.

13       (Sampson Deposition Exhibit 6

14          marked for identification)

15  BY MS. JONES:

16      Q.   Ms. Garner-Sampson, the court reporter has

17  handed you Exhibit 6.

18      A.   Uh-huh.

19      Q.   Do you recognize this document?

20      A.   It's an email.  Other than that, I can't

21  say I recognize it.

22      Q.   Email from Ms. Buzbee to you?

Page 111

1       A.   Yes.

2       Q.   And do you recall what Ms. Buzbee has been

3   referring to by this email?

4       A.   Can I have a second to read it?

5       Q.   Sure.  Absolutely.

6       A.   So the piece that Ms. Buzbee wrote, it

7   doesn't really tell me anything, but I see I have a

8   note trying to put some context to what this is

9   about.

10      Q.   This is your handwriting?

11      A.   At the bottom, yes.

12      Q.   And so what can you -- I can read some of

13  this but -- sorry, no offense -- but if you could

14  read that for us into the record.

15      A.   So per Sally, 3/9/12 Kim Hefling, a former

16  staffer, was going to be working on a piece and

17  reached out to Sonya for thoughts, guidance and

18  support.  Sonya explained to Mike and Sally that she

19  didn't assist because she was given only about 24

20  hours' notice.  Sally and Mike were baffled and

21  concerned, explaining to Sonya that short notice

22  coverage is the norm in the news business.  Planned

Page 112

1   enterprise is good, but short notice stories are our

2   norm.  I believe the story in question related to

3   punishment being harsher in schools for minority

4   students.

5       Q.   Okay.  And is it fair to say that you,

6   after receiving this email from Ms. Buzbee, that you

7   printed it out and made this notation?

8       A.   Yes.

9       Q.   And do you recall whether you made it that

10  same day?

11      A.   I'm sure I did because I dated it that

12  day.

13      Q.   Per Sally, 9/12 -- 3/9/12?

14      A.   Yes.

15      Q.   And why did you do that?  Why did you make

16  a notation to, I guess, essentially to the file

17  based on this email?

18      A.   So -- because if -- Sally's note, again,

19  as I said, is vague.  So I would have no way of

20  having context of what it was about.  So I would

21  have wanted to have a note of what this was about,

22  what was she sending this in for.

Page 113

1       Q.   Would that be a practice of yours, that

2   you would maybe print out a communication, email or

3   anything else and write a note about it on the

4   document to kind of refresh your memory as to what

5   was discussed or what the issue was?

6       A.   I do that sometimes, yes.

7        (Sampson Deposition Exhibit 7

8           marked for identification)

9   BY MS. JONES:

10      Q.   Ms. Garner-Sampson, the court reporter has

11  handed you Exhibit 7.  Although -- I'm going to ask

12  that the last page of it, that you just separate it

13  from this particular exhibit.

14       And you can hand that back to me for now.

15      A.   Okay.

16      Q.   Do you recognize this document?

17      A.   No.

18      Q.   Do you recognize the handwriting at the

19  top right side of it?

20      A.   No.

21      Q.   And on the second page, do you recognize

22  that handwriting?

Page 114

1   A.   No.

2        (Sampson Deposition Exhibit 8

3        marked for identification)

4   BY MS. JONES:

5   Q.   Ms. Garner-Sampson, the court reporter has

6   handed you Exhibit 8.  Do you recognize this

7   document?

8   A.   Only because it's the document that you

9   just separated from seven.

10  Q.   Other than that, do you recognize it?

11  A.   No, sorry.

12  Q.   Do you recognize the handwriting in the

13  document?

14  A.   No.

15  Q.   Let me check my notes real quickly.

16       (Pause)

17       MS. JONES:  Okay.  Thank you for coming.

18  I don't have anything in addition today.

19       Although I'm not positive that it will be

20  necessary, but I did receive quite a few documents

21  from the Associated Press today.  And as result, I'm

22  going to have to -- I'm entitled to leave the --

Page 115

1   technically leave the deposition open in the event

2   there's something in there that I didn't have before

3   that I might wish to depose you about again.

4        Doubtful, but technically, I'm allowed to

5   leave the deposition open.

6        THE WITNESS:  Yes, ma'am, understood.

7        MR. CARTAFALSA:  We'll take it under

8   advisement.  Normally when a deposition is open, the

9   witness can't talk with anyone about the nature of

10  the deposition.  In this instance, I think we agree

11  that we can speak about the deposition; is that

12  fair?

13       MS. JONES:  That's fine.

14       MR. CARTAFALSA:  Okay.

15       MS. JONES:  Do you want her to read and

16  sign, or do you want her to waive reading and

17  signing, meaning that you have a right to review it

18  and not necessarily change the substance of your

19  answers, but for instance if you said "Jill" and you

20  meant "Jessica" you could say, Well, I meant

21  Jessica, things like that.

22       MR. CARTAFALSA:  She'll read and sign.

Page 116

1        (Signature reserved)

2        (Whereupon, at 2:50 p.m., the deposition

3   of MONTESE GARNER-SAMPSON was adjourned)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

1   CERTIFICATE OF STENOTYPE REPORTER - NOTARY PUBLIC

2

3        I, Lohna Burns, Court Reporter, the officer before

4   whom the foregoing proceeding was taken, do hereby certify

5   that the foregoing transcript is a true, correct, and

6   complete record of the proceeding; that said proceeding was

7   taken by me stenographically and thereafter reduced to

8   typewriting by me; and that I am neither counsel

9   for, related to, nor employed by any of the parties

10  to this litigation and have no interest, financial or

11  otherwise, in its outcome.

12       IN WITNESS WHEREOF, I have hereunto set my hand

13  and affixed my notarial seal this 5th day

14  of March 2018.

15

16       LOHNA BURNS

17       Notary Public in and for

18       District of Columbia

19  My commission expires:

20  November 30, 2022

21

22