

# Transcript of Sonya Ross

**Date:** February 13, 2018
**Case:** Ross -v- The Associated Press

**Planet Depos**
**Phone:** 888.433.3767
**Email::** transcripts@planetdepos.com
**www.planetdepos.com**

Transcript of Sonya Ross

1 (1 to 4)

Conducted on February 13, 2018

---

**1**

```
 1        IN THE UNITED STATES DISTRICT COURT
 2            FOR THE DISTRICT OF COLUMBIA
 3
 4    ------------------------x
 5    SONYA L. ROSS,        )
 6            Plaintiff, )
 7         vs.      ) Case No.
 8    THE ASSOCIATED PRESS   ) 16-cv-820TSC
 9            Defendant. )
10    ------------------------x
11
12         Videotaped Deposition of
13              SONYA ROSS
14            Washington, D C
15        Tuesday, February 13, 2017
16             10:10 a.m.
17
18
19
20    Job No.: 176878
21    Pages: 1 - 250
22    Reported by: Donna Marie Lewis, RPR, CSR (HI)
```

**2**

```
 1        IN THE UNITED STATES DISTRICT COURT
 2            FOR THE DISTRICT OF COLUMBIA
 3
 4    ------------------------x
 5    SONYA L. ROSS,        )
 6            Plaintiff, )
 7         vs.      ) Case No.
 8    THE ASSOCIATED PRESS   ) 16-cv-820TSC
 9            Defendant. )
10    ------------------------x
11
12
13
14        Videotaped Deposition of SONYA ROSS,
15    held at Ogletree Deakins, 1909 K Street, NW, Suite
16    1000, Washington, D C 20036, pursuant to Notice,
17    before Donna Marie Lewis, Registered Professional
18    Reporter and Notary Public of and for the District
19    of Columbia.
20
21
22
```

**3**

```
 1          A P P E A R A N C E S
 2    ON BEHALF OF PLAINTIFF:
 3        LISA ALEXIS JONES, PLLC
 4        BY: LISA ALEXIS JONES, ESQUIRE
 5        One Rockefeller Plaza
 6        10th Floor
 7        New York, New York 10020
 8        Telephone: (646)756-2967
 9        Facsimile: (888) 755-6778
10        Email: ljones@LisaAJones.com
11    ON BEHALF OF DEFENDANT:
12        OGLETREE, DEAKINS, NASH, SMOAK &
13        STEWARD, P.C.
14        BY: JOSEPH B. CARTAFALSA, ESQUIRE
15        1745 Broadway,
16        22nd Floor
17        New York, New York 10019
18        Telephone: (212) 492-2500
19        Facsimile: (212) 492-2501
20        Email: joseph.cartafalsa@ogletree.com
21    ALSO PRESENT:
22        ANTHONY VORNDRAN, LEGAL VIDEOGRAPHER
```

**4**

```
 1            I N D E X
 2    WITNESS:
 3      SONYA ROSS
 4    EXAMINATION BY:                PAGE
 5      Mr. Cartafalsa              6
 6      Ms. Jones                 245
 7
 8          E X H I B I T S
 9    ROSS
10    EXHIBITS:      DESCRIPTION      PAGE
11    No. 1        Complaint        5
12
13    CERTIFIED QUESTION:
14    Page/Line
15    24 : 17
16
17
18
19
20
21
22
```

**5**

1        P-R-O-C-E-E-D-I-N-G-S
2        (Whereupon, Exhibit No. 1 was marked for
3    identification)
4        THE VIDEOGRAPHER:  This is the beginning
5    of disk one in the videotaped deposition of Sonya
6    Ross in the matter of Ross v. The Associated Press
7    in the United States District Court for the
8    District of Columbia case number 16-CV-820TSC.
9        Today's date is February 13, 2018.  The
10   exact time on the video monitor is 10:10 a.m. the
11   videographer today is Anthony Vorndran
12   representing Planet Depos.  This deposition is
13   taking place at Ogletree Deakins located at 1909 K
14   Street, NW, Suite 1000, Washington, D C 20005.
15       At this time would counsel voice
16   identify themselves and state whom they represent.
17       MR. CARTAFALSA: Joseph Cartafalsa of
18   Ogletree Deakins for Associated Press.
19       MS. JONES:  Lisa Alexis Jones on behalf
20   of Sonya Ross.
21       THE VIDEOGRAPHER:  The court reporter
22   today is Donna Lewis also representing Planet

**6**

1    Depos.  If the reporter could please swear in the
2    witness we may proceed with the deposition.
3    Whereupon,
4        S O N Y A  L.  R O S S
5    after having been first duly sworn by the Notary
6    Public was examined and testified as follows:
7        EXAMINATION ON BEHALF OF DEFENDANT
8        MR. CARTAFALSA:  Good morning, Ms. Ross.
9        THE WITNESS:  Good morning.
10       MR. CARTAFALSA:  And, Lisa, I assume
11   usual stips as far as -- you know, objections
12   other than -- other than form are not waived if
13   not raised, no speaking objections, things like
14   that?  Or --
15       MS. JONES:  Well, actually in the
16   District of Columbia the rules are a little
17   different than in New York.
18       MR. CARTAFALSA:  What do you have --
19       MS. JONES:  -- You can do speaking
20   objections.
21       MR. CARTAFALSA:  Okay.
22       MS. JONES:  But I try to keep them at a

**7**

1    minimum.
2        MR. CARTAFALSA:  Okay.
3    BY MR. CARTAFALSA:
4        Q    Okay.  Ms. Ross, you are here today for
5    your deposition.  Do you understand that?
6        A    Yes.
7        Q    And the court reporter is going to take
8    down all of your words and you're being
9    video-graphed as well.  The court reporter is also
10   going to take down all of my words and the words
11   of everyone else in the room.  Okay?
12       A    Okay.
13       Q    Okay.  Some of the most simple rules
14   are, they're not going to be able to get -- or at
15   least the court reporter will not be able to get a
16   head shake or something like that or an uh huh.
17   So sometimes you may ask me -- you may hear me ask
18   you to say -- you know, please state that verbally
19   or just to make it clear.  Is that okay?
20       A    That's okay.
21       Q    At any time you want to take a break
22   just let us know.  It's your deposition, so you

**8**

1    can take breaks whenever you want.  The one rule
2    is if there's a question pending you need to
3    answer the question first and then you can take
4    the break.  Okay?
5        A    All right.
6        Q    We're going to ask that if you don't
7    understand a question for any reason to let us
8    know, because if you do answer it we're going to
9    assume that you understood it.  All right?
10       A    Okay.
11       Q    Is there any reason, such as alcohol or
12   medications, that would affect your ability to
13   testify truthfully today.
14       A    No.
15       Q    Okay.  Any medication or alcohol that
16   would affect your memory today?
17       A    No.
18       Q    Okay.  Since 2008 have you been on any
19   medications that might affect your memory?
20       A    No.
21       Q    Since 2008 any medications that might
22   affect your mood?

9

1      A   No.
2          MS. JONES:  Objection.  Relevance, but
3  you can answer.
4  BY MR. CARTAFALSA:
5      Q   Okay.  Did you talk to anyone about your
6  testimony today?
7          And don't -- I assume you will object to
8  attorney/client privilege?
9          MS. JONES:  Of course.
10 BY MR. CARTAFALSA:
11     Q   So, don't tell me what you spoke with
12 your attorney about if you spoke with your
13 attorneys, but just who did you speak with about
14 the deposition today if anyone?
15     A   Can you rephrase your question?
16     Q   Okay.  Fair enough.  Did you tell anyone
17 that you had this deposition today?
18     A   Yes.
19     Q   Okay.  And who did you tell?
20     A   My sister.
21     Q   Okay.  And what did you tell your
22 sister?

10

1      A   That I had a big day today and to wish
2  me luck.
3      Q   Okay.  Anything else?
4      A   No.
5      Q   Does your sister know anything about --
6  does your sister have any firsthand knowledge of
7  the facts or allegations in this case?
8          MS. JONES:  Objection.  Calls for
9  speculation.  But you can answer if you know.
10         THE WITNESS:  She has a little
11 knowledge, yes.
12 BY MR. CARTAFALSA:
13     Q   When you say that what knowledge do you
14 think she has?
15     A   When we pray together.
16     Q   Okay.  And what would you pray about in
17 relation to this case?
18     A   I reach out to her.  She is a minister.
19 I reach out to her when it gets tough for me.
20     Q   Okay.  And I will ask are you -- you're
21 going to invoke the minister privilege here?  Or I
22 will ask what the discussions were.

11

1          MS. JONES:  Now that I know that she --
2  her sister is not just a layperson but a minister
3  and clergy, yes, I will invoke that.
4  BY MR. CARTAFALSA:
5      Q   Did you tell anyone about the lawsuit
6  that you have against the AP?
7      A   Can you rephrase that question?
8      Q   What don't you understand in that?  Why
9  do you need that rephrased?
10     A   I want to understand what you mean by
11 tell someone.
12     Q   Did you verbally or in writing inform
13 anyone that you had this lawsuit?
14     A   Yes.
15     Q   And who did you tell verbally or in
16 writing?
17     A   A couple of reporters.
18     Q   Who are they?
19     A   Who contacted me because they saw the
20 lawsuit get filed in court.
21     Q   Got it.  So, these are reporters for
22 other news agencies, not AP?

12

1      A   Correct.
2      Q   Okay.  Did you tell anyone else?
3      A   No.
4      Q   Did anyone, any employee of the AP ask
5  you about the lawsuit?
6      A   Yes.
7      Q   Okay.  Who asked you?  Let me withdraw
8  that.  Let me -- I'll rephrase the question.  Did
9  you speak with anyone about this lawsuit?  You
10 mentioned the reporters before, the non-AP
11 reporters.  Anyone else?
12     A   Yes.
13     Q   Okay.  And who was that?
14     A   I want to understand what you mean by
15 speak to because people routinely ask me about
16 this lawsuit.  And I reply to them, but I'm not
17 disclosing much about this lawsuit beyond the fact
18 that it exists.
19     Q   Who has asked you about the lawsuit?
20     A   Colleagues in general.  Mostly at the
21 AP.  And several people in the industry asked me.
22     Q   Okay.  Who at the AP do you recollect

13

1 asking you?
2    A   Every reporter who has reported to me
3 and currently worked for the AP.
4    Q   And who is that?
5    A   Gosh.  Let's see.  I can't really recall
6 specifics about who, because it was such a daily
7 thing.  And this was in the beginning of the
8 lawsuit.
9    Q   Okay.  Do you have even one person that
10 you recollect speaking with?
11    A   Yes.
12    Q   Okay.  Who is that?
13    A   That would be Jesse Holland.
14    Q   Jesse Holland?
15    A   Yes.
16    Q   Who is Jesse Holland?
17    A   He is a reporter for the AP here in
18 Washington, D C.
19    Q   Do you recall speaking with anyone else?
20    A   Not really.  Because again, when you get
21 back to speaking to, this is just in general
22 inquiring, so.

14

1    Q   Well, do you have any specific
2 recollection of anyone other than Jesse Holland
3 speaking with you in general about the lawsuit?
4    A   Well, there are people who worked for AP
5 and don't now work for AP --
6    Q   -- Okay.
7    A   -- who did ask me about the lawsuit.
8    Q   Sure.  I'm asking generally, not just
9 limited to people at the AP?
10    A   There are former colleagues who asked
11 about this lawsuit.
12    Q   Okay.  Who?
13    A   Suzanne Gamboa who was once was my
14 reporter inquired about the lawsuit.
15    Q   Okay.  Who else?
16    A   Anne Gearan who was a friend and
17 colleague in the bureau, who no longer works for
18 the AP.
19    Q   Just so I get it right.  Anne Gearan?
20    A   Yes.
21    Q   Anyone else?
22    A   Right off of the bat I can't really

15

1 recall.  And that's because there was not much
2 intensity to this -- these queries.  I mean, they
3 were just saying; Hey, I saw this, how are you
4 doing.
5    Q   Okay.  So, we will go back to Jesse
6 Holland.  His -- your discussion with him was
7 basically just what you said?  Or tell me if it's
8 something different?
9    A   His might be different because he
10 reports to me.
11    Q   Okay.
12    A   He is aware of the lawsuit and he has
13 obvious concern about it, given that it affects
14 his boss.
15    Q   Okay.  So, what did you and Jesse
16 discuss?
17    A   Other than the lawsuit being a reality?
18    Q   Yes.
19    A   Nothing much really beyond that.  He
20 will ask occasionally; Is it still going on?  And
21 I tell him; Yes it is.
22    Q   Any other conversations with Jesse of

16

1 any substance?
2    A   No.
3    Q   What about Suzanne?
4    A   Suzanne left the AP and would love for
5 me to come to work where she currently works and
6 is constantly asking me the status of this
7 situation because she wants to know when I would
8 be available to come to her at her current place
9 of employment.
10    Q   And where is that?
11    A   NBC.
12    Q   Excuse me.  What is the name of the
13 employer?
14    A   NBC.
15    Q   Oh, I'm sorry.  I thought you said in
16 D C.  I'm sorry.
17    A   No.
18    Q   NBC?
19    A   NBC.
20    Q   I heard that wrong.  Okay.  Did she
21 offer you a specific role there?
22    A   No.

17

1    Q    Did you follow up and ask about
2 submitting an application or anything like that?
3    **A    I replied to her thank you for letting**
4 **me know about this or that position, which she's**
5 **let me know of things that were available at NBC**
6 **twice.**
7    Q    And did you follow up and apply for
8 them?
9    **A    No.**
10    Q    Okay.  How come?
11    **A    Well, they weren't necessarily what I**
12 **would like to do.**
13    Q    Do you remember what the positions were?
14    **A    No, other than they were in television.**
15    Q    And what is it that you would --
16    **A    -- And I am a writer.**
17    Q    And what is it that you would like to
18 do?
19    **A    I would like to direct coverage along**
20 **the vein of what I do now.  And most of what she**
21 **let me know about were not that level of -- you**
22 **know, those jobs were not on that level.**

18

1    Q    When you say direct coverage what do you
2 mean by that?
3    **A    Meaning be an editor in charge of**
4 **coverage.**
5    Q    Okay.  Would you be willing to be an
6 editor in charge of coverage at a -- on the T.V.
7 side?
8    **A    It's different for television.  You --**
9 **that's really more of a producer role.  And I**
10 **don't have producer experience along that vein for**
11 **what I'd like to do.**
12    Q    So, where would you like to be an editor
13 in charge of coverage?  Have you applied to any
14 other jobs?
15    **A    No.**
16    Q    How would you describe your memory?
17 Good memory?  Bad memory?
18    **A    I have a decent memory.**
19    Q    So, you have not applied to any other
20 jobs, let's say since 2008.  Correct?
21    **A    Yes, actually there is one.**
22    Q    Okay.  What was that?

19

1    **A    I applied to be president of the Atlanta**
2 **Press Club a couple of months ago.**
3    Q    Okay.  Is that a paying position?
4    **A    Yes, it is.**
5    Q    And have you heard back?
6    **A    Yes.**
7    Q    And what did they tell you?
8    **A    No.**
9    Q    Did they tell you why?
10    **A    They went with a different candidate.**
11    Q    And what made you apply for that?
12    **A    It struck me as a unique opportunity to**
13 **be an influencer in industry in a different way.**
14 **It had flexibility to it.**
15    Q    What do you mean by that?
16    **A    Well, meaning it's essentially running a**
17 **nonprofit association with coverage**
18 **responsibilities in terms of political debates,**
19 **political events, things that were in my bailiwick**
20 **of experience.  And it was some -- a new**
21 **challenge.  It was something different.  I was**
22 **intrigued by it, so I pursued.**

20

1    Q    Do you know what the position paid?
2    **A    No.**
3    Q    And when was this that you applied?
4    **A    Well, it was in recent months.  I'm not**
5 **exactly sure of the date.**
6    Q    That's okay.
7    **A    But recently.**
8    Q    Were you given an interview?
9    **A    No.**
10    Q    Did you submit a writing sample or CV?
11    **A    Yes.**
12    Q    To which?  Both?
13    **A    No.**
14    Q    Okay.  CV you submitted?
15    **A    Yes.**
16    Q    Did you submit a portfolio or anything
17 like that?
18    **A    No.**
19    Q    So, things are not so bad at the AP to
20 make you look for employment elsewhere.  Correct?
21    **A    No, that is not correct.**
22    Q    Okay.  But you have not looked for

Transcript of Sonya Ross
Conducted on February 13, 2018

21

1  employment elsewhere with one exception?
2       MS. JONES: Objection. Argumentative.
3  You can answer, Ms. Ross.
4       THE WITNESS: Well, the answer would be
5  yes and no. Yes in the sense that I'm always open
6  to opportunities that come up at a certain level
7  in media. You have to be connected and know
8  people and know when the opportunities are coming
9  along. So in that aspect, yes, I'm open and
10 looking.
11 BY MR. CARTAFALSA:
12    Q   Okay.
13    A   No, in the sense of the mechanics of it
14 as you described.
15    Q   What do you mean by that?
16    A   I mean literally filling out
17 applications. Literally responding to postings
18 and things like that have been minimal.
19    Q   Minimal or you have that one?
20    A   I have that one.
21    Q   Okay. Is it fair to say you are not
22 actively looking for other employment?

22

1     A   What do you mean?
2     Q   Are you sort of doing passive where you
3  are willing to -- if somebody brings something up
4  you're willing to listen? Or are you actively
5  looking for employment?
6     A   I'm passive.
7     Q   Okay. You're content enough with your
8  job at the AP for now?
9     A   Yes.
10    Q   Did you meet with your attorneys to
11 prepare for today? And again, don't tell me what
12 was said.
13    A   Define meet?
14    Q   Well, did you speak with your attorneys
15 in person or over the phone?
16    A   Yes.
17    Q   Okay. And when was that?
18       MS. JONES: Objection. But you can
19 answer.
20       THE WITNESS: Well, I mean obviously we
21 have talked in the days leading up to this
22 deposition.

23

1  BY MR. CARTAFALSA:
2     Q   Okay. Okay. Did you have an in-person
3  meeting or over the phone or over electronic
4  communication, a meeting about the deposition?
5       MS. JONES: Objection.
6  BY MR. CARTAFALSA:
7     Q   Again, don't tell me what was said. You
8  can answer.
9     A   Can you rephrase your question?
10    Q   Did you have a specific meeting or
11 conversation with your attorneys to prepare for
12 the deposition as opposed to talking about the
13 case in general?
14       MS. JONES: Objection.
15 BY MR. CARTAFALSA:
16    Q   You can answer that. I'm not looking
17 for what you spoke about.
18    A   Yes.
19    Q   And when was that?
20       MS. JONES: Objection.
21 BY MR. CARTAFALSA:
22    Q   You can answer.

24

1     A   I'm trying to understand what you mean
2  here. Did I meet with or talk with my attorneys?
3     Q   To prepare for today's deposition?
4     A   Yes.
5     Q   And when?
6       MS. JONES: Asked and answered. You can
7  answer it again, Ms. Ross.
8       THE WITNESS: Yesterday, over the past
9  three or four days, again as we were heading into
10 this deposition.
11 BY MR. CARTAFALSA:
12    Q   Okay. Did you review any documents?
13    A   Yes.
14    Q   Okay. Do you recollect what those
15 documents were?
16    A   Yes.
17    Q   Okay. And what were they, to the best
18 of your recollection?
19       MS. JONES: Objection. Don't answer
20 that.
21 BY MR. CARTAFALSA:
22    Q   You can answer.

Transcript of Sonya Ross
Conducted on February 13, 2018

---

25

1        MS. JONES:  Don't answer that, Ms. Ross.
2        MR. CARTAFALSA:  Are you directing her
3  not to answer.
4        MS. JONES:  Yes.
5        MR. CARTAFALSA:  Can you mark that for a
6  ruling?  Can you mark that for ruling?  Do you do
7  that?
8  BY MR. CARTAFALSA:
9     Q    Before I asked you a question about who
10 you spoke with about the lawsuit, did you have any
11 email or other correspondence, electronic or
12 otherwise, with anyone else about the lawsuit
13 other than your attorneys?
14    A    No.
15    Q    Without specifically discussing the
16 lawsuit did you have conversations with anyone
17 about the allegations contained in the lawsuit?
18    A    **Can you rephrase that question please?**
19    Q    Without saying I'm suing the Associated
20 Press -- but did you have conversations with
21 anyone other than your attorneys and other than
22 your sister about the allegations that you've

---

26

1  raised in the lawsuit?
2     A    **Yes.**
3     Q    Okay.  And who did you speak with or
4  have conversations with?
5     A    **My other sister.**
6     Q    Okay.
7     A    **Who is not a minister.**
8     Q    Okay.  And what did you say to her?
9     A    **That I have this lawsuit pending.**
10    Q    Okay.  I'm talking about not again about
11 the lawsuit, but any of the allegations contained
12 in it about this alleged discrimination,
13 harassment, or retaliation?
14    A    **Yes.**
15    Q    Who did you speak with?
16    A    **The same sister.**
17    Q    Okay.  Do you recollect what you said to
18 her?
19    A    **Not anything specific, just that this**
20 **situation continues.  It's been going on for**
21 **almost two years and that it is continuing.**
22    Q    Okay.  So you didn't raise or -- I'm

---

27

1  sorry.  Did you discuss, again, the allegations of
2  discrimination, harassment, or retaliation that
3  you feel you suffered at the AP with anyone else?
4     A    **No.**
5     Q    Did you have any written communications
6  including emails, blog posts, written letters,
7  etc., with anyone about the allegations in the
8  lawsuit?
9     A    **Yes.**
10    Q    Okay.  Who?
11    A    **Again, various people in the industry**
12 **have contacted me asking me about this lawsuit.**
13 **So in the process of telling them no I can't talk**
14 **about it I reply to them.  Sometimes it has been**
15 **in email, sometimes it's been other forms of**
16 **communication, but I'm telling them I can't talk**
17 **about it.**
18    Q    Okay.  Anyone else?
19    A    **No.**
20    Q    Did you ask anyone to serve as a witness
21 for you?
22    A    **No.**

---

28

1     Q    Did you ask anyone to provide a
2  statement for you?
3     A    **No.**
4     Q    Did you ask anyone for evidence or
5  documents?
6     A    **No.**
7     Q    And just to be clear, I'm talking about
8  the allegations in the lawsuit it includes
9  obviously allegations before the physical filing
10 of the lawsuit.  At any point did you have any
11 conversations with anyone about those allegations?
12    A    **What do you mean by conversations?**
13    Q    Either verbal, written, any form of
14 communication, writing, etc.?
15    A    **Yes.**
16    Q    Okay.  Tell me how?
17    A    **This goes back to the same people in the**
18 **industry who routinely inquire with me about this**
19 **case.**
20    Q    Okay.  Anyone else?
21    A    **No.**
22    Q    Is it your testimony then that you

Transcript of Sonya Ross
Conducted on February 13, 2018

---

29

1  didn't communicate verbally or in writing with
2  anyone else that you believed the AP was
3  discriminating against you, harassing or
4  retaliating against you?
5      A   Yes.
6      Q   Okay.  You're currently the race and
7  ethnicity editor at the AP?
8      A   Yes.
9      Q   I assume you're knowledgeable about race
10 relations?
11     A   Yes.
12     Q   Okay.  You're knowledgeable about
13 discrimination or harassment?
14     A   Yes.
15     Q   Okay.  And you know what violates the
16 law?
17     A   To a degree.
18     Q   Do you know retaliation is unlawful?
19     A   Yes.
20     Q   When did you first learn that -- I will
21 break it down, that retaliation was unlawful, if
22 you recollect?

---

30

1      A   It had to have been in the 1990's when I
2  was covering civil rights for the AP.
3      Q   Okay.
4      A   And there were multiple discrimination
5  cases that would come up as part of the coverage I
6  was responsible for.
7      Q   Okay.  So, in the same question
8  regarding discrimination and harassment that would
9  have been in the 1990's?
10     A   Yes.
11     Q   And what do you do to gain knowledge
12 about race and ethnicity issues?  For example, any
13 courses, blogs that you regularly read or
14 subscribe to, anything like that?
15     A   Yes.  Just like any journalist would do.
16 You keep track of developments in your subject
17 area by multiple ways.  I mean you — the internet
18 has made it a lot easier to gain access to this
19 information.  Prior to the internet you subscribed
20 to journals and read publications regularly.  That
21 sort of thing.  You maintain relationships with
22 knowledgeable people.

---

31

1      Q   Okay.  And who are those knowledgeable
2  people that you have relationships with?
3      A   You want me to name every source I have
4  had over 30 years of doing this?
5      Q   That you remember, yeah.
6      A   Gosh.  People like Jesse Jackson is one
7  of my sources.  I do feel as a journalist to be
8  asked to reveal my sources is weird.
9      Q   Well, you're here as a plaintiff in a
10 lawsuit.
11     A   I understand that.  But I'm just letting
12 you know that.
13     Q   Okay.
14     A   Gosh.  Over the years I have known
15 various activists in this area and they were
16 affiliated with groups ranging from the Southern
17 Christian Leadership Conference to the NAACP, the
18 National Council of La Raza, the political action
19 committees in Congress, the various minority
20 caucuses in Congress, advocacy groups for various
21 issues affecting children, women, families, racial
22 groups, fraternities, sororities, civic groups,

---

32

1  religious groups.
2      It's really been a very, very broad
3  range of organizations and people who I have
4  cultivated contacts with over the years.
5      Q   Other than Jesse Jackson can you tell me
6  any specific names?
7      MS. JONES:  Objection.  Relevance and
8  overbroad.  But you can answer, Ms. Ross.
9      THE WITNESS:  It's really hard for me to
10 think of specific people like that.  I mean, on
11 any given day I can talk to any number of people.
12 For example we get emails from various
13 organizations and we'll call them up and talk to
14 them.  Like Color of Change.  So I'll get a
15 different person with each group.  So, it's hard
16 to say specifically who on any given day that I'm
17 speaking with other than abiding sources.
18 BY MR. CARTAFALSA:
19     Q   Other than?  What was that?
20     A   Abiding sources.
21     Q   And what does that phrase mean?  I'm not
22 familiar with that.

---

33

1     A     That means people who I have had an
2 abiding relationship with as a source.
3     Q     What does an abiding relationship mean
4 as a source?
5     A     That would mean a long time, ongoing.
6     Q     Okay.  And who are those abiding
7 sources?
8     A     I named one for you.  Jesse Jackson.
9     Q     Okay.  Do you have others?
10    A     Yes.
11    Q     Okay.  Who are the others?
12    A     Good grief.  Al Sharpton is one,
13 although I have not spoken to him in a few months.
14 But he's one.  I'm sorry.  I'm going through in my
15 mind various people that I'm spoken with in
16 recent months to try to -- try to explain this
17 better.  Here's an example of why this is hard to
18 answer -- this question is hard to answer this
19 way.  Obviously -- let's take for example the
20 family of Martin Luther King, Jr.  Okay?
21 Obviously they are people I have spoken with over
22 the years old and maintain a relationship over the

34

1 years.  However, in contacting them I have dealt
2 with an array of different handlers many of
3 whom -- name I can -- I barely know because they
4 are intermediaries.  They contact you with email
5 or something like that.  You call that person and
6 then they connect you with the person.  So it's --
7 it's --
8     Q     All right.  I'm not looking for
9 intermediaries then.
10    A     Okay.
11    Q     So, who else?  There's the family of
12 Martin Luther King, Jr.; Al Sharpton; Jesse
13 Jackson?
14    A     Yes.
15    Q     Anyone else you can think of?
16    A     Various elected officials, mostly in
17 Georgia.
18    Q     And why mostly in Georgia?
19        MS. JONES: Objection.  Relevance.
20 BY MR. CARTAFALSA:
21    Q     You can answer, please?
22    A     Because that's where I'm from.

35

1     Q     Okay.  Any other specific names at all
2 that you can recollect?
3     A     No.
4     Q     Okay.  Let me show you what we have
5 marked as Exhibit Number 1, which is the complaint
6 in this action.  Do you recognize that document?
7     A     Yes.
8     Q     And this is your complaint in the
9 lawsuit, correct?
10    A     Yes.
11    Q     Okay.  And do you understand that the
12 lawsuit is a serious matter?
13    A     Yes.
14    Q     Okay.  And the OFCCP charge was a
15 serious matter?
16    A     Yes.
17    Q     Okay.  And you took those matters
18 seriously?
19    A     Yes.
20    Q     Okay.  And you needed to be truthful and
21 accurate in the complaint, the document if front
22 of you?

36

1     A     Yes.
2     Q     And same thing, you needed to be
3 truthful and accurate in the OFCCP charge?
4     A     Yes.
5     Q     And in both the complaint and the OFCCP
6 charge you were able to raise your allegations of
7 discrimination, harassment, or retaliation?
8     A     Yes.
9     Q     Okay.  And you did so?
10    A     Yes.
11    Q     Okay.  Thank you.  In the complaint you
12 talk about a consent decree that is -- resulted in
13 your hiring at the AP in 1983.  Do you recollect
14 that?
15    A     Could you rephrase your question?
16    Q     Okay.  Were you aware that some consent
17 decree that directly or indirectly led to your
18 hiring?
19    A     Yes.
20    Q     Okay.  Tell me about what you know about
21 that consent decree?
22    A     The Associated Press entered into that

Transcript of Sonya Ross
Conducted on February 13, 2018

37

1  consent decree after being sued for discrimination
2  against women and minorities in the 1970's.  As a
3  result of that an internship program was created
4  to ameliorate the problem.  And I was hire as an
5  intern through that program.
6      Q   Okay.  Is the consent decree as far as
7  you know still in place?
8      A   No.
9      Q   Do you know when it ended?
10     A   No.
11     Q   How did you learn about the consent
12 decree?
13     A   They told us this when we were chosen
14 for the internship program.
15     Q   Did you do anything to look up the
16 consent decree, anything like that?
17     A   No.
18     Q   At any point did you look up the consent
19 decree?
20     A   No.
21     Q   So, you took the internship in 1983
22 knowing that the AP has allegedly discriminated?

38

1      A   No.  I took the internship in 1986.
2      Q   Okay.  So, I'm sorry.  Okay.  So you
3  took -- you're right.  Took the internship --
4  thank you -- in 1986 knowing the AP had allegedly
5  discriminated?
6      A   Yes.
7      Q   Okay.  And why would you take the
8  internship?
9      A   It was a wonderful opportunity.
10     Q   Now in 1992 you were transferred to the
11 AP's Washington, D C bureau?
12     A   Yes.
13     Q   At that point you were working on the
14 civil rights or urban affairs beat?
15     A   Yes.
16     Q   Okay.  What does it mean to work on a
17 beat?
18     A   That means there is a subject that you
19 are responsible for gathering the information on
20 and reporting it for the AP.
21     Q   Okay.  And who did you report to?
22     A   At that time?

39

1      Q   Uh huh.
2      A   My first editor in coming to Washington
3  was Carole Feldman.
4      Q   Okay.
5      A   And then I reported to Kathleen Carroll.
6      Q   Okay.
7      A   And after that I reported to Sandy
8  Johnson.
9      Q   Did you report to Jonathan Wolman?
10     A   Yes.
11     Q   Directly or is that an indirect
12 reporting?
13     A   That was more of an indirect report.  He
14 was the bureau chief.
15     Q   Okay.  When you were on the beat were
16 you assigned to a specific editor?
17     A   Yes.
18     Q   Okay.  And that would have been Carole,
19 Kathleen, or Sandy?
20     A   Yes.
21     Q   How many other beat reporters were there
22 at that time on that beat, do you recollect?

40

1      A   Could you rephrase?
2      Q   Okay.  When you transferred, started at
3  the beginning of 1992.  Okay.  Were first assigned
4  to the civil rights/urban affairs beat were there
5  other beat reporters in the civil rights urban
6  affairs beat?
7      A   Yes.
8      Q   How many others approximately?
9      A   Maybe 15 from various other
10 organizations.
11     Q   What do you mean?  Excuse me.  What do
12 you mean various other organizations?
13     A   They did not work for the AP.
14     Q   Okay.  All right.  How many AP reporters
15 were on that beat?
16     A   Just me.
17     Q   Okay.  And how were other organizations
18 sort of report -- how would that work?  You said
19 there were various other organizations or various
20 other reporters from other organizations?
21     A   There were reporters on that same beat
22 for the New York Times, The Washington Post.

41

1    Q    Got it.  Okay.
2    **A    Different other newspapers and T.V.**
3  **stations.**
4    Q    Okay, so it was just you and the editor.
5  Did the editor supervise other employees?
6    **A    Yes.**
7    Q    About how many others, do you know?
8  Let's start with Carole?
9    **A    Meaning at that time?**
10   Q    Yeah, at that time?
11   **A    I am not exactly sure.**
12   Q    Okay.
13   **A    Maybe four or five others.**
14   Q    And what about Kathleen?
15   **A    About the same number.**
16   Q    Same thing for Sandy?
17   **A    Yes.  Sandy may have had more because**
18 **she was an assistant bureau chief.**
19   Q    So, would, for example, Carole supervise
20 beats other than the race -- I'm sorry, the civil
21 rights, urban affairs beat?
22   **A    Yes.**

42

1    Q    Okay.  And same thing for Kathleen and
2  Sandy?
3    **A    Yes.**
4    Q    Would Kathleen and Sandy actually write
5  on civil rights, urban affairs issues?
6    **A    No.**
7    Q    Would AP reporters other than you write
8  on civil rights or urban affairs issues?
9    **A    Yes.**
10   Q    So, obviously you did not have to be on
11 that beat to write about that subject matter?
12   **A    No.**
13   Q    Okay.  You were then assigned to cover
14 the White House?
15   **A    Yes.**
16   Q    That was about 1995?
17   **A    Yes.**
18   Q    Okay.  Was the assignment to the White
19 House discriminatory?
20   **A    Can you rephrase your question?**
21   Q    Did you believe that you were assigned
22 to the White House for discriminatory reasons?

43

1    **A    No.**
2    Q    Okay.  In fact I would have to assume
3  being assigned to the White House is a prestigious
4  assignment?
5    **A    Yes, it is.**
6    Q    Okay.  And tell me about being elected
7  to the seat, to a seat on the board of the White
8  House Correspondents' Association?
9    **A    There was an opening on the**
10 **Correspondents' Association board for a wire**
11 **service representative and Sandy Johnson**
12 **encouraged me to run for it.**
13   Q    Was that a prestigious election?
14   **A    The election itself was more of a basic**
15 **election.  There was significance to it.**
16   Q    Okay.  And what do you mean by
17 significance?
18   **A    In getting elected I became the first**
19 **black woman to do so.**
20   Q    Okay.
21   **A    And the second black person to do so.**
22   Q    So, it was a positive thing?

44

1    **A    Yes.**
2    Q    Did you believe that Sandy Johnson
3  discriminated against you, harassed you, or
4  retaliated against you?
5    **A    Yes and no.**
6    Q    Okay.  Why don't you start with the yes?
7    **A    Yes in the sense that there was general**
8  **discrimination going on in terms of advancement,**
9  **in terms of daily assignment or regular**
10 **assignment.  But no in the sense that she**
11 **personally set out to do that.**
12   Q    So, she did not personally set out to do
13 that?
14   **A    Not to my belief, no.  It was more**
15 **institutional.**
16   Q    Okay.  And you were working with Sandy
17 Johnson prior -- in or about 1995 or just prior to
18 1995?
19   **A    In 1995.**
20   Q    I ask the same question about Carole
21 Feldman and Kathleen Carroll, would your answer be
22 different for either?

Transcript of Sonya Ross
Conducted on February 13, 2018

45

1    A   No.
2    Q   So, the years when you worked for them
3  would have been a little bit different, right?
4    A   Yes.
5    Q   Did you complain about the
6  discrimination at this time in or about 1995?
7    A   No.
8    Q   But you knew you could complain.
9  Correct?
10   A   I felt that complaining would not have
11 gotten me anywhere and I felt complaining could
12 effectively end my career.
13   Q   Why did you feel that way?
14   A   I was young and intimidated.
15   Q   Who were you intimidated by?
16   A   It wasn't really who I was intimidated
17 by as much as what I was intimidated by.
18   Q   Okay.  Tell me what that what is?
19   A   It is the institutional practices that
20 result in people of color not having opportunity.
21   Q   But being promoted to cover the White
22 House was a positive advancement, correct?

46

1    A   Yes.
2    Q   Okay.  So, that would not fall within
3  the institutional practices?
4    A   No.
5    Q   So, there are exceptions to the
6  institutional practices?
7    A   My understanding of it was that John
8  Wolman wanted to give that opportunity to me.
9    Q   Okay.  And do you know why he wanted to?
10   A   I can only go on what he told me.
11   Q   Okay.  What did he tell you?
12   A   He appreciated my background in terms of
13 the reporting I had been doing on civil rights and
14 urban affairs.  He had previously been an urban
15 affairs reporter himself and he wanted that same
16 skill set brought to covering the then Clinton
17 administration.
18   Q   Okay.  So, in that instance there was
19 not an institutional practice that held you back
20 from a promotion.  Right?
21   A   Correct.
22   Q   And again Sandy telling you that there

47

1  was an opening on the White House Correspondent's
2  Association, that was not discriminatory, was it?
3    A   No.
4    Q   In fact she was looking out for your
5  advancement?
6    A   I would say she was looking out for AP's
7  advancement because it was a wire representative
8  seat and she chose who she would like to pursue
9  it.
10   Q   Okay.  So, she could have chosen others
11 then?
12   A   She could have chosen others.
13   Q   The fact that she chose you was
14 something that was positive, right?  In your mind?
15   A   In my mind.
16   Q   Do you know if management at AP at any
17 time took steps to promote the hiring or
18 advancement of African Americans -- pardon me, or
19 women?
20   A   In 1995.
21   Q   Well, at any time.  But why don't we
22 start with 1995?

48

1    A   Yes, they did take steps.
2    Q   Okay.  What were those steps?
3    A   Recruiting at minority journalism
4  conferences.
5    Q   Okay.
6    A   They periodically would ask those of us
7  who are journalists of color for referrals for
8  openings.  Steps like that.
9    Q   Okay.  And did that happen -- that has
10 happened since 1985?
11   A   Do you mean since 1995?
12   Q   I'm sorry.  1995?
13   A   It did happen after 1995.
14   Q   Okay.  Has that stopped as far as you
15 know?
16   A   It happens with less frequency now.
17   Q   Okay.  But it's still ongoing?
18   A   It's been considerably weakened.
19   Q   Okay.  And when did it become
20 considerably weakened?
21   A   In recent years.  I would say since May
22 2012.

Transcript of Sonya Ross
Conducted on February 13, 2018

49

1    Q    Okay.  Do you know why it's become
2  weakened since 2012?
3    A    No.
4    Q    Now, when you say it's become weakened,
5  it's become weakened in your observations.
6  Correct?
7    A    Yes.
8    Q    Okay.  Are you aware that it's become
9  weakened in anyone else's observations?
10   A    Yes.
11   Q    Okay.  Who is that?
12   A    The president of the National
13 Association of Black Journalists.
14   Q    Okay.  And how do you know that person
15 feels that way?
16   A    They told me.
17   Q    When did they tell you?
18   A    In -- gosh.  Over -- over several years.
19 Recently I would say maybe since 2010 is when they
20 really started bringing it up.
21   Q    Okay.
22   A    And these are different presidents over

50

1  the years.
2    Q    When was the last time you had a
3  discussion with someone from the National
4  Association of Black Journalists about that issue?
5    A    About that issue?
6    Q    Uh huh.
7    A    At AP?
8    Q    Yeah.
9    A    Last year.
10   Q    Okay.  When last year, to the best of
11 your recollection?
12   A    During the NABJ convention in New
13 Orleans last year.
14   Q    When was that, do you recollect?
15   A    August.
16   Q    August.  Okay.  Who was the president
17 then?
18   A    Sarah Glover.
19   Q    Okay.  What exactly did she say to you
20 or you say to her?
21   A    Well, she asked me about AP's lack of
22 participation in the job fair.  AP typically had

51

1  gotten tables at these job fairs to recruit from.
2  And in recent years AP decided to stop recruiting
3  that way and instead they would do a reception
4  where we would be encouraged to bring colleagues
5  to meet AP top -- top AP officials who were at the
6  convention.
7    Q    So, the AP would hold a reception at the
8  convention?
9    A    Yes.
10   Q    Rather than having a table at a job
11 fair?
12   A    Yes.
13   Q    All right.  And you think that's bad?
14   A    Yes.
15   Q    Okay.  I guess would you -- you may
16 know, but do you think the reception costs more
17 than having the table?
18       MS. JONES:  Objection.  Calls for
19 speculation.  You can answer if you know.
20       THE WITNESS:  It isn't the cost.  It is
21 the process itself.  When you make contacts with
22 people in those convention settings invariably

52

1  they may come back with questions or they may
2  bring other people to the table.  And the tables
3  in the job fairs often are a logical gathering
4  point where you catch people being interviewed or
5  people who have the power to hire and interview.
6  And without that table there they -- they don't
7  know where or how to access the AP as easy as they
8  would if the table were there.
9  BY MR. CARTAFALSA:
10   Q    I assume that the reception is published
11 somewhere?
12   A    Usually it's by invitation only.
13   Q    Do you have any sense -- well, let me
14 ask this.  You said the senior -- senior level
15 employees from the AP would attend?
16   A    Yes.
17   Q    And be available to meet with
18 candidates?
19   A    Yes, yes.
20   Q    Do you have any sense of whether the AP
21 believes it's more productive to hire through the
22 receptions as opposed to a table?

53

1    A    That is what we were told.

2    Q    Who told you that?

3    A    Well, that was what was communicated to

4    me through Diane Parker who is the director of

5    recruitment and diversity who handles AP's

6    operations at these conventions.  And that's what

7    was conveyed to her, as I understand it by

8    Kathleen Carole when she was executive editor of

9    the AP.

10    Q    So, what are some of the other

11    institutional practices at the AP that limits the

12    advancement of blacks, women, or employees over 40

13    years of age -- 40 years of age or older?

14    A    Well, in general when vacancies come up

15    often times there are very few if any candidates

16    of color considered for those jobs.  I have been

17    asked over the years to provide names of people

18    who could apply for or pursue these jobs and I

19    have done so.  And sometimes these candidates come

20    back to me with no, without even having heard from

21    the AP or who just for whatever reason were

22    discouraged in the process.

54

1    Q    What do they say discouraged them?

2    A    Different things such as; Oh, we want to

3    consider you, but we don't think you have enough

4    experience or we want a candidate who has X

5    quality or something.  It's always been an array

6    of subjective things that they have come back to

7    me and said.

8    Q    Okay.  Have you looked into who was

9    hired into the position that these applicants were

10    applying for?

11    A    Not really.  It's just when the

12    announcement will come down that someone had been

13    hired.

14    Q    So, do you know whether the people who

15    were hired into those positions were minimally

16    qualified for the jobs?

17    A    I assume they are minimally qualified

18    for the job if they got hired.

19    Q    Do you know if they may have been more

20    qualified than the applicants you referred?

21    A    In some cases I can't say that.

22    Q    You haven't looked into that, right?

55

1    A    Oh, in a couple of cases I did look into

2    it.

3    Q    Okay.  Which cases?

4    A    Well, there was a sportswriter vacancy

5    in Detroit in -- oh, gosh the early 2000's or so,

6    early to mid 2000 that I had referred an African

7    American woman sportswriter for who was interested

8    in pursuing the job.  And I was told that they

9    didn't want to consider her because one of the

10    sportswriters in Detroit had said that this young

11    lady shows up late at press conferences or he had

12    seen her show up late at press conferences.  He

13    didn't think she would be the right fit.  And they

14    never pursued her further.

15    Q    Do you know if in fact she did show up

16    late for press conferences?

17    A    I do not.

18    Q    Do you know who the reporter who said

19    that --

20    A    -- No.

21    Q    -- the sportswriter?  So, who told you

22    about this?

56

1    A    Sarah Nordgren.

2    Q    Anyone else?

3    A    Yes.

4    Q    Can you tell me?

5    A    About this particular case or?

6    Q    Not this personally.  Other times where

7    you have looked into circumstances when you

8    recommended someone that was not hired?

9    A    Yes.

10    Q    Okay.  Who else?

11    A    There was a colleague, former reporter

12    for the Los Angeles Times and a former business

13    editor who was interested in the editor position

14    in Washington and he told me he never got a call

15    back.

16    Q    Do you know who the position went to?

17    A    Yes.

18    Q    Okay.  Who?

19    A    That was when they filled the position

20    internally with a Hill colleague.  Alan Fram was

21    his name.

22    Q    Alan Fram?

57

1    A    Yes.
2    Q    Was Alan minimally qualified for the
3 job?
4    A    Yes.
5    Q    Perhaps equally qualified to the
6 candidate from the LA Times?
7    A    I felt the candidate I offered might
8 possibly have been more qualified.
9    Q    Okay.
10   A    Given that he was on a team that won a
11 Pulitzer.
12   Q    Okay.
13   A    And that he was a columnist and that he
14 had more editing experience.
15   Q    And do you know what Alan Fram's
16 position was before?
17   A    Alan was a reporter for the AP covering
18 Congress.
19   Q    Okay.  Any other times?
20   A    Yes.
21   Q    Tell me?
22   A    There was another news editor vacancy in

58

1 Washington, D C.  And a NABJ colleague who had
2 previously been a news editor at The Dallas
3 Morning News was interested in the job because he
4 wanted to relocate to Washington, D C.
5    Q    And when was this?
6    A    Oh, gosh.  I can't recall the exact
7 year, but it was within the past decade, I'm sure.
8    Q    Okay.  And how about the -- when was it
9 with the reporter from the LA Times that you just
10 mentioned?
11   A    Along a similar time frame.  Again, I
12 can't recall the exact year.
13   Q    All right.  Anyone else?
14   A    I'm pretty sure there are others.  I
15 just can't recall them right off of the bat.
16   Q    Okay.  Any other institutional practices
17 that you believe discriminate against blacks,
18 women, or persons 40 years of age or older in
19 advancement or assignments?
20   A    Yes.
21   Q    Okay.  What are they?
22   A    For example sometimes job vacancies come

59

1 up and positions come open, but there will be
2 decisions made as to who AP would like to have
3 that job versus being open to any candidate
4 seeking that job.  Or there would be a desire to
5 position a person internally for that job.  So,
6 even though a job would get posted, sometimes it
7 would seem to be a predetermined deal who would
8 get that job.
9    Q    Are you aware of anyone who did not meet
10 the minimal qualifications of the job who was
11 given a job that way?
12   A    Can you rephrase your question?
13   Q    Well, is there anyone who didn't meet
14 the minimal qualifications, just should not have
15 been promoted to that job?  Can you think of
16 anyone?
17   A    No.
18   Q    Okay.  Other institutional practices
19 that would prevent advancement of African
20 Americans, women, or persons 40 years of age or
21 older?
22   A    Well, there is a distinct lack of

60

1 African Americans in particular in the bureau
2 where I work.  The number is very low.  Over the
3 25 years that I've worked in the Washington
4 bureau, as far as the text operation is concerned
5 the number of African American reporters and
6 editors has gone down.
7    Q    Hasn't the total number of the reporters
8 and editors in general gone down?
9    A    Yes.  When I joined the Washington
10 bureau I was the seventh black reporter in the
11 bureau in the text operations.  Today there are
12 two.
13   Q    Do you know why the other five left?
14   A    Yes.
15   Q    Okay.  First tell me who they are and
16 tell me why they left, please?
17   A    From 1992 forward.  Anita Womack went to
18 film school because she felt she was not advancing
19 further from the Metro desk in Washington.
20       LeRoy Tillman left to take a PR
21 opportunity, as I understand it, in order to earn
22 more money.

61

1    Q    Okay.
2    A    Robert Naylor.  Was promoted to bureau
3 chief in Jackson, Mississippi.
4    Q    Okay.
5    A    There was another woman on the Metro
6 desk whose last name I cannot recall right this
7 moment.  Her first name was Cassandra.
8    Q    Why did she leave?
9    A    As I understand it she left due to
10 illness.  I think she went on disability, but I'm
11 not sure.
12    Q    Okay.
13    A    Denise Cabrera became a news editor in
14 Washington and then became bureau chief in
15 Baltimore.
16    Q    Okay.
17    A    And then there was me.
18    Q    Okay.  Who is the other black employee
19 who is still there?
20    A    Who is still there?
21    Q    Yeah.
22

62

1    A    Oh, none of these people from 1992 are
2 still there.
3    Q    Oh, okay.  You said -- I'm sorry.
4    A    I'm thinking of the last person.  Trying
5 to think of the last person's name.
6    Q    Okay.
7    A    Why am I blanking on this person?
8    Q    It's not a test.
9    A    All right.  I'm blanking on that last
10 reporter now.
11    Q    Okay.  It was a reporter, though?
12    A    Yes.
13    Q    And when did he or she -- is it a he or
14 a she?
15    A    A she.
16    Q    Okay.  White, black?
17    A    Black.
18    Q    About how old at that time?
19    A    Tamara Henry.  I finally got her name.
20 She left AP to join USA Today as an education
21 writer.
22

63

1    Q    Do you know if she earned more money at
2 USA Today?
3    A    I don't know.
4    Q    Okay.  Do you know if she considered
5 that an advancement?
6    A    Yes, she did.
7    Q    How about Anita Womack, when did she
8 leave approximately?
9    A    Approximately 1994.  Somewhere around
10 1994.
11    Q    Okay.  And other than saying that she
12 felt there wasn't room for advancement did she
13 tell you anything specifically about why she was
14 leaving?
15    A    Well, yes.
16    Q    What did she say?
17    A    She said she felt she was in a dead-end
18 job and she wanted to change her career direction,
19 so she went to film school.
20    Q    Okay.  Anything else that you recollect
21 her saying?
22    A    No.

64

1    Q    Okay.  Other institutional practices
2 that prevent the advancement of African Americans,
3 women, or people 40 years of age or older?
4    A    Well, yes.
5    Q    Okay.  What were they?
6    A    Of the journalists I've seen come into
7 Washington in a management capacity who are
8 African American, there are similarities as to
9 what they experienced.
10    Q    Okay.  Who?
11    A    Okay.  Fred Sweets was assistant bureau
12 chief for photography and then his job was
13 eliminated, or at least that is what I understood.
14    Q    Were other jobs eliminated at
15 approximately the same time?
16    A    I am not sure.
17    Q    Anyone else?
18    A    John Hall.
19    Q    Okay.
20    A    Was director of the State Photo Center
21 in Washington.
22    Q    And what happened to him?

65

1  A   His job was eliminated.
2  Q   Were other jobs eliminated at
3 approximately the same time?
4  A   Yes.  The State Photo Center was closed
5 and that is what he was responsible for.
6  Q   Okay.  And he was the last person out of
7 the State Photo Center to be let go, correct?
8  A   I'm not sure.
9  Q   He was African American?
10  A   Yes.
11  Q   And he was over 40 years of age?
12  A   Yes.
13  Q   Okay.  And he was running the State
14 Photo Center?
15  A   Yes.
16  Q   Do you know any other reason other than
17 business reasons why the AP closed the State Photo
18 Center?
19  A   No.
20  Q   Okay.  Other names, please?
21  A   Denise Cabrera.
22  Q   Excuse me.  Okay.

66

1  A   She became news editor in Washington and
2 then she became bureau chief in Baltimore.
3  Q   Okay.  That sounds like a promotion?
4  A   Yes, it was.  Then the AP decided to
5 consolidate the Baltimore bureau and what was the
6 Metro desk in Washington and called it the Mid
7 Atlantic bureau and in that process eliminated her
8 job as Baltimore bureau chief and told her to
9 reapply for the Mid Atlantic bureau chief
10 position.
11  Q   Do you know if she reapplied?
12  A   She did.
13  Q   Did she get the position?
14  A   No.
15  Q   Was -- who got the position?
16  A   David Wilkinson.
17  Q   Is David Wilkinson minimally qualified?
18  A   I assume he is.
19  Q   Okay.  Do you know whether Denise
20 Cabrera would be more qualified than David
21 Wilkinson?
22  A   She was already the Baltimore bureau

67

1 chief and was doing the work of the position as it
2 was.  In essence it was already her job.
3  Q   Okay.  And what was David Wilkinson's
4 job?
5  A   I'm not exactly certain what his
6 position was, but I know it was not a bureau chief
7 position.
8  Q   Did Denise ever tell you that this was
9 related to race, gender, or age?
10  A   She felt pushed out.
11  Q   Okay.  Did she ever tell you that it was
12 related to race, gender, or age?
13  A   Yes.
14  Q   Okay.  What exactly did she say?
15  A   She told me that she felt this is what
16 AP does.
17  Q   What do you mean?
18  A   To its African American managers.
19  Q   So, it is a suggestion there is some
20 grand ploy to promote people only to later lay
21 them off?
22  A   Yes.  Or really, she was warning me.

68

1  Q   What do you mean by that?
2  A   Because she had preceded me as a news
3 editor in Washington and that these managers prior
4 to me had all somehow been taken out.
5  Q   Okay.  When there was a consolidation of
6 Baltimore and the Metro District other employees
7 lost their jobs, right?
8  A   No, I don't recall that.  They merged
9 two desks into one operation.
10  Q   Okay.  And again, when State Photo
11 Center closed a number of white employees lost
12 their jobs?
13  A   I'm not sure.
14  Q   If I told you white employees lost their
15 jobs when that closed would that change your view
16 on whether it was institutional discrimination?
17     MS. JONES:  Objection.  Assumes facts,
18 but if you can answer.
19     THE WITNESS:  No.
20 BY MR. CARTAFALSA:
21  Q   Why not?
22  A   Because this is an institutional

69

1  behavior that others have described to me playing
2  out in other media companies, too.
3      Q    What other media companies?
4      A    Well, I've had colleagues at the
5  New York Times say this is happening where I work,
6  too.
7      Q    Okay.  Any other media companies?
8      A    It happened in general at the Atlanta
9  Journal-Constitution.  Colleagues there have
10 described that to me.
11     Q    Anywhere else?
12     A    Not that I recall off of the bat.
13     Q    Anyone else that you believe suffered
14 from institutional behavior?
15     A    Yes.
16     Q    Who?
17     A    In management or in general?
18     Q    In general at the AP?
19     A    Robert Naylor left Washington to become
20 bureau chief in Jackson, Mississippi.
21     Q    That was a promotion?
22     A    Yes.

70

1      Q    Okay.
2      A    And then he left Jackson, Mississippi to
3  become bureau chief in Albany, New York.
4      Q    Was that a promotion?
5      A    Yes.  And then he was moved from Albany
6  to New York headquarters.
7      Q    Was that a promotion?
8      A    Yes.  To be director I believe his title
9  at the time was director of strategic planning and
10 career development.
11     Q    Okay.
12     A    John Wolman promoted him.
13     Q    So, where was the lack of advancement
14 for Robert Naylor?
15     A    After becoming director of strategic
16 planning and career development strategic planning
17 was taken off of his title and given to someone
18 else to do.  And then there was a director of
19 content development, or something to that effect,
20 that he applied for and did not get.
21     Q    Who got that position?
22     A    Sarah Nordgren.

71

1      Q    Was Sarah minimally qualified for the
2  job?
3      A    I assume she is.
4      Q    Any reason to believe that Mr. Naylor
5  was significantly more qualified for the job than
6  Sarah?
7      A    Well, yes.
8      Q    Okay.  What?
9      A    At the time he was a very high ranking
10 executive at the AP.
11     Q    Okay.  Anything else?
12     A    After being turned down for that job
13 Robert Naylor ultimately was laid off.
14     Q    Were other employees laid off at
15 approximately the same time?
16     A    Yes.
17     Q    White employees that you know of?
18     A    Yes.
19     Q    Male employees?
20     A    Yes.
21     Q    Employees under 40 years of age?
22     A    One.

72

1      Q    Is it fair to say over the years the AP
2  has made a number of structural changes in
3  changing job titles, departments, etc.?
4      A    Yes.
5      Q    Are you aware that any of those
6  structural changes were for discriminatory reason?
7      A    Can you rephrase?
8      Q    Did the AP change its structure based on
9  discrimination?
10     A    No.
11     Q    Any other institutional behaviors that
12 prevent advancement?
13     A    Yes.
14     Q    Okay.  What?
15     A    In the same layoffs in which Robert
16 Naylor was laid off, Delores Barclay and Andrew
17 Frazier also were laid off.
18     Q    And what --
19     A    -- They are both African American and
20 over 40 in management for the AP.  And given the
21 low numbers in the company those three employees
22 being laid off disproportionately impacted African

Transcript of Sonya Ross
Conducted on February 13, 2018

73

1 Americans in management in the company.
2     Q     Okay.  But disproportionately impacted
3 because they had been promoted into management.
4 Right?
5     A     No.
6     Q     Okay.  How is that?
7     A     Because there are so few African
8 Americans in management a layoff that took out
9 three senior ranking African American managers put
10 a serious dent in the number of African American
11 managers in the company.
12     Q     Do you know if those jobs were ever
13 replaced?
14     A     Yes.
15     Q     And when were they replaced?  When was
16 the layoff?
17     A     This layoff was in January of 2012 and
18 February of 2012.
19     Q     Do you know who replaced Robert Naylor?
20     A     Robert Naylor's responsibilities were
21 given to John Dowling, I believe.
22     Q     He was a current employee?

74

1     A     He was a current employee at the time.
2     Q     Okay.  And what about Delores?
3     A     Delores Barclay's job was posted shortly
4 after her layoff.
5     Q     What was her job?
6     A     Entertainment editor for the East.
7     Q     Okay.  And Andrew?
8     A     Andrew Frazier was assistant bureau
9 chief in Philadelphia.
10     Q     Okay.  And what happened?
11     A     He was laid off.
12     Q     Was his job replaced?
13     A     I'm not sure.
14     Q     When was the entertainment editor for
15 the East job posted?
16     A     Around the same time in early 2012.
17     Q     Did any of these three tell you that
18 they felt they were being laid off for
19 discriminatory reasons?
20     A     Yes.
21     Q     Who?
22     A     Robert Naylor.

75

1     Q     Okay.
2     A     And Delores Barclay.
3     Q     What did Robert Naylor say to you or
4 write?
5     A     That this was what AP does.
6     Q     Does he have any other examples of
7 anybody being laid off, any black managers being
8 laid off other than the three we've just talk
9 about?
10     A     What he meant by that is that the AP
11 eliminates jobs or moves responsibilities to leave
12 African Americans hanging in the system.
13     Q     Do you have any evidence of that?
14     A     Yes.
15     Q     What's the evidence?
16     A     What happened to me.
17     Q     Okay.  We'll get back to that.  Any
18 other conversations with Robert Naylor about
19 discrimination, harassment, or retaliation at the
20 AP?
21     A     Yes.
22     Q     Okay.  What did you and Robert Naylor

76

1 discuss?
2     A     In the days after his layoff he shared
3 that he felt devastated by this layoff and that he
4 was trying to sort out his next career steps.
5     Q     Anything else?
6     A     He felt targeted by the AP because he
7 had informed the CEO that the AP had a serious
8 problem in the hiring, promotion, and retention of
9 African Americans.
10     Q     The AP knew it had that problem, right?
11     A     Yes.
12     Q     Okay.  And when he told that to the CEO
13 the CEO, according to your complaint, directed
14 that it be fixed immediately.  Correct?
15     A     Yes.
16     Q     Other than his own opinion does he have
17 any evidence that he shared with you that he was
18 laid off because of race?
19     A     Can you rephrase that?
20     Q     Other than his own opinion does he have
21 any evidence that he was laid off because of race?
22     A     I want to understand what you mean by

Transcript of Sonya Ross
Conducted on February 13, 2018

77

1  evidence.
2      Q    Any hard facts or evidence other than
3  his opinion that he felt he was laid off because
4  of his race?
5      **A    After he sent a letter to CEO Curley**
6  **pointing out the problems with African Americans**
7  **in the company an internal investigation followed.**
8      Q    Okay.
9      **A    Because he had raised this complaint.**
10 **And several African American managers -- well,**
11 **some might not have been managers.  Several**
12 **African Americans were interviewed for that**
13 **investigation.**
14     Q    Okay.
15     **A    The AP concluded there was no**
16 **discrimination.**
17     Q    Okay.  Who conducted the investigation
18 on behalf of the AP, do you know?
19     **A    The AP's human resources department.**
20     Q    Were you interviewed as part of that
21 investigation?
22     **A    Yes.**

78

1      Q    And what did you say to the AP?
2      **A    I was asked whether I felt that I was**
3  **being discriminated against because I am a woman**
4  **or because I am an African American and I replied**
5  **yes.**
6      Q    Okay.  What did you tell them?  Did they
7  ask you the reason?
8      **A    I said I felt it was because I am both**
9  **of those things.**
10     Q    Okay.  Did you have any specific
11 examples of being discriminated against?
12     **A    Yes.**
13     Q    Okay.  And what were those examples?
14         MS. JONES:  Before we get into that area
15 can we take a bio break?
16         MR. CARTAFALSA:  Sure.
17         THE VIDEOGRAPHER:  Stand by, please.
18 This is the end of media one.  Going off the
19 record at 11:50.
20         (The proceeding recessed from 11:50 p.m.
21 to 12:05 p.m.)
22         THE VIDEOGRAPHER:  This is the beginning

79

1  of media two.  We are back on the record at 12:05.
2  BY MR. CARTAFALSA:
3      Q    What were your conversations with
4  Delores about alleged institutional
5  discrimination?
6      **A    When I found out she had been laid off I**
7  **reached out to say I'm sorry to see you go.**
8      Q    And what were the discussions about
9  discrimination or retaliation, if any?
10     **A    She said that -- she thanked me for**
11 **reaching out to her.  And she said she felt it was**
12 **unfair, but she would be okay.**
13     Q    Did she say why she felt it was unfair?
14     **A    Yes.**
15     Q    Okay.  What did she say?
16     **A    She said that she felt they had been**
17 **coming for her for a long time because she had**
18 **been hassled prior to being laid off.**
19     Q    Who was she hassled by and what did she
20 tell you?
21     **A    Well, she said that she felt she was**
22 **being pushed out because she's been with the AP**

80

1  for a long, long time.
2      Q    Did she say anything else?
3      **A    No.**
4      Q    So, she had been at the AP for a long
5  time you said?
6      **A    Yes.**
7      Q    Okay.  And she had been promoted a
8  number of times, correct?
9      **A    She always was the entertainment editor.**
10     Q    How about Robert Naylor?  He was with
11 the AP for a long time?
12     **A    When I knew her -- I mean, over the**
13 **years that I knew her she was always the**
14 **entertainment editor.**
15     Q    Okay.  Robert Naylor was promoted?
16     **A    Yes.**
17     Q    I meant Delores.  Did I say Denise?  Was
18 Delores the entertainment editor?
19     **A    Yes.**
20     Q    Okay.  Robert Naylor was promoted a
21 number of times?
22     **A    Yes.**

Transcript of Sonya Ross
Conducted on February 13, 2018

81

1    Q    And he was a long term employee?
2    A    Yes.
3    Q    Would promotion be part of institutional
4  discrimination?
5    A    It can be, yes.
6    Q    Do you know if it was in his case?
7    A    Not really.
8    Q    And how could it be part of
9  institutional discrimination?
10    A    Because it depends on what you get
11  promoted to.
12    Q    And what do you mean by that?
13    A    What I mean is sometimes it is difficult
14  to get an existing job in the AP.
15    Q    I don't understand?
16    A    And therefore you have to create your
17  own opportunities in the AP.
18    Q    And explain what you mean by that?
19    A    Well, for example, I had pursued
20  promotions that were denied to me, so in order to
21  try to advance my career I proposed a new position
22  hoping to advance.

82

1    Q    Were you given that position?
2    A    Yes and no.
3    Q    Okay.  Tell me why yes and no?
4    A    Yes I was given the position, but the
5  nature of the position was changed in the process
6  of creating it, so it wasn't exactly the position
7  I had envisioned.
8    Q    Okay.  The AP has a say in what its
9  positions entail, correct?
10    A    Yes.
11    Q    Okay.  And you negotiated about this
12  position for a number of years?
13    A    For pretty much a year.
14    Q    Okay.  And it was give and take?
15    A    Yes.
16    Q    And you took the position, correct?
17    A    Yes.
18    Q    Okay.  This is the race and ethnicity
19  position?
20    A    Yes.
21    Q    And when you took that position you went
22  from -- oh, I'm sorry.  Sorry, guys.

83

1         What was your job title before taking
2  that position?
3    A    I was the news editor for the regional
4  reporters in Washington.
5    Q    When you took that position that was a
6  national position, right?
7    A    Yes.
8    Q    So, your exposure is obviously broader?
9    A    Yes.
10    Q    Could it be viewed as a promotion?
11    A    Yes.
12    Q    What did you want in that position that
13  was not given to you?
14    A    Which position?
15    Q    The race and ethnicity editor?
16    A    I wanted the ability to have a say in
17  creating a news product built around this subject
18  matter that the AP could package and sell.
19    Q    Okay.  Did the AP tell you why they were
20  not going to give you the ability to do that?
21    A    No.
22    Q    Why would the AP create that position

84

1  for you if it sought to discriminate on the basis
2  of race, gender, age, or for retaliatory reasons?
3    A    I asked for this job because I had been
4  turned down for assistant bureau chief in
5  Washington and I felt that any avenue to a
6  promotion in the AP under the usual way was not
7  working.  So, I suggested it because it is a
8  subject I understood and knew well and had a
9  demonstrated track record of success with it.
10    Q    And when did you apply for the assistant
11  bureau chief position?
12    A    In 2008.
13    Q    Who was that position given to?
14    A    That position was given to Janet
15  Leissner.
16    Q    Is Janet Leissner minimally qualified
17  for that job?
18    A    Yes.
19    Q    Do you know if you're more qualified
20  than Janet?
21    A    Yes.
22    Q    What makes you say you're more qualified

Transcript of Sonya Ross
Conducted on February 13, 2018

---

85

1 than Janet?

2    A   Because I had wire service experience.

3 The position in question dealt with what's called

4 enterprise stories which are larger, more in-depth

5 feature stories, written stories.

6    Q   Okay.

7    A   For print publications.  Janet came to

8 AP from CBS News and her experience was primarily

9 broadcast.

10    Q   Do you know if Janet was successful in

11 that role?

12       MS. JONES:  In what role?  Excuse me.

13 BY MR. CARTAFALSA:

14    Q   In the role when she was assistant

15 bureau chief?

16    A   I assume that she was performing to the

17 satisfaction of her superiors.

18    Q   So the enterprise writing is important?

19    A   Yes.

20    Q   Have you ever been told that you don't

21 do enough enterprise writing?

22    A   Can you rephrase that?

---

86

1    Q   Have you ever been told that you don't

2 write enough on your job?

3    A   Yes.

4    Q   Okay.  Who told you?

5    A   Mike Oreskes.

6    Q   Anyone else?

7    A   Sally Buzbee.

8    Q   Anyone else?

9    A   No.

10    Q   And they were both your supervisors

11 directly or indirectly?

12    A   Yes.

13    Q   And they asked you to write more?

14    A   Yes.

15    Q   And they told you that writing was

16 important, right?  As an editor?

17    A   Yes.

18    Q   Okay.  And that was while you were the

19 race and ethnicity editor, correct?

20    A   Yes.

21    Q   Okay.  Are you aware of any white, male,

22 or under 40 editors that write less than you?

---

87

1    A   At that time?

2    Q   At that time, sure?

3    A   No.

4    Q   Are you aware of any --

5    A   -- Because the vast majority of the

6 white male editors were over 40.

7    Q   Okay.  So, tell me white males who wrote

8 less than you as editors?

9    A   The congressional editor Matt Yancey.

10    Q   Okay.  Anyone else?

11    A   The investigative team editor Ted

12 Bridis.

13    Q   Okay.

14    A   The foreign affairs editor, which was

15 Alan Fram.

16    Q   Okay.

17    A   The assistant -- well deputy bureau

18 chief Terence Hunt.

19    Q   Okay.

20    A   The accountability editor Jim Drinkard.

21    Q   And how do you know they wrote less than

22 you?

---

88

1    A   Because they didn't put byline stories

2 out on the wire, to my knowledge, on a regular

3 basis.

4    Q   Do you know if they were in different

5 roles than you?  Correct?

6    A   They were in roles that were similar to

7 mine.

8    Q   Okay.  But their roles may have required

9 less direct writing?

10    A   Yes.

11    Q   Any other positions that you applied for

12 that you didn't get due to discrimination,

13 harassment, or retaliation?

14    A   There is a position that I did not get

15 to apply for.

16    Q   Okay.  What was that?

17    A   That was also assistant bureau chief.

18    Q   And when was that?

19    A   2011, I believe.

20    Q   Okay.  Who was that position given to?

21    A   Wendy Benjaminson.

22    Q   Was she minimally qualified for the

---

Transcript of Sonya Ross
Conducted on February 13, 2018

---

89

1    assistant bureau chief position?

2       A    Yes, I assume she is or was.

3       Q    She's no longer with the AP?

4       A    Correct.

5       Q    Do you know what her background was?

6       A    She was a news editor in Texas.

7       Q    Okay.

8       A    They brought her to Washington to

9    replace me as regional news editor.

10      Q    How do you know that?

11      A    Because they posted my regional news

12   editor job while I still occupied the job before I

13   became race and ethnicity editor.

14      Q    Do you know if Wendy negotiated for the

15   assistant bureau chief title?

16      A    I don't know that.

17      Q    Okay.  Do you know if perhaps she was

18   offered a news editor position and she refused to

19   leave Texas unless she was given a different

20   title?

21      A    I don't know that.

22      Q    So, you don't really know the background

---

90

1    or circumstances as to why she was given that

2    title?

3       A    Why she was given the title regional

4    news editor?

5       Q    No.  Assistant bureau chief?

6       A    All I know is that Janet Leissner had

7    left that position, it was available, and it did

8    not get posted.  I never saw it posted.  I was

9    looking for a posting so that I could apply for

10   it.  They announced Wendy Benjaminson as regional

11   news editor in Washington.

12      Q    Okay.

13      A    To succeed me.

14      Q    Okay.  And at that point she was working

15   part of the time in D C, part of the time in

16   Texas?

17      A    I was told she was going back and forth

18   to Texas until she could move her family to

19   Washington, D C.

20      Q    Okay.

21      A    But she was working in Washington.

22      Q    Okay.  And you said before in fact the

---

91

1    AP created a position for you, correct?

2       A    Yes.

3       Q    Okay.  Was a race and ethnicity editor

4    position posted?

5       A    Yes.

6       Q    When was it posted?

7       A    In the summer of 2010.

8       Q    So, did you apply for it?

9       A    Yes.

10      Q    Do you know if anybody else applied?

11      A    I don't know.

12      Q    Do you know if at other times, while it

13   may be the AP's effort to post all positions

14   sometimes through individual negotiations people

15   are given a different job title that had not been

16   posted?  Are you aware that that happens from time

17   to time at the AP?

18      A    No.

19      Q    So, is -- let me ask this.  Is Wendy

20   Benjaminson, when she was given the assistant

21   bureau chief position -- withdraw that.

22         Are you aware of any other promotions or

---

92

1    hirings where the position is not posted?

2       A    No.

3       Q    And I'm sorry.  When did you apply for

4    that assistant bureau chief position?

5       A    The first one?

6       Q    Yes.  No, I'm sorry.  When it was given

7    to -- oh, you did not apply when it was given to

8    Wendy, right?

9       A    I did not apply because I did not know

10   the position was available.

11      Q    Okay.  But the position was open.  You

12   knew it was open, right?

13      A    I knew it was open because I knew the

14   person who occupied the job had left.

15      Q    Did you ask anyone about applying?

16      A    No.

17      Q    Any other jobs that you applied for at

18   the AP that you weren't hired for based on

19   discrimination, harassment, retaliation?

20      A    Yes.

21      Q    Okay.  What job?

22      A    I applied for director of content

---

93

1 development and alliances.
2    Q    And when did you apply for that?
3    A    In 2010.
4    Q    Okay.  Do you know who was given that
5 position?
6    A    Yes.
7    Q    Who?
8    A    Sarah Nordgren.
9    Q    Again, she was minimally qualified?
10    A    I assume she was.
11    Q    Any direct evidence that that was --
12 that they hired Sarah rather than you based on
13 race, gender, or age?
14    A    Can you rephrase the question?
15    Q    Do you have any evidence, any direct
16 evidence that the position was given to Sarah and
17 not you because of your race, gender, or age?
18    A    No.
19    Q    Okay.  Any other positions that you
20 either applied for or got denied advancement
21 because of your race, gender, age, or other
22 discriminatory or retaliatory reasons?

94

1    A    Yes.
2    Q    Okay.  Tell me?
3    A    Last year I applied for three jobs that
4 came available in the AP.
5    Q    And what jobs?
6    A    Deputy managing editor for US News.
7    Q    Okay.  What else?
8    A    Director of partnerships.
9    Q    What else?
10    A    News editor for national beats.
11    Q    Okay.  Who was given the deputy managing
12 editor of US News position?
13    A    Lorraine Gillespie.
14    Q    Okay.  How about the director of
15 partnerships position?
16    A    Lisa Gibbs.
17    Q    Okay.  And the news editor for national
18 beats?
19    A    Wendy Benjaminson.
20    Q    Are each of them minimally qualified for
21 those positions?
22    A    I assume they were.

95

1    Q    Do you have any evidence that you are
2 significantly more qualified for those positions
3 than any of those three?
4    A    Yes.
5    Q    Okay.  What's that?  Which position?
6    A    News editor for national beats.
7    Q    Okay.  What makes you think you're
8 significantly more qualified?
9    A    I had already been directing a national
10 beat for seven years.  A national beat team, I
11 should say.
12    Q    And that was the race and ethnicity?
13    A    Correct.
14    Q    But Wendy had been serving as an
15 assistant bureau chief.  Right?
16    A    Yes.
17    Q    And you claim that while race and
18 ethnicity editor you were given poor reviews or at
19 least a poor review?
20    A    I was given a poor review, yes.
21    Q    Who gave you the poor review?
22    A    Sally Buzbee.

96

1    Q    Do you believe you were given a poor
2 review because of your race, age, gender, or for
3 other discriminatory and retaliatory reasons?
4    A    Yes.
5    Q    Okay.  What were they?
6    A    At the time I had an active complaint
7 before the Office of Federal Contract Compliance
8 Programs at the Department of Labor.
9    Q    Okay.  But what makes you think that you
10 were denied the position for that reason -- I'm
11 sorry, that you were given a poor review for that
12 reason?
13    A    Because I had not gotten a poor review
14 or as poor a review prior to that.
15    Q    Had Sally reviewed you prior to then?
16    A    No.
17    Q    Okay.  Do you believe that Sally gave
18 you a poor review based on your gender?
19    A    No.
20    Q    Okay.  What about on your age?
21    A    No.
22    Q    So, it's based on race or it was based

97

1  on the OFCC charge?
2      A   I feel it was based on the OFCCP charge.
3      Q   So, it was in retaliatory -- retaliation
4  for filing the charge?
5      A   Yes.
6      Q   Okay.  What evidence do you have to
7  support that position?
8          MS. JONES:  Objection.  Asked and
9  answered, but you can answer again.
10         THE WITNESS:  Prior to that performance
11 appraisal I received a 360 review from Sally and
12 some other AP colleagues that was more exemplary
13 than the performance appraisal.
14 BY MR. CARTAFALSA:
15     Q   Okay.  And when you received that more
16 exemplary 360 review, that was through a special
17 program at the AP?
18     A   Yes.  It was through a management
19 training program.
20     Q   Okay.  So you were given an opportunity
21 to participate in the management training, right?
22     A   I was asked to participate in it, as all

98

1  managers were asked to participate in it.
2      Q   All managers were asked to participate
3  in that?
4      A   Yes.  It was required.
5      Q   And how often does the AP do that
6  training?
7      A   That particular training, I had never
8  participated in one of those before.  I had
9  participated in a different management training
10 program prior to that.
11     Q   Okay.  So, when was this training that
12 we were just talking about?  Not the different
13 one.
14     A   2013.
15     Q   Okay.  So, it's your testimony that you
16 believe all managers at the AP participated in
17 that training in 2013?
18     A   All Washington mangers were asked to
19 participate in that training.
20     Q   Are you aware of any Washington managers
21 that did not participate?
22     A   Yes.

99

1      Q   Do you know why?
2      A   They were part of the broadcast news
3  center as opposed to the Washington bureau.
4      Q   Okay.  Anybody in the Washington bureau
5  side that did not, any managers that did not
6  participate?
7      A   Not that I recall, no.
8      Q   Fair to say that the purpose of that
9  training program is different from the purpose of
10 a performance review?
11     A   Yes.
12     Q   Anything in that performance review that
13 you can recollect was false or untrue?
14     A   There were items in that review where it
15 was stated I did not perform up to expectations.
16 And I felt that was based on falsehoods, because I
17 had spent a lot of time trying to get my superiors
18 to articulate their expectations.
19     Q   Which superiors did you ask to
20 articulate?
21     A   Sally Buzbee, Mike Oreskes.
22     Q   And they had articulated that you needed

100

1  to write more, correct?
2      A   They said that I did not meet
3  expectations and I did not know what those
4  expectations were.
5      Q   Okay.  Before the performance review,
6  years before you were told that you needed to
7  write more in that position, right?
8      A   Before the performance review I was
9  told — I was asked.
10     Q   Okay.
11     A   Why I was not writing according to the
12 20 percent of my duties that writing entailed.
13 The writing was for news analyses, mainly special
14 news analysis, not every day breaking news.
15     Q   Okay.  So, before the review you were
16 asked why you weren't writing more?
17     A   Yes.
18     Q   Okay.  Where does this 20 percent come
19 from?
20     A   That was according to the way the job,
21 the race and ethnicity job was structured when we
22 created it.

Transcript of Sonya Ross
Conducted on February 13, 2018

---

101

1    Q    The AP will change jobs over time,
2  right?
3    **A    Can you rephrases the question?**
4    Q    You're aware at AP that as times change
5  job duties change.  Correct?
6    **A    No.**
7    Q    Okay.  So, it's --
8    **A    -- Not without changing the jobs**
9  **themselves.**
10    Q    What do you mean changing the job?
11 Giving it a different title or something?
12    **A    Or adjusting the job description to**
13 **reflect the duties expected of that job.**
14    Q    Aren't some of the duties of any job
15 doing what your supervisor asks?
16    **A    Yes.**
17    Q    And were you writing 20 percent?
18    **A    No.**
19    Q    Anything else on the job description
20 that you believe was discriminatory or
21 retaliatory?
22    **A    I had not been writing because I had**

---

102

1  **been asking who would edit my copy and see it to**
2  **the wire.  And there was incomplete structure to**
3  **this job.  And that was a factor in why the job --**
4  **the job never got completely negotiated.**
5    Q    Okay.  But you --
6    **A    -- The editor responsibility was one of**
7  **those factors in -- that needed to be smoothed**
8  **out.  So, it was tough to deliver stories without**
9  **an idea of who my editor was.  So, when I was not**
10 **writing I was trying to get clarity on who would**
11 **edit my copy.**
12    Q    Okay.  Why did you need clarity on who
13 would edit?
14    **A    Because a story has to be edited before**
15 **it can be sent anywhere.**
16    Q    Okay.  So, what were you supposed to do
17 with the stories?
18    **A    What do you mean?**
19    Q    Is it your opinion that you would write
20 stories and they would just languish on your
21 computer file somewhere?
22    **A    It was my opinion that there was nothing**

---

103

1  definite to who would edit my stories or how they
2  would get to the wire.
3    Q    Did Sally ever say that she would edit?
4    **A    She did eventually say that she would**
5  **edit.**
6    Q    Okay.  Did she give you other
7  suggestions for people who might edit?
8    **A    Not that I recall, no.**
9    Q    And how long did this go on for after
10 negotiating the position where there wasn't in
11 your mind a clear process for who the editor was?
12    **A    About two years.**
13    Q    Did you complain to this -- to anyone?
14    **A    Yes.**
15    Q    Who?
16    **A    Sally Buzbee and Michael Oreskes.**
17    Q    Anyone else?
18    **A    No.**
19    Q    All right.  You never told them it was
20 because of your race, right?
21        MS. JONES:  Told what?
22

---

104

1  BY MR. CARTAFALSA:
2    Q    Sally or Mike?
3        MS. JONES:  That was what because?
4  BY MR. CARTAFALSA:
5    Q    That you were not being given a clear
6  answer on who the editor was because of your race?
7    **A    No.**
8    Q    Did you ever -- you never in fact
9  complained to either of them about race
10 discrimination, did you?
11    **A    What do you mean?**
12    Q    Did you ever complain to Sally about
13 race discrimination, you were being discriminated
14 against or retaliated against?
15    **A    I did tell Sally by raising the question**
16 **with multiple vacancies coming open in the**
17 **Washington bureau why there seemed to be a**
18 **complete inability to hire any African Americans**
19 **out of the vacancies that had came up.**
20    Q    Okay.  So you raised the inability to
21 hire African Americans.  You didn't say you were
22 being discriminated against, right?

105

1    A    At that particular time?
2    Q    Yeah.
3    A    In 2012 or '13?
4    Q    Uh huh.
5    A    No.
6    Q    And you did not apply for those
7    positions, did you?
8    A    No.
9    Q    Did you every say to Mike that you were
10   being discriminated against because of
11   discriminatory reasons?  I'm sorry.
12        Did you ever complain to Mike that you
13   were being discriminated against or retaliated
14   against?
15   A    Yes.
16   Q    What did you say to Mike?
17   A    Years before that.
18   Q    Approximately when?
19   A    Approximately 2009.
20   Q    What did you say to Mike?
21   A    I told him that I felt singled out for
22   mistreatment by the former bureau chief.

106

1    Q    Who was the former bureau chief that you
2    are referring to?
3    A    Ron Fournier.
4    Q    Did you file a formal complaint of
5    discrimination?
6    A    I complained internally.
7    Q    To anyone other than Mike?
8    A    Yes.
9    Q    Who?
10   A    My very first complaint about
11   mistreatment by Ron Fournier was to Montrese
12   Garner-Sampson in the Washington bureau.
13   Q    Okay.  Any other complaints to Mike?
14   A    I had told Mike that I wanted to push
15   for the race and ethnicity position in order to
16   find a better way to contribute than what I
17   currently had because I felt stagnated in the
18   position of regional news editor.
19   Q    And he gave you the opportunity,
20   correct?
21   A    He said he thought it was a good
22   proposal and he pushed to get it approved.

107

1    Q    When did you -- I'm sorry.
2         Just back to that poor performance
3    review.  Anything that Sally did that you believe
4    to be discriminatory or retaliatory?
5    A    Yes.
6    Q    Okay.  What?  Discriminatory or
7    retaliatory toward you?
8    A    In 2012 I had asked for -- to take
9    advantage of an opportunity to give election
10   analysis for BET, Black Entertainment Television
11   at the Democratic National Convention.
12   Q    Okay.  What happened with that?  How was
13   it discriminatory?
14   A    They told me no I could not do it.
15   Q    Who told you?
16   A    Sally.
17   Q    Did she give you a reason?
18   A    She said that I might have something to
19   do for AP for the Democratic National Convention.
20   Q    In fact you did work on some things for
21   the Democratic National Convention, right?
22   A    At the point when she told me that I

108

1    might have something to do with the Democratic
2    National Convention I asked her to tell me
3    specifically what it was because until that point
4    I did not know I had any assignments for the
5    Democratic National Convention.
6    Q    Okay.  And what did she say?
7    A    She said I might be needed to edit short
8    notebook stories.
9    Q    Okay.  And did you in fact edit short
10   notebook stories?
11   A    I did one notebook.
12   Q    Did you do anything else for the
13   Democratic National Convention?
14   A    No.
15   Q    Isn't it a fact, though, that the
16   Democratic National Convention or any political
17   convention really but -- withdrawn.
18        Isn't it a fact that the Democratic
19   National Convention at that time -- is a very big
20   event for the Associated Press?
21   A    Yes.
22   Q    Okay.  So, it would have been all hands

Transcript of Sonya Ross
Conducted on February 13, 2018

109

1 on deck, if you will?

2 **A   Yes.  And typically the hands they want**
3 **on deck are the hands they take with them to the**
4 **city where the convention is being held.**

5 Q   Like people will work on the convention
6 from their home offices, correct?

7 **A   The most essential people are taken to**
8 **the city where the convention is being held.**

9 Q   Okay.  How do you know that?

10 **A   Because I covered multiple conventions**
11 **for the Associated Press over my nearly 30 years**
12 **of working for the AP.**

13 Q   Now, over time the AP due to structural
14 changes, cost issues, etc., was sending relatively
15 fewer people to cover the DNC?

16 **A   Yes.**

17 Q   Okay.  So, at one point you were one of
18 the essential people that got to cover it, right?

19 **A   Yes.**

20 Q   Now, you claim in your complaint that at
21 about the time Delores Barclay, Andrew Frazier,
22 and Rob Naylor were laid off you were not only

110

1 because of her cooperation with the OFCCP
2 investigators fewer than 90 days earlier?

3 **A   That's what I felt, yes.**

4 Q   So, filing with the OFCCP saved you from
5 layoff?

6 **A   No.  Communicating with the OFCCP --**

7 Q   Okay.

8 **A   Is what I felt spared me.**

9 Q   Because the AP would not want to
10 retaliate?

11 **A   I had spoken with the OFCCP in the AP**
12 **Washington bureau fewer than 180 days earlier.**

13 Q   Okay.  And do you know that that
14 impacted the AP's decision other than you're
15 saying that it helped avoid a layoff?

16 **A   No.**

17 Q   Okay.  What did you complain to Montrese
18 about Ron Fournier?

19 **A   Ron Fournier yelled at me in front of**
20 **my -- one of my direct reports, because that**
21 **particular reporter had gotten news early in the**
22 **morning while I was on my -- during my commute to**

111

1 **work.  Ron yelled at me for not physically having**
2 **arrived at work before the reporter broke the**
3 **news.**

4 Q   How is that discriminatory?

5 **A   It was one of many instances where he**
6 **singled me out for harsh treatment.**

7 Q   He yelled at a number of other reporters
8 on the news floor, right?

9 **A   At that time?**

10 Q   Well, during -- while he was bureau
11 chief?

12 **A   Not that I recall.**

13 Q   So, it's your recollection that he
14 didn't have a reputation as a yeller and screamer?

15 **A   Can you rephrase that question?**

16 Q   Did he have a reputation of being a
17 yeller and a screamer?

18 **A   He did have that reputation.**

19 Q   So, what makes you think he yelled at
20 you based -- because of discriminatory reasons?

21 **A   Because he had done it before with me.**

22 Q   So, the fact that he did it more than

112

1 once means it's discrimination?

2 **A   It was alongside other activities that**
3 **made me feel singled out because of my race and my**
4 **gender.**

5 Q   Okay.  What other activity?

6 **A   When we were White House reporters**
7 **together in 2001 Ron Fournier generally made a**
8 **hostile work environment for me.**

9 Q   Did you ever complain about that?

10 **A   Yes.**

11 Q   Who did you complain to?

12 **A   Terence Hunt the deputy bureau chief.**

13 Q   Was there anything done about it?

14 **A   Yes.**

15 Q   What was done?

16 **A   Terry asked me to come and meet him for**
17 **lunch.  And I explained to him why I felt picked**
18 **on by Ron.**

19 Q   Did Terry say anything?

20 **A   He just listened.**

21 Q   Did he do anything?  Do you know if he
22 spoke with Ron?

113

1    A    I assume he did.
2    Q    Did the hostile work environment stop at
3  that point?
4    A    No.
5    Q    Did you complain again?
6    A    No.
7    Q    Why not?
8    A    I felt I had already said what I had to
9  say about it.  And then as I understood it Ron was
10  told to go to sensitivity training, is what the
11  way it was described to me.
12    Q    Okay.  So, there was a step taken,
13  right?
14    A    There was a step taken.
15    Q    Do you know if other employees ever
16  complained about Ron creating a hostile
17  environment?
18    A    Yes.
19    Q    Okay.  Who else complained about Ron?
20    A    Stephanie Stoughton.
21    Q    Who else?
22    A    That is — she is only one that I'm

114

1  absolutely sure of.
2    Q    Okay.  And how are you sure of it with
3  Stephanie?
4    A    She told me.
5    Q    What did she say to you?
6    A    She said that she felt bullied by Ron.
7    Q    Anything else that she said?
8    A    She also said that she felt he was a
9  bigot.
10    Q    Did she have evidence to support that?
11    A    I'm not sure what evidence that she had.
12  I only know what she told me.
13    Q    Okay.  What did she tell you?
14    A    That she felt Ron was a bigot and that
15  she felt bullied by Ron.
16    Q    When you say he created a hostile
17  environment when you were coworkers, how did he
18  create a hostile environment?
19    A    He — well, for example he would
20  criticize my reporting style, my work style.  I am
21  a calm person.  I'm not a screamer.  I am not a
22  yeller.  And I am deliberate in my actions.  I

115

1  don't just run helter skelter when news breaks.  I
2  feel a cooler head has to prevail.  Ron fussed me
3  out in the White House booth one day because I did
4  not jump and run to the press secretary's office
5  to ask about a shooter on the south lawn.
6    Q    Is it fair to say that Ron would have
7  thought a shooter on the south lawn of the White
8  House was a significant issue?
9    A    He had already run to the press
10  secretary's office about the same shooter.  So, to
11  me it did not make sense for both of us to do
12  that.  So, instead I went outside and found a
13  groundskeeper.
14    Q    Did Ron do anything else that you claim
15  is a hostile environment?
16    A    Yes.
17    Q    Okay.  What?
18    A    He would single me out in the morning
19  news meetings or make comments about the stories
20  that I pitched, negative comments mostly.
21    Q    Do you recall anything specifically that
22  he said?

116

1    A    Yes.
2    Q    Okay.  Tell me?
3    A    One morning as he convened the morning
4  news meeting just before I came in he said,
5  everybody else seemed to get here through the
6  traffic just fine, in a dismissive way that made
7  me feel singled out in front of my colleagues.
8    Q    Okay.  But you were late for the
9  meeting, right?
10    A    He said this as I walked into the
11  meeting.
12    Q    And the others were there before you?
13    A    Yes.
14    Q    Okay.  Do you know if you have a
15  reputation for showing up late or leaving early?
16    A    No, I can't say that.
17    Q    Are there any other editors at the AP
18  that you believe you regularly come into the
19  office earlier than and regularly leave later
20  than?
21    A    Yes.
22    Q    Okay.  Who?

Transcript of Sonya Ross
Conducted on February 13, 2018

---

117

1    A    AP has a rather relaxed environment,
2  it's flexible.  So, some days some editors are at
3  work early because of breaking news or news
4  happening in a different part of the world that
5  time difference has to be accommodated.  And
6  sometimes news breaks and you have to stay late.
7  It's all driven by the news.  So, there are days
8  when I get there ahead of my colleagues, there are
9  days when my colleagues get there ahead of me.
10   Q    Regularly?  Who do you regularly come in
11 earlier than?
12   A    But it doesn't work that way.
13   Q    Okay.  So, can you identify anyone who
14 you regularly come in earlier than?
15   A    Yes.
16   Q    Okay.  Who?
17   A    All of the desk editors that work the
18 desk in the evening because they come to work in
19 the evening.
20   Q    Okay.  Anybody on the same shift as you?
21   A    No.
22   Q    Anyone that you regularly leave later

---

118

1  than at the end of the shift?
2    A    Well, yes.
3    Q    Okay.  Who?
4    A    I routinely stayed at work later than
5  Wendy Benjaminson did.
6    Q    Okay.  Anyone else?
7    A    No.
8    Q    Isn't it a fact that Ron would single
9  out other AP employees at the morning meetings
10 with negative comments?
11   A    No, not that I witnessed.
12   Q    Is it possible that Ron had more of a
13 difficult time managing you, if you will, because
14 you used to be coworkers?
15   A    No.
16   Q    Why do you say no?
17   A    Because there are other people on the AP
18 staff that came from being reporters in the bureau
19 to being managers.
20   Q    Okay.  But that were coworkers?
21   A    That were coworkers prior to that.
22   Q    With Ron?

---

119

1    A    With any staff member.
2    Q    But anybody else where -- you and Ron
3  were what -- it was the White House?
4    A    Yes.
5    Q    Okay.  Anyone else a coworker with him
6  and you when you covered the White House that
7  subsequently reported to him when he became bureau
8  chief?
9    A    Yes.
10   Q    Okay.  Who?
11   A    Bob Burns who was on the White House
12 team with us and became the Pentagon reporter.
13   Q    Do you know if any white males ever
14 complained about Ron?
15   A    I don't.
16   Q    Are you aware of Ron ever acting,
17 singling out or yelling at white males?
18   A    No.  Wait, yes.
19   Q    Okay.
20   A    The reporter in question when he yelled
21 at me is a white male.
22   Q    So, Ron would yell at white males as

---

120

1  well?
2        MS. JONES:  Objection.  Misstates her
3  testimony.  You can answer.
4        THE WITNESS:  What he said to my white
5  male reporter and what he said to me were
6  different.
7  BY MR. CARTAFALSA:
8    Q    Okay.  But would he yell at white males
9  as well?
10       MS. JONES:  Objection.  Misstates her
11 testimony.
12 BY MR. CARTAFALSA:
13   Q    Wouldn't Ron yell at white males?
14       MS. JONES:  Objection.  Misstates her
15 testimony.
16 BY MR. CARTAFALSA:
17   Q    You can answer.
18   A    Ron yelled at my reporter who is a white
19 male.
20   Q    Okay.  Do you know why Stephanie
21 Stoughton's position was eliminated?
22   A    What I understood to be going on at that

---

121

1 time was a reorganization of the bureaus that
2 were -- that were the responsibility of the South
3 regional desk.
4     Q     Were any white employees laid off at
5 that time?
6     A     I don't know.
7     Q     Any males laid off at that time?
8     A     I don't know.
9     Q     Any under 40 laid off at that time?
10    A     I don't know.
11    Q     Okay.  So, you don't know if her
12 position was eliminated because of her race,
13 gender, or age.  Right?
14    A     No.
15    Q     Now, you negotiated with Steve Komarow
16 for the -- excuse me, race and ethnicity position?
17    A     Yes.
18    Q     Okay.  Was it give and take with Steve?
19    A     Some, but not a lot.
20    Q     Okay.
21    A     Most of my dealings were with Ron
22 Fournier and Sarah Nordgren up until Ron Fournier

122

1 left the AP.  And then I was dealing with Sarah
2 and Mike Oreskes, more so than Steve.
3     Q     Okay.
4     A     Steve succeeded Ron as bureau -- as
5 acting bureau chief.
6     Q     Okay.  But Ron was willing to create
7 this position for you, right?
8     A     Mike Oreskes was willing to create this
9 position for me.
10    Q     Would Ron have to approve it, as far as
11 you know?
12    A     Ron and Sarah Nordgren were asked to
13 review the job description I had submitted because
14 I -- I assumed he was involved because I reported
15 to him at that time.
16    Q     Okay.  And that would make sense, right?
17 That would make sense?
18    A     He was my -- it stands to reason that
19 someone's employee -- someone would be involved in
20 something that affects one of their direct
21 reports.
22    Q     Okay.  Do you know who ultimately

123

1 approved the creation of the position?
2     A     I assumed the position was approved by
3 Kathleen Carroll.
4     Q     So, what is the last name?
5     A     Carroll.
6     Q     Why do you assume that?
7     A     Because she was executive editor at the
8 AP.
9     Q     Since 2010 the AP has had a number of
10 layoffs, right?
11    A     Yes.
12    Q     Okay.  And the size of the AP has
13 shrunk?
14    A     Yes.
15    Q     Fair to say AP is doing less hiring?
16    A     Yes.
17    Q     Let's talk about the complaint you filed
18 with the OFCCP.  Now, someone at AP announced that
19 the OFCCP would be on site, right?
20    A     Yes.
21    Q     Okay.  Was that Sally Buzbee?
22    A     That was Diane Parker.

124

1     Q     How did Diane Parker announce it?
2     A     She informed us of a training session
3 that we were going to have to prepare for that
4 visit.
5     Q     Okay.  What was the training on?
6     A     On compliance with federal
7 antidiscrimination laws.
8     Q     Okay.  And when did she make this
9 announcement?
10    A     In -- in 2011.
11    Q     Okay.  And when was the training?
12    A     In 2011.
13    Q     And you reached out to a Willy Lucas at
14 the OFCCP.  Is that right?
15    A     Yes.
16    Q     Okay.  How did you know to reach out to
17 Mr. Lucas?
18    A     I wanted to try to find out more
19 information about who was coming.
20    Q     Okay.  But somebody at the AP
21 specifically said Willy Lucas from the OFCCP was
22 coming, right?

125

1    A    No.
2    Q    Okay.  So, you did not have a name?
3    A    No.
4    Q    Okay.  So, what did you do?  You just
5  called the 1-800 number at the OFCCP or?
6    A    Yes.
7    Q    Okay.  And you spoke with Mr. Lucas?
8    A    Yes.  They routed me to him.
9    Q    And when was this approximately?
10   A    Maybe October or so of 2011.
11   Q    Okay.  And you said you wanted to find
12  out more about the process.  What did you mean by
13  that?
14   A    I told him that I understood that they
15  were coming to do an on site visit at the AP.
16   Q    And he said -- he confirmed that?
17   A    Yes.
18   Q    Okay.  Did you say you wanted to speak
19  with him?
20   A    Yes.
21   Q    Okay.  Did he say when he visited he
22  would reach out for you?

126

1    A    Yes.
2    Q    Did he go into details about how he
3  would reach out for you?
4    A    No.  I told him I worked there.
5    Q    Okay.  So, you expected that he would
6  reach out to you in the job place?
7    A    No.  I just let him know I wanted to
8  speak with him.
9    Q    Okay.  And did he tell you that he would
10  speak with you?
11   A    He just said okay.
12   Q    Okay.  But you said you wanted to speak
13  with him when he was -- when the OFCCP was on
14  site?
15   A    Yes.
16   Q    Okay.  So, that's at the job place,
17  right?
18   A    Yes.
19   Q    So you knew there was a possibility that
20  Willy Lucas of the OFCCP would speak to you while
21  and the AP?
22

127

1    A    I knew there was a possibility that
2  someone from OFCCP would speak to me.  But I did
3  not know for certain that it would be then and in
4  that setting.
5    Q    Okay.  But you did ask to meet with them
6  then and in that setting, right?
7    A    I asked to speak with them.
8    Q    When they were on site, right?
9    A    I asked to speak with them.
10   Q    When they were on site?
11   A    Period.  No, I didn't specify that they
12  were on site.  I asked to speak with them.
13   Q    But before you testified that he said
14  when they came to the workplace he'd reach out for
15  you.  Right?
16   A    I told him I wanted to speak with him
17  and -- or with OFCCP, period.
18   Q    Okay.
19   A    And that was my only real expectation.
20  I was not sure how he would execute that or who
21  would execute that.
22   Q    Okay.  Before you said you had an

128

1  expectation that he would reach out to you while
2  they were in the workplace?
3    A    I had an expectation of speaking with
4  OFCCP which was coming to my workplace.
5    Q    Okay.  Did you tell him not to contact
6  you in the workplace?
7    A    No.
8    Q    Okay.  And in fact you thought they were
9  going to contact you when they were on site,
10  right?
11   A    I thought they were going to contact me
12  because he said okay.  I was not clear how.
13   Q    Okay.  But how -- tell me your
14  conversation with him?  Did you say I understand
15  you are coming to the AP on November 15th for an
16  investigation?
17   A    I said that I understand that the OFCCP
18  is conducting an on site review, a compliance
19  review in the place where I work.
20   Q    And you identified AP?
21   A    I had already identified myself as
22  someone who worked for AP.

Transcript of Sonya Ross
Conducted on February 13, 2018

---

129

1    Q    Okay.  And he confirmed that?  That they
2  were doing it --
3    **A    -- He said -- he said okay.**
4    Q    Okay.  It doesn't seem like he'd say
5  okay to that.  Do you remember exactly how the
6  conversation went?
7    **A    I reached out to OFCCP.  They**
8  **transferred me to him.  I told him I understood**
9  **that AP was under an on site compliance review.**
10  **And I expressed a desire to speak with OFCCP.**
11    Q    Okay.  And in the very same conversation
12  whether you talked about them being on site,
13  right?
14    **A    Yes.**
15    Q    Okay.  Even if not explicit you had some
16  understanding that they'd reach out for you while
17  they were at the AP?
18    **A    I didn't know whether they would or**
19  **would not reach out for me physically while they**
20  **were at the AP.**
21    Q    Okay.  They might?
22    **A    I expected to hear from them in some**

---

130

1  capacity or another.
2    Q    But they might reach out to you while at
3  the AP, right?
4    **A    I expected to hear from OFCCP.**
5    Q    Did you think that they might reach out
6  to you at the workplace?
7        MS. JONES:  Asked and answered.  You can
8  answer it.
9        THE WITNESS:  I figured that since they
10  were coming to the workplace, they might reach out
11  to me at work.
12  BY MR. CARTAFALSA:
13    Q    Okay.
14    **A    What I couldn't know is whether I would**
15  **be at work when they came.  So, I simply assumed I**
16  **would hear from OFCCP one way or another.**
17    Q    Excepting Montrese Garner-Sampson for a
18  minute, did anybody at the AP ever tell you not to
19  cooperate with the OFCCP?
20    **A    No.**
21    Q    And in fact the AP encouraged
22  cooperation with the OFCCP?

---

131

1    **A    Can you rephrase that question?**
2    Q    In fact the AP encouraged employees to
3  speak openly and honestly with the OFCCP?
4    **A    No.**
5    Q    Okay.
6    **A    The Associated Press told us what was**
7  **going on and what compliance meant.  It was like**
8  **that.  It wasn't we urge you all to speak openly**
9  **with them.  I mean, it was general knowledge.**
10    Q    Do you have a recollection about an
11  email going out about the OFCCP coming to the AP
12  from Sally?  Withdrawn.  It doesn't matter.
13        Given you thought the OFCCP might reach
14  out to you -- okay, and might do so at work, you
15  were comfortable with the OFCCP reaching out to
16  you at the AP.  Right?  You didn't take any steps
17  to prevent that?
18    **A    No.**
19    Q    And at the time you knew retaliation was
20  unlawful?
21    **A    Yes.**
22    Q    In fact you had undergone EEO training

---

132

1  at the AP?
2    **A    We got a briefing from Diane Parker**
3  **prior to the visit from OFCCP.**
4    Q    Okay.  About a year prior, right?
5    **A    No.**
6    Q    Okay.
7    **A    It was within a window of when that**
8  **visit would happen.**
9    Q    Okay.  It was within a few weeks?
10    **A    Yes.**
11    Q    Okay.  Didn't you say there was
12  something that happened -- the training was 2011,
13  I think you said.  Okay.
14    **A    That particular training was 2011.**
15    Q    Okay.
16    **A    There was training in 2002 called**
17  **managing diversity that I got as a new manager of**
18  **the AP.**
19    Q    And you're aware that AP has a policy
20  against harassment?
21    **A    Can you rephrase that question?**
22    Q    Are you aware that the AP has a policy

---

133
1  against harassment, sometimes called an equal
2  opportunity policy?
3      **A   Yes.**
4      Q   And a policy against retaliation?
5      **A   No, I don't know specifically of a**
6  **policy against retaliation.  I know in general AP**
7  **has an EEO policy.**
8      Q   Okay.
9      **A   And an affirmative action policy.**
10     Q   Okay.  And you knew retaliation was
11 unlawful?
12     **A   Yes.**
13     Q   Are you aware of anyone else at the AP
14 who was retaliated against?  Let me rephrase.  Are
15 you aware of anyone at the AP other than yourself
16 who was retaliated against for making a complaint
17 of discrimination?
18     **A   Yes.**
19     Q   Okay.  Who?
20     **A   Robert Naylor.**
21     Q   Other than the fact that after he
22 complained he was laid off, do you have any

134
1  evidence that his layoff was for retaliatory
2  reasons?
3      **A   I'm not sure what you mean.**
4      Q   It seemed that Robert Naylor made a
5  complaint of discrimination, was later laid off.
6  Anything else that makes you think that's
7  retaliatory?
8      **A   Well, prior to his layoff there was**
9  **diminishing of his role, elimination of his bonus,**
10 **and what he described to me as a sense that -- a**
11 **sense of hostility toward him.**
12     Q   Did he say who was being hostile?
13     **A   Yes.**
14     Q   Okay.  Who?
15     **A   Kathleen Carroll.**
16     Q   Anyone else?
17     **A   No.**
18     Q   And when was he laid off again?
19 Approximately?
20     **A   Early 2012.**
21     Q   And there was some years, a few year
22 before or a few years after 2012 when certain

135
1  employees didn't get raises.  Was there a year
2  that the AP did not give raises?
3      **A   Can you repeat that?**
4      Q   Was there a year where the AP did not
5  give any employees raises?
6      **A   I can't know that because that would**
7  **require me to know every employee's raise status.**
8  **I mean --**
9      Q   Okay.
10     **A   I can't say.**
11     Q   You did not supervise Rob Naylor, did
12 you?
13     **A   No.**
14     Q   Okay.  So, you didn't have direct
15 knowledge of his job performance, did you?
16     **A   No.  Other than work we did together.**
17 **Do you mean that?**
18     Q   No.  And -- but he had been promoted a
19 number of times, right?
20     **A   Yes.**
21     Q   What changed at the AP to go from
22 promoting someone who is African American to

136
1  deciding to lay them off for discriminatory
2  reasons?
3      **A   There was a change of leadership at the**
4  **AP.**
5      Q   Okay.  When was that?
6      **A   I don't know the exact year, but there**
7  **was a change of CEO from Lou Boccardi to Tom**
8  **Curley.**
9      Q   So, is that when you believe that AP
10 institutionalized discrimination?
11     **A   No.  I believe institutional**
12 **discrimination existed to AP prior to that.**
13 **However, there was definitely a change in the**
14 **environment at the AP.**
15     Q   There were changes in many ways, not
16 just related to discrimination, right?
17     **A   Yes.**
18     Q   Any other instances where you contend
19 that discrimination, harassment, or retaliation
20 kept you from a promotion or otherwise impeded
21 your ability to do your job?
22     **A   Can you rephrase that question?**

137

1    Q    Can you give me examples as to when you
2  believe discrimination -- let me ask you this
3  first.  I will withdraw that question.
4          You complained in the complaint about
5  different promotions not given and other jobs not
6  given to you.  Was that caused by direct
7  discrimination against you or was that caused by
8  the institutional discrimination?
9    A    It's a mixture of both of those things.
10   Q    Okay.  What was the direct
11 discrimination against you?
12   A    I was denied the job that in a bureau
13 where I had worked for many years, a significant
14 role in the news operation that I knew very, very
15 well from having managed in that same environment
16 for an extended period of time.
17   Q    Anything else to support direct
18 discrimination?
19   A    My interview process was a little weird.
20   Q    For which job?
21   A    Assistant bureau chief.
22   Q    That was with Ron?

138

1    A    Yes.
2    Q    Anything else?
3    A    That interview was distinctly unlike any
4  other interview I had had for every other position
5  I got.
6    Q    What was weird about that interview?
7    A    I was waiting to hear that I would be
8  interviewed for the job.  And when I didn't hear
9  back I asked Ron if he planned to interview me
10 that we needed to schedule an interview.  And he
11 replied, okay, and told me to come to his office
12 at 1:15 for an interview.  That was not on the
13 same day.  I think he replied a day later or a day
14 or two later.
15   Q    What's weird about that?
16   A    Well, in all of my other interviews they
17 were proactive in contacting me to tell me that I
18 would be interviewed at a certain place and time.
19 I was -- a couple of times I was taken to lunch as
20 part of the interview and I was given a clear idea
21 of what to expect.  In some cases in more recent
22 years these have migrated to phone interviews or

139

1  video interviews.  But again, it was proactive.  I
2  had never had to actually remind someone that I
3  needed to be interviewed for a job.
4    Q    Okay.  But you were interviewing with
5  the bureau chief of one of the AP's premier
6  bureaus.  Right?
7    A    Yes.
8    Q    Were any of those other interviews with
9  a bureau chief?
10   A    Yes.
11   Q    Okay.  Which one?
12   A    When I was promoted to world services
13 editor my interview was with Sandy Johnson.
14   Q    Okay.
15   A    When I was promoted to news editor for
16 regional reporters my interview was with Sandy
17 Johnson.
18   Q    Any other direct evidence of
19 discrimination, harassment, or retaliation?
20   A    During the interview with Ron Fournier
21 for the assistant bureau chief job he talked to me
22 about a job I hadn't applied for.  And I had to

140

1  remind him I had applied for a different job.
2    Q    Okay.  Anything else there?
3    A    I was waiting for the interview to start
4  because he wanted to find a power bar in his
5  cabinet so he could eat because he hadn't had
6  lunch.  I told him I hadn't had lunch either.
7    Q    Anything else?
8    A    In that interview after I reminded him
9  that I had applied for a different position, he
10 said; Okay, and here is what we want from that
11 position and thanks.
12   Q    Okay.
13   A    I left the interview not really knowing
14 a next step.
15   Q    Okay.  So, you were -- there was an
16 assistant bureau chief position?
17   A    Yes.
18   Q    Okay.  That would be a position that
19 would work closely with the bureau chief?
20   A    Would actually work more closely with
21 the deputy bureau chief, but yes.
22   Q    And so you were willing to apply for

Transcript of Sonya Ross
Conducted on February 13, 2018

141

1 position that worked closely with Ron, right?
2    A   Yes.
3       MR. CARTAFALSA: Okay. It's 1:30. Do
4 you guys -- is a break now good? Talk of the
5 power bar.
6       MS. JONES: Yes.
7       THE WITNESS: Yes.
8       THE VIDEOGRAPHER: Stand by, please.
9 This is the end of media two. We are going off
10 the record at 1330 hours.
11       (The proceeding recessed from 1:30 p.m.
12 to 2:15 p.m.)
13       THE VIDEOGRAPHER: This is the beginning
14 of media three. We are back on the record at 1427
15 hours.
16 BY MR. CARTAFALSA:
17    Q   Okay. We were talking about direct
18 discrimination before. Any other examples of
19 direct discrimination against you?
20    A   Can you rephrase the question?
21    Q   You had used the phrase sort of a
22 institutional discrimination or institutional

142

1 policies which would be AP wide. Correct?
2    A   Yes.
3    Q   And direct discrimination might be
4 discrimination that's aimed at you?
5    A   Well, yes and no. Because institutional
6 racism can be aimed at me by virtue of me being
7 African American.
8    Q   Okay. But it's not aimed at you
9 particularly, it's aimed at all African Americans?
10    A   And since I'm one it's aimed at me.
11    Q   Okay. Understood. Was there
12 discrimination -- you talked about some before, I
13 don't know if there is any more. Any specific
14 direct discrimination that was aimed solely at
15 you? Other than what you said already?
16    A   Not that comes to mind in the immediate.
17 I would have to really put some thought to it.
18    Q   In your complaint you alleged
19 discrimination on the basis of race, gender, age,
20 and protected activity. Protected activity is
21 when we talk about retaliation. Do you understand
22 that?

143

1    A   Give me a little bit more clarity.
2    Q   Okay. What do you understand protected
3 activity to mean today? That you were
4 discriminated on the basis of protected activity?
5    A   I would take that to mean the work I do
6 every day, going about my daily existence.
7    Q   And so then how were you discriminated
8 against on the basis of going about your daily
9 existence?
10    A   Well, in order to exist I need to earn a
11 living. So the compensation that I get for the
12 job I do matters to me. And if I'm unable to
13 advance in my profession it is that much tougher
14 for me to earn more income to live a standard life
15 like anyone else. So, the effort to get another
16 position that pays well can hinder my ability to
17 operate in my daily life. It has an impact on
18 that.
19    Q   But the impact has been so small that
20 you have only applied for one other job in the
21 recent, say five years?
22    A   Well, no. That is not the size of the

144

1 impact, that's a factor in that.
2    Q   But you have advanced in the past at the
3 AP, correct? We've talked about promotions for
4 you?
5    A   Yes.
6    Q   Okay. Again, what has changed?
7    A   That is something I would like to know.
8 I feel I have brought the same level of skill and
9 professionalism to the table in every position
10 that I've had. And it puzzles me as to why I have
11 not been able to advance past a certain point.
12    Q   Are you aware of any white employees at
13 the AP who don't advance after a certain point?
14    A   Yes.
15    Q   Are you aware of any male employees at
16 the Associated Press that don't advance after a
17 certain point?
18    A   Yes.
19    Q   You aware of any persons under 40 years
20 of age who don't advance after -- at the AP who
21 don't advance after a certain point?
22    A   No.

145

1    Q    You mentioned an employee who left to go
2  to film school?
3    **A    Yes.**
4    Q    Okay.  Was she under 40?
5    **A    At the time, yes.**
6    Q    Okay.  So, there is at least one
7  employee who was under 40 who felt she could not
8  advance?
9    **A    Okay.**
10    Q    So, your complaint alleges
11  discrimination on the basis of race, gender, and
12  age.  Okay?  Is it one-third gender, one-third
13  race, one-third age?  How would you describe the
14  breakdown?
15    **A    I wouldn't compartmentalize it quite**
16  **like that.**
17    Q    Okay.  How would you?
18    **A    Well, I'm a hundred percent of all three**
19  **of those things.**
20    Q    Okay.  Do you believe it to be a
21  preponderance of race, of gender, of age, one or
22  the other.  Can you take a guess?

146

1    **A    No, I don't believe to it be a**
2  **preponderance.  It's different types of it**
3  **happening at different times.  I mean, in the**
4  **aggregate it's all of those things.**
5    Q    So, over time you would argue it's
6  relatively equal amongst all three of those
7  classifications?
8    **A    There are times when the racial**
9  **discrimination is more intense.**
10    Q    Any other times when gender is more
11  intense?
12    **A    No.**
13    Q    Okay.
14    **A    Because the gender discrimination --**
15  **well, the discrimination that can happen to me as**
16  **a woman tends to happen to me as a black woman.**
17    Q    So, they go hand in hand, is what you
18  are saying?
19    **A    They can.**
20    Q    Well, do they?
21    **A    Sometimes they do.**
22    Q    Okay.  Do you have examples of when they

147

1  do and when they don't?
2    **A    I have anecdotal explanations of when**
3  **they do and when they don't.**
4    Q    Okay.
5    **A    For example sometimes for racial**
6  **remedies companies hire men who are black.**
7  **Sometimes for gender remedies companies hire women**
8  **who are not black.  And both of those cases a**
9  **black woman would be eligible on either side, but**
10  **can still find themselves outside of the option.**
11    Q    Okay.  Are you aware of any specific
12  examples of that at the AP?
13    **A    Yes.**
14    Q    Okay.  Who?
15    **A    On multiple occasions there have been --**
16  **there has been a concerted effort to diversify the**
17  **AP's upper management ranks.  And in a lot of**
18  **these cases the hires have gone to women who help**
19  **on the gender discrimination side of that**
20  **question, but racially are not black or a minority**
21  **therefore the racial aspect of the discrimination**
22  **goes unfulfilled.**

148

1    Q    You said there's concerted efforts by
2  the AP, that's AP management?  Is that what you're
3  saying?
4    **A    Yes.**
5    Q    Do you know that candidates that apply
6  for the positions -- let me withdraw that.
7       Do you know if there is the same number
8  of candidates who are black women as white women
9  or as black men or nonblack?  Or you wouldn't know
10  necessarily the candidate pool?
11    **A    Not necessarily, no.**
12    Q    And how do you know that there are
13  consistent efforts by the AP to diversify?
14    **A    That's what they've told us.**
15    Q    Okay.  And when you say they, who is
16  that and how did they tell you, how does it come
17  out?
18    **A    Meaning senior executives at the AP**
19  **state a general desire to be committed to**
20  **diversifying the company's ranks.**
21    Q    Have you seen examples where they do
22  attempt to diversify the company ranks?  Attempt

149

1 to?  They don't necessarily have to succeed, just
2 to be clear.
3     A    Yes.
4     Q    Okay.  And when were these examples?
5     A    When I've applied for jobs there was a
6 general statement that the AP is committed to
7 diversity and an equal workplace.  In the cases of
8 some of my colleagues who are of color, some of
9 whom are also women, that same statement has been
10 made.
11     Q    Do you know if there is an effort by the
12 AP particularly to diversify at the mid level and
13 senior level management ranks?
14     A    No.
15     Q    You don't know or there is not?
16     A    No, I don't know.
17     Q    What sort of promotional opportunities
18 have you pushed for some of your team members or
19 people that you've supervised?
20     A    Over what time period are you talking
21 about?
22     Q    Since 2008?

150

1     A    Well, in 2008, 2009 while I was news
2 editor for the regional reporters I advocated for
3 my regional reporters to get actual beats, subject
4 matter beats, because developing that expertise
5 could help them make the transition to the
6 Washington national staff.  I have pushed for them
7 to win internal reporting honors that help to
8 bolster their quantifiables on how they deliver
9 the news.  And in the course of the time since
10 then the majority of those reporters have gone on
11 to promotions and better assignments at the AP.
12 And some have left the AP to bigger and better
13 assignments elsewhere in the industry.
14     Q    Did you do this for African American
15 employees and white employees or only minority
16 employees?  Who did you do this for?
17     A    For all employees that came under my
18 supervision or authority.  The vast majority of
19 them were white.
20     Q    Did you engage in any particular or
21 different or special efforts on behalf of minority
22 employees?

151

1     A    Yes.
2     Q    Okay.  And what were those efforts?
3     A    General efforts to diversify.  General
4 efforts to put AP in touch with qualified
5 journalists of color who could also work for AP at
6 some point.
7     Q    Okay.  How about the employees that you
8 supervised, though?
9     A    Well, when I was regional editor I did
10 not have any African American reporters.  I had
11 one Hispanic reporter and one Asian reporter and
12 all the rest were white.
13     Q    Did you do anything in particular for
14 the Hispanic or Asian reporter?
15     A    Well, yes.
16     Q    Okay.  What was that?
17     A    I advocated for them to go to specific
18 diversity training initiatives at the journalists
19 of color conventions that they would attend.
20     Q    Did the AP allow that to happen?
21     A    Yes.
22

152

1     Q    Okay.  You had mentioned about internal
2 reporting honors?
3     A    Uh huh.
4     Q    What internal reporting honors have your
5 team members won?
6     A    There is an internal honor called Beat
7 of the Week and Best of the States.  And my
8 reporters have won those honors before or come
9 close to winning those honors by getting an
10 honorable mention for their work.  Those two
11 competitions are for what -- for what AP
12 considered the best or biggest breaking news story
13 of that week.
14     Q    Okay.  When was the last time one of
15 your reporters won that honor?
16     A    Last year.  We won it two or three times
17 last year.
18     Q    Did a story you wrote ever win?
19     A    No.
20     Q    Is it fair to say that particularly
21 given the election of President Obama and now the
22 election of Trump race issues have been

153

1 particularly important in the United States?
2     A   Yes.
3     Q   And the race and ethnicity editor
4 position would be important, right?
5     A   Yes.
6     Q   Do you have any minority staff who won
7 the Beat of the Week or the Best of States?
8     A   Yes.
9     Q   Okay.  And so they were honored by the
10 AP, correct?
11     A   Yes.
12     Q   Any other African Americans who have won
13 Beat of the Week or Best of States outside of your
14 supervision?
15     A   I don't recall any.
16     Q   Okay.  How about female reporters?
17     A   Yes.
18     Q   There certainly could have been African
19 Americans who won, you just wouldn't know?
20     A   I'm simply not recalling right off of
21 the bat because this is a weekly competition and
22 it's been going on for several years.

154

1     Q   Sure.  So, African Americans may have
2 won, you just don't recall, right?
3     A   They could have.
4     Q   Okay.
5     A   Because I might have been on vacation
6 that week not paying attention.  But typically if
7 an African American reporter wins that honor I'm
8 aware of it because internally we talk about those
9 things.
10     Q   Okay.  Who do you talk about those
11 things with?
12     A   Meaning black colleagues in the AP will
13 say:  Wow, so and so won Beat of the Week.  It's
14 a -- sort of a collegial thing.
15     Q   I asked before about conversations about
16 discrimination or harassment or retaliation with
17 AP employees.  You gave a few, but anything you
18 want to add?  Does it refresh your recollection?
19 Or you wouldn't have conversations with these
20 employees about that?
21     A   Would you rephrase that question,
22 please?

155

1     Q   I asked earlier today about
2 conversations you had about discrimination or
3 retaliation in the workplace with other AP
4 colleagues.  And you had mentioned a few names.
5 I'm just asking if your testimony now refreshes
6 your recollection you may have had more
7 conversations?
8     A   No.
9     Q   Okay.  Do you ever post to blogs or
10 Facebook about discrimination at the AP?
11     A   No.
12     Q   Any social media type of posting
13 regarding discrimination at the AP?
14     A   No.
15     Q   Are you aware of any blogs or postings
16 where other employees or former employees talk
17 about discrimination or retaliation at the AP?
18     A   Yes.
19     Q   Okay.  What is the blog and post and
20 who?
21     A   There is a blog called Journal-isms and
22 it is run by Richard Prince who covers, for lack

156

1 of a better term, the condition of minorities in
2 media.  And he routinely posts stories when, for
3 example, there are layoffs anywhere in the
4 industry; when a lawsuit like mine gets filed;
5 when there is an anniversary of a historic
6 landmark involving discrimination in media.
7 Similarly, there is All Digitocracy.
8     Q   I'm sorry.  It's All Digitocracy?
9     A   All Digitocracy, which focuses on women
10 and people of color.
11     Q   Any others that you regularly visit?
12     A   Can you rephrase that?
13     Q   Are there any other blogs or online
14 sites, web pages, etc., regarding discrimination
15 either at the AP in particular or discrimination
16 in the media industry?
17     A   There probably are.
18     Q   Okay.  Do you recall any?
19     A   Well, I'm slightly confused because I'm
20 not clear on whether you're asking me about the
21 blogs I visit or have visited or blogs in general.
22     Q   Blogs that you visited?

157

1    A    Those are the ones that I've visited.
2    Q    Okay.  So, you are aware of others, but
3 don't visit?
4    A    There could be others, but the internet
5 being the vast beast that it is, I can't say I
6 know all of them.
7    Q    Understood.  Yeah.  Okay.  Is it fair to
8 say the media industry in general has problems
9 recruiting or retaining minority employees and/or
10 women?
11    A    Yes.
12    Q    Let me ask this looking at it a little
13 bit of the opposite way.  Is there an employee in
14 the media industry out there that you would say is
15 a great exemplar of what employers should be
16 doing?
17    A    Well, yes.
18    Q    Who is that?
19    A    ABC does a good job.  USA Today has done
20 a good job in the past.
21    Q    Okay.  And I assume you know just from
22 talking to colleagues with the industry?

158

1    A    Yes.  Nobody is perfect.
2    Q    Sure.
3    A    And everyone has shortcomings.  But they
4 also have a pretty substantial number of minority
5 employees, which suggests that they feel
6 comfortable working there.
7    Q    Do you have any recommendations for the
8 Associated Press to eliminate or attempt to
9 eliminate anyway, what you called sort of
10 institutional discrimination?
11    A    Yes.
12    Q    Okay.  What are those recommendations?
13    A    Hire more journalists of color
14 specifically African Americans.  Promote and
15 fairly compensate journalists of color who work
16 for you, because they are your ambassadors to the
17 industry.
18    Q    Do you feel you're an ambassador to the
19 industry for the AP?
20    A    I have been, yes.
21    Q    Are you now?  You say you have been --
22    A    -- I have been.

159

1    Q    When were you or did it stop?
2    A    I have always been, but lately the
3 relationship is raggedy.
4    Q    We talked about promotions before.  Were
5 there any promotions that we have not spoken about
6 that you were passed over for at the AP?
7    A    Yes.
8    Q    Okay.  Tell me about that?
9    A    I never knew that the Associated Press
10 was thinking about changing White House
11 correspondents when Terence Hunt moved over to
12 deputy bureau chief and Ron Fournier became the
13 White House correspondent.
14    Q    Okay.  So, you never applied for that?
15    A    No.
16    Q    And it was given to Ron?
17    A    Yes.
18    Q    Okay.  Was Ron minimally qualified?
19    A    I assume he was.
20    Q    Do you believe you were significantly
21 more qualified than Ron?
22    A    I believe I was just as qualified as

160

1 Ron.
2    Q    And how come you didn't apply?
3    A    By the time I found out the posting had
4 gone up, it had come down.
5    Q    And that would have been sometime prior
6 to 2010?
7    A    Yes.  That would have been 2001.
8    Q    Okay.  Any other promotions you were
9 passed up for or denied?
10    A    Can you clarify that for me?
11    Q    Well, was there any promotion -- or let
12 me make it broader.  A promotional opportunity,
13 okay, that you were denied or passed up for?
14    A    Meaning something that I applied for or
15 was aware of?
16    Q    Yes.
17    A    There were other positions that I was
18 aware of, but not interested in.
19    Q    Okay.  So you never applied, right?
20    A    I didn't apply because I was not
21 interested.
22    Q    Okay.  And what were these positions?

161

1    A    Congressional editor.
2    Q    I will ask you if you can tell me why
3 you wouldn't be interested?
4    A    Because it is -- it was on Capitol Hill,
5 it was far more hectic and hands-on and I had
6 already done hectic and hands-on when I was
7 filling in as foreign affairs and national
8 security news editor.  And I felt I wanted a
9 slower more deliberate pace at that time.
10    Q    Okay.  Other opportunities that you
11 didn't apply for?
12    A    I didn't apply for bureau chief.
13    Q    Okay.  How come?
14    A    Well, after being turned down for
15 assistant bureau chief I felt I didn't really have
16 a chance at it.
17    Q    Was anyone promoted to a bureau chief
18 position who didn't meet the minimal
19 qualifications that you are aware of?
20    A    Tell me what you mean by minimum
21 qualifications?
22    Q    Was there anyone who you can say -- you

162

1 know, clearly not qualified for the job?
2    A    Yes and no.
3    Q    Okay.  Talk to me about the yes?
4    A    Yes would be yes there was a candidate.
5 But no because they really were more poorly
6 qualified for the job.  And not being completely
7 privy to exactly what subjective standard the AP
8 set for determining who should have the job, I
9 can't say what all of the qualifications were, but
10 I can say this particular person was poorly
11 qualified for the job.
12    Q    Who was that?
13    A    Ron Fournier.
14    Q    Any bureau chiefs that you'd say that
15 you were significantly more qualified to be the
16 bureau chief then they were?
17    A    Yes.
18    Q    Okay.  Who?
19    A    Ron Fournier.
20    Q    Anyone else?
21    A    No.
22    Q    What makes you think you were

163

1 significantly more qualified than Ron Fournier?
2    A    I had more management experience.
3    Q    Excuse me.  Let's talk about pay raises
4 and bonuses.  And any adverse impact on your
5 compensation that you are aware of because of your
6 race, gender, or age?
7    A    Yes.
8    Q    Okay.  Tell me about that?
9    A    I'm the lowest paid news editor in
10 Washington.  I'm also the only African American
11 news editor in Washington.
12    Q    Were any of those news editors, did they
13 have more experience than you?
14    A    Rephrase your question?
15    Q    Do you know if any of those news editors
16 had more experience?
17    A    In what?
18    Q    As an editor?  All right.  Let me
19 rephrase.
20        Do you think you should be paid -- all
21 news editors should be paid the same?
22    A    Yes.

164

1    Q    So, regardless of years of experience?
2    A    Yes.
3    Q    And you talked before I think it was
4 about a congressional position or position on the
5 Hill being very hectic and you didn't want to
6 apply to congressional editor.  Any of these news
7 editor positions more hectic than your current
8 position?
9    A    Yes.  The congressional editor position
10 is hectic.  The investigations editor position is
11 hectic right now due to scandals.  The foreign
12 affairs national security position is less hectic
13 now.
14    Q    Okay.  What about any of the other
15 positions?
16    A    The deputy bureau chief and a news
17 editor that is to be named, are responsible for
18 White House coverage which is hectic right now
19 because the president in question is generating a
20 lot of news.
21    Q    Being -- having a very hectic position
22 could be a rationale to give higher pay, right?

165

1     A   No.
2     Q   No?  Are there any rationales to give
3  news editors -- any nondiscriminatory rationales
4  to give news editors different pay?
5     A   Yes.
6     Q   Okay.  What would they be?
7     **A   Competitive salaries as in paying people**
8  **what most people in that similar position earn in**
9  **the industry.**
10    Q   Do you know any competitors of yours, or
11 comparators I should say, of the race and
12 ethnicity editor position?
13    **A   Yes.**
14    Q   Okay.  Who are they and tell me what
15 they're paid if you know?
16    **A   I don't know what they're paid every**
17 **day.  But since the Associated Press created the**
18 **position that I hold other industry — companies**
19 **in the industry followed that example and**
20 **established custom race and ethnicity coverage.**
21    Q   Okay.  So the AP was on the forefront?
22    **A   Yes, because I took them there by**

166

1  proposing this job.
2     Q   Are you aware of other employees at the
3  AP proposing jobs and the AP either agreeing or
4  not agreeing?
5     **A   Yes.**
6     Q   Do you know what the comparators for the
7  other editors make in the industry?
8     **A   Anecdotally I know positions pay more.**
9     Q   Which positions would pay more?
10    **A   The editor of this content for the**
11 **New York Times is paid more.**
12    Q   So, would an editor of content at the AP
13 then deserve to be paid more?
14    **A   Yes.**
15    Q   Now again, you had negotiated your
16 salary when given the race and ethnicity position.
17 Right?
18    **A   No.**
19    Q   Okay.  Did you raise your salary at all?
20 Did you ask for more pay?
21    **A   Yes.**
22    Q   And it was not given to you, right?

167

1     **A   Correct.**
2     Q   But you took the job anyway?
3     **A   Because the job I occupied at that time**
4  **was abruptly posted as opened to be filled while I**
5  **still occupied it.**
6     Q   Okay.  Did you ask anyone to keep your
7  job at that time?
8     **A   I asked why this job was posted.**
9     Q   Okay.  Did you ask to keep the job?
10    **A   No.  I asked for the job I had asked**
11 **for.**
12    Q   Okay.  Because you wanted that job,
13 right?
14    **A   I wanted the job I had tried to create.**
15 **I was under the belief that we were negotiating**
16 **this job.  And in the midst of those negotiations**
17 **the job I was occupying at that time appeared on**
18 **the internal job postings.**
19    Q   Okay.  Did you complain about that to
20 anyone?
21    **A   I asked about that.**
22    Q   Who did you ask?

168

1     **A   I asked Jessica Bruce about that.**
2     Q   What did Jessica say?
3     **A   Jessica said it was an error.  The**
4  **posting went up in error.**
5     Q   Were you aware that the other AP has
6  ever made other job posting errors?
7     **A   I was told when that happened that that**
8  **can happen sometimes, but I don't know of any**
9  **other examples of that.**
10    Q   Okay.  Do you think that job was posted
11 for discriminatory reasons?  Let me rephrase.
12       Do you have any evidence that was posted
13 for reasons other than a mistake?
14    **A   I felt it was posted to pressure me.**
15    Q   To pressure you to what?  To take the
16 new one?
17    **A   It would leave me effectively in the**
18 **system with no job sustaining me.  So, in order to**
19 **have a job I had to take whatever permutation they**
20 **put the race and ethnicity position in.**
21    Q   When you complained did the AP take down
22 the posting?

Transcript of Sonya Ross
Conducted on February 13, 2018

43 (169 to 172)

---

169

1     A   I don't know.

2     Q   Okay.  Did you say; Hey, take down that

3  posting so I have more time to negotiate?  Words

4  to that effect?

5     A   No.  I asked why is my job posted.  And

6  I was told it was in error.

7     Q   Do you believe Jessica Bruce ever

8  discriminated against you or retaliated against

9  you?

10    A   Can you rephrase that?

11    Q   Do you believe Jessica Bruce -- let me

12 phrase it this way -- Jessica Bruce directly

13 discriminated or retaliated against you?

14    A   I believe in her capacity as the head of

15 HR that Jessica Bruce had to carry out functions

16 that resulted in me being discriminated against.

17    Q   Okay.  What were those functions?

18    A   Well, the job description with -- with

19 my job description -- creation of my job in

20 general.  Which -- what I was paid for that job.

21 And the process never really coming to fruition

22 the way it should have in terms of completing the

---

170

1  job description and actually negotiating a salary

2  with me.

3     Q   Did you ever complain about that to

4  Jessica?

5     A   I complained about that to Mike Oreskes

6  and to Kathleen Carroll and I made Jessica privy

7  to my complaints to them.  Those negotiations were

8  things that Mike Oreskes and Kathleen Carroll were

9  supposed to carry out.

10    Q   Okay.  You were complaining about the

11 process, you didn't specifically say it was due to

12 discrimination.  Right?

13    A   At that juncture in time I felt

14 incredibly discriminated against in a number of

15 ways.

16    Q   Okay.  How did you feel incredibly

17 discriminated against?

18    A   I feel that -- at that time I felt

19 marginalized because I had been in the regional

20 capacity where I was for six years.  And despite

21 my efforts to get a different job or a promotion I

22 wasn't able to get a promotion in the standard way

---

171

1  that the AP gives promotions.  I had tried that by

2  applying for assistant bureau chief and didn't get

3  it, so I decided to create a position.

4     Q   Do you have evidence that you were not

5  given the assistant bureau chief because of race

6  or age or gender?

7     A   What do you mean by evidence?

8     Q   Do you have specific evidence or is it

9  just your belief that there is institutional

10 discrimination at the AP?

11    A   I mean, I would argue I'm the evidence

12 because I didn't get the job.  If the AP wanted a

13 woman of color in that job I was a candidate who

14 was qualified for it and could have been given

15 that job.

16    Q   Again, but you weren't substantially

17 more qualified for that position than the person

18 it was given to, right?  The person who --

19    A   I felt -- you mean in 2008?

20    Q   For this -- yeah.  What we're talking

21 about.

22    A   I felt I was more qualified because I

---

172

1  had more experience directing written -- well,

2  print enterprise stories, which is what the job

3  entailed.

4     Q   Would it have been fairer for the AP to

5  give the position to you just because of your race

6  and gender?

7     A   In this particular instance yes, because

8  I'm not only a black woman, I'm a qualified black

9  woman.  I'm qualified for the job outside of being

10 a black woman.

11    Q   Okay.  Do you know if the AP believed a

12 candidate who it hired into that position was more

13 qualified?

14    A   Apparently they believed that the

15 candidate they chose was more qualified than me.

16    Q   And is it fair for a company to hire

17 someone they believe to be more qualified even if

18 that person is not a minority or a woman?

19    A   It's far for a company to hire a person

20 who is qualified for the job who happens to be a

21 minority particularly when their minority

22 representation is sorely lacking, as was in this

---

173

1  case.
2     Q    Okay.  That's not what I asked.  I said
3  is it fair for the -- you go back and read my
4  question?
5         Is it fair for a company -- fair for a
6  company to hire a person who is qualified for the
7  job who just happens to be a minority,
8  particularly a minority -- wrong one.  Sorry.
9  Mixed up question and answer.  Let me just
10 rephrase that.
11        If a nonminority is more qualified, do
12 you believe that it's fair for the AP to hire a
13 lesser qualified minority?
14    A    I'm confused in terms of what you mean
15 by lesser qualified.
16    Q    If the AP believes one candidate to be
17 more qualified -- okay, should they hire someone
18 that it believes to be minimally qualified --
19 okay, but lesser qualified for the position solely
20 because minority status or gender?
21    A    No.  Any more than it is fair to hire
22 someone who is minimally qualified or less

174

1  qualified who is a nonminority.
2     Q    Okay.  Other than when you said Ron,
3  anyone else that was hired to a position that you
4  wanted that was less qualified than you?
5     A    No.
6     Q    At one point in 2013 you had complained
7  about the AP hadn't increased your salary --
8     A    -- Yes.
9     Q    -- like it was supposed to have done?
10 Okay.  Who did you complain to there?
11    A    I complained to Sally Buzbee.
12    Q    And your salary was then fixed
13 retroactively?
14    A    Eventually it was.
15    Q    Okay.  How long from when you complained
16 to Sally to when it was fixed?
17    A    I don't recall the exact period of time,
18 but in general a matter of months, like maybe four
19 months.
20    Q    Did she tell you why it took four
21 months?
22    A    Maybe three.  No, we didn't talk about

175

1  it like that.  I just assumed that was the pace at
2  which AP's changes proceed.  You know, things tend
3  to go slowly at the AP.
4     Q    And you had not had this increase in
5  your paycheck for three years, almost three years
6  before you raised it though, right?
7     A    Right.
8     Q    How come you didn't raise it sooner?
9     A    Well, the two percent increase was so
10 small that the impact really couldn't be felt.
11 I'd assumed that AP had delivered on the 2 percent
12 that was promised to me when I applied -- when we
13 were creating the race and ethnicity position.
14    Q    Okay.
15    A    So, I was operating in faith that they
16 had followed through with that 2 percent increase,
17 but by the time withholding got ahold of it the
18 impact was negligible -- to me anyway.
19    Q    Okay.  But when you complained after
20 three or four months you said it was fixed, right?
21    A    Well, the increase was supposed to come
22 in in 2010 when I was moved to the job and I

176

1  wasn't aware of that for three years.
2     Q    What do you mean by that?
3     A    I did not know I had not gotten the 2
4  percent increase for three years.
5     Q    Did anyone tell you why the increase
6  didn't go through?
7     A    No.  What they asked me was whether or
8  not I had that promised 2 percent in writing.
9     Q    And did you?
10    A    I had emails assuring me that they would
11 work on giving me the two percent increase.
12    Q    Who sent those emails?
13    A    Steve Komarow and Mike Oreskes.
14    Q    Now, at that time Steve was gone?
15    A    Steve was the acting bureau chief at the
16 time.
17    Q    No, when you -- in 2013 he was still at
18 the AP?
19    A    No.  He was gone by then.
20    Q    Are you aware of any -- well, do you
21 think that you're the only employee at the AP that
22 ever had a pay raise that wasn't put through?  It

177

1   wasn't put through timely?
2      A   I can't really know that.
3      Q   Okay.  Do you have any evidence that --
4   other than you didn't get it for three years, that
5   the pay raise was -- the fact that it didn't go
6   through in 2010 was tied to discrimination or
7   retaliation?
8      A   Yes.
9      Q   Okay.  What's that?
10     A   I had been mentioned in the internal
11  complaint that had unfolded prior to me asking for
12  this particular job.
13     Q   You lost me there.  You had been
14  mentioned in the internal complaint?
15     A   Yes.
16     Q   Prior to asking for the job?
17     A   Yes.
18     Q   What internal complaint?
19     A   The internal complaint raised by Robert
20  Naylor informing Tom Curley that the Associated
21  Press had a problem with African Americans.
22     Q   And that was prior to 2010?

178

1      A   Yes.
2      Q   But then subsequent to 2010 the AP went
3   ahead and created this position for you, right?
4      A   AP created the position in 2010.  These
5   things were happening rather rapid fire.  The
6   complaints that Robert Naylor brought up were
7   unfolding in 2009 and into 2010 and played out
8   through 2010 while I was trying to pursue the race
9   and ethnicity position being created.
10     Q   What evidence do you have that you being
11  mentioned in Naylor's what you described as a
12  complaint had an impact on the position, had an
13  impact on the pay raise?
14     A   Rephrase that, please.
15     Q   What evidence do you have that the fact
16  that -- and it wasn't you by name, it was a
17  general description of you or a general
18  description of your position that was mentioned by
19  Robert Naylor?
20     A   Yes.
21     Q   Okay.  What evidence do you have that
22  Robert Naylor mentioning that, mentioning you or

179

1   your position caused the delay in pay?
2      A   My being mentioned in that complaint I
3   felt that there was a change in AP's attitude
4   toward me.
5      Q   Okay.  By who?  Who had an attitude
6   change?
7      A   It seemed to me to eminent from the very
8   top.  And I couldn't get questions answered.  I
9   couldn't get a response in asking for what I was
10  asking for from the top leadership of the news
11  division.
12     Q   Okay.  What were you asking for from the
13  top leadership?
14     A   I was asking for a new job.  I was
15  asking for a new line of report.  I was asking to
16  move up, really.
17     Q   And they gave you a new job that went
18  from regional to national in scope?
19     A   Eventually they did.
20     Q   So, if they really wanted to
21  retaliate -- you because you were mentioned in the
22  complaint they wouldn't have given you the

180

1   position, would they?
2      A   I can't speak to that.  They might have.
3      Q   But you would had mentioned in the
4   complaint earlier where you said that the fact
5   that you had cooperated with the OFCCP
6   investigation actually protected your job.  Right?
7   At one point?
8      A   That was in 2011.
9      Q   Okay.  And is it fair to assume that the
10  AP wouldn't want to retaliate?
11     A   Rephrase, please?
12     Q   You said it -- you know, protected your
13  job.  The AP did not want to be seen as
14  retaliating?
15     A   Yes.
16     Q   Now, with just your whole theory before,
17  in talking about Robert Naylor and some of the
18  others who were promoted, promoted, promoted and
19  they were long term employees -- okay.  Why would
20  they have been promoted if the AP was looking to
21  discriminate?
22     A   Well, when they were promoted AP had one

Transcript of Sonya Ross
Conducted on February 13, 2018

46 (181 to 184)

181

1  set of leaders and then their situation and their
2  fortunes changed after there was a leadership
3  change at the AP.
4     Q    And that leadership change being
5  particularly from Lou Boccardi to Tom Curley?
6     A    Yes.  Or really John Wolman's departure
7  from the AP.
8     Q    And when did Wolman depart from the AP
9  approximately?
10    A    Sometime in the mid 2000's.  Maybe 2005
11 or '06 I believe.  I'm not exactly clear on the
12 year.  He departed after Lou Boccardi departed and
13 during the tenure of Tom Curley.
14    Q    Okay.  So, you believe since then the AP
15 has had this institutional culture of
16 discrimination?
17    A    Yes.
18    Q    And since then the AP would retaliate
19 against employees who voiced complaints?
20    A    Yes.
21    Q    Now, are you aware that the OFCCP found
22 your allegations of race discrimination to be

182

1  without basis or without merit?
2     A    No.
3     Q    Did the OFCCP find in the case that you
4  filed that the Associated Press discriminated
5  against you on the basis of race, gender, or age?
6     A    The OFCCP could not get to the gist of
7  my complaints about race discrimination because of
8  time bars requested by the AP.
9     Q    How do you know AP requested time bars?
10    A    AP cited time bars to OFCCP, pointed out
11 that certain information was time barred according
12 to the regulations.
13    Q    And so, you included these issues in the
14 federal complaint?
15    A    Yes.
16    Q    Who replaced John Wolman?
17    A    As executive editor I believe it was
18 Kathleen Carroll.
19    Q    So, you were timing the AP's change to
20 institutional discrimination to John's departure.
21 Was it caused by the arrival of Kathleen Carroll,
22 something else?

183

1     A    I'm not sure.
2     Q    Nothing you could point your finger to,
3  point your finger at?
4     A    Not that I can think of in this moment,
5  no.
6     Q    Do you believe Sarah Nordgren
7  discriminated against you on the basis of your
8  gender?
9     A    No.
10    Q    Did she discriminate against you on the
11 basis of race?
12    A    Possibly.
13    Q    So, you're not sure?
14    A    I'm saying the potential is there.
15    Q    Okay.  Can you think of an example of
16 her discrimination right now?
17    A    There were certain responsibilities that
18 I requested as part of my race and ethnicity
19 function that she told me she considered that to
20 be something she did.  And she felt -- I guess she
21 felt that I was encroaching upon that because she
22 brought it up to me.

184

1     Q    Okay.  Were these things -- were these
2  responsibilities that she did?
3     A    This was a content development
4  responsibility that I wanted to include in the
5  race and ethnicity job because I wanted to be able
6  to develop the race and ethnicity content we sold.
7  The very stories that we were generating I wanted
8  to be able to be at the table when AP was trying
9  to decide how to sell it and to whom to sell it.
10    Q    Okay.  Is that something that fell
11 within her purview?
12    A    At the time she was the director of
13 state news.
14    Q    Okay.  So, did content development
15 responsibilities fall within her purview?
16    A    Not to my knowledge.
17    Q    Did she tell you why you were denied the
18 content development responsibilities?
19    A    No.
20    Q    But you took the job after being told
21 that, right?
22    A    Well, there was much editing of the job

Transcript of Sonya Ross
Conducted on February 13, 2018

185

1 description that I wrote. And Sarah and Ron
2 Fournier participated in the editing of it. And I
3 gave them a draft that included the job, the
4 content development responsibilities. They gave
5 me a draft without it. And I restored those
6 responsibilities when they gave the draft back to
7 me because I said it was important to be able to
8 participant in the development of a race and
9 ethnicity news product.
10   Q   And they decided that it wasn't?
11   A   Well, no. At that point I began to work
12 more directly with Jessica and with Michael
13 Oreskes on the actual job description.
14   Q   Did Jessica and Mike decide that you
15 should not be doing content development?
16   A   Mike told me that Kathleen said to leave
17 the news to the news people and the business to
18 the business people. And I asked what that meant.
19   Q   And what did he say?
20   A   He didn't really explain it.
21   Q   Okay. You don't know what that means?
22   A   No. At the time Kathleen had also said

186

1 that she wanted there to be a bridge between the
2 news functions and the business functions of AP so
3 that the people who sell AP's news products can
4 have a better understanding of what we do in
5 gathering the news.
6   Q   Any of the other national editors have
7 the content development -- at that time have a
8 content development piece?
9   A   There had previously been an effort to
10 develop a news product specifically for young
11 people called Asap, A-S-A-P.
12   Q   Okay. Any others?
13   A   No, not that I can think of.
14   Q   Okay. Was Asap successful?
15   A   AP said it was successful. I was not
16 intrinsically involved in Asap. But it folded.
17   Q   When did it fold?
18   A   I'm not exactly sure. Maybe 2006 or
19 '07, '07 or '08. Somewhere in there.
20   Q   So, then prior to your requesting the
21 ability to do content development in your job
22 description, the only other example that you're

187

1 aware of was an example that folded?
2   A   Yes.
3   Q   Is it possible that that was the reason
4 the AP didn't want you doing content development?
5   A   Maybe. But I am not involved in that
6 folded product, so.
7   Q   Okay. In the complaint you alleged that
8 after Mr. Naylor gave the complaint of
9 discrimination to Tom Curley, Tom Curley told
10 Kathleen Carroll to fix it. Right?
11   A   Yes.
12   Q   How do you know that?
13   A   Because that's what I was told.
14   Q   Do you remember who told you?
15   A   Yes.
16   Q   Okay. Who?
17   A   Robert Naylor told me that.
18   Q   Did he tell you there were any efforts
19 at fixing it?
20   A   No.
21   Q   Did you talk further about this with
22 Robert Naylor?

188

1   A   No.
2   Q   Okay. This is the AP's CEO looking to
3 fix an issue with the employment of minorities.
4 Right? Or under -- employment of underrepresented
5 minorities?
6   A   It was his direct quote, as I understand
7 it.
8   Q   Any reason to think that Tom Curley did
9 not want to fix reported problems with a diverse
10 workforce?
11   A   Can you rephrase that question?
12   Q   Well, you're complaining that there was
13 institutional -- I will withdraw that.
14       In one point of your complaint you
15 allege that after you had given some of the
16 revisions to the job description for the race and
17 ethnicity editor that another job appeared with
18 similar verbiage?
19   A   Yes.
20   Q   Okay. What was the other job, do you
21 know?
22

Transcript of Sonya Ross

Conducted on February 13, 2018

189

1    **A    Director of content development and**
2 **alliances or something along that vein.**
3    Q    Okay.  How does that support allegations
4 of discrimination or retaliation?
5    **A    Well, the actual job description was**
6 **quite close to elements of the race and ethnicity**
7 **position that I was seeking to create.**
8    Q    Okay.  How does that support
9 discrimination?
10    **A    Because it seemed to me that it was**
11 **being put beyond my reach or something that I**
12 **wouldn't be allowed to do.  That was the sense**
13 **that I got out of that by pushing it over to the**
14 **business end of the AP.**
15    Q    Okay.  But that's entirely consistent
16 with what Mike said Kathleen had said, right?
17 News does news, business does business?
18    **A    It's consistent with what he said she**
19 **told him.**
20    Q    Okay.
21    **A    It's not consistent with what she had**
22 **generally stated about wanting there to be a**

190

1 **bridge between business and news.**
2    Q    Okay.  Do you know if she had other
3 thoughts on how to build that bridge?
4    **A    No.**
5    Q    Do you believe Mike Oreskes
6 discriminated against you on the basis on race,
7 gender, or age?
8    **A    Yes.**
9    Q    Okay.  And let me ask this; did Mike
10 directly discriminate against you on the basis of
11 race, gender, or age?
12    **A    Yes.**
13    Q    Okay.  Tell me how?
14    **A    Because in the midst of trying to**
15 **negotiate my race and ethnicity position in 2010**
16 **they simply gave it to me without completing**
17 **aspects of it, without determining what my**
18 **editorial authority would be.  They gave me no**
19 **reporters.  They gave me no budget for it.  All of**
20 **these were elements we needed to discuss in order**
21 **for the coverage to succeed.  So, all they did was**
22 **approve a title.  And they initially were trying**

191

1 to not give me a raise, either.  And I insisted on
2 having a raise.
3    Q    Okay.  And they agreed to give you the
4 raise, right?
5    **A    They said they would try to give me the**
6 **2 percent that I was asking for and that is after**
7 **they narrowed the amount to 2 percent.**
8    Q    Okay.  I'm sure virtually every employee
9 of the AP would like to be paid more?
10    **A    I'm sure all working people would like**
11 **to be paid more money.**
12    Q    Okay.  And fair to say employers want to
13 pay as little as possible in most instances?
14    **A    I would like to believe there are some**
15 **employers out there who actually want to pay a**
16 **fair salary for theirs workers.**
17    Q    Do your believe your salary was fair?
18    **A    No.**
19    Q    But you accepted it, right?
20    **A    Yes, because I felt I had no choice**
21 **given that the job I occupied at the time had been**
22 **posted.**

192

1    Q    But you didn't -- you spoke to Jessica
2 about the job that was posted.  Right?
3    **A    Yes.**
4    Q    She told you it was a mistake?
5    **A    Yes.**
6    Q    You didn't follow up and say; Is that
7 job still mine, can I have it?
8    Nothing like that, right?
9    **A    That particular job?**
10    Q    Yeah.
11    **A    I was focused on negotiating the job I**
12 **wanted.**
13    Q    Okay.  So, you didn't ask whether it was
14 open for you, right?
15    **A    I was still in it.**
16    Q    Okay.  Did you ask if you would -- how
17 long you could remain in it?
18    **A    No.  I assumed I would remain in that**
19 **until I got the job I was asking for.**
20    Q    Okay.  And then you ultimately got that
21 job, right?
22    **A    They gave me the job we negotiated**

193

1  without finishing the negotiations.
2      Q    You didn't quit obviously, right?
3      A    I did not.
4      Q    Okay.  You didn't start looking --
5      A    -- Over that period of time I also
6  applied for the director of content development
7  and alliances position that surfaced during that
8  time.
9      Q    Who made the hiring decision for the
10 director of content?
11     A    I believe it was -- I want to say it was
12 Sue Cross and Brian Scanlon.
13     Q    Did they tell you why you weren't given
14 the position?
15     A    No.  They simply said they chose someone
16 else for the position.
17     Q    Do you know who they chose?
18     A    Yes.
19     Q    Who did they choose?
20     A    Sarah Nordgren.
21     Q    Again, she was minimally qualified for
22 the position, right?

194

1      A    I assume she met their qualifications
2  for the job.
3      Q    Any facts where you would say you were
4  significantly more qualified than her?
5      A    Yes.
6      Q    Okay.  Tell me what those are?
7      A    All the ideas that I brought to the
8  table to develop the race and ethnicity content
9  specifically, those elements were stripped out of
10 the job description that I had written and put
11 into this particular job in a more general way.
12 So, I would have been capable of performing those
13 duties too, since I had envisioned them.
14     Q    Well, just envisioning something doesn't
15 mean you can do it successfully, right?
16     A    It doesn't mean that I would fail at it.
17     Q    Right.  And in fact you had not done
18 those duties when you applied for the director of
19 content, right?
20     A    No.  Because they had -- that did not
21 exist in the AP prior to that.
22     Q    Do you know what Sarah's background was?

195

1      A    Other than?
2      Q    Her work history?
3      A    Her work history?
4      Q    Yeah.
5      A    At the time that I was working closely
6  with Sarah on this she was director of state news.
7  She had been with the AP for a decent amount of
8  time, too.  But I'm not recalling right off the
9  bat which position she held prior to director of
10 state news.
11     Q    Do you know if she had any business
12 experience?
13     A    No.
14     Q    You don't know?
15     A    No.
16     Q    I'm sorry.  Is it you don't know or she
17 did not?
18     A    No, I don't know.
19     Q    Thanks.  So, you felt at or shortly
20 after the race and ethnicity job was created for
21 you that the AP was not providing you with the
22 resources to do the job?

196

1      A    Yes, I felt that way.
2      Q    And you felt they were underpaying you?
3      A    Yes.
4      Q    At any point did you complain to Jessica
5  about that?
6      A    I complained to Jessica that the
7  negotiations -- that we had just stopped trying to
8  finish creating this job.  That there was no real
9  effort to put the meat on the bones around the
10 job.
11     Q    Is it possible that someone at the AP
12 wanted to see how the job went for a while to
13 finish that?
14     A    I don't know.
15     Q    Okay.  Talking about the OFCCP audit.
16 Okay.  Do you recall when the OFCCP was on the AP
17 site?
18     A    November 2011.
19     Q    Do you remember Montrese speaking to you
20 about the audit?  Or Montrese telling you the
21 OFCCP wanted to meet with you?
22     A    Yes.

197

1    Q    Okay.  Why don't you walk me through
2  that, how that happened?
3    **A    I was standing in the news room near the**
4  **deputy bureau chief's office talking to Wendy**
5  **Benjaminson about a story.  And Montrese**
6  **approached.  Meanwhile, I was standing there with**
7  **her.**
8    Q    Okay.  Go ahead.
9    **A    And she told me that Willy Lucas wanted**
10 **to interview me.**
11   Q    Okay.
12   **A    Specifically she said; You reached out**
13 **to Willy Lucas, like a question.**
14   Q    At that point when she said Willy Lucas
15 wanted to interview you, did you say I don't know
16 Willy Lucas or something like that?
17   **A    No.**
18   Q    Okay.
19   **A    She said; You reached out to Willy**
20 **Lucas,Question mark.  And I didn't respond.  And**
21 **she said; He wants to interview you.**
22       **I didn't respond because Wendy was**

198

1  **standing there listening.**
2    Q    How do you know she was listening?
3    **A    Because I saw her.**
4    Q    You know she heard?
5    **A    Yes.  She was standing close enough to**
6  **hear.**
7    Q    Did you speak to Wendy about this after?
8    **A    No.**
9    Q    I'm sorry.  You said Wendy Lucas?
10   **A    Wendy Benjaminson.**
11   Q    Okay.
12   **A    So Montrese repeated her question.**
13   Q    Tell me exactly what she said?
14   **A    You reached out to Willy Lucas?**
15   Q    Okay.  Saying it as a question?
16   **A    Yes.**
17   Q    Okay.  What did you say?
18   **A    Nothing.  I said; Excuse me?**
19   Q    Okay.  What did you mean by excuse me?
20   **A    What I meant was I was incredulous that**
21 **she had said that to me.**
22   Q    So, it was in a bit of an incredulous

199

1  tone?
2    **A    Yes.**
3    Q    Do you think your sort of body language
4  or face reflected that at all?
5    **A    I suppose it did.**
6    Q    Anything else said?
7    **A    Well, it was like she was waiting for me**
8  **to confirm for her that I had spoken to Willy**
9  **Lucas.**
10   Q    Okay.  And what happened next?
11   **A    She said; He wants to interview you.**
12   Q    Okay.  Did she tell you where or?
13   **A    Upstairs.  So I turned to Wendy and said**
14 **excuse me and walked away with Montrese.**
15   Q    Did Montrese walk away first?
16   **A    No.**
17   Q    You walked up there side by side?
18   **A    Yes.**
19   Q    Did you speak to her at all?
20   **A    No.**
21   Q    Okay.
22   **A    She was speaking to me.**

200

1    Q    While you were walking she was speaking?
2    **A    Yes.**
3    Q    What did she say?
4    **A    Just small talk, the weather.**
5    Q    Anything else?  She took you up to the
6  room, I guess?
7    **A    Right up to the door.**
8    Q    And did she introduce you to Mr. Lucas
9  or anything?  Open the door or anything?
10   **A    She opened the door and said that I was**
11 **there and then she left.**
12   Q    Okay.  Did you mention this to
13 Mr. Lucas?
14   **A    Yes.**
15   Q    What exactly did you say?
16   **A    I told him that the tone that she had**
17 **used with me in telling me about this interview**
18 **made me feel as if I might experience some form of**
19 **consequences if I revealed certain things in that**
20 **interview.**
21   Q    I'm sorry.  What was the last thing you
22 said?

Transcript of Sonya Ross
Conducted on February 13, 2018

201

1    A    I -- I told Willy Lucas I felt from the
2  tone that had just been used with me by Montrese
3  that I might experience some consequences for what
4  I say in my interview with him that day.
5    Q    Okay.  And what did he tell you or what
6  did he say?
7    A    He said; Okay, we will get to that.
8    Q    Okay.  And what happened next?
9    A    We -- he interviewed me.
10   Q    Okay.  What did you two talk about?
11   A    We talked about my work experience at
12 AP.
13   Q    Do you remember specifically?
14   A    We talked about my standing in the
15 industry.
16   Q    What do you mean by that?
17   A    Various other things I'm involved in in
18 the media industry like the National Association
19 of Black Journalists, things like that.  He asked
20 if I felt I was a valuable presence in the
21 industry, the kind of person that a company would
22 be proud to have in the industry, and I told him

202

1  yes.
2    Q    What else did you discuss?
3    A    Working conditions.
4    Q    What do you mean by that?
5    A    Did I feel comfortable in my workplace.
6    Q    Were you saying you did not feel
7  comfortable?
8    A    I said at times I did not feel
9  comfortable.
10   Q    Okay.  What would cause you not to be
11 comfortable?
12   A    Just the isolation of being the only
13 black manager in that office.
14   Q    Anything else?
15   A    Not much more than that, that I can
16 recall.
17   Q    Did you complain about what you talked
18 about before with the job and the negotiations or
19 the race editor position and the negotiations?
20   A    Yes, but not in great detail.
21   Q    How come not in great deal -- great
22 detail?

203

1    A    The way he was asking his questions I
2  didn't really have a chance to go into detail
3  about that.
4    Q    Okay.  He said, we'll get to that,
5  because of what you said about Montrese.  Did you
6  get back to talking about Montrese?
7    A    Yes.
8    Q    Okay.  What was said there?
9    A    He asked me how that made me feel.  And
10 I told him again, I felt that it was meant to make
11 me feel as if telling too much might get me in
12 trouble.
13   Q    What did he say?
14   A    He told me that if I -- that if I wanted
15 to I needed to file that complaint through the
16 OFCCP's website.  And he told me how to do that.
17   Q    Okay.  Did you indicate that that's what
18 you intended to do --
19   A    -- And he told me that I had 180 days to
20 do that.
21   Q    Okay.  Did you tell him you intended to
22 do that?

204

1    A    I told him I would think about it and I
2  thanked him for the information.
3    Q    Okay.  Based on Montrese and how
4  Montrese made you feel did you not tell Willy
5  anything?
6    A    No.  I wasn't inclined to hold back from
7  him.
8    Q    Okay.  Because you knew you could
9  complain about discrimination, right?
10   A    I didn't know that at the time I talked
11 to him.  He told me that part afterward.
12   Q    Okay.  But you were willing to then even
13 risk your job to complain about discrimination?
14   A    Yes.
15        MR. CARTAFALSA:  And -- well, why don't
16 we take a break for a minute, please.
17        THE VIDEOGRAPHER:  Stand by, please.
18 This is the end of media three.  We are going off
19 of the record at 1600 hours.
20        (The proceedings recessed from 4:00 p.m.
21 to 4:11 p.m.)
22        THE VIDEOGRAPHER:  This is the beginning

205

1 of media four.  We are back on the record at 1611
2 hours.
3 BY MR. CARTAFALSA:
4     Q    So, going back.  You had called the
5 OFCCP, which was prior to this meeting which was
6 on or about November 15.  Does that sound right?
7     A    **That sounds right.  It could have been**
8 **the 14th.**
9     Q    Okay.  Could be 14th, 16th, but give or
10 take?
11    A    **Somewhere in that window, yeah.**
12    Q    Okay.  You didn't tell anybody at the AP
13 that you had called the OFCCP.  Correct?
14    A    **No.**
15    Q    So, unless the OFCCP told Montrese to go
16 get you she would have no idea that you had filed
17 a complaint?
18    A    **Not from me she would not have an idea.**
19 **I certainly did not tell her.**
20    Q    And indeed Montrese at that point may
21 not even have known that you had filed anything,
22 just that the OFCCP wanted to speak with you.

206

1 Right?
2     A    **At that point I had not filed anything**
3 **with the OFCCP.**
4     Q    She wouldn't have even known that you
5 spoke with them?
6     A    **I can't speak to what she knew or didn't**
7 **know.**
8     Q    Okay.  Now, the OFCCP was on site
9 interviewing a number of other employees, correct?
10    A    **Yes.**
11    Q    Do you know if any of the other
12 employees were threatened by Montrese?
13    A    **No.**
14    Q    You don't know?
15    A    **No, I don't know.**
16    Q    Now, prior to speaking with the OFCCP
17 you had raised other complaints about
18 discrimination and workplace issues to Montrese.
19 Correct?
20    A    **Yes.**
21    Q    So, you were comfortable raising
22 complaints with Montrese?

207

1     A    **Not really.  She was the HR**
2 **representative and I knew I had to complain to HR.**
3     Q    Okay.  And at times you had gone above
4 her to Jessica or others at the AP?
5     A    **Yes.**
6     Q    So, you can complain to other folks in
7 the HR department if you feel that that HR rep is
8 not servicing you, right?
9     A    **Sometimes I would just eliminate the**
10 **middle person and go straight to the top.**
11    Q    Okay.  Meaning Jessica?
12    A    **Yes.**
13    Q    Montrese doesn't have the power to hire
14 or fire you, right -- or fire?
15    A    **No.**
16    Q    Okay.  Are you the same level of
17 management as Montrese?
18    A    **I am not sure.**
19    Q    Okay.  Do you know if Montrese has the
20 power to change -- unilaterally change your job
21 description or job duties?
22    A    **Not to my knowledge.**

208

1     Q    What about unilaterally make a change in
2 your pay or benefits?
3     A    **Not to my knowledge.**
4     Q    Did you ask Mr. Lucas why he had
5 Montrese come get you?
6     A    **No.**
7     Q    Did you ask him what he said to
8 Montrese?
9     A    **No.**
10    Q    When you got there he was expecting you,
11 right?
12    A    **Yes.**
13    Q    Okay.  Were there any other witnesses
14 that you recollect who would have seen
15 Montrese speaking with you?  Or let me put it this
16 way; heard Montrese speaking with you?  You
17 mentioned Wendy.
18    A    **Really anybody in that proximity could**
19 **have heard it.  Our newsroom is rather open.  The**
20 **area where we were standing doesn't have any**
21 **walls.  So, anyone standing within the same type**
22 **of spacing we have in this office right now could**

209

1  have heard what she said.
2      Q    How far from you was she when she spoke
3  to you physically?  I mean, was she ten feet
4  across the room?
5      A    No.
6      Q    Okay.  Normal conversation foot and a
7  half away or so?
8      A    She was closer to me than you are right
9  now;
10     Q    Okay.  So she wasn't yelling or
11 anything?
12     A    No.  She didn't yell.
13     Q    Gesturing with her arms or anything like
14 that?
15     A    No, not that I recall.
16     Q    When she walked up did she say excuse me
17 or anything to interrupt the conversation?
18     A    No.  She just stood there while Wendy
19 and I were talking.  I noticed that she was
20 standing there so I stopped talking and turned to
21 her.
22     Q    Okay.  What happened next then?

210

1      A    After I noticed that she was standing
2  there?
3      Q    Yeah.
4      A    I turned to her to see what she wanted.
5      Q    Okay.
6      A    And she said; You reached out to Willy
7  Lucas -- and paused as if I were supposed to say
8  yes I did.
9      Q    Okay.  But by saying that she would have
10 known that you reached out to Willy Lucas, right?
11     A    I assumed she knew something.  She
12 mentioned his name to me.  She mentioned him to me
13 by name.
14     Q    Did Willy Lucas say that she had been
15 responsible for getting employees for the
16 interviews?
17     A    No.
18     Q    Did you ask about that at all?
19     A    No.
20     Q    Did she speak in a subdued voice or?
21     A    No.  It was just a normal voice.  It was
22 not a whisper, in other words.

211

1      Q    You didn't -- when she said -- you said
2  you were there silent.  You didn't say, hey, can
3  we talk some where else, or anything like that?
4      A    No.
5      Q    Is it possible you gave the appearance
6  to her as if you didn't know what she was talking
7  about?  You said incredulous?
8      A    I might have given her a raised eyebrow
9  look like; What?
10     Q    Did you speak with Montrese about that
11 conversation afterwards?
12     A    No.
13     Q    Did you speak with anyone at the AP
14 about the conversation?
15     A    Yes.
16     Q    Okay.  Who?
17     A    I think at that point I mentioned it to
18 Diane Parker.
19     Q    Okay.  And why would you mention it to
20 Diane?
21     A    Because Diane was coordinating the OFCCP
22 compliance stuff and she had given us the briefing

212

1  about the OFCCP on site audit.
2      Q    Okay.  What did Diane say?
3      A    Something to the effect of; Did she
4  really say that to you?  Along that vein.
5      Q    Any other discussion?
6      A    Well, I told her; Yes, she did say that.
7  And I told her how it made me feel.
8      Q    Okay.  Did she have a response?  Excuse
9  me.
10     A    Nothing in depth other than okay.
11     Q    Do you remember having a conversation
12 with Jessica Bruce about this?
13     A    Yes.
14     Q    Okay.  Tell me about that?
15     A    I had — I believe I emailed Jessica
16 about this.  And Jessica's response was that I was
17 perfectly entitled to speak to whomever I wanted
18 about whatever I wanted whenever I wanted.  And
19 she also said that we could discuss it further if
20 I wanted that.
21     Q    And did you want to?
22     A    Yes.  I said I did want to discuss it

213

1  because I was upset behind it.

2      Q    And did you in fact discuss it?

3      A    Yes, we did discuss it I believe in a

4  phone call about two or three days later we played

5  a little bit of phone tag.

6      Q    Do you recall what was discussed?

7      A    Just the gist of what we had exchanged

8  in the email, although I did say that I had no

9  trust in Montrese as a result of this.

10     Q    Okay.  And Jessica is Montrese's boss's

11 boss's boss, right?

12     A    Yes.  She's way up there.

13     Q    You were comfortable that if Jessica

14 says you're not going to be punished for talking

15 to the OFCC you would not be punished?

16     A    At that point, yes.

17     Q    You said at that point.  Was there a

18 change?

19     A    Well, at that point in November of 2011

20 I had only had the internal complaint against the

21 AP and what had gone down at that compliance audit

22 in the compliance audit setting.  And in the

214

1  months after that other things happened that made

2  me mistrustful of AP.

3      Q    What were these things that made you

4  mistrustful?

5      A    Well, there was the ongoing problem with

6  trying to clarify my job and what I was able to

7  do.  I couldn't get other editors in the AP to be

8  cooperative about lending reporters to do the

9  reporting that was needed for my coverage to

10 succeed.  And then -- that was in November.  So

11 between November and January those -- those

12 communications were unfolding.  And then in

13 January is when the layoffs began to happen.

14 When -- I think it was Andrew Frazier who was laid

15 off first and then Delores Barclay and then Robert

16 Naylor, in a matter of days.  It was dizzying.  I

17 had never seen that many African American managers

18 lose their jobs that quickly before.

19     Q    And again, these three were not the only

20 people laid off at that time, right?

21     A    No, they were not the only people laid

22 off.

215

1      Q    Should their jobs have been -- if their

2  positions were slated for layoff should their jobs

3  have been preserved just because they're African

4  American?

5      A    It was confusing to me because there

6  didn't seem to be a sudden need to not have career

7  development in the AP, nor did there seem to be a

8  desire to not have an East entertainment editor,

9  seeing as how they reposted that job almost

10 immediately.

11     Q    What about the other positions that were

12 laid off?  Did you agree they all should have been

13 laid off then?

14     A    I can't speak to that because I don't

15 know a rationale AP was using at the time.  But

16 there were bureau chiefs laid off and one Latino,

17 I believe, assistant bureau chief at the time.

18     Q    Do you know -- I mean layoffs generally

19 are not a decision made immediately.  Do you know

20 if those decisions to have layoffs began before

21 November 14, 15, 16, whatever of 2011?

22     A    No, I don't know.

216

1      Q    Do you believe that the AP laid off

2  other employees because you spoke with the OFCCP

3  investigator?

4      A    No.

5      Q    Okay.  And about the problems you were

6  having on the job.  Those problems started at or

7  shortly after the race and ethnicity editor

8  position was created.  Right?

9      A    Rephrase the question?

10     Q    The problems you were having in the

11 race -- you had mentioned with the race, ethnicity

12 position?

13     A    Yes.

14     Q    Those problems had started at the time

15 the job was created or shortly thereafter, right?

16     A    Shortly after that because the job -- I

17 was trying to do the job even though it wasn't

18 completely defined yet.  And there were problems

19 coming up.  Because like I said, they gave me no

20 reporters, so I had to ask other editors for their

21 reporters.  And their attitude was; No, these are

22 my reporters.  And at the same time I was being

217

1  **challenged to produce stories with no resources.**
2      Q    Other editors have to -- particularly
3  for these types of positions, have to use
4  resources who are not their direct reports.
5  Right?
6      **A    Sometimes.**
7      Q    Okay.  And in fact Sally spoke to you a
8  number of times about that and tried to coach you
9  on how you could get other editors to cooperate?
10     **A    Not exactly.  She was telling me that**
11 **maybe we should try this, that, or the other**
12 **thing.  The issue was not a lack of effort on my**
13 **part nor was it necessarily a function of things**
14 **that she was suggesting, as much as it was these**
15 **folks were responding to -- they were responding**
16 **the way they were responding because there had**
17 **been no directive from the very top of the news**
18 **division instructing them that this coverage**
19 **mattered and that they should cooperate with it.**
20     Q    Do you -- are you aware of any other
21 example where there is a directive from the top of
22 the news division instructing other editors to

218

1  cooperate with a different editor?
2      **A    Well, when the education beat team was**
3  **created there was an announcement that had**
4  **specifics around it, that this coverage means this**
5  **and we have this person in charge of it and**
6  **they're going to make stories happen.  That was**
7  **not -- that did not come from Kathleen and Mike in**
8  **my case.  There was simply an announcement from**
9  **Steve Komarow who was the acting chief in**
10 **Washington at the time stating that I had that new**
11 **role.**
12     Q    Okay.  Who made the announcement of the
13 education beat team?
14     **A    Kathleen and Mike Oreskes.**
15     Q    Oh, I'm sorry.  It came from them.  Did
16 the announcement just introduce the education beat
17 team or was there a specific directive for editors
18 to share reporters?
19     **A    There was an announcement that Carole**
20 **Feldman had been named as education beat team**
21 **leader responsible for coordinating the coverage**
22 **of education issues nationwide.**

219

1      Q    Okay.  And was there an announcement
2  that you had been named race and ethnicity?
3      **A    Yes.**
4      Q    But your point is because it was sent
5  from -- by Steve rather than Kathleen or Mike it
6  had a different importance?
7      **A    Yes.**
8      Q    When did Steve leave the AP?
9      **A    I'm not completely sure.  Maybe he left**
10 **before -- no, he left in 2011.  He left in 2011**
11 **because Sally came on board as bureau chief in**
12 **2011.**
13     Q    Do you recall when she came on in the
14 year?  First half of the year, second half of the
15 year?
16     **A    I think it was the first half of the**
17 **year.**
18     Q    Is there any sort of consistent policy
19 at the AP or practice about how new jobs are
20 announced?
21     **A    Typically they are announced by the --**
22 **at that time they were announced by the executive**

220

1  editor or the managing editor.
2      Q    Did you at that time complain to anyone?
3      **A    Complain about?**
4      Q    About that it was Steve who announced
5  your position?
6      **A    I wouldn't say complain.  I pointed out**
7  **that I wished that this had been embraced from the**
8  **very top, because typically that would make my**
9  **colleagues feel that this was a priority for the**
10 **AP.**
11     Q    Who did you mention that to?
12     **A    I said that to Mike Oreskes.**
13     Q    What was his response?
14     **A    I didn't receive a response from him to**
15 **that email.**
16     Q    Did you raise that issue with Jessica?
17     **A    I believe I did, yes.**
18     Q    Do you remember what she said?
19     **A    I want to say that we discussed this at**
20 **lunch at Brasserie Beck maybe, because we talked**
21 **about several issues there.**
22     Q    Do you recall what was said?

Transcript of Sonya Ross
Conducted on February 13, 2018

221

1      A    No, not every single detail of the
2    conversation, but it was mainly a checking on me
3    to see how I'm doing kind of sit down session that
4    we had.
5      Q    So, this is a top HR person at the AP
6    checking in with you?
7      A    Yes.
8      Q    Did that make you feel good?
9      A    I felt comfortable.
10     Q    Did you feel that Jessica had your back?
11     A    At that time, yes.
12     Q    And you said at that time.  Is there a
13   time that you felt that Jessica stopped having
14   your back?
15     A    Yes.
16     Q    Okay.  When was that?
17     A    That was pretty much over the course of
18   the time that this lawsuit has been around.  After
19   the initial two or three months it wasn't
20   really -- it was really more of a thing where
21   there is not a whole lot of communication on the
22   level that had gone on prior when say for example

222

1    the Labor Department investigation was underway.
2      Q    So, back then during the Labor
3    Department investigation you were communicating
4    more with Jessica?
5      A    Yes.
6      Q    And back then what was your relationship
7    like prior to November of 2010 with Montrese?
8      A    I didn't really have a relationship with
9    Montrese.
10     Q    Okay.
11     A    There were a few things that I had asked
12   for her to do that didn't really get done or I
13   came away from it feeling like my concern was not
14   addressed.  So, I didn't have much faith in her
15   ability to get anything done for me.
16     Q    Do you believe Montrese discriminated
17   against you because you're black?
18     A    Yes and no.
19     Q    Okay.  Tell me about yes and no?
20     A    Yes in the sense that I felt that
21   Montrese hides behind policies to avoid doing
22   things for African Americans.  I felt there was a

223

1    difference in the way many of us were -- there was
2    a difference in the experience many of us were
3    having with her compared to some of the treatment
4    that I'd gotten from white counterparts in HR and
5    elsewhere in the AP and some African Americans, or
6    people of color rather, in HR.
7      Q    So, you believe Montrese treated you
8    more harshly?
9      A    I wouldn't say harshly as much as there
10   was some indifference there.
11     Q    And when did that indifference begin?
12     A    I really began to notice it sometime
13   around 2007.
14     Q    Okay.  What comes to mind about why you
15   noticed it?
16     A    Other colleagues in the AP coming to me
17   wondering why they were having a hard time getting
18   action out of Montrese on different things.
19     Q    Were these only black colleagues or
20   black and white?
21     A    Just black colleagues.
22     Q    And who was it?

224

1      A    Well, for example one colleague said
2    that she felt Montrese was rather indifferent to
3    her request for some leave for the passing of her
4    step-father who had been like her father to her.
5    Or I think there was some statement that he wasn't
6    a direct relative, therefore she couldn't have the
7    time.  And it upset her greatly.
8      Q    Do you know if Montrese ever denied
9    similar requests for white employees?
10     A    I don't know that.
11     Q    Are you aware of any steps that the AP
12   has allegedly taken to destroy your credibility in
13   the industry?
14     A    Yes.
15     Q    Okay.  Tell me about that?
16     A    There was a request from the Radio T.V.
17   News Directors Association a few years ago for me
18   to appear on a panel discussion about 9-11 at
19   their convention.  A Tobias, I think he was still
20   working for AP at the time, had fielded the
21   request and they wanted to diversify that panel.
22   He had mentioned it to Lisa Matthews who was a

225

1  planning editor at the AP but had been in radio
2  before and she gave him my name.  He went to Ron
3  Fournier to ask if I could fulfill that role for
4  the RTDNA -- RTNDA Convention that year and
5  Fournier said no.
6      Q    That's when he was Bureau Chief
7  Fournier?
8      A    Yes.
9      Q    Anything else?  And that's more of --
10 you know, them denying you an opportunity to
11 speak.  Are you aware of anybody saying anything
12 negative about you to the industry?
13     A    No.  It's just that the potential for
14 that is always there.
15     Q    So, in 2015 you claim that the AP was
16 expanding the coverage for which you were
17 responsible?
18     A    Yes.
19     Q    Okay.  And in what sense were they
20 expanding the coverage?
21     A    I was asked to join an effort that Sarah
22 Nordgren, Lisa Pane, and Pauline Arrillaga had

226

1  underway already; to establish a beat team to
2  handle race and ethnicity coverage.
3      Q    Isn't that something similar to what you
4  had asked for years earlier?
5      A    Yes.  And in this particular instance
6  the plans and the discussions were already
7  underway before I was brought into the process.
8      Q    How do you know that?
9      A    That's what they told me.
10     Q    Who is Lisa Pane?
11     A    At the time Lisa Pane was the South
12 regional editor for the AP.
13     Q    The AP never officially named Pauline
14 co-editor or gave her co-editor title or gave you
15 co-editor title, right?
16     A    That is what Sarah Nordgren told me the
17 plan would be.
18     Q    Okay.  But the plan didn't come to pass,
19 did it?
20     A    Technically, no.  However, we were told
21 to work together and that she would be
22 coordinating race coverage along with me.  I asked

227

1  if that meant that she would be reporting to me,
2  and they told me no.
3      Q    But editors across the AP, you would not
4  report to other editors.  Correct?
5      A    No.  Editors report to other editors in
6  the AP.
7      Q    Did you ever report to other editors at
8  the AP?
9      A    As an editor, yes.
10     Q    When and to who?
11     A    Right now I report to the news editor
12 for national beats.
13     Q    Sure.  But that was due to a structural
14 change.  How about then in 2015?
15     A    In 2015 I reported to the Washington
16 bureau chief.
17     Q    Okay.  Can you think of examples in 2015
18 when an editor reported to another editor?
19     A    Well, yes.
20     Q    Okay.  What is the example?
21     A    Ken Guggenheim who succeeded me as world
22 services editor reported to the international

228

1  editor.  Subsequently they changed his title to be
2  an assistant international editor or something to
3  that effect, but at either rate he reported to
4  another editor.
5      Q    Okay.  But then they presumably changed
6  the title because it was a bit different from what
7  is ordinarily done at the AP?
8      A    I'm not sure.
9      Q    Okay.
10     A    At the time I occupied the world
11 services editor role I reported to the deputy
12 international editor who reported to the
13 international editor.
14     Q    What about domestically are you aware of
15 editors reporting to editors in 2015?
16     A    Yes.
17     Q    Who?
18     A    Well, all of the -- all of the regional
19 editors, the regional desk editors report to the
20 managing editor.
21     Q    Okay.  How about an editor reporting to
22 an editor, not an editor reporting to a managing

229

1  editor?

2  **A   Now or in 2015?**

3  Q   In 2015?

4  **A   In 2015 news editors in state bureaus**

5  **reported to the regional desk editors.**

6  Q   Again, that's one level below reporting

7  to a level up.  Are you aware of an editor

8  reporting to an editor?

9  **A   The enterprise editor reports to --**

10 **those deputy editors report to the enterprise**

11 **editor.**

12 Q   Okay.

13 **A   In 2015.**

14 Q   Again, that's a deputy editor reporting

15 to an editor.  Are you aware of an editor

16 reporting to an editor?

17 **A   All of these are editors.**

18 Q   Anybody with just the title of editor

19 reporting to just someone with just the title

20 editor?

21 **A   Well, there are no just plan editors in**

22 **the AP.  All of the titles are specified.  All of**

230

1  **the editor titles are specified.**

2  Q   But a regional desk editor is known to

3  be more senior than a news editor.  Right?

4  **A   Yes.**

5  Q   Okay.  So, you said in 2015 that the

6  changes they were looking to make, the AP was

7  looking to make to the department were publicly

8  characterized and perceived as a promotion, there

9  was no increase in pay.  Is that right?

10 **A   In 2015?**

11 Q   Yeah.

12 **A   Correct.**

13 Q   Okay.  So, it helped your stature at the

14 AP?

15 **A   Not really.**

16 Q   But you said others would perceive it as

17 a promotion, right?

18 **A   Yes.**

19 Q   It didn't hurt your stature, did it?

20 **A   I can't really say that.**

21 Q   So, neither the OFCCP charge nor your

22 court complaint contains any allegations of

231

1  racially derogatory comments, slurs; gender based

2  comments; or ageist comments.  Correct?

3  **A   Can you rephrase?**

4  Q   You don't allege that anybody at the AP

5  used -- in either the OFCCP charge or the federal

6  complaint used racially derogatory comments

7  towards you?

8  **A   No.**

9  Q   So, you do not allege that?

10 **A   I do not allege that.**

11 Q   Okay.  And same thing; no sexist or

12 gender based slurs?  Not alleged, right?

13 **A   No, they are not alleged.**

14 Q   Okay.  And same thing as far as ageist

15 comments?  Not alleged?

16 **A   Not alleged.**

17 Q   You have not sought medical treatment

18 for the alleged pain and suffering suffered at the

19 AP, correct?

20 **A   No, I have not.**

21 Q   What is the pain and suffering?

22 **A   Other than having to psyche myself up to**

232

1  **go to work every day.  I feel very demoralized in**

2  **my role.  I feel ostracized.  I feel that my**

3  **career got derailed for reasons that didn't even**

4  **need to happen.  I feel sad a lot at work because**

5  **I know the effect -- I know the impact I could be**

6  **having.  But I'm routinely passed over in**

7  **communications, in opportunities, things like**

8  **that.  I get routinely passed over for those.  I**

9  **have experience, expertise, and knowledge that**

10 **goes untapped even though it is abundantly clear**

11 **that that same expertise and knowledge are needed.**

12 **It is very frustrating to know what your capable**

13 **of and to be treated dismissively for that.**

14 Q   What are these communications that you

15 claim that you were passed over?

16 **A   They're really more of a lack of**

17 **communication.**

18 Q   Are you able to point to something that

19 should have happened but didn't specifically?

20 **A   In terms of something that could have**

21 **happened, but didn't.**

22 Q   Not could have.  That was communicated

233

1  to others but was not communicated to you because
2  of race, gender, or age?
3      A   Well, I covered the White House before.
4  I understand presidential politics very well.  And
5  we have right now in Washington a bit of a
6  learning curve in terms of seniority and expertise
7  in that subject matter, but I am not consulted to
8  contribute to that coverage.  I am not asked to
9  provide my -- my experience and knowledge for that
10 coverage.  So, that's an example.
11     Q   When did you last cover the White House?
12     A   In the Bush administration.  Bush 43.
13     Q   Probably others at the AP with more
14 recent White House experience than you that could
15 be consulted on White House issues?
16     A   There are now.
17     Q   You ever work with Montrese
18 Gardener-Sampson to -- in efforts to increase
19 diversity?
20     A   Indirectly, yes.
21     Q   Okay.  What do you mean indirectly?
22     A   She tended to follow those

234

1  responsibilities down through an aide of hers,
2  Diane Butler-Ellison, who has since left the AP.
3  And one of the things that Diane would coordinator
4  was AP's recruitment efforts at the job fair that
5  Howard University would have every year.
6      Q   Did you work with Diane on that?
7      A   Yes.
8      Q   So Diane was doing that, not Montrese?
9      A   Correct.
10     Q   Okay.  And you participated?
11     A   Yes.
12     Q   Okay.  Have you made any other attempts
13 to sort of push into or share your expertise or
14 knowledge?
15     A   Yes.
16     Q   Okay.  Tell me about that?
17     A   Fairly regularly throughout the Obama
18 years I would offer myself up and sometimes I
19 would just get radio silence in return.
20     Q   And who would you be offering yourself
21 up to?
22     A   I would offer myself up to the White

235

1  House team, to the then White House
2  correspondents, to the deputy bureau chief.
3      Q   Okay.  What were you offering up?  That
4  you were -- some sort of expertise in?
5      A   Yes.
6      Q   Were you offering to write stories for
7  them?
8      A   No.  I was offering them suggested story
9  angles, news that I saw and events that would
10 unfold at the White House, why it was news, things
11 that they maybe missing out on.
12     Q   Did all of these have some sort of race
13 or ethnic component?
14     A   Not all of them.
15     Q   Did some of them?
16     A   Yes.
17     Q   You could have gone out and written
18 those on your own, right?
19     A   It was not incumbent upon me to write
20 it.  It was incumbent upon the White House
21 reporters to write it.  As an editor it is
22 incumbent on me to identify news that I see

236

1  happening that needs to be covered.
2      Q   Okay.  So, it is your position that as
3  an editor you basically tell others to go out and
4  write it?
5      A   Yes.  That's what editors do.
6      Q   And these other folks in the White House
7  that you were just talking about were all your
8  level of editor or above?
9      A   The White House correspondent is not an
10 editor.
11     Q   Okay.  Correspondents below you?
12     A   Yes, in theory.  But in practice it does
13 not always get treated that way.
14     Q   Okay.  That's a fairly prestigious
15 position I'd have to say.  Right?
16     A   Yes.
17     Q   Did you ever reject a story idea that
18 someone suggested to you?
19     A   Yes.
20     Q   And do you recall any specific examples?
21     A   Not directly in this moment right off
22 the bat.  I'd have to think more deeply.  I do

Transcript of Sonya Ross
Conducted on February 13, 2018

237

1 recall a story being suggested to me to write that
2 in the suggestion itself it was -- the idea itself
3 was rather ill informed and a bit racist.
4    Q    Do you recall what it was?
5    A    It revolved around Obama.
6    Q    Anything to do with Donald Trump?
7    A    No, no.
8    Q    Sorry.
9    A    Trump had nothing to do with it.
10   Q    Okay.
11   A    It was -- it was around actions by the
12 Obama White House.  And if I'm recalling, to the
13 best of my recollection it was implying that the
14 behavior itself was kind of like reverse racist,
15 but it wasn't.  And I explained why that angle was
16 ill conceived and not going to fly.
17   Q    Do you recall Montrese Gardener-Sampson
18 ever suggesting issues for you to write on?
19   A    No, because she is in human resources.
20 She's not in the news division.
21   Q    But someone from HR could not suggest
22 anything?

238

1    A    I mean, if they know of something going
2 on that they think we might need to know they can
3 pass it -- pass it along.
4    Q    Could she raise it -- a story directly
5 with you?  Do you have any recollection of that?
6    A    She certainly could raise a story
7 directly with me, but I don't recall her ever
8 doing that.
9    Q    If I told you a story about the impact
10 of the most recent presidential election and kids
11 in school and how to talk to kids, anything like
12 that ring a bell?
13   A    No.
14   Q    Are you aware of an OFCC complaint filed
15 by a Ms. Mohammed against the AP?
16   A    Yes.
17   Q    Have you talked with Ms. Mohammed about
18 this lawsuit at all?
19   A    Yes.
20   Q    Okay.  And what did you say?
21   A    When I filed it she called to ask me
22 about it.

239

1    Q    Do you recall what you told her?
2    A    Told her I had filed it.
3    Q    Anything else?
4    A    She was annoyed.
5    Q    What was she annoyed at?
6    A    With the outcome of her own situation
7 and trying to debate what to do.
8    Q    What did she say specifically?  You said
9 she was annoyed.  What was the outcome that she
10 was annoyed about?
11   A    She was annoyed about the finding
12 resulting in a very low payout to her that she
13 felt should have been higher.
14   Q    Anything else?
15   A    No.
16   Q    Did she ever complain to you that she
17 had been retaliated against for filing with the
18 EEOC -- with the OFCCP?
19   A    Not quite as directly as you're saying,
20 but yes.
21   Q    Okay.  What did she say?
22

240

1    A    She felt that she was being given a
2 hassle about having to work from Baton Rouge where
3 she needed to go to tend to her elderly parents.
4    Q    I don't quite get what you're saying
5 there?
6    A    She had asked to be able to work from
7 Baton Rouge instead of from Washington.
8    Q    Okay.
9    A    Because she needed to go tend to her
10 parents.  And she felt that she was being given a
11 run around by the AP in order to be able to do
12 that.
13   Q    Okay.  Did she have any specific
14 evidence that that was caused by -- due to
15 retaliatory reasons other than her feelings?
16   A    She said that she was being pressed to
17 take FMLA, which her understanding was unpaid.
18 And that they had told her she needed to show up
19 in the AP's bureau to work rather than from home
20 or whatever.
21   Q    Were you aware of anyone else who has or
22 had a complaint of discrimination against the AP?

Transcript of Sonya Ross
Conducted on February 13, 2018

241

1    A    Other than the issue raised by Robert
2    Naylor?
3    Q    Uh huh.
4    A    There were other people, yes.
5    Q    Okay.  Do you recall who?
6    A    There was Andrew Innerarity, I think is
7    his name, who had complained about how he was
8    treated by the AP.
9    Q    On what basis?
10   A    Race.  There was Victor Vaughan.
11   Q    What did he complain about?
12   A    That he was discriminated against based
13   on his race.  There was Jeffrey Hasty.
14   Q    Say that last name again, please?
15   A    Hasty.
16   Q    What was his complaint about?
17   A    Discrimination based on race.
18   Q    Anyone else?
19   A    Eons ago there was Marlene Johnson.
20   Q    That was race?
21   A    Yes.
22   Q    Okay.  Any others that you're aware of?

242

1    A    None that I can think of right now
2    beyond those.
3    Q    Okay.  Were any of these current
4    employees when they complained of race or were
5    they all former employees, do you know?
6    A    Marlene was a current employee when she
7    complained of race.  I believe the others were
8    former when they complained.  Andrew Innerarity
9    might have been still at AP then, I'm not sure.
10   Oh, there also was Terry Collins.
11   Q    That was race?
12   A    Yes.  He felt that he was -- he felt
13   that he lost his job because of race.  It revolved
14   around a social media policy violation, as I
15   understand it.  But he felt that he had been
16   experiencing a whole lot of racial discrimination
17   prior to that and the social media policy issue
18   was used as an excuse to get rid of him.
19   Q    Have you spoke with any of these people
20   about the lawsuit?
21   A    About this lawsuit?
22   Q    Yes.

243

1    A    No.
2    Q    Have you spoken with any of them about
3    discrimination at the AP?
4    A    Yes.
5    Q    Okay.  Who?
6    A    I spoke with Terry Collins when he was
7    going through his drama.  I spoke with Victor
8    Vaughan.
9    Q    Do you recall what you said to Terry or
10   what he said to you?
11   A    He said that he felt that he had been
12   discriminated against for a while before this
13   social media issue.  He asked me for guidance on
14   what he could do.
15   Q    What did you tell him?
16   A    I told him -- at the time he was trying
17   to respond to the social media allegations against
18   him.  And it was rather difficult for him because
19   he had technically done what they were accusing
20   him of.  I didn't really have good guidance for
21   him.  I could only just lend him a supportive ear,
22   really.

244

1    Q    So, from what you knew of the facts he
2    was terminated for a valid reason?
3    A    What I knew of the facts is he was
4    terminated.  I can't speak to the validity of the
5    reasons.
6    Q    Did he tell you he violated the social
7    media policy?
8    A    He said he didn't think he had.
9    Q    What about Victor Vaughan?
10   A    Victor was trying to actually find
11   employment after AP when I spoke with him.
12   Q    And what did you two discuss?
13   A    His efforts to get a job.
14   Q    Do you know if he was ultimately
15   successful?
16   A    To my knowledge he has not been success
17   finding other media work since he left the AP.
18   Q    When did he leave the AP?
19   A    Maybe -- geez.  Maybe 2009 or '10, 2008
20   or '09.  Somewhere in there.
21   Q    So, you spoke with him way back then?
22   A    Yes.

245

1    Q    And how about Terry Collins?

2    **A    Terry was maybe 2014 or 2015.**

3         MR. CARTAFALSA:  Okay.  Give me two

4  minutes?

5         THE VIDEOGRAPHER:  Stand by, please.  We

6  are going off of the record at 1714 hours.

7         (The proceeding recessed from 5:14 p.m.

8  to 5:20 p.m.)

9         THE VIDEOGRAPHER:  We are back on the

10 record at 1720 hours.

11        EXAMINATION ON BEHALF OF PLAINTIFF

12 BY MS. JONES:

13   Q    Good afternoon, Ms. Ross.

14   **A    Hello.**

15   Q    Just a few questions.  The individuals

16 by the name of Mike Oreskes that you have been

17 referring to during the course of the deposition,

18 is that the same Mike Oreskes who recently was --

19 stepped down from National Public Radio after

20 allegations of sexual harassment and gender

21 discrimination were lodged against him?

22   **A    Yes.**

246

1    Q    You discussed with counsel generally the

2  relative qualifications between you and Ron

3  Fournier leading up to his hire as the deputy

4  bureau chief or the bureau chief.  Do you remember

5  those questions?

6    **A    I think so.**

7    Q    Okay.  And as counsel noted and asked

8  you, it was well known that Mr. Fournier had a

9  temperament problem.  Do you remember those

10 questions?

11   **A    Yes.  That he was a yeller or known as a**

12 **yeller.**

13   Q    Did you have a -- were you known to have

14 a temperament problem?

15   **A    No.**

16   Q    At AP?

17   **A    Not to my knowledge.**

18   Q    Is having an agreeable or well balanced

19 temperament an important quality for a manager?

20   **A    It's a plus.**

21   Q    At the time that Mr. Fournier was hired

22 as the bureau chief do you recall or do you know

247

1  any allegations of bias that had been lodged

2  against Mr. Fournier in his reporting?

3    **A    Yeah.**

4    Q    And what do you recall those allegations

5  consisting of?

6    **A    Well, there was a publisher who was an**

7  **AP subscriber who said he felt that Mr. Fournier**

8  **was compromised.  That he was, I guess, super**

9  **friendly to the Republican administration at the**

10 **time.**

11   Q    Okay.  Would being unbiased as a

12 journalist, particularly a political journalist,

13 be an important attribute?

14   **A    Yes.**

15   Q    In fact would it be disqualifying if

16 there were serious allegations of a journalist, a

17 political journalist exhibiting political bias?

18   **A    Technically, yes, because you would be**

19 **considered compromised and that makes it harder**

20 **for you to be critical of an administration.**

21   Q    Do you -- sitting here today do you know

22 how old the company or the organization called the

248

1  Associated Press is?

2    **A    I'm trying to do the quick math in my**

3  **head.  At least 170 years old.  It has been around**

4  **since the 1840's.**

5    Q    Based on your testimony today, since the

6  1840's until 1995 the AP had never had a black

7  woman as a White House correspondent.  Is that

8  correct?

9    **A    Yes.**

10   Q    Now finally, Ms. Ross, you have -- you

11 testified that you've made -- since you've lodged

12 your lawsuit you have made efforts to gain

13 promotions or other positions within the AP.  Do

14 you remember those questions and those answers?

15   **A    Yes.**

16   Q    I believe you testified that you, at

17 least during some period since you filed either

18 the lawsuit or the complaint with the OFCCP that

19 you've only made one attempt to -- to apply for a

20 job outside of the AP?

21   **A    Yes.**

22   Q    And why is that?

249

1    A    Well, I -- it's sort of an odd posture
2  to be in because I have to disclose to people that
3  I have sued my employer, and that makes me look a
4  little strange to potential employers.  So, I felt
5  that I would need closure on my current status at
6  AP before trying to move on in any really
7  meaningful way.
8        MS. JONES:  Thank you.  I have nothing
9  further.
10        MR. CARTAFALSA:  I have nothing further.
11        THE VIDEOGRAPHER:  Stand by.  This is
12  the end of the videotaped deposition of Sonya L.
13  Ross.  We are going off of the record at 1727
14  hours.
15        MR. CARTAFALSA:  Thank you.
16        (Whereupon, at 5:27 p.m., the above
17  proceedings adjourned.)
18
19
20
21
22

250

1        CERTIFICATE OF SHORTHAND REPORTER
2        I, DONNA M. LEWIS, RPR, the officer
3  before whom the foregoing deposition was taken, do
4  hereby certify that the foregoing transcript is a
5  true and correct record of the testimony given;
6  that said testimony was taken by me
7  stenographically and thereafter reduced to
8  typewriting under my direction; that reading and
9  signing was not requested; and that I am neither
10 counsel for, related to, nor employed by any of
11 the parties to this case and have no interest,
12 financial or otherwise, in its outcome.
13        IN WITNESS WHEREOF, I have hereunto set
14 my hand and affixed my notarial seal this 18th day
15 of February, 2018.
16
17 My commission expires: March 14, 2018
18
19
20
21 _____
22 DONNA M. LEWIS, RPR